IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MUMIA ABU-JAMAL, et al., | : |
| | : |
| Plaintiffs, | : |
| v. | :     **3:15-CV-00967** |
| | :     **(JUDGE MARIANI)** |
| JOHN KERESTES, et al. | : |
| | : |
| Defendants. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendant Kerestes's Motion to Dismiss Plaintiff's

Amended and Supplemental Complaint (Doc. 81) for failure to state a claim upon which

relief may be granted. The First Amended and Supplemental Complaint (Doc. 57) contains

claims arising out of Plaintiff Mumia Abu-Jamal's hospitalization at Geisinger Medical Center

from May 12 to May 18, 2015, as well as his medical conditions, including his ongoing

hepatitis C infection.

Plaintiff Abu-Jamal along with Plaintiffs Brett Grote and Robert Boyle, also Mr. Abu-

Jamal's attorneys of record in this matter, initially filed this action on May 18, 2015 claiming

violations of the right to association and access to the courts. (Compl., Doc. 1 at 10).

Plaintiffs alleged that Defendant Kerestes and Defendant Geisinger "barred the plaintiff

attorneys from visiting with Mr. Abu-Jamal" and further "prohibited all communication

between Mr. Abu-Jamal and anyone," with the exception of a short phone call between him

and his wife. (*Id.* at 3). Subsequently, Plaintiffs Boyle and Grote filed notices of voluntary dismissal (Docs. 17, 18), leaving Mr. Abu-Jamal (hereinafter, "Plaintiff") as the only remaining plaintiff.

On November 24, 2015, Plaintiff filed a Supplemental and Amended Complaint (Doc. 57) (hereinafter "Amended Complaint"), which added several defendants. Those Defendants are Defendants Lisiak, Khanum, and Saxon (hereinafter, the "Medical Defendants") and Defendants Oppman and Steinhart, Pennsylvania Department of Corrections ("DOC") employees. The Amended Complaint also added Eighth Amendment and state law negligence medical claims related to Plaintiff's hepatitis C and other conditions. Defendant Kerestes now moves for dismissal of the claims against him for failure to state a claim upon which relief may be granted. This Motion (Doc. 81) has been briefed and is ripe for review. For the reasons stated herein, the Court will grant in part and deny in part Defendant Kerestes's Motion.

## II. FACTUAL BACKGROUND

The Amended Complaint alleges the following facts.

Plaintiff Mumia Abu-Jamal is currently incarcerated in the custody of the Pennsylvania Department of Corrections. (Doc. 57 at 2, ¶ 1). Plaintiff was convicted in the December 9, 1981 death of a Philadelphia police officer. (*Id.* at ¶¶ 13-14). In 2011, the Third Circuit affirmed a lower court's order setting aside Plaintiff's death sentence and DOC

placed him into general population[1] after the Philadelphia District Attorney's Office chose not to seek to reinstate Plaintiff's death sentence. (*Id.* at ¶¶ 18-19).

Plaintiff tested positive for the Hepatitis C antibody during routine blood work in January 2012. (*Id.* at ¶ 24). Hepatitis C is the leading cause of cirrhosis of the liver and of liver cancer; a chronic Hepatitis C infection can also cause serious chronic liver disease, liver fibrosis and death. (*Id.* at ¶ 25). According to Plaintiff, if a person tests positive for the Hepatitis C antibody, the next step is to determine whether the infection is an "active" one, including but not limited to determining whether that person has a "viral load." (*Id.* at ¶ 26). If the infection is determined to be active, the individual is at risk for serious complications that arise from the disease. (Doc. 57 at ¶ 26).

Despite repeated requests, the Defendants have not conducted a complete Hepatitis C workup of Plaintiff and have not treated the disease or adequately treated his symptoms. (*Id.* at ¶ 27).

Plaintiff alleges that Hepatitis C can manifest in a number of ways even in the absence of abnormal liver functions, including in the form of persistent skin rash and/or eczema that does not respond to traditional treatment. (*Id.* at ¶ 28).

In or about August 2014, Plaintiff alleges that he began to experience itching over his whole body and that the itching was reported to facility staff. (*Id.* at ¶ 30). He was prescribed creams, which had no effect, and the rash spread. (*Id.*). Plaintiff alleges that the

---

[1] Plaintiff curiously fails to allege explicitly that he is incarcerated at SCI-Mahanoy, however the Court draws the reasonable inference that he is from the allegations of the Amended Complaint.

underlying cause of the rash, including the possibility that it was a manifestation of an active Hepatitis C infection, was not investigated. (*Id.*).

The rash became infected on two occasions in early 2015, with lesions appearing on Plaintiff's lower extremities. (Doc. 57 at ¶ 31). Medical staff noted that the lesions were "too numerous to count." (*Id.*). Plaintiff's lower extremities became swollen and his skin took on a dark, scaly appearance. (*Id.*). Plaintiff alleges that the rash caused and continues to cause extreme pain and discomfort. (*Id.* at ¶ 32). The rash covered 70 percent of Plaintiff's body by February 2015. (*Id.* at ¶ 33). The itch was unceasing; Plaintiff began using a wheelchair to move any significant distance because the lower extremity and genital edema caused so much discomfort. (*Id.*).

