## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MUMIA ABU-JAMAL, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **3:15-CV-00967** |
| | : | **(JUDGE MARIANI)** |
| **JOHN KERESTES, et al.** | : | |
| | : | |
| **Defendants.** | : | |

### MEMORANDUM OPINION

#### I. INTRODUCTION

Presently before the Court is Defendants Steinhart and Oppman's Motion to Dismiss

Plaintiff's Amended and Supplemental Complaint (Doc. 108) for failure to state a claim upon

which relief may be granted.  The First Amended and Supplemental Complaint (Doc. 57)

contains claims arising out of Plaintiff Mumia Abu-Jamal's hospitalization at Geisinger

Medical Center from May 12 to May 18, 2015, as well as his medical conditions, including

his ongoing hepatitis C infection.

Plaintiff Abu-Jamal along with Plaintiffs Brett Grote and Robert Boyle, also Mr. Abu-

Jamal's attorneys of record in this matter, initially filed this action on May 18, 2015 claiming

violations of the right to association and access to the courts.  (Compl., Doc. 1 at 10).

Plaintiffs alleged that Defendant Kerestes and Defendant Geisinger "barred the plaintiff

attorneys from visiting with Mr. Abu-Jamal" and further "prohibited all communication

between Mr. Abu-Jamal and anyone," with the exception of a short phone call between him

and his wife. (*Id*. at 3). Subsequently, Plaintiffs Boyle and Grote filed notices of voluntary dismissal (Docs. 17, 18), leaving Mr. Abu-Jamal (hereinafter, "Plaintiff") as the only remaining plaintiff.

On November 24, 2015, Plaintiff filed a Supplemental and Amended Complaint (Doc. 57) (hereinafter "Amended Complaint"), which added several defendants. Those Defendants are Defendants Lisiak, Khanum, and Saxon (hereinafter, the "Medical Defendants") and Defendants Oppman and Steinhart, Pennsylvania Department of Corrections ("DOC") employees. The Amended Complaint also added Eighth Amendment and state law negligence medical claims related to Plaintiff's hepatitis C and other conditions. The counts alleged against Defendants Steinhart and Oppman are: Count II – Deprivation of Eighth Amendment Right to Medical Care for Hepatitis C, Count V – Negligence – Medical Malpractice for Failure to Treat Plaintiff's Hepatitis-C, and Count V – Medical Malpractice for Failure to Treat Skin Condition.[1] (*See* discussion *infra* p. 24 n.6). Defendants Steinhart and Oppman now move for dismissal of these claims. This Motion (Doc. 108) has been briefed and is ripe for review. For the reasons stated herein, the Court will grant in part and deny in part Defendants Steinhart and Oppman's Motion.

---

[1] Plaintiff's Amended Complaint (Doc. 57) has two different counts listed as "Count V:" "Count V – Negligence – Medical Malpractice for Failure to Treat Plaintiff's Hepatitis-C" on page 18 of the Amended Complaint and "Count V – Medical Malpractice for Failure to Treat Skin Condition" on page 19. While the Court does not wish to be unduly harsh on lawyers for the occasional error in their submissions, in this case, when viewed in conjunction with the numerous substantive and drafting deficiencies in the Amended Complaint, this error is the last drop that makes the cup run over. The Court admonishes Plaintiff's Counsel to devote closer attention to these points of practice in future filings before this and other Courts, lest their credibility and professional competence be questioned. For clarity and ease of reference, the Court designates the above-mentioned counts as Count $V_1$ and Count $V_2$, respectively.

2

## II. FACTUAL BACKGROUND

The Amended Complaint alleges the following facts.

Plaintiff Mumia Abu-Jamal is currently incarcerated in the custody of the Pennsylvania Department of Corrections. (Doc. 57 at 2, ¶ 1). Plaintiff was convicted in the December 9, 1981 death of a Philadelphia police officer. (*Id.* at ¶¶ 13-14). In 2011, the Third Circuit affirmed a lower court's order setting aside Plaintiff's death sentence and DOC placed him into general population[2] after the Philadelphia District Attorney's Office chose not to seek to reinstate Plaintiff's death sentence. (*Id.* at ¶¶ 18-19).

Plaintiff tested positive for the Hepatitis C antibody during routine blood work in January 2012. (*Id.* at ¶ 24). Hepatitis C is the leading cause of cirrhosis of the liver and of liver cancer; a chronic Hepatitis C infection can also cause serious chronic liver disease, liver fibrosis and death. (*Id.* at ¶ 25). According to Plaintiff, if a person tests positive for the Hepatitis C antibody, the next step is to determine whether the infection is an "active" one, including but not limited to determining whether that person has a "viral load." (*Id.* at ¶ 26). If the infection is determined to be active, the individual is at risk for serious complications that arise from the disease. (Doc. 57 at ¶ 26).

