IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| MUMIA ABU-JAMAL, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | 3:15-CV-00967 |
| | : | (JUDGE MARIANI) |
| JOHN KERESTES, et al. | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendant Geisinger Medical Center's Motion to

Dismiss Plaintiff's First Amended and Supplemental Complaint (Doc. 63) for failure to state

a claim upon which relief may be granted. The First Amended and Supplemental Complaint

(Doc. 57) contains claims arising out of Plaintiff Mumia Abu-Jamal's hospitalization at

Geisinger Medical Center from May 12 to May 18, 2015, as well as his medical conditions,

including his ongoing hepatitis C infection.

Plaintiff Abu-Jamal along with Plaintiffs Brett Grote and Robert Boyle, also Mr. Abu-

Jamal's attorneys of record in this matter, initially filed this action on May 18, 2015 claiming

violations of the right to association and access to the courts. (Compl., Doc. 1 at 10).

Plaintiffs alleged that Defendant Kerestes and Defendant Geisinger "barred the plaintiff

attorneys from visiting with Mr. Abu-Jamal" and further "prohibited all communication

between Mr. Abu-Jamal and anyone," with the exception of a short phone call between him

and his wife. (*Id.* at 3). Subsequently, Plaintiffs Boyle and Grote filed notices of voluntary dismissal (Docs. 17, 18), leaving Mr. Abu-Jamal (hereinafter, "Plaintiff") as the only remaining plaintiff.

On November 24, 2015, Plaintiff filed a Supplemental and Amended Complaint (Doc. 57) (hereinafter "Amended Complaint"), which added several defendants. Those Defendants are Defendants Lisiak, Khanum, and Saxon (hereinafter, the "Medical Defendants") and Defendants Oppman and Steinhart, Pennsylvania Department of Corrections ("DOC") employees. The Amended Complaint also added Eighth Amendment and state law negligence medical claims related to Plaintiff's hepatitis C and other conditions. The only claims asserted in the Amended Complaint against Defendant Geisinger are Count VI, claiming a violation of Plaintiff's right to "access to courts," and Count VII, claiming a violation of Plaintiff's First Amendment Right of Association. Defendant Geisinger now moves for dismissal of these two claims against it on the basis that they fail to state claims upon which relief may be granted. This Motion (Doc. 63) has been briefed and is ripe for review. For the reasons stated herein, the Court will grant Defendant Geisinger's Motion.

## II. FACTUAL BACKGROUND

The Amended Complaint alleges the following facts.

Plaintiff Mumia Abu-Jamal is currently incarcerated in the custody of the Pennsylvania Department of Corrections. (Doc. 57 at 2, ¶ 1). Plaintiff was convicted in the

2

December 9, 1981 death of a Philadelphia police officer. (*Id.* at ¶¶ 13-14). In 2011, the

Third Circuit affirmed a lower court's order setting aside Plaintiff's death sentence and DOC

placed him into general population[1] after the Philadelphia District Attorney's Office chose

not to seek to reinstate Plaintiff's death sentence. (*Id.* at ¶¶ 18-19).

Plaintiff tested positive for the Hepatitis C antibody during routine blood work in

January 2012. (*Id.* at ¶ 24). Hepatitis C is the leading cause of cirrhosis of the liver and of

liver cancer; a chronic Hepatitis C infection can also cause serious chronic liver disease,

liver fibrosis and death. (*Id.* at ¶ 25). According to Plaintiff, if a person tests positive for the

Hepatitis C antibody, the next step is to determine whether the infection is an "active" one,

including but not limited to determining whether that person has a "viral load." (*Id.* at ¶ 26).

If the infection is determined to be active, the individual is at risk for serious complications

that arise from the disease. (Doc. 57 at ¶ 26).

Despite repeated requests, the Defendants have not conducted a complete Hepatitis

C workup of Plaintiff and have not treated the disease or adequately treated his symptoms.

