## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MUMIA ABU-JAMAL, et al.,** | : |
| | : |
| **Plaintiffs,** | : |
| **v.** | :   **3:15-CV-00967** |
| | :   **(JUDGE MARIANI)** |
| **JOHN KERESTES, et al.** | : |
| | : |
| **Defendants.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Plaintiff Mumia Abu-Jamal's Motion for Preliminary

Injunction (Doc. 23) filed August 24, 2015. Plaintiff's case has forged an unorthodox

procedural path before this Court and recapitulation here is necessary to set the stage for a

ruling on this Motion.

Plaintiff Abu-Jamal along with Plaintiffs Brett Grote and Robert Boyle, also Mr. Abu-

Jamal's attorneys of record in this matter, initially filed this action on May 18, 2015 claiming

violations of the right to association and access to the courts. (Compl., Doc. 1 at 10).

Plaintiffs alleged that Defendant Kerestes and Defendant Geisinger "barred the plaintiff

attorneys from visiting with Mr. Abu-Jamal" and further "prohibited all communication

between Mr. Abu-Jamal and anyone," with the exception of a short phone call between him

and his wife. (*Id.* at 3). Subsequently, Plaintiffs Boyle and Grote filed notices of voluntary

dismissal (Docs. 17, 18), leaving Mr. Abu-Jamal (hereinafter, "Plaintiff") as the only remaining plaintiff.

Plaintiff then filed a Motion for Leave to File a First Amended and Supplemental Complaint (Doc. 21) on August 3, 2015. The proposed First Amended and Supplemental Complaint (hereinafter "Amended Complaint") sought to add as defendants John Lisiak, Shaista Khanum, and Scott Saxon (hereinafter, the "Medical Defendants") and Christopher Oppman and John Steinhart, Pennsylvania Department of Corrections ("DOC") employees. The Amended Complaint also sought to add Eighth Amendment and state law negligence medical claims related to Plaintiff's Hepatitis C and other conditions.

While the Motion to Amend was pending, Plaintiff filed a Motion for Preliminary Injunction (Doc. 23) on August 24, 2015 seeking, *inter alia*, immediate treatment of his hepatitis C with recently developed direct-acting antiviral ("DAA") medication. Magistrate Judge Mehalchik filed a Report and Recommendation (Doc. 39) on September 18, 2015, recommending that Plaintiff's Motion for Preliminary Injunction be denied. On November 23, 2015, the Magistrate Judge permitted Plaintiff to docket as of record his Amended Complaint, (*see* Order, Doc. 56); Plaintiff filed his Amended Complaint on November 24, 2015. (Doc. 57). Defendant Kerestes filed an appeal of the Magistrate Judge's Order on December 7, 2015. (Doc. 64).

With both the Motion for Preliminary Injunction, the Magistrate Judge's Report and Recommendation thereon, and the issue of amendment properly before it, this Court

scheduled an oral argument on Defendant Kerestes's appeal and an evidentiary hearing on Plaintiff's Motion; the three-day proceeding was held on December 18, December 22, and December 23, 2015. At the outset of the proceeding, the Court heard oral argument on Defendant Kerestes's appeal of the Magistrate Judge's Order (Doc. 56). Upon the request of DOC Counsel, (Oral Arg., Dec. 18, 2015, Doc. 94 at 31:24-32:3), the Court issued a ruling from the bench and found that the Magistrate Judge did not err in allowing the Amended Complaint to be filed on November 24, 2015, (id. at 37:16-19). The remainder of the three-day proceeding constituted an evidentiary hearing on Plaintiff's Motion for Preliminary Injunction (Doc. 23). In lieu of oral argument on the Motion, the parties agreed to submit simultaneous briefing post-hearing.

Four motions to dismiss the Amended Complaint were filed: one by Geisinger (Doc. 63), one by the Medical Defendants (Doc. 110), one by Defendant Kerestes (Doc. 81), and one by Defendants Steinhart and Oppman (Doc. 108). On June 22, 2016, the Court denied the Medical Defendants' Motion to Dismiss. (Docs. 157, 158). On August 5, 2016 the Court dismissed with prejudice Plaintiff's claims against Defendant Geisinger. (Docs. 172, 173). Also on August 5, 2016, the Court granted in part and denied in part the motions of Defendants Kerestes, Oppman, and Steinhart, giving Plaintiff leave to amend certain aspects of his Amended Complaint as to these Defendants. (Docs. 168, 169, 170, 171). Plaintiff timely filed his Corrected Second Amended Complaint (Doc. 178) (hereinafter "Second Amended Complaint") on August 16, 2016.

The matter is now ripe for disposition. For the reasons that follow, the Court will
deny Plaintiff's Motion for Preliminary Injunction (Doc. 23) because the persons against
whom injunctive relief may be granted are not parties to this case and are not officers,
agents, servants, employees, or attorneys of the named defendants; nor are they persons
who are in active concert or participation with any of the parties or their officers, agents,
servants, employees, or attorneys. With respect to the Magistrate Judge's Report and
Recommendation (Doc. 39) on said motion, the Court declines to adopt it. While the result
of this Memorandum Opinion and the accompanying order is the same as that of the
Magistrate Judge's Report and Recommendation – that is, the rejection of Plaintiff's request
for preliminary injunctive relief – in no sense does the Court adopt the findings or reasoning
contained in the Report and Recommendation. The Magistrate Judge did not have before
her any of the very significant evidence that underlies the Court's ruling and, as such we
find necessary to reject the Report and Recommendation. The Report and
Recommendation contains no treatment of the factual issues that were the subject of the
evidentiary hearing held before the Court in December 2015 and, as such, the Report
and Recommendation is without evidentiary foundation and does not address in any real
sense the issues that are the subject of this Memorandum Opinion.

## II. FINDINGS OF FACT

## Hepatitis C and Treatment Thereof

1.     The DOC Defendants' expert witness Dr. Jay Cowan is licensed to practice

medicine in Pennsylvania, New York, and New Jersey and is double board-certified in

internal medicine and gastroenterology and hepatology (Cowan Test., Dec. 22, 2015, Doc.