Plaintiff was prescribed "another steroid, oral prednisone, and Cyclosporine, an immunosuppressant," in late February 2015, but the rash persisted. (Doc. 57 at ¶ 34). A medical note dated February 19, 2015 recorded that Plaintiff was experience "increasing peeling off of dry skin at the site of the rashes." (*Id.*).

Plaintiff's blood was drawn on March 6, 2015 and the results showed that Plaintiff's glucose level had risen to the severely abnormal level of 419. (*Id.* at ¶ 35). Prior to this, Plaintiff's blood glucose was always within normal range. (*Id.*).

Plaintiff alleges that the Medical Defendants were aware of his dramatically elevated glucose level indicating a dangerous case of hyperglycemia and that they took no action to address the glucose level even though it was noted in their records. (*Id.* at ¶¶ 36-37).

4

Plaintiff alleges that there was no treatment provided and no follow up testing of his glucose level, and that the Medical Defendants did not inform him of the test result. (*Id*. at ¶ 37).

Plaintiff lost consciousness on March 30, 2015 and was rushed to Schuylkill Medical Center. (Doc. 57 at ¶ 38). His blood glucose was found through testing to be 507. (*Id*.). He had gone into diabetic shock and was placed in the Critical Care Unit. (*Id*.)

Untreated hyperglycemia is a potentially fatal condition. (*Id*. at ¶ 39).

Plaintiff returned to prison on April 1. (*Id*. at ¶ 40). Release papers indicate his prognosis as "guarded" and included the following medical issues: "diabetes, new onset, encephalopathy secondary to hyperglycemia, dehydration, acute kidney injury, hyponatremia, hypokalemia, asymptomatic gallstones, skin rash, anemia and a history of hepatitis C." (*Id*.).

Plaintiff experienced fatigue, episodes of "brain fog," and emotional distress in the weeks following the diabetic shock. (Doc. 57 at ¶ 41).

Plaintiff's blood work revealed and continues to reveal abnormalities. (*Id*. at ¶ 42). He suffers anemia as indicated by a consistently below-normal hemoglobin count. (*Id*.).

Defendants continued to administer cyclosporine despite the fact that it is contraindicated for an African-American of Plaintiff's age who has sudden-onset diabetes. (*Id*. at ¶ 43). Plaintiff is an African-American. (*Id*. at 2, ¶ 1).

5

The Schuylkill Medical Center release order noted a history of Hepatitis C; none of the Defendants, including the Medical Defendants, took any steps to investigate whether Hepatitis C may be the cause of Plaintiff's rash or other medical issues. (*Id.* at ¶ 44).

Plaintiff retained counsel in March 2015 to advocate on his behalf for appropriate medical care; efforts have included visits, procurement of medical records, and consultation with medical experts. (Doc. 57 at ¶ 45). One expert reviewed Plaintiff's medical records. (*Id.* at ¶ 46). On April 28, 2015, Counsel transmitted to DOC a medical opinion letter from this expert. (*Id.*). The expert opined, *inter alia*, that an "occult malignancy workup" should be done to determine the cause of Plaintiff's still-present severe rash and anemia, as both are indicative of T-Cell Lymphoma. (*Id.* at ¶ 47). The expert noted that the workup to investigate the cause of the rash was "urgent at this time" and that if the rash is due to lymphoma or another serious underlying medical condition, delay in diagnosis "may have severe and even lethal consequences." (*Id.*).

Plaintiff experienced extreme pain in his lower extremities when showering on or about May 12, 2015. (*Id.* at ¶ 48). He was removed to Geisinger Medical Center[2] later that day. (Doc. 57 at ¶ 48).

Plaintiff's Counsel and his wife both requested that they be permitted to visit with Plaintiff at Geisinger. (*Id.* at ¶ 49).

---

[2] Plaintiff does not provide the address of Geisinger Medical Center or otherwise specify to which Geisinger Health Systems inpatient hospital he was taken. The Court takes judicial notice of the fact that that "Geisinger Medical Center" is the name of the Geisinger facility located in Danville, Pennsylvania. *See* "About Geisinger Medical Center," http://www.geisinger.org/for-patients/locations-directions/gmc/index.html (July 12, 2016).

Counsel and Plaintiff's wife were initially told that Defendant Kerestes would permit visits from immediate family members but were then told that Plaintiff would be denied all visitation, including visits with Counsel, so long as he remained at Geisinger. (*Id*. at ¶ 50). Plaintiff would also not be permitted to telephone Counsel or his wife. (*Id*.).

Counsel for DOC asserted that the prohibition on visitation and phone calls was the policy of Defendant Geisinger. (*Id*. at ¶ 51). During a prior hospitalization at Schuylkill Medical Center, Plaintiff received visits from his attorney and immediate family. (*Id*.).

On May 14, 2015, Counsel contacted Geisinger's litigation counsel, Donald Zaycosky, who agreed to seek authorization from Geisinger's Chief Medical Officer and DOC officials to permit family and attorney visits and phone calls. (Doc. 57 at ¶ 52).

Plaintiff was granted a fifteen minute telephone call with his wife on May 18, 2015. (*Id*. at ¶ 53).

Plaintiff was not permitted visitation with his attorneys or family during his stay at Geisinger. (*Id*.).