Despite repeated requests, the Defendants have not conducted a complete Hepatitis C workup of Plaintiff and have not treated the disease or adequately treated his symptoms. (*Id.* at ¶ 27).

---

[2] Plaintiff curiously fails to allege explicitly that he is incarcerated at SCI-Mahanoy, however the Court draws the reasonable inference that he is from the allegations of the Amended Complaint.

Plaintiff alleges that Hepatitis C can manifest in a number of ways even in the absence of abnormal liver functions, including in the form of persistent skin rash and/or eczema that does not respond to traditional treatment. (*Id*. at ¶ 28).

In or about August 2014, Plaintiff alleges that he began to experience itching over his whole body and that the itching was reported to facility staff. (*Id*. at ¶ 30). He was prescribed creams, which had no effect, and the rash spread. (*Id*.). Plaintiff alleges that the underlying cause of the rash, including the possibility that it was a manifestation of an active Hepatitis C infection, was not investigated. (*Id*.).

The rash became infected on two occasions in early 2015, with lesions appearing on Plaintiff's lower extremities. (Doc. 57 at ¶ 31). Medical staff noted that the lesions were "too numerous to count." (*Id*.). Plaintiff's lower extremities became swollen and his skin took on a dark, scaly appearance. (*Id*.). Plaintiff alleges that the rash caused and continues to cause extreme pain and discomfort. (*Id*. at ¶ 32). The rash covered 70 percent of Plaintiff's body by February 2015. (*Id*. at ¶ 33). The itch was unceasing; Plaintiff began using a wheelchair to move any significant distance because the lower extremity and genital edema caused so much discomfort. (*Id*.).

Plaintiff was prescribed "another steroid, oral prednisone, and Cyclosporine, an immunosuppressant," in late February 2015, but the rash persisted. (Doc. 57 at ¶ 34). A medical note dated February 19, 2015 recorded that Plaintiff was experience "increasing peeling off of dry skin at the site of the rashes." (*Id*.).

4

Plaintiff's blood was drawn on March 6, 2015 and the results showed that Plaintiff's glucose level had risen to the severely abnormal level of 419. (*Id*. at ¶ 35). Prior to this, Plaintiff's blood glucose was always within normal range. (*Id*.).

Plaintiff alleges that the Medical Defendants were aware of his dramatically elevated glucose level indicating a dangerous case of hyperglycemia and that they took no action to address the glucose level even though it was noted in their records. (*Id*. at ¶¶ 36-37). Plaintiff alleges that there was no treatment provided and no follow up testing of his glucose level, and that the Medical Defendants did not inform him of the test result. (*Id*. at ¶ 37).

Plaintiff lost consciousness on March 30, 2015 and was rushed to Schuylkill Medical Center. (Doc. 57 at ¶ 38). His blood glucose was found through testing to be 507. (*Id*.). He had gone into diabetic shock and was placed in the Critical Care Unit. (*Id*.)

Untreated hyperglycemia is a potentially fatal condition. (*Id*. at ¶ 39).

Plaintiff returned to prison on April 1. (*Id*. at ¶ 40). Release papers indicate his prognosis as "guarded" and included the following medical issues: "diabetes, new onset, encephalopathy secondary to hyperglycemia, dehydration, acute kidney injury, hyponatremia, hypokalemia, asymptomatic gallstones, skin rash, anemia and a history of hepatitis C." (*Id*.).

Plaintiff experienced fatigue, episodes of "brain fog," and emotional distress in the weeks following the diabetic shock. (Doc. 57 at ¶ 41).

Plaintiff's blood work revealed and continues to reveal abnormalities. (*Id.* at ¶ 42). He suffers anemia as indicated by a consistently below-normal hemoglobin count. (*Id.*).

Defendants continued to administer cyclosporine despite the fact that it is contraindicated for an African-American of Plaintiff's age who has sudden-onset diabetes. (*Id.* at ¶ 43). Plaintiff is an African-American. (*Id.* at 2, ¶ 1).

The Schuylkill Medical Center release order noted a history of Hepatitis C; none of the Defendants, including the Medical Defendants, took any steps to investigate whether Hepatitis C may be the cause of Plaintiff's rash or other medical issues. (*Id.* at ¶ 44).

Plaintiff retained counsel in March 2015 to advocate on his behalf for appropriate medical care; efforts have included visits, procurement of medical records, and consultation with medical experts. (Doc. 57 at ¶ 45). One expert reviewed Plaintiff's medical records. (*Id.* at ¶ 46). On April 28, 2015, Counsel transmitted to DOC a medical opinion letter from this expert. (*Id.*). The expert opined, *inter alia*, that an "occult malignancy workup" should be done to determine the cause of Plaintiff's still-present severe rash and anemia, as both are indicative of T-Cell Lymphoma. (*Id.* at ¶ 47). The expert noted that the workup to investigate the cause of the rash was "urgent at this time" and that if the rash is due to lymphoma or another serious underlying medical condition, delay in diagnosis "may have severe and even lethal consequences." (*Id.*).