(*Id.* at ¶ 27).

Plaintiff alleges that Hepatitis C can manifest in a number of ways even in the

absence of abnormal liver functions, including in the form of persistent skin rash and/or

eczema that does not respond to traditional treatment. (*Id.* at ¶ 28).

---

[1] Plaintiff curiously fails to allege explicitly that he is incarcerated at SCI-Mahanoy, however the Court draws the reasonable inference that he is from the allegations of the Amended Complaint.

3

In or about August 2014, Plaintiff alleges that he began to experience itching over his whole body and that the itching was reported to facility staff. (*Id.* at ¶ 30). He was prescribed creams, which had no effect, and the rash spread. (*Id.*). Plaintiff alleges that the underlying cause of the rash, including the possibility that it was a manifestation of an active Hepatitis C infection, was not investigated. (*Id.*).

The rash became infected on two occasions in early 2015, with lesions appearing on Plaintiff's lower extremities. (Doc. 57 at ¶ 31). Medical staff noted that the lesions were "too numerous to count." (*Id.*). Plaintiff's lower extremities became swollen and his skin took on a dark, scaly appearance. (*Id.*). Plaintiff alleges that the rash caused and continues to cause extreme pain and discomfort. (*Id.* at ¶ 32). The rash covered 70 percent of Plaintiff's body by February 2015. (*Id.* at ¶ 33). The itch was unceasing; Plaintiff began using a wheelchair to move any significant distance because the lower extremity and genital edema caused so much discomfort. (*Id.*).

Plaintiff was prescribed "another steroid, oral prednisone, and Cyclosporine, an immunosuppressant," in late February 2015, but the rash persisted. (Doc. 57 at ¶ 34). A medical note dated February 19, 2015 recorded that Plaintiff was experience "increasing peeling off of dry skin at the site of the rashes." (*Id.*).

Plaintiff's blood was drawn on March 6, 2015 and the results showed that Plaintiff's glucose level had risen to the severely abnormal level of 419. (*Id.* at ¶ 35). Prior to this, Plaintiff's blood glucose was always within normal range. (*Id.*).

4

Plaintiff alleges that the Medical Defendants were aware of his dramatically elevated glucose level indicating a dangerous case of hyperglycemia and that they took no action to address the glucose level even though it was noted in their records. (*Id.* at ¶¶ 36-37). Plaintiff alleges that there was no treatment provided and no follow up testing of his glucose level, and that the Medical Defendants did not inform him of the test result. (*Id.* at ¶ 37).

Plaintiff lost consciousness on March 30, 2015 and was rushed to Schuylkill Medical Center. (Doc. 57 at ¶ 38). His blood glucose was found through testing to be 507. (*Id.*). He had gone into diabetic shock and was placed in the Critical Care Unit. (*Id.*)

Untreated hyperglycemia is a potentially fatal condition. (*Id.* at ¶ 39).

Plaintiff returned to prison on April 1. (*Id.* at ¶ 40). Release papers indicate his prognosis as "guarded" and included the following medical issues: "diabetes, new onset, encephalopathy secondary to hyperglycemia, dehydration, acute kidney injury, hyponatremia, hypokalemia, asymptomatic gallstones, skin rash, anemia and a history of hepatitis C." (*Id.*).

Plaintiff experienced fatigue, episodes of "brain fog," and emotional distress in the weeks following the diabetic shock. (Doc. 57 at ¶ 41).

Plaintiff's blood work revealed and continues to reveal abnormalities. (*Id.* at ¶ 42). He suffers anemia as indicated by a consistently below-normal hemoglobin count. (*Id.*).

Defendants continued to administer cyclosporine despite the fact that it is contraindicated for an African-American of Plaintiff's age who as sudden-onset diabetes. (*Id.* at ¶ 43). Plaintiff is an African-American. (*Id.* at 2, ¶ 1).