95 at 196:9-13, 197:10-11). He has been the Medical Director of the Rikers Island

correctional facility since 2011. (*Id*. at 198:1-4). Dr. Cowan has treated patients with

hepatitis C in his capacity as the Chief of Gastroenterology at North General Hospital in

Harlem, New York City, in private practice in Harlem, through his work in Harlem Hospital's

Division of Gastroenterology, and in his work at Rikers Island. (*Id*. at 197:20-198:11).

2.     Chronic hepatitis C is a serious disease that is a major public health issue in

the United States and worldwide. (Cowan Test., Dec. 23, 2015, Doc. 96 at 20:17-22). It is

the number one reason for liver transplants in the United States at present, as well as the

number one cause of liver cancer in the United States. (*Id*. at 21:22-22:2).

3.     Hepatitis C is contagious and transmitted primarily by blood. (Cowan Test.,

Dec. 23, 2015 at 22:3-5).

4.     Dr. Cowan testified that of those individuals infected with Hepatitis C, 75

percent to 85 percent will develop chronic hepatitis, which is inflammation of the liver. Of

those who develop chronic hepatitis, 20 percent to 30 percent will go on to develop cirrhosis

over the next 10 to 20 years. Of the individuals who develop cirrhosis, two percent to seven

percent will develop hepatocellular carcinoma. (Cowan Test., Dec. 22, 2015 at 199:16-25).

During cross examination, Dr. Cowan also testified that of those exposed to hepatitis C,

between 50 percent and 85 percent will develop chronic hepatitis. (Cowan Test., Dec. 23,

2015 at 21:7-8).

     5.     Cirrhosis represents a late stage of progressive hepatic fibrosis, characterized

by distortion in the liver architecture and the formation of regenerative nodules that no

longer allow the liver to function properly. (Cowan Test., Dec. 22, 2015 at 201:21-202:1).

     6.     Individuals with cirrhosis often experience a decrease in the number of

platelets circulating in their blood. Cirrhosis may have an impact on both platelet production

and platelet survival. (*Id*. at 204:18-205:1).

     7.     Individuals with cirrhosis are at an increased risk for ascites, which is an

accumulation of peritoneal fluid in the abdominal cavity, for portal hypertension, for hepatic

encephalopathy, which is mental confusion associated with the increased toxic burden that

the liver cannot filter out, and for the occurrence of jaundice and/or rising bilirubin levels in

the bloodstream. These are markers of decompensated cirrhosis. (*Id*. at 207:23-208:14).

     8.     Metavir scores indicate the level of fibrosis in the liver on a five-point scale

from F0 to F4. F2 and F3 mark the progression of fibrosis from less severe to more severe,

with F4 marking cirrhosis. (*Id*. at 202:9-13).

     9.     Dr. Cowan testified that very often, medical professionals cannot predict the

rate of progression of fibrosis. (*Id*. at 208:15-20).

10.     Correct Care Solutions ("CCS") is the contracted health provider for the DOC. (Cowan Test., Dec. 23, 2015 at 4:14-16).

11.     Dr. Cowan is a paid consultant with the Correct Care Solutions Hepatitis C Review Committee at DOC. (*Id*. at 4:8-13). Dr. Cowan also testified that he "serve[s] on the Correct Care Solutions Hepatitis C Review Committee." (*Id*. at 67:16-17).

12.     Dr. Cowan testified that that there is "not very good concordance between physical symptoms [of hepatitis C] that a patient may experience and their degree of fibrosis or cirrhosis," such that one cannot say at what level of fibrosis or cirrhosis a person will begin to experience physical symptoms related to hepatitis C. (Cowan Test., Dec. 22, 2015 at 207:11-17).

13.     The landscape of treatments for hepatitis C is evolving very rapidly. (*Id*. at 201:8-9).

14.     Sovaldi and Harvoni are DAA medications for the treatment of hepatitis C. Sovaldi was first approved by the Food and Drug Administration in December 2013. Harvoni was first approved in October 2014. (*Id*. at 201:1-6). These drugs have "relative low-risk side effects" and "high success rates of 90 percent plus." (*Id*. at 213:24-214:2).

15.     Dr. Cowan agreed that, on average, "with the new drug, there's a 90 to 95 percent chance that the treatment will be successful." (Cowan Test., Dec. 23, 2015 at 28:5-7; *see also* Noel Test., Dec. 23, 2015, at 129:10-13 (agreeing that if Plaintiff were treated with direct-acting antivirals, there is a 90 to 95 chance he would be cured of Hepatitis C)).

7

16.    "The goal of Hepatitis C anti-viral treatment is to achieve a sustained
virological response (SVR), defined as undetectable HCV virus in the blood." (Pa. Dep't of
Cor., Interim Hepatitis C Protocol, Pl.'s Ex. 30 at ¶ (A)(1)).

17.    "Achieving an SVR may significantly decrease the risk of disease progression
and the development of decompensated cirrhosis, liver cancer, liver failure, and death."
(*Id*.). Dr. Cowan agreed with the statement that patients cured of HCV infection experience
numerous benefits, including a decrease in liver inflammation and a reduction in liver
fibrosis. (Cowan Test., Dec. 23, 2015 at 25:19-25). He also agreed with the statement that
delay in treatment decreases the benefit of SVR. (*Id*. at 26:4-7). Dr. Cowan further agreed
that successful treatment of hepatitis C has been shown to reduce, if not eliminate, fatigue
in patients with chronic hepatitis C. (*Id*. at 28:1-4).

18.    The October 2015 guidelines from the American Association for the Study of
Liver Diseases ("AASLD") and Infectious Diseases Society of America ("IDSA") entitled
"When and in Whom to Initiate HCV Therapy" "recommend treatment [using DAA therapies]
for all patients with chronic HCV ["hepatitis C virus"] infection, except those with short life
expectancies that cannot be remediated by treating HCV, by transplantation, or by other
directed therapy." (Am. Ass'n for the Study of Liver Diseases & Infectious Diseases Soc'y
of Am., When and in Whom to Initiate HCV Therapy, Pl.'s Ex. 18 at 1; *see also* Cowan
Test., Dec. 23, 2015 at 24:9-14).

19.     The Centers for Disease Control ("CDC") states that the standard of care in hepatitis C treatment in the United States is treatment with direct-acting antiviral agents such as Harvoni and Viekira Pak.  (Ctr. for Disease Control, Surveillance for Viral Hepatitis – United States, 2013, Pl.'s Ex. 17 at 5-6).  The CDC refers providers caring for hepatitis C-infected patients to the AASLD/IDSA guidance for continuously updated information regarding hepatitis C treatment.  (*Id.* at 6).