During his May 12, 2015 to May 19, 2015[3] hospitalization at Geisinger, numerous diagnostic tests were conducted. (*Id*. at ¶ 54). While the tests and a subsequent bone marrow biopsy ruled out some serious conditions, including some cancers, the underlying causes of Plaintiff's health problems, including the rash and anemia, were not determined. (*Id*. at ¶ 55).

---

[3] It is unclear from the Amended Complaint on what date Plaintiff was released from Geisinger Medical Center and returned to SCI Mahanoy. Plaintiff provides both a release date of May 19, 2015, (*see* Doc. 57 at ¶ 54), and of May 18, 2015, (*see id*. at ¶ 59).

7

A Hepatitis C workup was not performed at Geisinger Medical Center. (*Id*. at ¶ 56).

While Plaintiff was at Geisinger, his rash was treated with a steroid wrap four times a day, which partially alleviated the rash's worst symptoms. (Doc. 57 at ¶ 57).

The Geisinger discharge reported dated May 18, 2015 advises DOC to, *inter alia*, arrange for a dermatology follow-up within two weeks and to order a Hepatitis C workup as Plaintiff might be a suitable candidate for Hepatitis C treatment. (*Id*. at ¶ 58).

From Plaintiff's May 18, 2015 return to SCI Mahanoy to the date of the filing of the Amended Complaint, Plaintiff's rash has only been treated with a Vaseline wrap. (*Id*. at ¶ 59). The wrap was applied twice a day upon his return from Geisinger. (*Id*.). As of the filing of the Amended Complaint, Plaintiff alleges that "the worst symptoms" have returned. (*Id*.).

Plaintiff again experiences itching over his entire body, his lower extremities are swollen, his skin peels and scales, he experiences a consistent low-grade fever, and he is unable to walk significant distances due to the pain in his lower extremities. (*Id*. at ¶ 60).

As of the filing of the Amended Complaint, there has been no follow-up with a dermatologist, notwithstanding the recommendations of Geisinger Medical Center. (Doc. 57 at ¶ 61).

Plaintiff alleges that the type of skin rash and edema experienced by Plaintiff at the time of the filing of the Amended Complaint is likely caused by an active Hepatitis C infection. (*Id*. at ¶ 62).

Defendants have been made aware that the skin condition is a likely complication of untreated Hepatitis C through letters from counsel accompanied by expert medical reports. (*Id*. at ¶ 63).

During the last week of July 2015, Plaintiff was informed by a doctor at SCI Mahanoy that a blood test revealed that he has active Hepatitis C. (*Id*. at ¶ 64).

Plaintiff was informed that DOC currently has no protocol for treating Hepatitis C. (*Id*.).

Plaintiff alleges that the Defendants are refusing to provide him with Hepatitis C treatment despite him having active Hepatitis C that has been causing him severe health problems for several months. (*Id*. at ¶ 65).

Despite repeated requests from counsel, Defendants have refused to permit Plaintiff to be examined by an independent physician under appropriate medical conditions, even at his own expense. (Doc. 57 at ¶ 66).

One expert visited Plaintiff on a regular visit and also examined available medical records. (*Id*. at ¶ 67). Based on the visit and records review, the expert opined that Plaintiff's skin condition is likely a manifestation of the Hepatitis C infection. (*Id*.). The expert recommended specific treatments for both the skin condition and the Hepatitis C, (*id*.); these recommendations were provided to DOC counsel but have not been implemented, (*id*. at ¶ 68).

Plaintiff has been informed that DOC officials have forbidden medical staff at SCI Mahanoy from receiving any opinions, letters, diagnoses, or other communications from doctors who are working with counsel for Plaintiff, even if such opinions or letters are provided to them by Plaintiff himself. (*Id.* at ¶69).

Plaintiff alleges that as of the filing of the Amended Complaint, he is currently receiving no treatment for his skin conditions and that the Vaseline applications have ended and his lower extremities are no longer wrapped. (Doc. 57 at ¶ 70).

Plaintiff alleges that the itching is extreme and incessant and that it causes pain, loss of sleep, and resultant fatigue. (*Id.* at ¶ 71).

Plaintiff alleges that there is no medical justification for Defendants' failure to treat his skin condition and/or Hepatitis C. (*Id.* at ¶ 72).

Plaintiff alleges that the Defendants' actions and inactions have caused and continue to cause him pain, suffering, and emotional distress. (*Id.* at ¶ 73).

Plaintiff alleges that the untreated, active Hepatitis C infection has caused and continues to cause damage to his liver. (*Id.* at ¶ 74).

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff must aver "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the

11

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks

omitted). This "plausibility" determination will be a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id*.

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court

must permit a curative amendment unless such an amendment would be inequitable or

futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a
> defendant moves to dismiss it, unless the district court finds that
> amendment would be inequitable or futile, the court must inform the plaintiff
> that he or she has leave to amend the complaint within a set period of time.

*Id*.

## IV. ANALYSIS

### A. Eleventh Amendment Immunity

Defendant Kerestes first asks the Court to dismiss Plaintiff's claims "to the extent

that [he] seeks to impose liability for money damages against Defendant Kerestes in his

official capacity," relying on the Eleventh Amendment. (Doc. 89 at 6).