Plaintiff experienced extreme pain in his lower extremities when showering on or about May 12, 2015. (*Id.* at ¶ 48). He was removed to Geisinger Medical Center[3] later that day. (Doc. 57 at ¶ 48).

Plaintiff's Counsel and his wife both requested that they be permitted to visit with Plaintiff at Geisinger. (*Id.* at ¶ 49).

Counsel and Plaintiff's wife were initially told that Defendant Kerestes would permit visits from immediate family members but were then told that Plaintiff would be denied all visitation, including visits with Counsel, so long as he remained at Geisinger. (*Id.* at ¶ 50). Plaintiff would also not be permitted to telephone Counsel or his wife. (*Id.*).

Counsel for DOC asserted that the prohibition on visitation and phone calls was the policy of Defendant Geisinger. (*Id.* at ¶ 51). During a prior hospitalization at Schuylkill Medical Center, Plaintiff received visits from his attorney and immediate family. (*Id.*).

On May 14, 2015, Counsel contacted Geisinger's litigation counsel, Donald Zaycosky, who agreed to seek authorization from Geisinger's Chief Medical Officer and DOC officials to permit family and attorney visits and phone calls. (Doc. 57 at ¶ 52).

Plaintiff was granted a fifteen minute telephone call with his wife on May 18, 2015. (*Id.* at ¶ 53).

---

[3] Plaintiff does not provide the address of Geisinger Medical Center or otherwise specify to which Geisinger Health Systems inpatient hospital he was taken. The Court takes judicial notice of the fact that that "Geisinger Medical Center" is the name of the Geisinger facility located in Danville, Pennsylvania. *See* "About Geisinger Medical Center," http://www.geisinger.org/for-patients/locations-directions/gmc/index.html (July 12, 2016).

Plaintiff was not permitted visitation with his attorneys or family during his stay at Geisinger. (*Id*.).

During his May 12, 2015 to May 19, 2015[4] hospitalization at Geisinger, numerous diagnostic tests were conducted. (*Id*. at ¶ 54). While the tests and a subsequent bone marrow biopsy ruled out some serious conditions, including some cancers, the underlying causes of Plaintiff's health problems, including the rash and anemia, were not determined. (*Id*. at ¶ 55).

A Hepatitis C workup was not performed at Geisinger Medical Center. (*Id*. at ¶ 56).

While Plaintiff was at Geisinger, his rash was treated with a steroid wrap four times a day, which partially alleviated the rash's worst symptoms. (Doc. 57 at ¶ 57).

The Geisinger discharge reported dated May 18, 2015 advises DOC to, *inter alia*, arrange for a dermatology follow-up within two weeks and to order a Hepatitis C workup as Plaintiff might be a suitable candidate for Hepatitis C treatment. (*Id*. at ¶ 58).

From Plaintiff's May 18, 2015 return to SCI Mahanoy to the date of the filing of the Amended Complaint, Plaintiff's rash has only been treated with a Vaseline wrap. (*Id*. at ¶ 59). The wrap was applied twice a day upon his return from Geisinger. (*Id*.). As of the filing of the Amended Complaint, Plaintiff alleges that "the worst symptoms" have returned. (*Id*.).

---

[4] It is unclear from the Amended Complaint on what date Plaintiff was released from Geisinger Medical Center and returned to SCI Mahanoy. Plaintiff provides both a release date of May 19, 2015, (*see* Doc. 57 at ¶ 54), and of May 18, 2015, (*see id*. at ¶ 59).

Plaintiff again experiences itching over his entire body, his lower extremities are swollen, his skin peels and scales, he experiences a consistent low-grade fever, and he is unable to walk significant distances due to the pain in his lower extremities. (*Id.* at ¶ 60).

As of the filing of the Amended Complaint, there has been no follow-up with a dermatologist, notwithstanding the recommendations of Geisinger Medical Center. (Doc. 57 at ¶ 61).

Plaintiff alleges that the type of skin rash and edema experienced by Plaintiff at the time of the filing of the Amended Complaint is likely caused by an active Hepatitis C infection. (*Id.* at ¶ 62).

Defendants have been made aware that the skin condition is a likely complication of untreated Hepatitis C through letters from counsel accompanied by expert medical reports. (*Id.* at ¶ 63).

During the last week of July 2015, Plaintiff was informed by a doctor at SCI Mahanoy that a blood test revealed that he has active Hepatitis C. (*Id.* at ¶ 64).

Plaintiff was informed that DOC currently has no protocol for treating Hepatitis C. (*Id.*).

Plaintiff alleges that the Defendants are refusing to provide him with Hepatitis C treatment despite him having active Hepatitis C that has been causing him severe health problems for several months. (*Id.* at ¶ 65).