The Schuylkill Medical Center release order noted a history of Hepatitis C; none of the Defendants, including the Medical Defendants, took any steps to investigate whether Hepatitis C may be the cause of Plaintiff's rash or other medical issues. (*Id.* at ¶ 44).

Plaintiff retained counsel in March 2015 to advocate on his behalf for appropriate medical care; efforts have included visits, procurement of medical records, and consultation with medical experts. (Doc. 57 at ¶ 45). One expert reviewed Plaintiff's medical records. (*Id.* at ¶ 46). On April 28, 2015, Counsel transmitted to DOC a medical opinion letter from this expert. (*Id.*). The expert opined, *inter alia*, that an "occult malignancy workup" should be done to determine the cause of Plaintiff's still-present severe rash and anemia, as both are indicative of T-Cell Lymphoma. (*Id.* at ¶ 47). The expert noted that the workup to investigate the cause of the rash was "urgent at this time" and that if the rash is due to lymphoma or another serious underlying medical condition, delay in diagnosis "may have severe and even lethal consequences." (*Id.*).

Plaintiff experienced extreme pain in his lower extremities when showering on or about May 12, 2015. (*Id*. at ¶ 48). He was removed to Geisinger Medical Center[2] later that day. (Doc. 57 at ¶ 48).

Plaintiff's Counsel and his wife both requested that they be permitted to visit with Plaintiff at Geisinger. (*Id*. at ¶ 49).

Counsel and Plaintiff's wife were initially told that Defendant Kerestes would permit visits from immediate family members but were then told that Plaintiff would be denied all visitation, including visits with Counsel, so long as he remained at Geisinger. (*Id*. at ¶ 50). Plaintiff would also not be permitted to telephone Counsel or his wife. (*Id*.).

Counsel for DOC asserted that the prohibition on visitation and phone calls was the policy of Defendant Geisinger. (*Id*. at ¶ 51). During a prior hospitalization at Schuylkill Medical Center, Plaintiff received visits from his attorney and immediate family. (*Id*.).

On May 14, 2015, Counsel contacted Geisinger's litigation counsel, Donald Zaycosky, who agreed to seek authorization from Geisinger's Chief Medical Officer and DOC officials to permit family and attorney visits and phone calls. (Doc. 57 at ¶ 52).

Plaintiff was granted a fifteen minute telephone call with his wife on May 18, 2015. (*Id*. at ¶ 53).

---

[2] Plaintiff does not provide the address of Geisinger Medical Center or otherwise specify to which Geisinger Health Systems inpatient hospital he was taken. The Court takes judicial notice of the fact that that "Geisinger Medical Center" is the name of the Geisinger facility located in Danville, Pennsylvania. *See* "About Geisinger Medical Center," http://www.geisinger.org/for-patients/locations-directions/gmc/index.html (July 12, 2016).

Plaintiff was not permitted visitation with his attorneys or family during his stay at Geisinger. (*Id.*).

During his May 12, 2015 to May 19, 2015[3] hospitalization at Geisinger, numerous diagnostic tests were conducted. (*Id.* at ¶ 54). While the tests and a subsequent bone marrow biopsy ruled out some serious conditions, including some cancers, the underlying causes of Plaintiff's health problems, including the rash and anemia, were not determined. (*Id.* at ¶ 55).

A Hepatitis C workup was not performed at Geisinger Medical Center. (*Id.* at ¶ 56).

While Plaintiff was at Geisinger, his rash was treated with a steroid wrap four times a day, which partially alleviated the rash's worst symptoms. (Doc. 57 at ¶ 57).

The Geisinger discharge reported dated May 18, 2015 advises DOC to, *inter alia*, arrange for a dermatology follow-up within two weeks and to order a Hepatitis C workup as Plaintiff might be a suitable candidate for Hepatitis C treatment. (*Id.* at ¶ 58).