20.     Dr. Cowan agreed that the CDC points to the AASLD/IDSA guidelines as the standard of care for the treatment of Hepatitis C.  (Cowan Test., Dec. 23, 2015 at 33:15-34:9).

21.     Dr. Cowan testified that he agreed that the same standard of care as to hepatitis C treatment that is applicable to the community at large should apply in a correctional setting.  (*Id.* at 32:17-20).

22.     Dr. Cowan testified that "[a]t the current time, given the backlog of patients that have this disease, it is [his] recommendation. . . that the sickest patients be treated first. Those are the patients with fibrosis scores of 3 and 4."  (*Id.* at 66:19-22).

23.     Dr. Cowan testified "[i]f [a] patient had Chronic Hepatitis C, in private practice, [he] would engage in a conversation with the patient's insurance company and recommend the current AASLD Guidelines" and that, if the patient could pay for it, he would recommend treatment.  (*Id.* at 68:7-18).

24.     Dr. Cowan testified that "[t]here is a fiscal component involved" in the

determination of who should and should not receive treatment with DAA medications for

hepatitis C. (*Id.* at 82:18-25).

25.     Dr. Paul Noel is the Chief of Clinical Services for DOC, a position which he

has held since 2014. (Noel Test., Dec. 23, 2015, Doc. 96 at 90:3-7). Dr. Noel has worked

in correctional health care in Pennsylvania since 1994. (*Id.* at 90:12-23).

26.     Dr. Noel testified that in his role as DOC's Chief of Clinical Services he is

"involved with oversight of the medical contract . . . [he is] the point of contact to make sure

that the clinical services are appropriate, according to contract, and policies and procedures

performed by the medical contractor. [He] deal[s] more directly with [the medical

contractor's] corresponding State Medical Director on issues of quality improvement,

policies and procedures, things like that." (*Id.* at 91:15-25).

27.     Dr. Noel agreed that the most recent AASLD Guidelines on the treatment of

hepatitis C recommend treatment for everyone. (*Id.* at 130:16-23).

28.     Dr. Noel testified that, with respect to the AASLD Guidelines,

We review them, we take them into consideration, they're part of the big
picture, they're not the single bullet that has everything right, it's a much more
complicated – it would be nice if we could go to one document and everybody
follow it and everything would be wonderful, it just doesn't work that way. So
the AASLD has a large voice at the table, if that's your question. We don't
necessarily do just what the AASLD says.

(*Id.* at 131:13).

10

29.    Dr. Noel testified that in or about December 2013, DOC ceased

administration of then-current medications because "the AASLD made specific

recommendations to cease those current medications that we were using. And that's why

they were no longer used, so it's not like we had the option to keep doing it." (Id. at 133:9-

134:1).

## DOC's Interim Hepatitis C Protocol

30.    Dr. Noel testified that DOC has an interim protocol to address patients with

hepatitis C. (Noel Test., Dec. 23, 2015 at 99:15-22).

31.    The interim protocol was issued on November 13, 2015 and effective

November 20, 2015. (Pl.'s Ex. 30).

32.    Dr. Noel testified that the interim protocol "was formulated to address those

patients with Hepatitis C who are in the most need of treatment right away." (Noel Test.,

Dec. 23, 2015 at 99:24-25). He testified that the policy is "interim" in the sense that it will be

adjusted as DOC treats current patients and as science and hepatitis C treatment guidelines

in the community and within the prison system evolve. (Id. at 99:23-100:9).

33.    Dr. Noel testified that the interim protocol replaced a prior hepatitis C protocol,

which "was a protocol for medications that are no longer used." (Id. at 100:14-25).

34.    Dr. Noel was involved in developing the interim protocol and had assisted in

developing the previous protocol. (Id. at 101:7-13). He also testified that he helped draft

the interim protocol. (Id. at 126:8-14).

11

35. The DOC's interim hepatitis C protocol is a "prioritization protocol," which Dr. Noel testified is designed "to identify those with the most serious liver disease and to treat them first, and then, as they're treated, move down the list to the lower priorities, from high priority to lower priority." (*Id.* at 102:17-103:1; *see also* Pl.'s Ex. 30 at 2 ("The purpose of this Hepatitis C Protocol is to prioritize candidates for anti-viral treatment.")).

36. Dr. Noel testified that the protocol does not preclude hepatitis C treatment from any inmate who has hepatitis C. (Noel. Test., Dec. 23, 2015 at 103:3-7).

37. The protocol defines patients with chronic hepatitis C as those with a documented detectable viral load and includes under this label "all patients on the continuum from no fibrosis -> fibrosis -> compensated cirrhosis -> decompensated cirrhosis." (Pl.'s Ex. 30 at 2).

38. Patients with "Chronic Hepatitis C (Compensated)" are defined by the protocol as those having the presence of "(1) a previous liver biopsy with fibrosis Metavir stage 4 or Ishak stage 6; (2) a Platelet Count of < 100,000/mcL; (3) a Hepatitis C Antiviral Long-term Treatment Against Cirrhosis (HALT-C) probability of >60%; and/or (4) no evidence of jaundice, ascites, bleeding esophageal varices, or hepatic encephalopathy." (Pl.'s Ex. 30 at 2).

39. Patients with "Chronic Hepatitis C (Decompensated)" are defined by the protocol as those that display "evidence of jaundice, ascites, bleeding esophageal varices, or hepatic encephalopathy." (Pl.'s Ex. 30 at 3).

40.     According to the protocol, all patients with chronic hepatitis C will be entered into the Liver Disease Chronic Care Clinic and given a diagnosis of "no cirrhosis," "compensated cirrhosis," or "decompensated cirrhosis." (Pl.'s Ex. 30 at 3). Patients with "no cirrhosis" will be seen for a follow-up Clinic appointment every twelve months, patients with "compensated cirrhosis" will be seen for a follow-up every six months, and patients with "decompensated cirrhosis" will be seen for a follow-up every month. (Id. at 4).