"[I]t is generally inappropriate for the Court to limit the remedies available to Plaintiffs

on a motion to dismiss and [ ] it is preferable to assess the availability of various remedies

after liability is established." *Dicicco v. Citizens Fin. Grp., Inc.*, No. CV 15-267, 2015 WL

5302767, at *10 (E.D. Pa. Sept. 10, 2015). However, the law upon which Defendant

Kerestes relies is sound and well-established. Federal courts cannot consider suits by

12

private parties against states and their agencies unless the state has consented to the filing

of such a suit. *See Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89 (1984);

*Christy v. Pa. Turnpike Comm'n,* 54 F.3d 1140 (3d Cir. 1995), *cert. denied,* 516 U.S. 932

(1995). The Eleventh Amendment bars claims for monetary damages sought against a

state official acting in his or her official capacity absent a valid abrogation by Congress or

consent of the State. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (holding that

"absent waiver by the State or valid congressional override, the Eleventh Amendment bars

a damages action against a State in federal court"). Congress did not validly abrogate or

purport to abrogate the States' sovereign immunity against damages claims under section

1983, and the Commonwealth of Pennsylvania has not waived its Eleventh Amendment

immunity. *See Hafer v. Melo,* 502 U.S. 21, 25–27 (1991) (suits against state officials acting

in their official capacities are suits against the employing government agency, and as such,

are barred by the Eleventh Amendment); 42 Pa.C.S.A. § 8521–22. Thus, Plaintiff cannot

recover monetary damages against Defendant Kerestes in his official capacity, as such

claims are barred by the Eleventh Amendment. Plaintiff's requests for monetary damages

are dismissed to the extent they are brought against Defendant Kerestes in his official

capacity.[4]

---

[4] In his Brief in Opposition to Defendant Kerestes's Motion to Dismiss (Doc. 93), erroneously titled "Brief in Opposition to Defendant Geisinger Medical Center's Motion to Dismiss," Plaintiff asks that the Court deny Defendant Kerestes's motion on this point because "Plaintiff seeks money damages from defendant Kerestes in his individual capacity, not his official capacity." (Doc. 93 at 5). It seems clear that, at least at this point, Plaintiff's Counsel agrees with Defendant Kerestes that he may not be sued for monetary damages in his official capacity. Plaintiff's Counsel would have done well to specify in their

## B. Personal Involvement

Section 1983 of Title 42 of the United States Code offers private citizens a cause of

action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute

provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for
> redress . . . .

*Id., see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95

F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the

violation of a right secured by the Constitution and laws of the United States, and must

show that the alleged deprivation was committed by a person acting under color of state

law." *West v. Atkins*, 487 U.S. 42, 48 (1988). *See also Barna v. City of Perth Amboy*, 42

F.3d 809, 815 (3d Cir. 1994).

Additionally, "[t]o establish liability for deprivation of a constitutional right under §

1983, a party must show personal involvement by each defendant." *Keys v. Carroll*, No.

3:10-CV-1570, 2012 WL 4472020, at *9 (M.D. Pa. Sept. 26, 2012), *citing Iqbal*, 556 U.S. at

676-77 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff

---

Amended Complaint whether the particular forms of relief sought were with respect to liability imposed on
Defendant Kerestes in his individual or his official capacity. As it stands, Plaintiff's decision not to do so
has burdened the Court; Defendant Kerestes's Motion to Dismiss with respect to this issue has done
nothing to alleviate this burden, instead requiring the Court to devote a section of this opinion and the
accompanying Order to an issue which could well have waited to the ultimate disposition of this case.

must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution."). "A plaintiff makes sufficient allegations of a

defendant's personal involvement by describing the defendant's participation in or actual

knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. N.J. Dep't of*

*Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207

(3d Cir. 1988)). A court may infer that the defendant had contemporaneous knowledge of

wrongful conduct from the circumstances of the case, but that knowledge must be actual,

not constructive. *Id.* "A conclusory allegation that defendants were 'directly involved' in the

violations of the plaintiff's rights is not sufficient to allege personal involvement." *Chimenti v.*

*Pa. Dep't. of Corr.*, No. 15-cv-3333, 2016 WL 1125580, at *5 (E.D. Pa. Mar. 21, 2016)

(citing *Bush v. Dep't of Human Servs.*, 614 F. App'x 616, 620 (3d Cir. 2015)).

Defendant Kerestes argues that Plaintiff's § 1983 claims against him should be

dismissed because he "alleges no personal involvement in by [*sic*] Superintendent Kerestes

in Plaintiff's medical care or the decision to deny visits during the one-week period that

Plaintiff was hospitalized at Geisinger Medical Center." (Doc. 89 at 7). As an initial matter,

Plaintiff alleges that

> Defendant John Kerestes is the Superintendent at SCI Mahanoy. Defendant
> Kerestes is responsible for the overall operation of SCI Mahanoy. Defendant
> Kerestes has the power to authorize attorney and family visits with individuals
> in the custody of SCI Mahanoy when they are in a hospital off of prison
> grounds. In addition, he is responsible for the well-being and health of
> individuals incarcerated at SCI Mahanoy.

15

(*Id.* at 2, ¶ 2). The Court will begin its analysis of Defendant Kerestes's personal involvement in this case with Plaintiff's § 1983 claims related to medical care (Counts I, II, and III of the Amended Complaint).