Despite repeated requests from counsel, Defendants have refused to permit Plaintiff to be examined by an independent physician under appropriate medical conditions, even at his own expense. (Doc. 57 at ¶ 66).

One expert visited Plaintiff on a regular visit and also examined available medical records. (*Id*. at ¶ 67). Based on the visit and records review, the expert opined that Plaintiff's skin condition is likely a manifestation of the Hepatitis C infection. (*Id*.). The expert recommended specific treatments for both the skin condition and the Hepatitis C, (*id*.); these recommendations were provided to DOC counsel but have not been implemented, (*id*. at ¶ 68).

Plaintiff has been informed that DOC officials have forbidden medical staff at SCI Mahanoy from receiving any opinions, letters, diagnoses, or other communications from doctors who are working with counsel for Plaintiff, even if such opinions or letters are provided to them by Plaintiff himself. (*Id*. at ¶69).

Plaintiff alleges that as of the filing of the Amended Complaint, he is currently receiving no treatment for his skin conditions and that the Vaseline applications have ended and his lower extremities are no longer wrapped. (Doc. 57 at ¶ 70).

Plaintiff alleges that the itching is extreme and incessant and that it causes pain, loss of sleep, and resultant fatigue. (*Id*. at ¶ 71).

Plaintiff alleges that there is no medical justification for Defendants' failure to treat his skin condition and/or Hepatitis C. (*Id*. at ¶ 72).

Plaintiff alleges that the Defendants' actions and inactions have caused and continue to cause him pain, suffering, and emotional distress. (*Id.* at ¶ 73).

Plaintiff alleges that the untreated, active Hepatitis C infection has caused and continues to cause damage to his liver. (*Id.* at ¶ 74).

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

11

*Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation

marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to
> determine the sufficiency of a complaint: First, the court must take note of the
> elements a plaintiff must plead to state a claim. Second, the court should
> identify allegations that, because they are no more than conclusions, are not
> entitled to the assumption of truth. Finally, where there are well-pleaded
> factual allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not show[n]—that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks

omitted). This "plausibility" determination will be a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court

must permit a curative amendment unless such an amendment would be inequitable or

futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a
> defendant moves to dismiss it, unless the district court finds that
> amendment would be inequitable or futile, the court must inform the plaintiff
> that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

At the beginning of their Brief in Support of their Motion to Dismiss, Defendants Steinhart and Oppman "request that the Court take judicial notice of the evidence admitted at the December 18, 2015 preliminary injunction hearing . . . ." (Doc. 115 at 8 n.1). They argue that the Court may consider such evidence without converting the instant motion to dismiss to a motion for summary judgment, citing *McTernan v. City of York, Penn.*, 577 F.3d 521, 530 (3d Cir. 2009). Plaintiff does not wish the Court to consider the record made at the preliminary injunction hearing, arguing that doing so would require converting the motion to dismiss into one for summary judgment and that Plaintiff would thus be entitled to discovery. (Doc. 117 at 6-7).

The Court declines to consider the evidence introduced at the preliminary injunction hearing held in December 2015. Consistent with *McTernan*, it is the "rare" case where "the circumstances make it likely that the findings [made in preliminary injunction decisions] are accurate and reliable" to the extent that they may be considered preclusive. *McTernan*, 577 F.3d at 530-31. Indeed, no such findings have been made in this case. Given that the litigation is in the pleadings stage, the Court finds it appropriate to put Plaintiff's allegations alone to the test of *Iqbal* and *Twombly*.

## A. Eleventh Amendment Immunity

Defendants Oppman and Steinhart first ask the Court to dismiss Plaintiff's claims "to the extent that [he] seeks to impose liability for money damages against [them] in their official capacities," relying on the Eleventh Amendment. (Doc. 115 at 16).

The law upon which Defendants Steinhart and Oppman rely is sound and well-established. Federal courts cannot consider suits by private parties against states and their agencies unless the state has consented to the filing of such a suit. *See Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89 (1984); *Christy v. Pa. Turnpike Comm'n,* 54 F.3d 1140 (3d Cir. 1995), *cert. denied,* 516 U.S. 932 (1995). The Eleventh Amendment bars claims for monetary damages sought against a state official acting in his or her official capacity absent a valid abrogation by Congress or consent of the State. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (holding that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court"). Congress did not validly abrogate or purport to abrogate the States' sovereign immunity against damages claims under section 1983, and the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. *See Hafer v. Melo,* 502 U.S. 21, 25–27 (1991) (suits against state officials acting in their official capacities are suits against the employing government agency, and as such, are barred by the Eleventh Amendment); 42 Pa. Cons. Stat. Ann. § 8521–22. Thus, Plaintiff cannot recover monetary damages against Defendants Steinhart and Oppman in their official capacities, as such

14

claims are barred by the Eleventh Amendment. Plaintiff's requests for monetary damages

are dismissed to the extent they are brought against Defendants Steinhart and Oppman in

their official capacities.