From Plaintiff's May 18, 2015 return to SCI Mahanoy to the date of the filing of the Amended Complaint, Plaintiff's rash has only been treated with a Vaseline wrap. (*Id.* at ¶ 59). The wrap was applied twice a day upon his return from Geisinger. (*Id.*). As of the filing of the Amended Complaint, Plaintiff alleges that "the worst symptoms" have returned. (*Id.*).

_____

[3] It is unclear from the Amended Complaint on what date Plaintiff was released from Geisinger Medical Center and returned to SCI Mahanoy. Plaintiff provides both a release date of May 19, 2015, (*see* Doc. 57 at ¶ 54), and of May 18, 2015, (*see id.* at ¶ 59).

Plaintiff again experiences itching over his entire body, his lower extremities are swollen, his skin peels and scales, he experiences a consistent low-grade fever, and he is unable to walk significant distances due to the pain in his lower extremities. (*Id*. at ¶ 60).

As of the filing of the Amended Complaint, there has been no follow-up with a dermatologist, notwithstanding the recommendations of Geisinger Medical Center. (Doc. 57 at ¶ 61).

Plaintiff alleges that the type of skin rash and edema experienced by Plaintiff at the time of the filing of the Amended Complaint is likely caused by an active Hepatitis C infection. (*Id*. at ¶ 62).

Defendants have been made aware that the skin condition is a likely complication of untreated Hepatitis C through letters from counsel accompanied by expert medical reports. (*Id*. at ¶ 63).

During the last week of July 2015, Plaintiff was informed by a doctor at SCI Mahanoy that a blood test revealed that he has active Hepatitis C. (*Id*. at ¶ 64).

Plaintiff was informed that DOC currently has no protocol for treating Hepatitis C. (*Id*.).

Plaintiff alleges that the Defendants are refusing to provide him with Hepatitis C treatment despite him having active Hepatitis C that has been causing him severe health problems for several months. (*Id*. at ¶ 65).

Despite repeated requests from counsel, Defendants have refused to permit Plaintiff to be examined by an independent physician under appropriate medical conditions, even at his own expense. (Doc. 57 at ¶ 66).

One expert visited Plaintiff on a regular visit and also examined available medical records. (*Id.* at ¶ 67). Based on the visit and records review, the expert opined that Plaintiff's skin condition is likely a manifestation of the Hepatitis C infection. (*Id.*). The expert recommended specific treatments for both the skin condition and the Hepatitis C, (*id.*); these recommendations were provided to DOC counsel but have not been implemented, (*id.* at ¶ 68).

Plaintiff has been informed that DOC officials have forbidden medical staff at SCI Mahanoy from receiving any opinions, letters, diagnoses, or other communications from doctors who are working with counsel for Plaintiff, even if such opinions or letters are provided to them by Plaintiff himself. (*Id.* at ¶69).

Plaintiff alleges that as of the filing of the Amended Complaint, he is currently receiving no treatment for his skin conditions and that the Vaseline applications have ended and his lower extremities are no longer wrapped. (Doc. 57 at ¶ 70).

Plaintiff alleges that the itching is extreme and incessant and that it causes pain, loss of sleep, and resultant fatigue. (*Id.* at ¶ 71).

Plaintiff alleges that there is no medical justification for Defendants' failure to treat his skin condition and/or Hepatitis C. (*Id.* at ¶ 72).

Plaintiff alleges that the Defendants' actions and inactions have caused and continue to cause him pain, suffering, and emotional distress. (*Id.* at ¶ 73).

Plaintiff alleges that the untreated, active Hepatitis C infection has caused and continues to cause damage to his liver. (*Id.* at ¶ 74).