41.     Dr. Noel testified that inmates with chronic hepatitis C will be "put into the Chronic Care Clinic," which he defined as "a tracking system to ensure that they are seen on a regular basis." According to Dr. Noel's testimony, "[t]he vast majority of them will live in general population and just be followed by one of [the] providers on-site, along with an Infectious Control Nurse . . . ." (Noel Test., Dec. 23, 2015, at 104:16-21).

42.     According to Dr. Noel, "[i]f a patient is absolutely 100 percent asymptomatic, . . . they're seen at least once a year." (Id. at 106:1-5). Dr. Noel testified that "[o]nce they start[ ] developing advanced fibrosis or cirrhosis . . . it goes to every six months . . . . And if they're really sick, where they have decompensated cirrhosis and in end stage liver disease, they're seen every month." (Id. at 106:7-11). According to Dr. Noel, "[c]linicians can see [patients in the Chronic Care Clinic] more often, as they see fit." (Id. at 106:12-14).

43.     According to the interim protocol, "it is most important to identify patients with advanced compensated cirrhosis and early decompensated cirrhosis . . . as the highest priority for anti-viral treatment" because "patients with decompensated cirrhosis are at high

13

risk in drug therapy and their treatment options may be limited to liver transplantation."
(Pl.'s Ex. 30 at 5, ¶ 3).

44.     According to the interim protocol, "[t]he population most in need of evaluation
will be defined as those with platelet counts below 100,000/mcL and those with HALT-C
predicted likelihood of cirrhosis above 60%" and "[t]hese patients will be individually
evaluated for prioritization in ascending order of platelet count . . . ." (Pl.'s Ex. 30 at 5, ¶ 5).

45.     The interim protocol states that a patient with either a platelet count below
100,000/mcL or a HALT-C probability of cirrhosis > 60 percent will have an initial review of
his or her medical charts only at his or her home site. (Id. at 6, ¶ 6). If no medical or
administrative exclusionary indications to anti-viral treatment are found at the home site, the
correctional Health Care Administrator of the home site will forward a Hepatitis C Treatment
Referral Form to the Bureau of Health Care Services Infection Control Coordinator for
further evaluation, possible recommendations for further testing, and final determination.
(Pl.'s Ex. 30 at 6, ¶ 8).

46.     Dr. Noel testified that if inmates have "a platelet count less of a hundred
thousand or a HALT-C score of greater than 60 percent, they would be identified as
someone who needs further evaluation" and would then be referred to the Central Office's
Hepatitis C Review Committee. (Noel Test., Dec. 23, 2015, at 104:23-105:4).

47.     According to the interim protocol, the Hepatitis C Treatment Committee
consists of at least four people: Dr. Noel, as the DOC's Bureau of Health Care Services

Chief of Clinical Services; the Bureau of Health Care Services Assistant Medical Director;

the Statewide Medical Director for Correct Care Solutions; and the Bureau of Health Care

Services Infection Control Coordinator. (Pl.'s Ex. 30 at 7, ¶ 1). Dr. Noel testified that the

Committee consists of himself, as "the Chief of Clinical Services, the representative from the

medical contractor CSS, Infectious Control nurse, the Assistant Medical Director for the

DOC, and anyone [the Committee] might invite to participate in any difficult cases." (Noel

Test., Dec. 23, 2015 at 129:22-130:1).

48.     The individual's clinical status will be reviewed by the Hepatitis C Treatment

Committee for prioritization for treatment with DAA medications. (Pl.'s Ex. 30 at 7, ¶ 1).

According to Dr. Noel's testimony, the Review Committee would then "sit down and

manually go through the patient's chart with some information provided by the site, possibly,

a phone conference with the Site Medical Director" and a "determination then would be

made if there was some further testing or further evaluation that needed to be done." (Noel

Test., Dec. 23, 2015 at 105:5-11).

49.     According to the protocol, if upon review the Committee determines the

patient is a candidate for treatment with DAA medication, an esophageal gastroendoscopy

("EGD") will be approved to evaluate the patient for esophageal varices. (Pl.'s Ex. 30 at 7, ¶

2). According to Dr. Noel, under the current protocol, the Review Committee makes "a

decision of whether or not to refer and schedule a patient for . . . an EGD," and, if so

referred, the inmate would be sent off site to "have an EGD performed to determine whether

or not they have esophageal varices." (Noel Test., Dec. 23, 2015, at 105:12-17).

     50.     According to the protocol, if the endoscopy documents the presence of

esophageal varices, the patient will be approved for referral to a supervising physician – that

is, a physician licensed in Pennsylvania and experienced in the treatment of Hepatitis C

utilizing the most current medications who will treat the patient via telemedicine. (Pl.'s Ex.

30 at 7, ¶¶ 3, 5). Dr. Noel testified that "[e]sophageal varices are a direct indication of portal

hypertension and correlates with those [patients] with the most severe disease that need

treatment immediately, [and] those with esophageal varices would then be referred for

treatment." (Noel Test., Dec. 23, 2015, at 105:18-21).

     51.     According to the protocol, if the EGD results show no esophageal varices, the

case will be returned to the home site for regular follow-up in the Chronic Care Clinic with a

recommendation for repeat EGD in two to three years. (Pl.'s Ex. 30 at 7, ¶ 3).

     52.     Dr. Noel testified that "when you have esophageal varices, there's a certain

pressure in the portal hypertension, and that pressure then correlates into the severity of the

disease". (Noel Test., Dec. 23, 2015, at 112:6-8). Dr. Noel described the significance of

esophageal varices as follows:

> . . . when they have esophageal varices, they pass a certain threshold into
> advanced disease, and not only is there an indication of advanced disease,
> but those who actually have esophageal varices are at risk for the varices
> rupturing and having a severe and critical bleed, because they're [*sic*] platelet
> counts are low, so they don't clot very well, and you could have a
> catastrophe.

So if we identify those with esophageal varices, not only do we have someone who has advanced disease, the Hepatitis C, would be most appropriate for, we can also have them band the esophageal varices so they don't have a bleed and a catastrophic event.

(*Id.* at 112:10-23).

53. Dr. Noel testified that if inmates are found to "have varices, they move on to immediate treatment, and if they don't have varices, they can wait." (*Id.* at 128:25-129:2).

54. Dr. Noel agreed with the statement that "before treatment is even considered by the DOC, a person has a diagnosis of cirrhosis." (*Id.* at 129:6-8).