In addition to the above-quoted allegation that Defendant Kerestes "is responsible for the well-being and health of individuals incarcerated at SCI Mahanoy," Plaintiff alleges in conclusory fashion that "Defendant[ ] Kerestes . . . ha[s] failed to treat his Hepatitis C," (Doc. 57 at ¶ 78), and that "Defendant[ ] Kerestes . . . ha[s] failed to treat his skin condition," (*id.* at ¶ 80). Beyond this, there is little in the Amended Complaint in the way of factual allegations related to medical care or lack thereof that specifically address Defendant Kerestes's conduct. The Amended Complaint is riddled with allegations in the passive voice -- allegations that do not permit the Court to infer which, if any, of the named Defendants is responsible for the alleged action.[5] Also frequently occurring throughout the Amended Complaint are vague, broad statements addressing the conduct or scienter of "defendants." For instance, Plaintiff alleges that "[t]he defendants have been made aware the skin condition is a likely complication of untreated Hepatitis C through letters from counsel accompanied by expert medical reports." (Doc. 57 at ¶ 63). Which Defendants were made aware, by whom, and when are questions that the Amended Complaint fails to answer. The Court cannot accept these broad-sweeping allegations as being plead with sufficient particularity to refer to Defendant Kerestes.

---

[5] *See, e.g.* Doc. 57 at ¶ 30 ("Creams were prescribed."); *id.* at ¶ 64 ("Mr. Abu-Jamal was informed that the DOC currently has no protocol for treating Hepatitis C.").

There are a few statements in the Amended Complaint whose construction allows the Court to say confidently that Plaintiff has alleged Defendant Kerestes did or did not take some action. For instance, Plaintiff alleges that despite a release order from Schuylkill Medical Center noting that Plaintiff had a history of Hepatitis C, "none of the defendants, including defendants Lisiak, Khanum, or Saxon, took any steps to investigate whether the Hepatitis C may be the cause of the rash and/or other medical issues." (Doc. 57 at ¶ 44). Though he is not specifically named in this allegation, as the Medical Defendants are, Defendant Kerestes is alleged not to have taken any steps to investigate Plaintiff's Hepatitis C condition as a cause of his rash or other medical conditions. Similarly, the Court reads Paragraph 27, though grammatically incorrect, to allege that Defendant Kerestes has not conducted a complete Hepatitis C workup for Plaintiff nor "treated the disease or adequately treated his symptoms." (*Id.* at ¶ 27).

These are the extent of the allegations that relate to medical care made against Defendant Kerestes. From the Amended Complaint, the Court cannot hazard a guess as to what Defendant Kerestes did or did not do when or with whom with respect to Plaintiff's health. As such, Plaintiff has failed to "make[ ] sufficient allegations of [Defendant Kerestes's] personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga*, 806 F.3d at 222. Nor has Plaintiff alleged that Defendant Kerestes was a policymaker for purposes of § 1983 liability. *See Valdez v. Danberg*, 576 F. App'x 97, 102 (3d Cir. 2014) ("Individual defendants

17

who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.") (internal quotation omitted).

In his Opposition Brief, Plaintiff seems to assume that the Court will consider the grievance Plaintiff filed about his medical conditions and the subsequent responses from DOC personnel to that grievance and related appeals. Thus, Plaintiff argues that Defendant Kerestes had sufficient personal involvement to state a § 1983 claim via his role in the grievance system in the DOC and in SCI Mahanoy. (Doc. 93 at 8-9). Were the Court to consider the grievance response written by Defendant Kerestes, it is not clear that this would be enough to sufficiently allege personal involvement. Courts in the Third Circuit have repeatedly held that a prison official's role in reviewing grievance is not, without more, sufficient to establish personal involvement in the alleged constitutional injury. *See, e.g., Mincy v. Chmielsewski*, 508 F. App'x 99, 104 (3d Cir. 2013) ("[A]n officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement."); *Rogers v. United States*, 696 F. Supp. 2d 472, 488 (W.D. Pa. 2010) ("If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official."); *see also Sims v. Wexford Health Sources*, 635 F. App'x 16, 19 (3d Cir. 2015) ("Prison officials who are not doctors are not liable for responding directly to prisoner medical complaints where the prisoner is under the

18

care of medical experts."). However, as Plaintiff points out, (see Doc. 93 at 8-9), there is support in the case law for the proposition that reviewing a grievance about an *ongoing* constitutional violation may be sufficient to establish the personal involvement of the reviewing official. *See Cardona v. Warden – MDC Facility*, No. 12-7161, 2013 WL 6446999, at *5 (D.N.J. Dec. 6, 2013) (collecting cases and noting that a plaintiff may have a claim against a supervisory defendant who reviewed a grievance where the plaintiff alleges an ongoing violation); *Diaz v. Palakovich*, 448 F. App'x 211, 215 (3d Cir. 2011) ("[A] reasonable factfinder could find that these defendants had knowledge of the violations through Diaz's grievances and acquiesced in the violations by failing to address a practice of opening legal mail outside of an inmate's presence.").