## B. Personal Involvement

Section 1983 of Title 42 of the United States Code offers private citizens a cause of

action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute

provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for
> redress . . . .

*Id.*, *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95

F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the

violation of a right secured by the Constitution and laws of the United States, and must

show that the alleged deprivation was committed by a person acting under color of state

law." *West v. Atkins*, 487 U.S. 42, 48 (1988). *See also Barna v. City of Perth Amboy*, 42

F.3d 809, 815 (3d Cir. 1994).

Additionally, "[t]o establish liability for deprivation of a constitutional right under §

1983, a party must show personal involvement by each defendant." *Keys v. Carroll*, No.

3:10-CV-1570, 2012 WL 4472020, at \*9 (M.D. Pa. Sept. 26, 2012), *citing Iqbal*, 556 U.S. at

676-77 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). A court may infer that the defendant had contemporaneous knowledge of wrongful conduct from the circumstances of the case, but that knowledge must be actual, not constructive. *Id.* "A conclusory allegation that defendants were 'directly involved' in the violations of the plaintiff's rights is not sufficient to allege personal involvement." *Chimenti v. Pa. Dep't. of Corr.*, No. 15-cv-3333, 2016 WL 1125580, at *5 (E.D. Pa. Mar. 21, 2016) (citing *Bush v. Dep't of Human Servs.*, 614 F. App'x 616, 620 (3d Cir. 2015)).

Defendants Steinhart and Oppman argue that Plaintiff's § 1983 Eighth Amendment claim against them (Count II) should be dismissed because neither of them "were directly responsible for treating Plaintiff's conditions." (Doc. 115 at 7). As an initial matter, Plaintiff alleges that

> Defendant John Steinhart is the Chief Health Care administrator at SCI Mahanoy. Upon information and belief, Defendant Steinhart is the official with the authority to approve medical tests and procedures, and treatments at issue in this litigation.

(Doc. 57 at ¶ 7). As for Defendant Oppman, Plaintiff alleges that he

16

is the Director of the Bureau of Health Care Services of the DOC. The
Bureau of Health Care Services is responsible for the delivery of all medical
and dental care services throughout the DOC.

(*Id*. at ¶ 3).

Besides the above-quoted allegations that Defendant Steinhart is "the official with

the authority to approve medical tests and procedures, and treatments at issue in this

litigation" and that Defendant Oppman heads the department "responsible for the delivery of

all medical and dental care service throughout the DOC," Plaintiff alleges in conclusory

fashion that "Defendants . . . Oppman . . . and Steinhart . . . have failed to treat his Hepatitis

C," (Doc. 57 at ¶ 78). Beyond this, there is little in the Amended Complaint in the way of

factual allegations related to medical care or lack thereof that specifically address either

Defendant Steinhart or Defendant Oppman's conduct. The Amended Complaint is riddled

with allegations in the passive voice – allegations that do not permit the Court to infer which,

if any, of the named Defendants is responsible for the alleged action.[5] Also frequently

occurring throughout the Amended Complaint are vague, broad statements addressing the

conduct or scienter of "defendants." For instance, Plaintiff alleges that "[t]he defendants

have been made aware the skin condition is a likely complication of untreated Hepatitis C

through letters from counsel accompanied by expert medical reports." (Doc. 57 at ¶ 63).

Which Defendants were made aware, by whom, and when are questions that the Amended

Complaint fails to answer. The Court cannot accept these broad-sweeping allegations as

---

[5] *See, e.g.* Doc. 57 at ¶ 30 ("Creams were prescribed."); *id.* at ¶ 64 ("Mr. Abu-Jamal was informed that the DOC currently has no protocol for treating Hepatitis C.").

being plead with sufficient particularity to refer to Defendant Steinhart or Defendant Oppman.

There are a few statements in the Amended Complaint whose construction allows the Court to say confidently that Plaintiff has alleged Defendant Steinhart or Defendant Oppman did or did not take some action. For instance, Plaintiff alleges that despite a release order from Schuylkill Medical Center noting that Plaintiff had a history of Hepatitis C, "none of the defendants, including defendants Lisiak, Khanum, or Saxon, took any steps to investigate whether the Hepatitis C may be the cause of the rash and/or other medical issues." (Doc. 57 at ¶ 44). Though they are not specifically named in this allegation, as the Medical Defendants are, Defendants Steinhart and Oppman are alleged not to have taken any steps to investigate Plaintiff's Hepatitis C condition as a cause of his rash or other medical conditions. Similarly, the Court reads Paragraph 27, though grammatically incorrect, to allege that Defendants Steinhart and Oppman have not conducted a complete Hepatitis C workup for Plaintiff nor "treated the disease or adequately treated his symptoms." (*Id.* at ¶ 27). These are the extent of the allegations that relate to medical care made against Defendants Steinhart and Oppman.