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

11

*Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation

marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to
> determine the sufficiency of a complaint: First, the court must take note of the
> elements a plaintiff must plead to state a claim. Second, the court should
> identify allegations that, because they are no more than conclusions, are not
> entitled to the assumption of truth. Finally, where there are well-pleaded
> factual allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not show[n]—that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks

omitted). This "plausibility" determination will be a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court

must permit a curative amendment unless such an amendment would be inequitable or

futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a
> defendant moves to dismiss it, unless the district court finds that
> amendment would be inequitable or futile, the court must inform the plaintiff
> that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

Defendant Geisinger moves to dismiss the two claims brought against it: Count VI, claiming a violation of Plaintiff's right to "access to courts," and Count VII, claiming a violation of Plaintiff's First Amendment right of association. Defendants make three arguments in favor of dismissal of both claims: 1) "Plaintiff fails to present an actual case or controversy" with respect to Geisinger; 2) "Plaintiff has failed to allege facts sufficient to demonstrate that Geisinger is a state actor" for purposes of § 1983; and 3) "with regard to the substantive theory of liability asserted against Geisinger, Plaintiff has failed to state a claim which would entitle him to relief." (Doc. 80 at 11).

### A. Access to Courts

"[I]n order to press a claim for interference with the right to court access, a prisoner plaintiff must allege that he or she has been actually injured in his or her access to the courts, *i.e.*, that he or she has been hindered in an effort to pursue a nonfrivolous legal claim." *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006) (citing *Lewis v. Casey*, 518 U.S. 343, 349-53 (1996)). The claim must relate to either a direct or collateral challenge to the prisoner's sentence or conditions of confinement. *Lewis*, 518 U.S. at 355 (finding "[i]mpairment of any other litigating capacity is simply one of the incidental . . . consequences of conviction and incarceration."). The United States Supreme Court has stated clearly the pleading requirements for an access to courts claim. Plaintiffs "must identify a nonfrivolous, arguable underlying claim" in order to pursue an access to courts

13

claim, and "that underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). An "actual injury" does not occur without a showing that a claim has been lost or rejected, or that the presentation of such a claim is currently being prevented. *Lewis*, 518 U.S. at 354-56.

Here, Plaintiff has failed to allege an actual injury sufficient to state a claim for access to courts. Plaintiff has alleged that on May 12, 2015, Plaintiff was moved from SCI Mahanoy to Geisinger Medical Facility and that Counsel requested permission to visit Plaintiff there. (Doc. 57 at ¶¶ 48-49). Plaintiff further alleges that Counsel was told that Plaintiff would be denied all visitation and phone calls with his attorneys while at Geisinger. (*Id.* at ¶ 50). It is unclear who Plaintiff alleges to be the source of this prohibition, as Defendant Geisinger itself points out. (*See* Doc. 80 at 19). Plaintiff alleges that "DOC counsel asserted that the prohibition on visitation and phone calls was the policy of Geisinger Medical Center," as contrasted to Plaintiff's experience during a recent hospitalization at Schuylkill Medical Center. (*Id.* at ¶ 51). However, the Complaint also alleges that:

> Defendant Geisinger Medical Center, in coordination with the DOC, has a policy of prohibiting all communication between hospital patients in the custody of the DOC and their lawyers, family, and friends, and others not in the employ of the DOC or Geisinger Medical Center.

(*Id.* at ¶ 8). Plaintiff also asserts that on May 14, 2015, Geisinger's litigation counsel Donald Zaycosky agreed to seek authorization for attorney visits and phone calls from Geisinger's

Chief Medical Officer and from DOC officials, (*id.* at ¶ 52), but that he ultimately was not

permitted visitation with his attorneys during his entire stay at Geisinger, (*id.* at ¶ 53).

According to Count VI of the Amended Complaint, these allegations add up to the

following constitutional violation:

> Defendants Kerestes and Geisinger Medical Center violated Plaintiff's Fifth
> and Fourteenth Amendment right of access to the Courts during his May 2015
> hospitalization at Geisinger Medical Center by preventing any and all
> communication between Plaintiff and his attorneys.

(Doc. 57 at ¶ 88). Plaintiff seeks "a permanent injunction ordering defendants to permit

attorney-client visits whenever plaintiff Abu-Jamal is taken from a DOC facility to receive

inpatient medical treatment." (Id. at 21, ¶ G).