## Plaintiff's Medical Conditions and Health

55. Plaintiff testified that he "feel[s] better than [he] had" and that the condition of his skin had "changed for the better" between September 2015 and the evidentiary hearing in December 2015. (Abu-Jamal Test., Dec. 18, 2015, Doc. 94 at 82:11-15, 95:22).

56. Plaintiff's expert witness Dr. Joseph Harris, a board-certified internist who sees, among others, patients with hepatitis C, testified that, in his opinion, Plaintiff's skin condition is secondary to his hepatitis C and that it is "probably" a condition called necrolytic acral erythema ("NAE"). (Harris Test., Dec. 18, 2015, Doc. 94 at 105:19-106:21, 135:17-25). Dr. Harris testified that hepatitis C can also cause the skin conditions psoriasis and eczema. (*Id.* at 137:13-20).

57. Dr. Harris testified that the way to treat NAE is to "[t]reat the Hepatitis C" and that the fact that Plaintiff's skin condition has not fully resolved after extensive treatment

speaks strongly for the condition being "either [NAE] or some condition that's predicated on the Hepatitis C that's not going to get better without treatment of Hepatitis C." (*Id.* at 137:9-12, 144:21-145:12).

58.    Dr. Harris testified that, in his opinion, Plaintiff is likely to have about a Metavir score of F2 or 2.5.  (Harris Test., Dec. 22, 2015, Doc. 95 at 21:19-22:6).

59.    The DOC Defendants' expert witness Dr. Stephen Schleicher, a board-certified dermatologist, testified that, in his opinion, Plaintiff's skin condition is a cross between psoriasis and eczema.  (Schleicher Test., Dec. 22, 2015, Doc. 95 at 59:18-19, 70:4-13).

60.    When asked if he would be surprised to learn that the CDC recommends treatment with antiviral medication to everyone with an active chronic hepatitis C infection, Dr. Schleicher testified as follows:

> A: I can't say I'm either surprised or not surprised. It's not my field, and I don't know what the current thinking is and what defines an active infection. You know, unfortunately, it's beyond my expertise.
>
> Q: Basically, you don't know much about Hepatitis C is what you're saying?
>
> A: Hepatitis C, as far as treatment goes, no, I can say, being a dermatologist, no, that's true.

(*Id*. at 112:4-14).

61.    Dr. Cowan and Dr. Noel agree that Plaintiff has chronic Hepatitis C.  (Cowan Test., Dec. 22, 2015 at 218:24-219:1; Noel Test., Dec. 23, 2015 at 123:14-16).

62.     Dr. Noel testified that the Hepatitis C Treatment Committee made the decision not to give Plaintiff the direct-acting antiviral medication he has requested. (Noel Test., Dec. 23, 2015 at 129:14-18).

63.     Dr. Noel testified that the Hepatitis C Treatment Committee has the ultimate authority to decide whether Plaintiff receives DAA medication. (Id. at 129:18-21).

64.     Upon review of Plaintiff's case, the Hepatitis C Committee determined that Plaintiff "did not have cirrhosis or vast fibrosis and, therefore, he was excluded from current treatment, based on his liver condition." (Id. at 120:23-7). Dr. Noel testified that Plaintiff will be reviewed again in the future. (Id. at 121:8-11).

65.     If Plaintiff were given DAA treatment, Dr. Noel testified that Plaintiff would be "jumping line, whoever is lower down will have to wait longer." (Id. at 122:14-19).

66.     When asked if there is any medical reason why Plaintiff should not be administered direct-acting antiviral medication, Dr. Noel testified as follows:

> [o]ff the top of my head, I can think of no medical contraindications at this time. The only caveat I would say is if someone were to get treatment, we always present them to a gastroenterologist for final decision on that. But, no, I have no medical exclusions.

(Id. at 154:8-15).

67.     Dr. Cowan agreed that if Plaintiff is treated with DAA medication, it is almost certain, although not absolutely certain, that he would avoid further progression of his hepatitis C disease. (Cowan Test., Dec. 23, 2015 at 23:10-13).

19

68. Dr. Noel agreed that Plaintiff has a Metavir score of F2, which means that his liver is scarred. (Noel Test., Dec. 23, 2015 at 123:17-20). Dr. Noel also testified that Plaintiff has "some liver disease." (Noel Test., Dec. 23, 2015 at 147:3-8).

## III. CONCLUSIONS OF LAW

1. Plaintiff has chronic hepatitis C.

2. The standard of care with respect to the treatment of chronic Hepatitis C is the administration of newly-developed DAA medications, such as Harvoni, Sovaldi, and Viekira Pak.

3. DOC's treatment protocol as currently adopted and implemented fails to provide treatment for hepatitis C through the administration of DAA medications such as Harvoni, Sovaldi, and Viekira Pak until an inmate, including Plaintiff, has progressed to the stage of advanced compensated cirrhosis or early decompensated cirrhosis manifested by esophageal varices. As such, the interim Hepatitis C Treatment Protocol presents a conscious disregard of a known risk of advanced cirrhosis and death by esophageal hemorrhage.

4. The interim protocol deliberately delays treatment for hepatitis C through the administration of the DAA drugs such as Harvoni, Sovaldi, and Viekira Pak despite the knowledge of representatives of the Hepatitis C Treatment Committee that: 1) the aforesaid DAA medications will effect a cure of Hepatitis C in 90 to 95 percent of the cases of that disease; and 2) that the substantial delay in treatment that is

inherent in the interim protocol is likely to reduce the efficacy of these medications and thereby prolong the suffering of those who have been diagnosed with chronic hepatitis C and allow the progression of the disease to accelerate so that it presents a greater threat of cirrhosis, hepatocellular carcinoma, and death of the inmate with such disease.

5.  The protocol as currently adopted and implemented presents deliberate indifference to the known risks which follow from untreated chronic hepatitis C.

6.  The named Defendants in this case – Defendants Kerestes, Oppman, Steinhart, Lisiak, Khanum, and Saxon – are not the appropriate defendants against whom to bring an Eighth Amendment claim challenging the DOC's interim protocol.

7.  It was the Hepatitis C Treatment Committee who made the decision not to give Plaintiff DAA medications and that had, and continues to have, the ultimate authority to determine whether or not Plaintiff will receive the DAA medications that offer him at least a 90 to 95 percent chance of attaining SVR – that is, of being cured of hepatitis C.