The Court need not reach this issue of whether Defendant Kerestes's role in reviewing Plaintiff's grievance was sufficient to establish personal involvement here, however, where Plaintiff's grievance and appeals thereof are mentioned nowhere in the Amended Complaint. Though the documents making up Plaintiff's grievance history are of record elsewhere in this case, the Court declines to consider them in conjunction with Defendant Kerestes's Motion to Dismiss. Unlike administrative exhaustion, which was at issue in the oft-cited *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004), the issue of personal involvement cannot be said to "turn[ ] on" the documents related to Plaintiff's grievances, *id.* at 223, and the Court will not consider them where Plaintiff has not included reference to them in his Amended Complaint. *Cf. id.* at 223 ("Given that the exhaustion issue turns on

19

the indisputably authentic documents related to Spruill's grievances, we hold that we may

also consider these without converting it to a motion for summary judgment."). The

pleadings of the Amended Complaint are insufficient to establish either participation in the

constitutional violations to which Plaintiff alleges he has been subjected, as well as

insufficient to show knowledge and acquiescence in those alleged violations. But since the

Court is of the view it is neither futile nor inequitable to allow Plaintiff to amend his complaint

with respect to Defendant Kerestes, leave to file a Second Amended Complaint is granted

with respect to Counts I, II, and III.

Turning to Plaintiff's § 1983 claims for violation his right to access to courts (Count

VI) and of freedom of association (Count VII), the Court finds that Plaintiff has sufficiently

alleged Defendant Kerestes's personal involvement. Plaintiff alleges that Defendant

Kerestes's "has the power to authorize attorney and family visits" for inmates who are

hospitalized at an outside facility. (Doc. 57 at 2, ¶ 2). From this allegation, it is reasonable

to infer that, if Plaintiff was prohibited from receiving visitors at Geisinger Medical Center,

Defendant Kerestes was personally involved.

## C. Access to Courts

Defendant Kerestes next moves for dismissal of Count VI of the Amended Complaint

– "Access to Courts." (Doc. 57 at 19). "[I]n order to press a claim for interference with the

right to court access, a prisoner plaintiff must allege that he or she has been actually injured

in his or her access to the courts, *i.e.*, that he or she has been hindered in an effort to

pursue a nonfrivolous legal claim." *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006) (citing

*Lewis v. Casey*, 518 U.S. 343, 349-53 (1996)). The claim must relate to either a direct or

collateral challenge to the prisoner's sentence or conditions of confinement. *Lewis*, 518

U.S. at 355 (finding "[i]mpairment of any other litigating capacity is simply one of the

incidental . . . consequences of conviction and incarceration."). The United States Supreme

Court has stated clearly the pleading requirements for an access to courts claim. Plaintiffs

"must identify a nonfrivolous, arguable underlying claim" in order to pursue an access to

courts claim, and "that underlying cause of action, whether anticipated or lost, is an element

that must be described in the complaint, just as much as allegations must describe the

official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). An

"actual injury" does not occur without a showing that a claim has been lost or rejected, or

that the presentation of such a claim is currently being prevented. *Lewis*, 518 U.S. at 354-

56.

Here, Plaintiff has failed to allege an actual injury sufficient to state a claim for

access to courts. Plaintiff has alleged that on May 12, 2015, Plaintiff was moved from SCI

Mahanoy to Geisinger Medical Facility and that Counsel requested permission to visit

Plaintiff there. (Doc. 57 at ¶¶ 48-49). Plaintiff further alleges that Counsel was told that

Plaintiff would be denied all visitation and phone calls with his attorneys while at Geisinger.

(*Id.* at ¶ 50). It is unclear who Plaintiff alleges to be the source of this prohibition. Plaintiff

alleges that "DOC counsel asserted that the prohibition on visitation and phone calls was

the policy of Geisinger Medical Center," as contrasted to Plaintiff's experience during a

recent hospitalization at Schuylkill Medical Center. (*Id*. at ¶ 51). However, the Complaint

also alleges that:

> Defendant Geisinger Medical Center, in coordination with the DOC, has a
> policy of prohibiting all communication between hospital patients in the
> custody of the DOC and their lawyers, family, and friends, and others not in
> the employ of the DOC or Geisinger Medical Center.

(*Id*. at ¶ 8). Plaintiff also asserts that on May 14, 2015, Geisinger's litigation counsel Donald

Zaycosky agreed to seek authorization for attorney visits and phone calls from Geisinger's

Chief Medical Officer and from DOC officials, (*id*. at ¶ 52), but that he ultimately was not

permitted visitation with his attorneys during his entire stay at Geisinger, (*id*. at ¶ 53).

According to Count VI of the Amended Complaint, these allegations add up to the

following constitutional violation:

> Defendants Kerestes and Geisinger Medical Center violated Plaintiff's Fifth
> and Fourteenth Amendment right of access to the Courts during his May 2015
> hospitalization at Geisinger Medical Center by preventing any and all
> communication between Plaintiff and his attorneys.

(Doc. 57 at ¶ 88). Plaintiff seeks "a permanent injunction ordering defendants to permit

attorney-client visits whenever plaintiff Abu-Jamal is taken from a DOC facility to receive

inpatient medical treatment." (Id. at 21, ¶ G).

However, nowhere in the Amended Complaint does Plaintiff identify a nonfrivolous

and arguable underlying claim which was lost, or even otherwise impaired, by this

prohibition on visitation or other communication with his attorneys. It is clear that Counsel's

22

attempts to communicate with Plaintiff were not handled by either DOC, Geisinger, or both institutions as Counsel or Plaintiff would have wished. However, "[n]ot everyone who can point to some 'concrete' act and is 'adverse' can call in the courts to examine the propriety of executive action, but only someone who has been actually injured." *Lewis*, 518 U.S. at 353 n.3. Plaintiff has not adequately alleged actual injury here; indeed, a thorough review of the Amended Complaint reveals he has not alleged injury at all.