The Court begins its analysis with Defendant Oppman. Given the above-noted deficiencies and lack of specificity in the Amended Complaint with respect to Defendant Oppman, Plaintiff has failed to "make[ ] sufficient allegations of [Defendant Oppman's] personal involvement by describing the defendant's participation in or actual knowledge of

18

and acquiescence in the wrongful conduct." *Chavarriaga*, 806 F.3d at 222. From the Amended Complaint, the Court does not know what Plaintiff believes Defendant Oppman did or did not do when or with whom with respect to Plaintiff's health.

To the extent that Plaintiff bases his § 1983 claim against Defendant Oppman on any policymaking role that he may have, Plaintiff has also failed to allege sufficient personal involvement to survive the Motion to Dismiss. Plaintiff states in his Brief in Opposition to this motion that "Defendant Oppman was sued for his role in the DOC's failure to treat [his] hepatitis C, as he was the head of health care for the entire DOC and therefore responsible for any treatment protocol for hepatitis C." (Doc. 117 at 10). Plaintiff attempts to ground this assertion in Paragraph 64 of the Amended Complaint, which reads, in relevant part, "Mr. Abu-Jamal was informed that the DOC currently has no protocol for treating Hepatitis C." (Doc. 117 at 10; Doc. 57 at ¶ 64). Plaintiff also represents to the Court that "[f]acts alleging that the DOC had a policy and practice of not treating hepatitis C are sufficient to implicate the personal involvement of defendant Oppman due to his role in ensuring the delivery of all medical services throughout the DOC," with a citation to *Santiago v. Warminster Township*, 629 F.3d 121, 129 n.5 (3d Cir. 2010). Upon review of *Santiago*, the Court has determined that it does not directly support the proposition asserted by Plaintiff, as his citation would otherwise indicate. The footnote cited by Plaintiff quotes *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 586 (3d Cir.2004) for the proposition that

'[t]here are two theories of supervisory liability,' one under which supervisors can be liable if they 'established and maintained a policy, practice or custom

which directly caused [the] constitutional harm,' and another under which they can be liable if they 'participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations.'

*Santiago*, 629 F.3d at 129 n.5. But Plaintiff has failed to demonstrate to the Court how the allegations in the Amended Complaint – either directly or by reasonable inference – add up to state a claim against Defendant Oppman under either of these theories. Plaintiff cannot graft new factual allegations onto the Amended Complaint via his Opposition Brief. For instance, Defendant Oppman is alleged to be the Director of the part of DOC that "is responsible for the delivery of all medical and dental care services throughout DOC," (Doc. 57 at ¶ 3); however, Plaintiff makes no allegations regarding how or at what level medical policies are set, and, thus, the Court cannot infer Defendant Oppman's responsibility for them. Indeed, Plaintiff has not even alleged, as he asserts in his Opposition Brief that he did, "that the DOC had a policy and practice of not treating hepatitis C." (Doc. 117 at 10). The Amended Complaint alleges that Plaintiff was not treated and that he "*was informed that the DOC currently has no protocol for treating Hepatitis C.*" (Doc. 57 at ¶ 64) (emphasis added). The Court cannot infer that Defendant Oppman, by virtue of his role as "Director of the Bureau of Health Care Services of the DOC," is responsible for a policy or practice that is not actually alleged to exist. The Court will dismiss Count II as to Defendant Oppman.

With respect to Defendant Steinhart, Plaintiff seems to assume that the Court will consider the grievance Plaintiff filed about his medical conditions and the subsequent

20

responses from DOC personnel to that grievance and related appeals. Thus, Plaintiff argues that Defendant Steinhart had sufficient personal involvement to state a § 1983 claim against him because he "was made aware, through [Plaintiff]'s grievance and his appeals, that he was in an ongoing health crisis that was not being addressed by prison medical staff," and because Defendant Steinhart then "refused" to intervene and instead issued a denial. (Doc. 117 at 11). Were the Court to consider Defendant Steinhart's role in the grievance system, it is not clear that this would be enough to sufficiently allege personal involvement. Courts in the Third Circuit have repeatedly held that a prison official's role in reviewing grievance is not, without more, sufficient to establish personal involvement in the alleged constitutional injury. *See, e.g., Mincy v. Chmielsewski,* 508 F. App'x 99, 104 (3d Cir. 2013) ("[A]n officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement."); *Rogers v. United States,* 696 F. Supp. 2d 472, 488 (W.D. Pa. 2010) ("If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official."); *see also Sims v. Wexford Health Sources,* 635 F. App'x 16, 19 (3d Cir. 2015) ("Prison officials who are not doctors are not liable for responding directly to prisoner medical complaints where the prisoner is under the care of medical experts."). However, as Plaintiff points out, (*see* Doc. 117 at 11), there is support in the case law for the proposition that reviewing a grievance about an *ongoing* constitutional violation may be sufficient to

establish the personal involvement of the reviewing official. *See Cardona v. Warden – MDC Facility*, No. 12-7161, 2013 WL 6446999, at *5 (D.N.J. Dec. 6, 2013) (collecting cases and noting that a plaintiff may have a claim against a supervisory defendant who reviewed a grievance where the plaintiff alleges an ongoing violation); *Diaz v. Palakovich*, 448 F. App'x 211, 215 (3d Cir. 2011) ("[A] reasonable factfinder could find that these defendants had knowledge of the violations through Diaz's grievances and acquiesced in the violations by failing to address a practice of opening legal mail outside of an inmate's presence.").