However, nowhere in the Amended Complaint does Plaintiff identify a nonfrivolous

and arguable underlying claim which was lost, or even otherwise impaired, by this

prohibition on visitation or other communication with his attorneys. It is clear that Counsel's

attempts to communicate with Plaintiff were not handled by either DOC, Geisinger, or both

institutions as Counsel or Plaintiff would have wished. However, "[n]ot everyone who can

point to some 'concrete' act and is 'adverse' can call in the courts to examine the propriety

of executive action, but only someone who has been actually injured." *Lewis*, 518 U.S. at

353 n.3. Plaintiff has not adequately alleged actual injury here; indeed, a thorough review of

the Amended Complaint reveals he has not alleged injury at all.

Plaintiff incorrectly relies on case law from the preliminary injunction context in an

attempt to show injury, despite the fact that the Motion currently before the Court is a motion

to dismiss and the fact that Plaintiff seeks a permanent injunction rather than a preliminary injunction with respect to his access to courts claim. (Doc. 57 at 21, ¶ G). In focusing his argument in opposition to Defendant Kerestes's Motion on the proposition that "[t]he loss of a constitutional right . . . constitutes actionable injury, and has even been recognized as sufficiently injurious to establish the type of irreparable harm justifying a preliminary injunction," (Doc. 90 at 8), Plaintiff attempts to sidestep the weakness of his pleadings with hysteron proteron rhetoric – that is, Plaintiff puts the cart before the horse. Without having sufficiently pleaded the existence of any underlying claim, Plaintiff assumes its existence and jumps forward to the matter of injury. This analytic move neglects the Supreme Court's cautioning that "the right [of access to courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415. Because Plaintiff has not alleged sufficient facts to present a prima facie case of denial of access to the courts, his access to the courts claim will be dismissed for failure to state a claim. The Court need not reach Geisinger's additional arguments about the presence of state action or an actual case or controversy with respect to this claim.

## B. Freedom of Association

Defendant Geisinger also moves for dismissal of Count VII of the Amended Complaint, (*see* Doc. 89 at 9), which alleges that Defendant Geisinger and Defendant Kerestes violated Plaintiff's First Amendment right of association "by arbitrarily restricting communication and preventing all visitation with his family during his May 2015

hospitalization at Geisinger Medical Center," (Doc. 57 at 19-20). "A prison inmate retains those first amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Thus, "[t]o the extent that a 'right' to visitation exists via the right to association, this entitlement is limited by prison officials' judgment in furthering penological goals." *Rivera v. Fed. Bureau of Prisons*, 197 F. App'x 169, 170 (3d Cir. 2006) (citing *Overton v. Bazzetta*, 539 U.S. 126, 131-32 (2003)). Affording substantial deference to the professional judgment of prison administrators, *Overton*, 539 U.S. at 132, courts will uphold a prison official's action alleged to have impinged on an inmate's constitutional rights if "it is reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987). This test, set out in *Turner v. Safley*, examines the following four factors: (1) whether the regulation or practice in question furthers a legitimate governmental interest unrelated to the suppression of expression; (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) whether the right can be exercised only at the cost of less liberty and safety for guards and other prisoners, and the effect on prison resources in general; and (4) whether an alternative exists which would fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Thornburgh v. Abbott*, 490 U.S. 401, 415-18 (1989); *Turner*, 482 U.S. at 89-91. However, the Court need not address the substance of Plaintiff's freedom of association claim against Defendant Geisinger because Plaintiff's freedom of association claim is moot.