8.  The Hepatitis C Treatment Committee consists of at least four people: Dr. Noel, as the DOC's Bureau of Health Care Chief of Clinical Services, a representative from the medical contractor/vendor (most likely the Statewide Medical Director for Correct Care Solutions), the Bureau of Health Care Services Infectious Control nurse/Infection Control Coordinator, and the Bureau of Health Care's Assistant

Medical Director, as well as additional persons invited to participate on an *ad hoc* basis.

9. The named Defendants are not members of the Hepatitis C Treatment Review Committee.

10. The Plaintiff has not yet established a connection between Defendants Kerestes, Oppman, Steinhart, Lisiak, Khanum, and Saxon, and the protocol that is at the heart of this case.

11. The Court cannot properly issue an injunction against the named Defendants, as the record contains no evidence that they have authority to alter the interim protocol or its application to Plaintiff.

12. Issuing a mandatory injunction against these defendants would be a nullity: they are incapable of implementing the relief that any injunction would necessarily require.

13. As to other DOC officials or CCS employees who may be proper defendants in this case but were not sued, the Court cannot issue an injunction against them on the basis of the case presently before it.

14. It is a principle of general application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.

## IV. STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. In ruling on a motion for a preliminary injunction, the Court must consider: "'(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'"[1] *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)). Although the moving party bears the burden to show its entitlement to the requested relief, "each factor need not be established beyond doubt." *Stilp v. Contino*, 629 F. Supp. 2d 449, 457 (M.D. Pa. 2009), *aff'd and remanded*, 613 F.3d 405 (3d Cir. 2010).

"[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995)). Furthermore, federal law specifies that in civil actions challenging prison conditions, to the extent preliminary injunctive relief is granted, it "must be narrowly drawn, extend no further than necessary to

---

[1] The Third Circuit has also characterized the first factor as whether the moving party has demonstrated "a reasonable probability of success on the merits." *McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 526 (3d Cir. 2009) (internal citation and quotation marks omitted).

correct the harm the court finds requires preliminary relief, and be the least intrusive means

necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Additionally, "[t]he court shall give

substantial weight to any adverse impact on public safety or the operation of a criminal

justice system caused by the preliminary relief . . . ." *Id.*

## V. ANALYSIS

At the outset, it is necessary to cut through the portions of the three-day hearing on

the instant Motion and the arguments made in the parties' briefs which do not advance the

resolution of this case. The Court recognizes that Plaintiff devoted testimony and argument

to showing that Plaintiff had conditions caused by chronic Hepatitis C, namely diabetes,

anemia, and a skin condition ranging from pruritus to NAE. (*See, e.g.*, Post-Hearing Br. in

Supp. of Pl.'s Mot. for Prelim. Inj., Doc. 112 at 22-29). The Court also recognizes that the

DOC Defendants presented testimony and devoted argument to showing that Plaintiff's

cracked, suppurating skin condition was instead unrelated to Hepatitis C, that the elevated

blood sugar readings were not evidence of a diabetic condition caused by Hepatitis C, and

that his anemia was caused by the administration of cyclosporine for his skin condition.

(*See, e.g.*, Cowan Test., Dec. 22, 2015 at 217:6-218:19). However, reviewing all testimony

and arguments offered by Counsel for the parties, the Court is of the view that the true, real

issue in this case is whether Plaintiff is entitled to curative, DAA treatment for what all

24

parties concede is his chronic Hepatitis C.[2]  As such, our analysis will focus on whether he

has established all of the prerequisites for the issuance of preliminary injunctive relief of a

mandatory nature which would accord medical treatment consisting of the administration of

such curative DAA drugs as Harvoni or Sovaldi.

\* \* \* \* \*

Plaintiff does not have a reasonable chance of success on the merits against any of

the named Defendants.  The central question in this litigation is whether the DOC's interim

Hepatitis C protocol constitutes deliberate indifference to the serious medical needs of

individuals with the disease; as such, a mandatory injunction favorable to Plaintiff would

necessarily require that the individuals enjoined be able to exercise control over the

contents or application of the protocol.  Resolution of Plaintiff's Motion thus requires

analysis of the threshold topics of Eleventh Amendment immunity and the "extraordinary

remedy," *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014), of

injunctive relief.

The Eleventh Amendment bars suits in federal court against states and state

agencies.  *See Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261 (1997).  "[A] suit

---

[2] As will be discussed *infra*, the DOC's interim protocol for the administration of DAA hepatitis C medications in fact precludes all but the sickest of individuals from receiving treatment.  Thus, even if the Court were to find that Plaintiff's presentation of the facts as to his medical conditions and their interrelationships were true, it is the Court's view that the interim protocol would not allow for treatment of Plaintiff with these medications.  Because effective relief could only come through the process detailed by the interim protocol and because that process, by its own terms and the testimony of Dr. Noel, limits treatment to inmates with esophageal varices, which there is no indication or claim that Plaintiff has, it is the interim protocol and whether it constitutes deliberate indifference to the serious medical needs of individuals with hepatitis C that is the heart of Plaintiff's Eighth Amendment claim, not Plaintiff's personal medical condition.

against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *McCauley v. Univ. of the Virgin Islands,* 618 F.3d 232, 241 (3d Cir. 2010) (citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989)) (internal citations and quotation marks omitted). However, there is an exception to Eleventh Amendment immunity for state officials when they are sued for prospective injunctive relief to remedy ongoing violations of federal law. *See Ex parte Young,* 209 U.S. 123 (1908); *see also Koslow v. Commonwealth of Pennsylvania,* 302 F.3d 161, 178 (3d Cir. 2002) (The Eleventh Amendment "has not been interpreted to bar a plaintiff's ability to seek prospective relief against state officials for violations of federal law."). Before applying the *Ex parte Young* doctrine, a court must be sure the matter before it is one of federal, rather than state, law. *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess,* 297 F.3d 310, 325 (3d Cir. 2002) ("[T]he appropriate inquiry for *Ex parte Young* purposes is whether a court is being asked to enforce state law or federal law as against an individual state officer.").