Plaintiff oddly relies on case law from the preliminary injunction context in an attempt to show injury, despite the fact that the Motion currently before the Court is a motion to dismiss and the fact that Plaintiff seeks a permanent injunction rather than a preliminary injunction with respect to his access to courts claim. (Doc. 57 at 21, ¶ G). In focusing his argument in opposition to Defendant Kerestes's Motion on the proposition that "the loss of a constitutional right . . . has even been recognized as sufficiently injurious to establish the type of irreparable harm justifying a preliminary injunction," (Doc. 93 at 10), Plaintiff attempts to sidestep the weakness of his pleadings with hysteron proteron rhetoric – that is, Plaintiff puts the cart before the horse. Without having sufficiently pleaded the existence of any underlying claim, Plaintiff assumes its existence and jumps forward to the matter of injury. This analytic move neglects the Supreme Court's cautioning that "the right [of access to courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415. Because Plaintiff has not

alleged sufficient facts to present a prima facie case of denial of access to the courts, his access to the courts claim will be dismissed.

### D. Freedom of Association

Defendant Kerestes next moves for dismissal of Count VII of the Amended Complaint, (*see* Doc. 89 at 9), which alleges that Defendant Kerestes and Defendant Geisinger violated Plaintiff's First Amendment right of association "by arbitrarily restricting communication and preventing all visitation with his family during his May 2015 hospitalization at Geisinger Medical Center," (Doc. 57 at 19-20). Focusing only on the visitation aspect of Plaintiff's claim, Defendant Kerestes argues that Plaintiff does not have an unfettered right to contact visits; because "[i]t is beyond cavil that contact visits by inmates while outside prison walls at private medical facilities present a considerable security concern," Defendant Kerestes asserts that, assuming *arguendo* that he was responsible for the decision to deny such visits, it was within his "discretion to prohibit or limit visits in the interest of security," and that Plaintiff's claim thus fails. (Doc. 89 at 10). In response, Plaintiff argues that his freedom of association claim is subject to a "fact-intensive," "contextual, record-sensitive analysis" under *Turner v. Safley*, 482 U.S. 78 (1987), (*see* Doc. 93 at 12), and that, therefore, Plaintiff should be allowed to develop a record to establish "[t]he reasonableness of defendant Kerestes' decision to prohibit all visits," (*id.*).

24

"A prison inmate retains those first amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Thus, "[t]o the extent that a 'right' to visitation exists via the right to association, this entitlement is limited by prison officials' judgment in furthering penological goals." *Rivera v. Fed. Bureau of Prisons*, 197 F. App'x 169, 170 (3d Cir. 2006) (citing *Overton v. Bazzetta*, 539 U.S. 126, 131-32 (2003)). Affording substantial deference to the professional judgment of prison administrators, *Overton*, 539 U.S. at 132, courts will uphold a prison official's action alleged to have impinged on an inmate's constitutional rights if "it is reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987). This test, set out in *Turner v. Safley*, examines the following four factors: (1) whether the regulation or practice in question furthers a legitimate governmental interest unrelated to the suppression of expression; (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) whether the right can be exercised only at the cost of less liberty and safety for guards and other prisoners, and the effect on prison resources in general; and (4) whether an alternative exists which would fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Thomburgh v. Abbott*, 490 U.S. 401, 415-18 (1989); *Turner*, 482 U.S. at 89-91.

Here, Plaintiff alleges a near-total ban on visitation and telephone calls with his family and his attorneys during his hospitalization at Geisinger Medical Center from May 12,

2015 to May 18, 2015. (*See* Doc. 57 at ¶¶ 49-53). He also alleges that during a prior

hospitalization at Schuylkill Medical Center, he received visits from his attorney and

immediate family members. (*Id.* at ¶ 51). These allegations are sufficient to permit the

reasonable inference that the limitation on visitation and telephone calls was arbitrary and

not reasonably related to a legitimate penological interest. Plaintiff's freedom of association

claim is allowed to proceed.

### E. Sovereign Immunity

Defendant Kerestes next moves for dismissal of Counts IV, $V_1$, and $V_2$, which raise

state law medical negligence claims against Defendant Kerestes for failure to treat Plaintiff's

hyperglycemia, Hepatitis C, and skin condition.[6] Defendant Kerestes argues that he is

protected by sovereign immunity because he is not a "health care employee" within the

meaning of Pennsylvania's statutory waiver of sovereign immunity for medical-professional

liability. (Doc. 89 at 10-12); *see also* 42 Pa. Cons. Stat. Ann § 8522(b)(2). In response,

"Plaintiff concedes that defendant Kerestes is immune from liability as to the Pennsylvania

state law medical neglect claim, but only as to that claim." (Doc. 93 at 12). Thus,

Defendant Kerestes is entitled to dismissal of Counts IV, $V_1$, and $V_2$.