The Court need not reach this issue of whether Defendant Steinhart's role in reviewing Plaintiff's grievance was sufficient to establish personal involvement here, however, where Plaintiff's grievance and appeals thereof are mentioned nowhere in the Amended Complaint. Though the documents making up Plaintiff's grievance history are of record elsewhere in this case, the Court declines to consider them in conjunction with Defendant Steinhart and Defendant Oppman's Motion to Dismiss. Unlike administrative exhaustion, which was at issue in the oft-cited *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004), the issue of personal involvement cannot be said to "turn[ ] on" the documents related to Plaintiff's grievances, *id.* at 223, and the Court will not consider them where Plaintiff has not included reference to them in his Amended Complaint. *Cf. id.* at 223 ("Given that the exhaustion issue turns on the indisputably authentic documents related to Spruill's grievances, we hold that we may also consider these without converting it to a motion for summary judgment.").

The grievance theory of personal involvement dispensed with, the Court turns to Plaintiff's allegation that Defendant Steinhart, as the Chief Health Care Administrator at SCI Mahanoy, "is the official with the authority to approve medical tests and procedures, and treatments at issue in this litigation." (Doc. 57 at ¶ 7). From this allegation, Plaintiff wishes the Court to infer that Defendant Steinhart is "responsible for the facility's refusal to treat [Plaintiff]'s hepatitis C," a refusal of which Plaintiff believes he has alleged Defendant Steinhart was sufficiently aware. (Doc. 117 at 10). The Court disagrees with Plaintiff's understanding of the content of his Amended Complaint. Give the lack of allegations in the active voice, as well as those delineating the specific actions or omissions by Defendant Steinhart, if any, the Court finds that Plaintiff has failed to establish personal involvement or knowledge and acquiescence in the constitutional violations alleged by Plaintiff. Thus, Count II is dismissed as to both Defendant Steinhart and Defendant Oppman. But since the Court is of the view it is neither futile nor inequitable to allow Plaintiff to amend his complaint against Defendants Steinhart and Oppman, leave to file a Second Amended Complaint is granted with respect to Count II.

## D. Deliberate Indifference and Qualified Immunity

Defendants Steinhart and Oppman also request that the Court dismiss Plaintiff's § 1983 claim against them because 1) he has failed to establish the deliberate indifference to Plaintiff's serious medical needs necessary to make out an Eighth Amendment medical care claim, (see Doc. 115 at 18-23); and 2) because the claim is barred by qualified immunity

because it is not clearly established that the conditions of which Plaintiff complains must be treated immediately with direct-acting antiviral medication or that a so-called prioritization treatment protocol for the monitoring and treatment of inmates with Hepatitis C used by DOC is unconstitutional, (*id.* at 23-26). Because the Court has dismissed Plaintiff's § 1983 claim on the basis of a lack of sufficiently alleged personal involvement of Defendants Steinhart and Oppman, it is unable to evaluate whether these defendants acted with deliberate indifference. Similarly, it need not reach the qualified immunity argument.

### E. State Law Claims and Sovereign Immunity

Finally, the Court construes Defendant Oppman as moving for dismissal of Count $V_1$ and Count $V_2$, which raise state law medical negligence claims against him for failure to treat Plaintiff's Hepatitis C and skin condition, respectively.[6] Defendant Oppman argues that he is protected by sovereign immunity because he is not a "health care employee" within the meaning of Pennsylvania's statutory waiver of sovereign immunity for medical-professional liability. (Doc. 115 at 26-28); *see also* 42 Pa. Cons. Stat. Ann § 8522(b)(2). Plaintiff opposes dismissal of this state law claim against Defendant Oppman, stating that

---

[6] The Court notes that it is not entirely clear whether Defendant Oppman has moved for dismissal as to Count $V_1$ alone or as to both Counts $V_1$ and $V_2$ and further notes that the lack of clarity in the scope of the Motion is wholly – or at least in part – the result of the internally inconsistent pleading found in Count $V_2$ of the Amended Complaint where Plaintiff inexplicably begins by identifying Kerestes, Lisiak, Khanum, and Saxon as the defendants in Count $V_2$, but then, in the only paragraph of that count containing any specific allegations, alleges that "Kerestes, Oppman, Lisiak, Saxon[,] and Steihardt [*sic*] have violated Plaintiff's rights under Pennsylvania state law for their negligent disregard to Mr. Abu Jamal's skin condition," (Doc. 57 at ¶ 86). For the purposes of this Motion, the Court assumes that Plaintiff intended to bring Count $V_2$ against Defendants Oppman and Steinhart.

this defendant is "unambiguously" a health care employee within the meaning of the medical-professional liability exception to sovereign immunity. (Doc. 117 at 17).