Defendant Geisinger argues both that Plaintiff lacks standing to seek injunctive relief and that Plaintiff's claim for freedom of association is now moot. (Doc. 80 at 11-16). Article III of the Constitution provides that the "judicial power shall extend to . . . cases . . . [and] to controversies." U.S. Const. Art III, § 2. This grant of authority embodies a fundamental limitation restricting the federal courts to the adjudication of "actual, ongoing cases or controversies." *Khodara Envtl., Inc, v. Beckman*, 237 F.3d 186, 193 (3d Cir. 2001). Standing and the mootness doctrine are two parallel doctrines bearing on the justiciability of a given matter. In order for a plaintiff to have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). As he is the party seeking review of his claims in federal court, "[P]laintiff . . . bears the burden of establishing these elements." *Id.* The mootness doctrine is centrally concerned with the court's ability to grant effective relief. "If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996).

Plaintiff directly addresses only Defendant Geisinger's charge of mootness. (*See* Doc. 90 at 3). According to Plaintiff, his claims for declaratory and injunctive relief are not moot because they are 'capable of repetition, yet evading review.' The 'capable of

18

repetition, yet evading review' exception to the mootness doctrine "applies 'only in exceptional situations,' where (1) 'the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration,' and (2) 'there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again.'" *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998); brackets in original). The exception to the mootness doctrine requires this Court "to determine whether there is a 'demonstrated probability,' or a 'reasonable expectation,' as distinct from a 'mere physical or theoretical possibility,' that the conduct of which [Plaintiff] complains will recur." *New Jersey Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 33 (3d Cir. 1985)

Plaintiff believes that "he remains at imminent risk" for repeat violations due to his "undisputed health issues, his advancing age[,] and his sentence of life without the possibility of parole." (Doc. 90 at 4). Defendant Geisinger argues that because Plaintiff has been discharged from Geisinger Medical Center, his claims are moot and that "[a]ny allegations of future harm would be purely conjectural." (Doc. 80 at 15). According to Defendant Geisinger, "the possibilities that [Plaintiff] will – at some point in the future – require in-patient hospitalization at a facility outside the DOC and that facility will be Geisinger is purely speculative."

The Court agrees with Defendant Geisinger. "An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims." *Sutton v. Rasheed*,

323 F.3d 236, 248 (3d Cir. 2003), *as amended* (May 29, 2003); *Suarez v. Kerestes*, No. 3:13-CV-2004, 2016 WL 1756901, at *2 (M.D. Pa. Apr. 29, 2016)) (quoting *Burkey v. Marberry*, 556 F.3d 142, 147 (3d Cir. 2009) ("Once a petitioner has been released from custody, 'some continuing injury, also referred to as a collateral consequence, must exist for the action to continue.'"). Plaintiff is no longer at Geisinger Medical Center and there is no indication that he will be transported back there in the future. Thus, the Court finds that the second prong of the 'capable of repetition, yet evading review' test relied upon by Plaintiff is not met here; there is not a reasonable expectation that Plaintiff will be subject to the same action by Defendant Geisinger again. This is in contrast to Plaintiff's freedom of association claim against Defendant Kerestes, though Plaintiff's freedom of association claim against him and his freedom of association claim against Defendant Geisinger arise from the same May 2015 hospitalization. Critically, Defendant Kerestes heads the facility in which Plaintiff is incarcerated, and given Plaintiff's allegations that he has not received adequate medical care at SCI Mahanoy and that his condition has deteriorated to the point where he had to be hospitalized twice within a two-month span in the spring of 2015, there is a reasonable expectation that Plaintiff will be hospitalized outside of DOC again, while still being in the charge or control of Defendant Kerestes. However, Defendant Geisinger's relationship with Plaintiff ended when he was discharged from Geisinger Medical Center in May or 2015. There is nothing indicating more than a mere physical or theoretical possibility that Plaintiff will return to the care of Defendant Geisinger and that, if so, he will be denied opportunities

to speak to or meet with his attorneys or family. Plaintiff's freedom of association claim is moot as to Defendant Geisinger.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendant Geisinger's Motion to Dismiss (Doc. 63). A separate Order follows.

Robert D. Mariani
United States District Judge