Perhaps recognizing the influence that the Eleventh Amendment and its doctrine have on suits such as the one at bar, the Plaintiff has rightly chosen to sue individual DOC officers in their official capacity rather than an entity that indisputably enjoys sovereign immunity, such as the Commonwealth of Pennsylvania. Furthermore, Plaintiff's Amended Complaint (Doc. 57) and Motion for Preliminary Injunction (Doc. 23) clearly complain of and seek prospective injunctive relief for violations of federal law. However, while the Plaintiff

has attempted to sue the individuals whom – the Court assumes – he thought were

responsible for the federal law violations alleged rather than the State itself, the record at

this early stage of litigation has not borne these allegations out. Returning to *Ex parte*

*Young*, a century of case law makes clear that

> [i]n making an officer of the state a party defendant in a suit to enjoin the
> enforcement of an act alleged to be unconstitutional, it is plain that such
> officer must have some connection with the enforcement of the act, or else it
> is merely making him a party as a representative of the state, and thereby
> attempting to make the state a party.

*Ex parte Young*, 209 U.S. 123, 157 (1908). From the record thus far developed, it appears

to the Court that Defendants Kerestes, Oppman, and Steinhart will be entitled to sovereign

immunity and, thus, there is no likelihood of success on the merits of Plaintiff's claims as to

these Defendants such that a preliminary injunction could properly issue. Dr. Paul Noel,

DOC's Chief of Clinical Services and a member of the Hepatitis C Treatment Committee,

(Findings of Fact, *supra*, at ¶¶ 25, 47), testified as follows:

Q. And he's requested that he be offered that medication, has he not?

A. He has.

Q. And who made the decision not to give it to him?

A. The Hepatitis C Treatment Committee.

Q. Do they have the ultimate authority to decide whether he gets the medication?

A. Yes.

(Noel Test., Dec. 23, 2015 at 129:14-21). It was the Hepatitis C Treatment Committee who made the decision not to give Plaintiff direct-acting antivirals and that had, and continues to have, the ultimate authority to determine whether or not Plaintiff will receive the direct-acting antivirals that offer him at least a 90 to 95 percent chance of attaining SVR – that is, of being cured of Hepatitis C. (Id.). Dr. Noel testified that the Committee consists of at least four people: himself, as "the Chief of Clinical Services, the representative from the medical contractor, C[orrect] C[are] S[olutions], Infectious Control nurse, the Assistant Medical Director for the DOC, and anyone we have might [sic] invite to participate in any difficult cases." (Findings of Fact, supra, at ¶ 47). Additionally, the interim protocol itself describes the Hepatitis C Treatment Committee as consisting of the "BHCS Chief of Clinical Services, the BHCS Assistant Medical Director, the Statewide Medical Director for the medical vendor, and the BHCS I[nfection] C[ontrol] C[oordinator]." (Id.; Pl.'s Ex. 30 at 7). Though Dr. Noel did not provide the names of the other members of the Committee, the titles provided strongly suggest that they are not John Kerestes, who is the Superintendent of SCI-Mahanoy, John Steinhart, who is the Chief Health Care Administrator at SCI-Mahanoy, or Christopher Oppman, who Plaintiff identified as the Director of the Bureau of Health Care Services at DOC, (see Am. Compl., Doc. 57), but who has been employed by DOC in a different capacity since April 2015, before the lawsuit was initiated.[3] Thus, to sue

---

[3] The Court takes judicial notice of the fact that Christopher Oppman was named Acting Deputy Secretary for Administration in April 2015 and named Deputy Secretary for Administration in or about July 2016. Press Release, Pa. Dep't of Corr., Christopher Oppman Named Department of Corrections Deputy Secretary for Administration (July 5, 2016) (http://www.cor.pa.gov/About%20Us/Newsroom/Documents/

Defendants Kerestes, Steinhart, and Oppman, for whom the Plaintiff has not yet established a connection to the protocol that is at the heart of this case, is to make these parties merely representatives of the Commonwealth. Sovereign immunity cannot be so circumvented.

Additionally and alternatively, Plaintiff lacks a reasonable likelihood of success on the merits because the Court cannot properly issue an injunction against the named Defendants. As the record contains no evidence that they have authority to alter the interim protocol or its application to Plaintiff, issuing a mandatory injunction against them would be a nullity: they are incapable of implementing the relief that any injunction would necessarily require. As to other DOC officials or Correct Care Solutions employees who may be proper defendants in this case but were not sued, the Court cannot issue an injunction against them on the basis of the case presently before it. "'It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). Indeed, Rule 65(d)(2) provides that a preliminary injunction order

> binds only the following who receive actual notice of it by personal service or otherwise:
>
> (A) the parties;

---

2016%20Press%20Releases/Christopher%20Oppman%20Named%20Department%20of%20Corrections%20Deputy%20Secretary%20for%20Administration.doc).

(B) the parties' officers, agents, servants, employees, and attorneys; and

(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Fed. R. Civ. P. 65(d)(2)(A)-(C). While "[i]t is generally accepted that an injunction may be

enforced against a nonparty in 'privity' with an enjoined party," *Nat'l Spiritual Assembly of*

*Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of*

*U.S., Inc.*, 628 F.3d 837, 849 (7th Cir. 2010) (collecting cases), there are no parties that can

be properly enjoined in the instant litigation such that the Court need not reach the issue of

which DOC officials or Correct Care Employees may be in privity with the named parties.

> [N]o court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court. Thus, the only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party.

*Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (Hand, J.). *See also Nat'l*

*Spiritual Assembly of Baha'is*, 628 F.3d at 847-54 for an overview of Supreme Court and

circuit case law on enforcing injunctions against nonparties and extensive discussion of

enforcement against nonparties "legally identified" with an enjoined party.

Against this backdrop of legal principles and on the record now before the Court,

Plaintiff does not have a reasonable likelihood of success on the merits as to the current

DOC Defendants Kerestes, Steinhart, and Oppman. Similarly, there is no record evidence

to suggest that the Medical Defendants Lisiak, Khanum, and Saxon, as employees of CCS,

have any authority over the Hepatitis C Treatment Review Committee, the development,

adoption, or implementation of the interim Hepatitis C protocol, or the protocol's application

to Plaintiff. In the current posture of this case, there is no reasonable likelihood of success

on the merits and Plaintiff's Motion for Preliminary Injunction (Doc. 23) will be denied.