---

[6] Plaintiff's Amended Complaint (Doc. 57) has two different counts listed as "Count V:" "Count V –
Negligence – Medical Malpractice for Failure to Treat Plaintiff's Hepatitis-C" on page 18 of the Amended
Complaint and "Count V – Medical Malpractice for Failure to Treat Skin Condition" on page 19. For clarity
and ease of reference, the Court designates the above-mentioned counts as Count $V_1$ and Count $V_2$,
respectively.

## F. Mootness

Defendant Kerestes's final argument in his Motion to Dismiss asks the Court to dismiss as moot "Plaintiff's claims for declaratory and injunctive relief related to visits while at Geisinger Medical Center." (Doc. 89 at 12). Article III of the Constitution provides that the "judicial power shall extend to . . . cases . . . [and] to controversies." U.S. Const. Art III, § 2. This grant of authority embodies a fundamental limitation restricting the federal courts to the adjudication of "actual, ongoing cases or controversies." *Khodara Envtl., Inc, v. Beckman*, 237 F.3d 186, 193 (3d Cir. 2001). The mootness doctrine is centrally concerned with the court's ability to grant effective relief. "If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996).

The parties disagree as to whether Plaintiff's claims for declaratory and injunctive relief are moot or whether they are 'capable of repetition, yet evading review.' The 'capable of repetition, yet evading review' exception to the mootness doctrine "applies 'only in exceptional situations,' where (1) 'the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration,' and (2) 'there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again.'" *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998); brackets in original). Defendant Kerestes argues that because Plaintiff

has been discharged from Geisinger Medical Center, "[a]ny belief or suspicion that [he] may again be transferred to Geisinger, admitted to the hospital for inpatient treatment, and subsequently denied visits is too speculative to form a basis for prospective relief." (Doc. 101 at 14; *see also* Doc. 89 at 12-13). Plaintiff believes that "he remains at imminent risk" for repeat violations due to his "undisputed health issues, his advancing age[,] and his sentence of life without the possibility of parole." (Doc. 93 at 14).

At the outset, the Court notes that Plaintiff's request for permanent injunctive relief is actually far broader in scope than what Defendant Kerestes addresses. In Paragraphs G and H of the Amended Complaint (Doc. 57), Plaintiff asks the Court to "grant a permanent injunction ordering defendants to permit attorney-client visits whenever plaintiff Abu-Jamal is taken from a DOC facility to receive inpatient medical treatment" and to "grant a permanent injunction ordering defendants to permit family visits when plaintiff Abu-Jamal is taken from a DOC facility to receive inpatient medical treatment." At this juncture, the Court is of the opinion that, should Plaintiff ultimately be entitled to relief, it is unlikely that he will be able to show on the facts of this case that such a broad injunction, extending to every inpatient medical facility to which DOC might ever transport Plaintiff, is warranted.

"An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims." *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003), *as amended* (May 29, 2003); *Suarez v. Kerestes*, No. 3:13-CV-2004, 2016 WL 1756901, at *2 (M.D. Pa. Apr. 29, 2016)) (quoting *Burkey v. Marberry*, 556 F.3d 142, 147 (3d Cir. 2009) ("Once a

petitioner has been released from custody, 'some continuing injury, also referred to as a collateral consequence, must exist for the action to continue.'"). While it is true that Plaintiff is no longer at Geisinger Medical Center, he is still incarcerated at a facility headed by Defendant Kerestes and, thus, his claim against Defendant Kerestes is not in the same posture with respect to a mootness analysis as it would be if his sentence had been served or overturned and he was released from prison. The Court finds that the two prongs of the 'capable of repetition, yet evading review' test are met here. First, it is clear that the actions challenged by Plaintiff are too short in duration to be litigated prior to cessation or expiration; as of the date of this Opinion, Plaintiff continues to litigate an alleged denial of his associational rights that occurred between May 12, 2015 and May 18, 2015. Second, the Court finds that it is reasonable to expect that Plaintiff will be subject to the same conduct again. The crux of Plaintiff's Amended Complaint is that he has not received adequate medical care at SCI Mahanoy, causing him serious injuries, pain, and suffering. As part of this action, Plaintiff has alleged that his condition deteriorated to the point where he had to be hospitalized twice within a two-month span in the spring of 2015. (See Doc. 57 at ¶¶ 38, 48). Taking these allegations as true, as well as the various allegations throughout the Complaint that persons at SCI Mahanoy and within the DOC have failed to adequately treat him, there is a reasonable expectation that Plaintiff will again require hospitalization at a medical facility, although not necessarily one affiliated with or operated by Geisinger.

"The burden of demonstrating mootness is a heavy one." *Surrick v. Killion*, 449 F.3d 520, 526 (3d Cir. 2006) (citing *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)) (internal quotation omitted). "[T]he requirement that an action involve a live case or controversy extends through all phases of litigation, including appellate review." *Cnty of Morris v. Nationalist Movement*, 273 F.3d 527, 533 (3d Cir. 2001) (citing *Khodara Envtl., Inc.*, 237 F.3d at 193). If, as the case develops, Defendant Kerestes meets his burden and demonstrates that Plaintiff's claims for permanent injunctive relief and – to the extent he makes them – for declaratory relief have become moot, the Court will dismiss the claims. At this stage of litigation, however, Defendant Kerestes has not demonstrated mootness.

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendant Kerestes's Motion to Dismiss (Doc. 81). A separate Order follows.

Robert D. Mariani
United States District Judge