"'It is well-settled that immunity is waived only for claims asserted against health care employees, and not to individuals who are not medical professionals.'" *Chimenti*, 2016 WL 1125580 at *8 (quoting *Green v. Fisher*, Civ. A. No. 12-982, 2014 WL 65763, at *11 (M.D. Pa. Jan. 8, 2014). Thus, were Defendant Oppman the Secretary of the DOC, a correctional institution superintendent, or a DOC employee working in maintenance or food service, for example, the Court's path would be clear: Defendant Oppman would be entitled to sovereign immunity because he would not be a health care employee. *See, e.g., Chimenti*, 2016 WL 1125580 at *8 (concluding that state law medical malpractice claim against DOC Secretary was barred by sovereign immunity); *Robus v. Pa. Dep't of Corr.*, Civ. A. No. 04-2175, 2006 WL 2060615, at *4 (E.D. Pa. July 20, 2006) (holding the medical professional liability exception to sovereign immunity does not vitiate immunity of SCI Graterford Superintendent); *Green v. Fisher*, Civ. A. No. 12-982, 2014 WL 65763, at *11 (M.D. Pa. Jan. 8, 2014) (holding that medical negligence claim against warden, deputy warden, safety manager, maintenance manger, and food services manager did not fall into medical professional liability exception to sovereign immunity because said defendants were not health care employees). However, Defendant Oppman is the Director of DOC's Bureau of Health Care Services and is alleged to be "responsible for the delivery of all medical and dental care services throughout the DOC," (Doc. 57 at ¶ 3); while it is not asserted that

Defendant Oppman is a doctor or other licensed health care professional, his title suggests

that he has more in common with the statute's "health care employee" than would a facility

superintendent or a food safety manager.

Indeed, whether the Director of the DOC's Bureau of Health Care Services is a

"health care employee" such that he is not protected by sovereign immunity in state law

medical negligence claims such as the one at issue here appears to be an open question,

undecided by Pennsylvania courts.[7]  Nor have the Pennsylvania courts provided a uniform

answer as to whether a prison health care administrator falls within this exception. *See*

*Milliner v. Diguglielmo*, No. CIV.A. 08-4905, 2014 WL 413873, at *7 n.67 (E.D. Pa. Jan. 31,

2014) (collecting cases).  At the pleading stage, the Court lacks sufficient information about

Defendant Oppman's job responsibilities, professional qualifications, and the nature of his

work to determine whether he is a health care employee within the meaning of the "medical-

professional" exception to Pennsylvania's sovereign immunity.  Thus, the Court will deny

---

[7] In Defendants Steinhart and Oppman's untitled reply brief (Doc. 123), they assert that the Pennsylvania Commonwealth Court has in another case affirmed the dismissal of the Director of DOC's Bureau of Health Care Services based on sovereign immunity.  (Doc. 123 at 13 (citing *McCool v. Dep't of Corr.*, 984 A.2d 565 (Pa. Cmwlth. 2009))).  Surprisingly, they provided no pincite to *McCool*.  The Court has reviewed *McCool* and has determined that Defendants Steinhart and Oppman's claim that the Commonwealth Court upheld dismissal of the DOC's Director of the Bureau of Health Care Services is incorrect.  Pro se plaintiff McCool filed a complaint against, *inter alia*, Catherine McVey, who he asserted was the Director of the Bureau of Health Care Services. *Id*. at 567.  However, footnote 3 of the decision notes that "[DOC]'s Answer explained that McVey was the Department's Deputy Secretary for Administration rather than the Department's Director of the Bureau of Health Care." *Id*. at 567 n.3.  Thus, when the Commonwealth Court in *McCool* held that the medical professional liability exception to sovereign immunity had "no application to the defendants originally named in McCool's complaint, *i.e.*, the Department, Secretary Beard or Deputy Secretary McVey, because they are not 'health care employees of a Commonwealth agency,'" *id*. at 570, it was not, as Defendants Steinhart and Oppman incorrectly assert, "affirming dismissal of [the] BHCS Director based on sovereign immunity," (Doc. 123 at 13).

Defendant Oppman's Motion to dismiss on this ground without prejudice to the right to reassert this defense at a future point in this litigation.

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants Steinhart and Oppman's Motion to Dismiss (Doc. 108). A separate Order follows.

Robert D. Mariani
United States District Judge