\* \* \* \* \*

However, were the proper defendants named, the Court believes there is a sufficient

basis in the record to find that DOC's current protocol may well constitute deliberate

indifference in that, by its own terms, it delays treatment until an inmate's liver is sufficiently

cirrhotic that a gastroenterologist determines, at the end of a lengthy, multi-step evaluation

procedure taking place over a long period of time, that that inmate has esophageal varices.

In the words of Dr. Noel, DOC's Chief of Clinical Services, the presence of these

esophageal varices signifies that inmates have "pass[ed] . . . into advanced disease, and . .

. are at risk for the varices rupturing and having a severe and critical bleed, because they're

[sic] platelet counts are low, so they don't clot very well, and you could have a catastrophe."

(Findings of Fact, supra, ¶ 52; Noel Test., Dec. 23, 2015, at 112:10-23). In the Court's view,

the effect of the protocol is to delay administration of DAA medications until the inmate

faces the imminent prospect of "catastrophic" rupture and bleeding out of the esophageal

vessels. Additionally, by denying treatment until inmates have "advanced disease" as

marked by esophageal varices, the interim protocol prolongs the suffering of those who have been diagnosed with chronic Hepatitis C and allows the progression of the disease to accelerate so that it presents a greater threat of cirrhosis, hepatocellular carcinoma, and death of the inmate with such disease.

The protocol put forth by the Hepatitis C Treatment Review Committee exposes inmates in the care of DOC to these risks, despite knowing that the standard of care is to treat patients with chronic Hepatitis C with DAA medications such as Harvoni or Sovaldi, regardless of the stage of disease. The DOC Defendants' own expert, Dr. Jay Cowan, acknowledges that the standard of care is to treat every patient for whom treatment with direct-acting antiviral medications is not medically contraindicated, regardless of disease progression or status as an incarcerated person. (See Findings of Fact, supra, at ¶¶ 18-21). The interim protocol does not do that; instead it opts for a desultory monitoring[4] of patients who are afflicted with chronic hepatitis C, with active treatment, as indicated above, being delayed until the disease has progressed to the point that scarring of the liver has turned to cirrhosis and liver malfunction. Given that the DOC Defendants' expert Dr. Cowan acknowledges that "[v]ery often, you can't predict the rate of progression" of the disease, (Findings of Fact, supra, ¶ 9; Cowan Test., Dec. 22, 2015 at 208:15-20), this monitoring

---

[4] By Order of the Court (Doc. 125), the DOC Defendants supplemented the preliminary injunction record with medical records created after the December 2015 hearing; these records show that Plaintiff was seen for the "Hepatitis C Clinic" on or about April 4, 2016 and that his provider indicated that his next clinic should be "in 12 months." (Pl.'s Medical Records, Doc. 133 at 82). The Court is of the view that increased monitoring of Plaintiff is necessary to safeguard his health and leaves it to Plaintiff's Counsel to place this case in posture where the appropriate defendants are sued and such monitoring can be sought.

approach leaves inmates vulnerable to a "substantial risk of deteriorating health and death."
*B.E. v. Teeter*, No. C16-227-JCC, 2016 WL 3033500, at \*5 (W.D. Wash. May 27, 2016).

Indeed, an episode of such risk brought to bear is already documented in the federal
courts. In *B.E. v. Teeter*, a group of Washington State Medicaid enrollees with chronic
hepatitis C brought suit against the Washington State Health Care Authority ("WHCA"),
alleging that the WHCA's Hepatitis C treatment policy "categorically excludes 'all
monoinfected patients . . . who have a fibrosis score of F0 through F2'" from treatment with
the latest DAA medications. *Teeter*, 2016 WL 3033500 at \*1. While the legal context of the
*Teeter* case is different, arising under the federal Medicaid Act rather than the Eighth
Amendment, *id*. at \*2, the District Court for the Western District of Washington's analysis of
the risks to human health posed by chronic hepatitis C is applicable here, particularly where
the record evidence shows that the standard of care for individuals with chronic Hepatitis C
is no different within the prison walls than in the community. In finding that the "[p]laintiffs
have introduced compelling evidence that they will suffer irreparable harm if the preliminary
injunction is denied" and that the irreparable harm "factor weighs strongly in favor of a
preliminary injunction," *Teeter*, 2016 WL 3033500 at \*6, the district court noted the case of
L.B., a Washington Medicaid enrollee who was prescribed Sovaldi and later Harvoni, but
who was denied both medications by Washington State Health Care Authority ("WHCA").
L.B.'s "kidneys [then] deteriorated so significantly that his provider could no longer
recommend Harvoni," *id*., leading the district court to conclude that L.B. "suffered irreparable

damage to his liver because the WHCA's [treatment] policy required proof of other concerning health factors with an F2 fibrosis score" in order to be approved for treatment. *Id.* at *6 fn.1. The *Teeter* district court granted the Medicaid enrollee plaintiffs' motion for preliminary injunction, requiring the WHCA "to return to providing coverage for prescription medications to treat Hepatitis C virus ("HCV") without regard to fibrosis score." *Teeter*, 2016 WL 3033500 at *6.

"[O]utright refusal of any treatment for a degenerative condition that tends to cause acute infection and pain if left untreated and (2) imposition of a seriously unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials." *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000). In the wake of the advent of curative Hepatitis C medications, Defendants have charted a course that denies treatment to inmates until they are on the verge of a "catastrophic" health event, a decision that appears to contain a "fiscal component," (Findings of Fact, *supra*, ¶ 24; Cowan Test., Dec. 23, 2015 at 82:18-25), and ignores the standard of care for the treatment of chronic hepatitis C. It is regrettable for the Plaintiff and for the system of healthcare that is at issue that the posture of this case does not allow for a full exploration of the serious legal questions posed by the DOC's interim Hepatitis C Treatment Protocol. These are questions deserving of treatment and resolution at the level of the circuit courts or above, and, despite the substantial amount of judicial resources that have been devoted to this case thus far,

Plaintiff's presentation of his case has done little to facilitate the ultimate resolution of the core issues challenging both inmates and corrections officials across the country.

## VI. CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's Motion for Preliminary Injunction (Doc. 23). A separate Order follows.

Robert D. Mariani
United States District Judge