## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MUMIA ABU-JAMAL,** | : |
| | : |
| **Plaintiff,** | : |
| **v.** | : **3:15-CV-967** |
| | : **(JUDGE MARIANI)** |
| **JOHN KERESTES, et al.,** | : |
| | : |
| **Defendants.** | : |

### MEMORANDUM OPINION

#### I. INTRODUCTION

The above captioned matter is a consolidation of two civil rights actions filed by a

Pennsylvania state prisoner, Mumia Abu-Jamal, arising out of the same set of facts.

Presently before the Court are two Motions to Dismiss, one filed by Defendants Correct

Care Solutions, LLC, Dr. Jay Cowan, Dr. John Lisiak, Dr. Shaista Khanum, and Physician's

Assistant Scott Saxon (collectively the "Medical Defendants"), (Doc. 248),[1] and one filed by

Defendants John Kerestes, the Pennsylvania Department of Corrections, Theresa DelBalso,

Joseph Silva, John Wetzel, Dr. Paul Noel, Christopher Oppman, John Steinhart, Bureau of

Health Care Services Assistant Medical Director, and Bureau of Health Care Service

Infection Control Coordinator (collectively the "Corrections Defendants"), (Doc. 251). For

the reasons that follow, the Court will deny the Medical Defendants' Motion to Dismiss, and

grant in part and deny in part the Corrections Defendants' Motion to Dismiss.

---

[1] Unless noted otherwise, all citations to the record refer to case number 3:15-CV-967, which, as
discussed below, is a consolidation of case number 3:15-CV-967 and case number 3:16-CV-2000.

## II. PROCEDURAL HISTORY

Although only at the pleadings stage, this matter already has a long and somewhat complicated procedural history. Indeed, although the case was initiated almost three years ago, it appears that the parties have been unwilling to put this matter in the proper posture for resolution. Instead, counsel for Plaintiff and Defendants have all engaged in a variety of tactics aimed at slowing or even altogether stopping the orderly progress of this case. Moving forward, the Court expects that the parties will set aside the gamesmanship that has thus far defined this litigation and proceed with an eye towards timely resolving the questions presented in this case. With that, the Court will begin with a somewhat lengthy recitation of the procedural history so that the present motions may be understood in their proper context.

Plaintiff, Mumia Abu-Jamal, along with Plaintiffs Brett Grote and Robert Boyle, also Mr. Abu-Jamal's attorneys of record in this matter, initially filed a Complaint in case number 3:15-CV-967 ("*Abu-Jamal 1*") on May 18, 2015, claiming violations of their right to association and access to the courts. (Doc. 1 at 10). Plaintiffs alleged that Defendant Kerestes, the then-current superintendent at the State Correctional Institution at Mahanoy ("SCI- Mahanoy"), and Geisinger Medical Center "barred the plaintiff attorneys from visiting with Mr. Abu-Jamal" while Plaintiff was hospitalized at Geisinger Medical Center and further "prohibited all communication between Mr. Abu-Jamal and anyone," with the exception of a short phone call between him and his wife. (*Id.* at ¶ 6). Subsequently, Plaintiffs Boyle and

Grote each filed a notice of voluntary dismissal, (Docs. 17, 18), leaving Mr. Abu-Jamal ("Plaintiff") as the only remaining plaintiff.

On August 3, 2015, Plaintiff filed a Motion for Leave to File a "First Amended and Supplemental Complaint." (Doc. 21). The proposed amendment retained Plaintiff's right to association and access to the courts claims and sought to add several Eighth Amendment claims and state law medical negligence claims related to the medical treatment, or lack thereof, Plaintiff received in connection with his hepatitis C, hyperglycemia, and skin condition. (Doc. 21-2). The proposed amendment also sought to add as Defendants the then-current Director of the Bureau of Health Care Services at the Department of Corrections, Christopher Oppman, and the Chief Health Care Administrator at the Department of Corrections, John Steinheart, along with three of SCI-Mahanoy's medical staff, Dr. John Lisiak, Dr. Shaista Khanum, and Physician's Assistant Scott Saxon. (*Id.*). On November 24, 2015, after Magistrate Judge Mehalchick granted Plaintiff's Motion to Amend, Plaintiff's First Amended and Supplemental Complaint ("Amended Complaint") became the operative complaint. (Doc. 57).

On August 23, 2015, Plaintiff filed a Motion for a Preliminary Injunction seeking to require Defendants to

1) immediately treat plaintiff's active hepatitis C infection with the latest direct acting anti-viral drugs; 2) immediately treat his skin condition, a manifestation of the hepatitis C, with zinc supplementation and Protopic cream; and 3) permit Mr. Abu Jamal to have an in-person examination by an independent physician of his own choosing under conditions that are appropriate for such examinations.

3

(Doc. 23 at 1). Less than a month later, Magistrate Judge Mehalchick issued a Report and Recommendation ("R&R") which recommended denying Plaintiff's Motion for a Preliminary Injunction. (Doc. 39). Thereafter, Plaintiff filed objections to the R&R, arguing that this Court should either grant Plaintiff's Motion or hold an evidentiary hearing on the issue. (Doc. 42). In December of 2015, a three day evidentiary hearing was held for the purpose of receiving the evidence necessary to resolve the Motion. (Docs. 94, 95, 96).

While Plaintiff's Motion and objections remained pending, four motions to dismiss were filed, one by Defendant Geisinger, one by Defendant Kerestes, one by Defendants Oppman and Steinhart, and one by Defendants Khanum, Lisiak, and Saxton. (Docs. 63, 81, 108, 110). On June 22, 2016, the Court denied Defendants Khanum, Lisiak, and Saxton's Motion to Dismiss, finding that the only basis raised in the motion—that Plaintiff failed to exhaust his administrative remedies with respect to his hepatitis C claim—was without merit. (Docs. 157, 158). Next, on August 5, 2016, the Court granted in part and denied in part both Defendant Kerestes's Motion to Dismiss and Defendants Oppman and Steinhart's Motion to Dismiss. (Docs. 168, 169, 170, 171).[2] The Court also granted Defendant Geisinger's Motion to Dismiss in its entirety. (Docs. 172, 173).

With respect to Defendant Kerestes's Motion to Dismiss, the Court dismissed, with prejudice, (1) Plaintiff's claim for money damages against Defendant Kerestes in his official capacity, (2) Plaintiff's access to the courts claim against Defendant Kerestes, and (3)

---

[2] The Court later amended its Order concerning Defendant Kerestes to clarify the Order's meaning. (Doc. 183).

4

Plaintiff's medical negligence claims against Defendant Kerestes. (Docs. 168, 169). The Court also dismissed, but without prejudice, Plaintiff's Eighth Amendment claims because Plaintiff failed to sufficiently plead Defendant Kerestes's personal involvement as required in an action under 42 U.S.C. § 1983. Nevertheless, the Court held that Plaintiff had adequately pleaded his freedom of association claim, including Defendant Kerestes's personal involvement. Finally, the Court found that Defendant Kerestes failed to carry his burden to show that the permanent injunction Plaintiff sought in connection with his freedom of association claim was moot because such claim, at the pleading stage, met the "capable of repetition, yet evading review" test.

With respect to Defendants Oppman and Steinhart's Motion to Dismiss, the Court dismissed, with prejudice, Plaintiff's claim for money damages against them in their official capacities. (Docs. 170, 171). The Court also dismissed, without prejudice, Plaintiff's Eighth Amendment claims because Plaintiff failed to sufficiently plead Defendant Oppman's or Defendant Steinhart's personal involvement as required in an action under section 1983. In all other respects, the Court denied Defendants Oppman and Steinhart's Motion.

Finally, the Court granted Defendant Geisinger's Motion to Dismiss in its entirety, finding that Plaintiff's access to the courts claim against Defendant Geisinger failed as a matter of law and that Plaintiff's freedom of association claim against Defendant Geisinger was moot because Plaintiff was no longer in Defendant Geisinger's care. (Docs. 172, 173).

As those were the only claims against it, Defendant Geisinger was dismissed from this action.

In granting Plaintiff leave to amend his Eighth Amendment claims against Defendants Kerestes, Oppman, and Steinhart, the Court made clear "that the Court expects any such amendment to contain specific allegations of fact, stated in the active voice and delineating the specific actions or omissions by [Defendant Kerestes,] Defendant Steinhart[,] or Defendant Oppman, if any, which establish personal involvement or knowledge and acquiescence in the constitutional violations alleged by Plaintiff." (Docs. 169, 171). On August 16, 2016, in accordance with this Court's Orders, Plaintiff filed their Second Amended Complaint. (Doc. 178). The next day, Plaintiff filed a motion seeking to amend his Complaint once again. (Doc. 179).

While Plaintiff's Motion to Amend was pending, the Court denied Plaintiff's Motion for a Preliminary Injunction. (Docs. 191, 192). In an Opinion issued on August 31, 2016, this Court found that the Department of Corrections had "an interim protocol to address patients with hepatitis C" and that, under that protocol, a "Hepatitis C Treatment Committee has the ultimate authority to decide whether" an inmate is treated with direct-acting antiviral ("DAA") medications. (Doc. 191 at 11, 19). This Court then concluded that "[t]he protocol as currently adopted and implemented presents deliberate indifference to the known risks which follow from untreated chronic hepatitis C." (Id. at 21). This Court, however, did not issue a preliminary injunction because "[i]t was the Hepatitis C Treatment Committee who

6

made the decision not to give Plaintiff DAA medications and that had, and continues to have, the ultimate authority to determine whether or not Plaintiff will receive the DAA medications," and "[t]he named Defendants [were] not members of the Hepatitis C Treatment Review Committee." (*Id.* at 21-22). Thus, this Court held that it could not "properly issue an injunction against the named Defendants, as the record contain[ed] no evidence that they ha[d] authority to alter the interim protocol or its application to Plaintiff." (*Id.* at 22). In doing so, however, the Court advised that "were the proper defendants named, the Court believes there is a sufficient basis in the record to find that [the Department of Corrections'] current protocol may well constitute deliberate indifference." (*Id.* at 31).

On September 30, 2016, Plaintiff filed a separate action under case number 3:16-CV-2000 ("*Abu-Jamal 2*"). The Complaint in *Abu-Jamal 2* contained a single count titled "Deprivation of Eighth Amendment Right to Medical Care for Hepatitis C" and named the following as defendants: John Wetzel, Secretary of the Pennsylvania Department of Corrections; Dr. Paul Noel, Department of Corrections Bureau of Health Care Services Chief of Clinical Services, member of Hepatitis C Treatment Committee; Bureau of Health Care Services Assistant Medical Director, member of Hepatitis C Treatment Committee; Bureau of Health Care Services Infection Control Coordinator, member of Hepatitis C Treatment Committee; Correct Care Solutions representative on the Hepatitis C Treatment Committee; Correct Care Solutions; Joseph Silva, Department of Corrections Director of

7

Bureau of Health Care Services; and Treating Physician, SCI-Mahanoy. (3:16-CV-2000,

Doc. 1). On October 5, 2016, Plaintiff filed a Motion for a Preliminary Injunction in *Abu-*

*Jamal 2* which sought the same relief this Court had denied in *Abu-Jamal 1.* (3:16-CV-

2000, Doc. 7). During a conference call held on December 1, 2016, all parties agreed that a

new evidentiary hearing was not necessary and that this Court could decide Plaintiff's

Motion on the basis of the evidence presented in *Abu-Jamal 1.*

In an Opinion issued on January 3, 2017, this Court found that, despite the fact that

the Department of Corrections replaced the interim protocol that was analyzed in *Abu-Jamal*

*1* with a new protocol, "the new protocol completely bars those with chronic hepatitis C but

without vast fibrosis or cirrhosis from receiving DAA medications." (3:16-CV-2000, Doc. 23

at 32). More specifically, the Court concluded that

[t]he Hepatitis C Protocol deliberately delays treatment for hepatitis C through
the administration of DAA drugs such as Harvoni, Sovaldi, and Viekira Pak
despite the knowledge of Defendants that sit on the Hepatitis C Treatment
Committee: (1) that the aforesaid DAA medications will effect a cure of
Hepatitis C in 90 to 95 percent of the cases of that disease; and (2) that the
substantial delay in treatment that is inherent in the current protocol is likely to
reduce the efficacy of these medications and thereby prolong the suffering of
those who have been diagnosed with chronic hepatitis C and allow the
progression of the disease to accelerate so that it presents a greater threat of
cirrhosis, hepatocellular carcinoma, and death of the inmate with such
disease.

. . .

. . . In choosing a course of monitoring over treatment, [Defendants]
consciously disregarded the known risks of Plaintiff's serious medical needs,
namely continued liver scarring, disease progression, and other hepatitis C
complications.

8

(Id. at 20-21). As such, the Court held that Plaintiff had a reasonable likelihood of success on the merits of his claim. (Id. at 27-41). After determining that the other preliminary injunction factors weighed in Plaintiff's favor, the Court granted Plaintiff's Motion. (Id. at 42-43). The Court thereafter enjoined Defendants from enforcing the Hepatitis C Protocol as it pertained to Plaintiff and directed Defendants to administer DAA medications to Plaintiff unless such medications were found to be contraindicated by a medical professional. (3:16-CV-2000, Doc. 24).

In response, Defendants filed Motions for Reconsideration, Motions to Stay, and Notices of Appeal. (3:16-CV-2000, Docs. 29, 30, 31, 36, 37, 49). On February 7, 2017, Plaintiff filed a Motion for Contempt, arguing that Defendants' continued failure to administer DAA medications to Plaintiff was unjustified and in violation of the Court's Order because this Court had not yet ruled on any of the pending Motions to Stay. (3:16-CV-2000, Doc. 53).

While those matters were unfolding in Abu-Jamal 2, the Court granted Plaintiff's Motion to Amend his Complaint in Abu-Jamal 1. (Docs. 206, 207). Plaintiff's Third Amended Complaint, filed on January 17, 2017, added John Wetzel, the Department of Corrections, and Dr. Paul Noel as Defendants and substituted the current Superintendent of SCI-Mahanoy, Theresa DelBalso, for Kerestes in Plaintiff's claims seeking injunctive relief. (Doc. 210).

Meanwhile, on March 31, 2017, Defendants in *Abu-Jamal 2* informed the Court that "[f]ollowing recent medical testing and a review of the results thereof, Plaintiff will be treated with the Federal Drug Administration (FDA) approved Hepatitis C directing-acting [sic] antiviral medication in accordance with the Hepatitis C protocol of the Department of Corrections." (3:16-CV-2000, Doc. 59). On April 4, 2017, Plaintiff's counsel informed the Court that Plaintiff had undergone a "sonogram and a hepatic elastography" and that the test results revealed that his condition had "deteriorated to 'severe grade 4 liver cirrhosis.'" (3:16-CV-2000, Doc. 61 at 2).

The Court held a status conference with counsel for the parties on April 5, 2017. Counsel for the Corrections Defendants confirmed to the Court that Plaintiff would be administered the direct-acting antiviral agent Harvoni beginning Thursday, April 6, 2017, and that such treatment would continue for a period of twelve consecutive weeks. Further, counsel for the Corrections Defendants and counsel for Correct Care Solutions also represented that Plaintiff would be tested to confirm the efficaciousness of the treatment, and that the test would be administered twelve weeks after the completion of his Harvoni regiment. As a result of the above, the Court dismissed Defendants Motions to Stay and Motions for Reconsideration as moot. (3:16-CV-2000, Doc. 63). Plaintiff's Motion for Contempt was held in abeyance pending confirmation of completion of Plaintiff's treatment. (*Id.*).

On April 18, 2017, the Court held a conference with the parties to determine if *Abu-Jamal 1* and *Abu-Jamal 2* should be consolidated. The parties agreed that the two matters should be consolidated and thereafter filed a Joint Motion for Consolidation. (Doc. 223; 3:16-CV-2000, Doc. 71). On May 4, 2017, the Court issued an Order consolidating *Abu-Jamal 1* and *Abu-Jamal 2*. (Doc. 224; 3:16-CV-2000, Doc. 72).

On July 18, 2017, Plaintiff moved to join Dr. Jay Cowan as a Defendant. (Doc. 239). After Defendants acknowledged that Plaintiff's Motion was legally sufficient and that Plaintiff had the right to join Dr. Cowan, (Doc. 241), the Court granted Plaintiff's Motion. (Doc. 244). On August 23, 2017, Plaintiff filed his Fourth Amended Complaint. (Doc. 245).

Plaintiff's Fourth Amended Complaint contains the following claims: a 42 U.S.C. § 1983 Eighth Amendment claim for deliberate indifference to Plaintiff's hepatitis C against Defendants DelBalso, the Pennsylvania Department of Corrections, and Silva in their official capacities and for injunctive relief only, Defendants Wetzel, Oppman, Noel, Cowan, Lisiak, Khanum, Saxon, and Stienhart in both their individual capacities for money damages and in their official capacities for injunctive relief, and Defendant Kerestes in his individual capacity for money damages only (Count I); a section 1983 Eighth Amendment claim for deliberate indifference to Plaintiff's skin condition against Defendants Kerestes, Wetzel, Noel, Lisiak, Khanum, and Saxon in their individual capacities for money damages only (Count II); a section 1983 Eighth Amendment claim for deliberate indifference to Plaintiff's hyperglycemia against Defendants Kerestes, Lisiak, Khanum, and Saxon in their individual capacities for

11

money damages only (Count III); a state law medical malpractice claim for failure to treat Plaintiff's hyperglycemia against Defendants Lisiak, Khanum, and Saxon in their individual capacities for money damages only (Count IV); a state law medical malpractice claim for failure to treat Plaintiff's hepatitis C against Defendants Noel, Cowan, Oppman, Lisiak, Khanum, and Saxon in their individual capacities for money damages only (Count V); a state law medical malpractice claim for failure to treat Plaintiff's skin condition against Defendants Noel, Oppman, Lisiak, Khanum, and Saxon in their individual capacities for money damages only (Count VI); and a section 1983 First Amendment right of association claim against Defendants Kerestes and DelBalso in their official capacities and for injunctive relief only (Count VII).

On August 25, 2017, the Medical Defendants filed a Partial Motion to Dismiss Plaintiff's Fourth Amended Complaint. (Doc. 248). On September 7, 2017, the Corrections Defendants filed a Partial Motion to Dismiss, or, in the alternative, a Partial Motion for Summary Judgment. (Doc. 251). These Motions are presently pending before the Court.

### III. FACTUAL ALLEGATIONS

Plaintiff's Fourth Amended Complaint alleges the following facts which, for the purposes of resolving Defendants' Motions, the Court takes as true:

Plaintiff Mumia Abu-Jamal is currently incarcerated in the custody of the Pennsylvania Department of Corrections at SCI-Mahanoy. (Doc. 245 at ¶ 4). Plaintiff incarceration began in 1981 when he was arrested for, and later convicted of, murdering a

12

Philadelphia police officer. (Id. at ¶¶ 18, 22-23). Although Plaintiff was sentenced to death, in 2011, the Third Circuit affirmed a lower court's order setting aside Plaintiff's death sentence. (Id. at ¶¶ 22, 27). After the Philadelphia District Attorney's Office chose not to seek to reinstate Plaintiff's death sentence, the Department of Corrections placed him into the general population. (Id. at ¶ 28).

In 2012, Plaintiff tested positive for the hepatitis C antibody during routine blood work. (Id. at ¶ 60). Hepatitis C is a virus that infects the cells of the liver. (Id. at ¶ 33). Between seventy-five and eighty-five percent of individuals with hepatitis C will develop chronic hepatitis C, which will result in progressive inflammation of the liver. (Id.). This inflammation leads to liver scarring, known as fibrosis, and extreme liver scarring, known as cirrhosis, both of which impact the liver's ability to function. (Id. at ¶ 34). Chronic hepatitis C may cause complications such as liver cancer, anemia, and diabetes. (Id. at ¶¶ 37-38, 41). Chronic hepatitis C may also result in skin conditions such as lichen planus, necrolytic acral erythema, psoriasis, eczema, and pruritus. (Id. at ¶ 42). Approximately twenty percent of all those with chronic hepatitis C will die from complications of the disease. (Id. at ¶ 39).

In 2013, new antiviral drugs came onto the market that had a ninety to ninety-five percent cure rate for hepatitis C. (Id. at ¶ 43). Two of these drugs were Harvoni and Sovaldi. (Id.). The American Association for the Study of Liver Diseases ("AASLD") currently recommends that everyone with chronic hepatitis C be treated with the new

antiviral drugs. (Id. at ¶ 44). Further, the Centers for Disease Control has issued guidelines stating that the recommendations of the AASLD are the standard of care for treating hepatitis C. (Id. at ¶ 45). In late 2015, Defendants Oppman, Cowan, and Noel formulated and adopted a policy concerning which of the 5000 Pennsylvania inmates with chronic hepatitis C would be treated with the new antiviral drugs. (Id. at ¶¶ 47, 50). The policy was authorized by Defendant Wetzel. (Id. at ¶ 51). Under the policy, only inmates with decompensated cirrhosis with bleeding could receive the antiviral drugs. (Id. at ¶ 52). At this stage of the disease progression, however, an individual has already suffered irreversible damage to his or her health, including liver damage and increased risk of death. (Id. at ¶¶ 53-54).

The Department of Corrections hepatitis C treatment policy was implemented by Defendants Wetzel, Oppman, Noel, Kerestes, Steinhart, and Cowan despite their knowledge that there was no medical justification for denying treatment to inmates who did not meet the policy's treatment criteria and that failing to treat these infected inmates caused harm to the inmates' health, including a risk of death. (Id. at ¶ 56). The policy remains in effect and is enforced by Defendants Wetzel, Silva, Noel, DelBalso, and Steinhart. (Id. at ¶ 58).

In August of 2014, Plaintiff's hepatitis C resulted in a severe skin rash. (Id. at ¶ 63). Plaintiff began to experience itching over his whole body and he reported his condition to facility staff. (Id. at ¶ 64). He was prescribed creams, which had no effect. (Id.). On

14

February of 2015, Defendants Lisiak and Khanum noted that the rash covered seventy percent of Plaintiff's body. (Id. at ¶¶ 65-66). On February 20, 2015, Defendant Khanum ordered Plaintiff to be admitted to the facility infirmary. (Id. at ¶ 68). On that date, Defendant Lisiak noted that Plaintiff's blood glucose was abnormally high, but did not inform Plaintiff. (Id. at ¶ 69). Although Plaintiff's medical records indicated that he tested positive for hepatitis C years earlier, Defendants Lisiak, Saxon, and Khanum did not investigate whether Plaintiff's hepatitis C might be causing the skin condition. (Id. at ¶ 70). With the knowledge and approval of Defendants Lisiak, Saxon, and Khanum, Plaintiff was prescribed another steroid and an immunosuppressant. (Id. at ¶ 71).

On March 6, 2015, Plaintiff's blood work showed his glucose level had risen to a severely abnormal level. (Id. at ¶ 72). Defendants Lisiak, Saxon, and Khanum were aware of this information and knew or should have known that this indicated a dangerous case of hyperglycemia. (Id. at ¶¶ 72-73). Nevertheless, despite this knowledge, Defendants Lisiak, Saxon, and Khanum took no action. (Id. at ¶ 74). Untreated hyperglycemia is a potentially fatal condition. (Id. at ¶ 79). In March of 2015, an inmate told Defendant Kerestes that Plaintiff was very weak and suffering. (Id. at ¶ 76). Defendant Kerestes took no action to investigate this information. (Id. at ¶ 77). On March 30, 2015, Plaintiff lost consciousness and, upon being rushed to Schuylkill Medical Center, was found to have an abnormally high blood glucose level and be suffering from diabetic shock. (Id. at ¶ 78).

Plaintiff returned to prison on April 1, 2015. (*Id*. at ¶ 80). Release papers indicated that his prognosis was "guarded" and that he had the following medical issues: "diabetes, new onset, encephalopathy secondary to hyperglycemia, dehydration, acute kidney injury, hyponatremia, hypokalemia, asymptomatic gallstones, skin rash, anemia and a history of hepatitis C." (*Id*.). Despite being aware of this information, Defendants Kerestes, Steinhart, Lisiak, Khanum, and Saxon took no steps to investigate whether hepatitis C may be the cause of Plaintiff's rash and other medical issues. (*Id*. at ¶ 83). Plaintiff's blood work revealed and continues to reveal abnormalities, including a consistently below-normal hemoglobin count. (*Id*. at ¶ 82).

Plaintiff retained counsel in March of 2015 to advocate for his medical care. (*Id*. at ¶ 84). On April 6, 2015, counsel sent a letter to both Defendants Kerestes and Steinhart informing them that Plaintiff's blood sugar remained abnormal. (*Id*. at ¶ 90). Defendants Kerestes and Steinhart did not respond to the letter. (*Id*. at ¶ 91).

Plaintiff experienced extreme pain in his lower extremities when showering on May 12, 2015, and he was transported to Geisinger Medical Center later that day. (*Id*. at ¶ 99). Plaintiff's counsel and Plaintiff's wife both requested that they be permitted to visit with Plaintiff at Geisinger. (*Id*. at ¶ 100). Counsel and Plaintiff's wife were initially told that Defendant Kerestes would permit visits from immediate family members but were later told that Plaintiff would be denied all visitation, including visits with his counsel, so long as he remained at Geisinger. (*Id*. at ¶ 101). Plaintiff was also not allowed to telephone his

16

counsel or his wife. (Id.). Counsel for the Department of Corrections asserted that the prohibition on visitation and phone calls was the policy of Geisinger. (Id. at ¶ 102). On May 14, 2015, Plaintiff's counsel contacted Geisinger's litigation counsel, who agreed to seek authorization from Geisinger's Chief Medical Officer and the Department of Corrections officials to permit family and attorney visits and phone calls. (Id. at ¶ 103). Plaintiff was granted a fifteen minute telephone call with his wife on May 18, 2015, but was not allowed any contact with his counsel. (Id. at ¶ 104).

Numerous diagnostic tests were conducted during Plaintiff's May 12, 2015, to May 19, 2015,[3] hospitalization at Geisinger, but the underlying causes of Plaintiff's health problems were not determined. (Id. at ¶¶ 106-107). A hepatitis C workup was not performed at Geisinger Medical Center. (Id. at ¶ 109). The Geisinger discharge report dated May 18, 2015, however, noted that Plaintiff might be a suitable candidate for hepatitis C treatment. (Id. at ¶ 110). That discharge report was placed in Plaintiff's medical records at SCI-Mahanoy. (Id.). Defendants Lisiak, Khanum, Kerestes, and Steinhart did not order a hepatitis C blood test to determine whether the disease was chronic. (Id. at ¶ 111).

In June of 2015, Plaintiff's counsel sent a letter to the Department of Corrections' counsel requesting that blood work be performed to determine whether Plaintiff had chronic hepatitis C, as that could be the underlying cause of his skin condition, anemia, and

---

[3] It is unclear from the Fourth Amended Complaint on what date Plaintiff was released from Geisinger Medical Center and returned to SCI-Mahanoy. Plaintiff provides both a release date of May 19, 2015, (Doc. 245 at ¶ 106), and May 18, 2015, (Id. at ¶ 110).

hyperglycemia. (*Id*. at ¶ 115). This letter was shared with Defendants Kerestes, Steinhart, Oppman, Wetzel, and Noel. (*Id*. at ¶ 114). Plaintiff's counsel received no response to the letter. (*Id*. at ¶ 116).

In late July of 2015, the Department of Corrections' medical staff conducted blood work on Plaintiff which revealed that he had chronic hepatitis C. (*Id*. at ¶ 122). Between July of 2015 and mid-September of 2015, Plaintiff asked Defendants Lisiak and Khanum to treat him with Harvoni or Sovaldi, but was told that the matter was out of the physicians' hands because the Department of Corrections found the medication to be cost prohibitive. (*Id*. at ¶ 125).

Plaintiff's hepatitis C continues to progress and expose him to the risk of other health complications. (*Id*. at ¶¶ 126-129). Plaintiff's skin conditions persist and will only be cured if his hepatitis C is treated. (*Id*. at ¶¶ 130-131). Nevertheless, the Department of Corrections will not provide Plaintiff with hepatitis C treatment. (*Id*. at ¶ 141). Specifically, Defendants Noel and Cowan recommended that Plaintiff should not be treated with antiviral medications because he does not meet the treatment criteria under the policy developed by Defendants Wetzel, Noel, Cowan, and Oppman. (*Id*. at ¶¶ 146-147, 149). Defendants Wetzel, Kerestes, and Steinhart have adopted that recommendation and refuse to treat Plaintiff with antiviral medications. (*Id*. at ¶ 146). Defendant Delbalso continues to enforce this policy at SCI-Mahoney. (*Id*. at ¶ 151). There is no medical justification for denying Plaintiff

18

treatment; the sole basis for refusing treatment is the monetary cost of the medication. (Id.

at ¶¶ 155-156).

## IV. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it

does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft

v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement

to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal citations,

alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations

in the Complaint and the reasonable inferences that can be drawn from those facts, but . . .

disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements." Ethypharm S.A. France v. Abbott Labs., 707

F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted).

Thus, "the presumption of truth attaches only to those allegations for which there is

sufficient 'factual matter' to render them 'plausible on [their] face.'" Schuchardt v. President

19

of the U.S., 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id*.

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. at 786-87 (quoting *Iqbal*, 556 U.S. 679).

## V. ANALYSIS

The Medical Defendants and the Corrections Defendants have filed separate Motions to Dismiss. The Court will address each Motion in turn.

### A. The Medical Defendants' Motion

The Medical Defendants—that is, Correct Care Solutions, LLC, Dr. Jay Cowan, Dr. John Lisiak, Dr. Shaista Khanum, and Physician's Assistant Scott Saxon—have put forth several arguments as to why parts of Plaintiff's Fourth Amended Complaint should be

20

dismissed for failure to state a claim.[4] The Court will address each of the Medical Defendants' arguments separately.

### 1. Injunctive Relief

The Medical Defendants first argue that Plaintiff's claims for injunctive relief should be dismissed as they pertain to Defendants Khanum, Lisiak, and Saxon because those Defendants no "longer provide[ ] medical care at SCI-Mahanoy." (Doc. 249 at 8). Thus, they argue, even if the Court grants the injunctive relief requested, Defendants are not in a position to comply with the Court's order.

This argument is wholly inappropriate for a motion to dismiss. The Medical Defendants assert a unsupported statement of fact—that is, that Defendants Khanum, Lisiak, and Saxon are no longer employed at SCI-Mahanoy—and expect this Court to take it as true. Moreover, the statement of fact they assert is in direct contradiction to the allegations averred in the Fourth Amended Complaint. Therein, Plaintiff pleads that Defendants Khanum, Lisiak, and Saxon all currently provide medical services at SCI-Mahanoy. (Doc. 245 at ¶¶ 13-15). Accordingly, the Court will deny the Medical Defendants' Motion on this basis. See Ethypharm S.A. France, 707 F.3d at 231 n.14.

The Medical Defendants also argue that, because Plaintiff has already been treated with Harvoni, his claims for injunctive relief against Defendants Correct Care Solutions and

---

[4] The Medical Defendants' Motion and brief refers only to Plaintiff's Fourth Amended Complaint and therefore the Court does not read the Medical Defendants' Motion as moving to dismiss the claim against Defendant Correct Care Solutions contained in Count I of the Complaint in *Abu-Jamal 2*.

21

Cowan are now moot. (Doc. 249 at 9). Article III of the Constitution provides that the "judicial Power shall extend to . . . Cases . . . [and] to Controversies." U.S. CONST. art. III, § 2. This grant of authority embodies a fundamental limitation restricting the federal courts to the adjudication of "actual, ongoing cases or controversies." *Khodara Envtl., Inc, v. Beckman*, 237 F.3d 186, 193 (3d Cir. 2001). The mootness doctrine is centrally concerned with a court's ability to grant effective relief. "If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996).

The Medical Defendants' mootness argument suffers from the same defect that was present in the Medical Defendants' first argument. Plainly stated, to find in the Medical Defendants' favor on this ground, the Court would need to examine evidence not properly before the Court. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint . . . matters of public record . . . [and any] undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

Accordingly, the Court will deny the Medical Defendants' Motion as it pertains to Plaintiff's claims for injunctive relief.

## 2. Personal Involvement

Next, the Medical Defendants argue that Plaintiff's Eighth Amendment claim based on the treatment he received for his hepatitis C—contained in Count I of Plaintiff's Fourth Amended Complaint—should be dismissed because Plaintiff has not pleaded that the Medical Defendants were personally involved in creating or enforcing the policy under which Plaintiff was denied the treatment he sought. (Doc. 249 at 9-12). Thus, according to the Medical Defendants, "to the extent that Plaintiff is alleging that the Hepatitis C policy is unconstitutional, [the Medical Defendants] cannot be found liable." (*Id.* at 11).

To state a claim under 42 U.S.C. § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. That is, "a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs.'" *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Id*. "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Id*.

While the Medical Defendants are correct that Plaintiff's Fourth Amended Complaint contains no allegations that Defendants Khanum, Lisiak, and Saxon were involved in

23

developing the hepatitis C treatment policy, it does not follow that Count I should be dismissed as it pertains to these Defendants. Count I alleges that various Defendants, including Defendants Khanum, Lisiak, and Saxon, violated Plaintiff's Eighth Amendment rights by failing to treat his hepatitis C. (Doc. 245 at ¶ 159). While part of that allegation certainly concerns the hepatitis C treatment policy and its impact on the treatment—or lack thereof—that Plaintiff allegedly received, the Court does not read Count I to only concern itself with the hepatitis C treatment policy. Instead, fairly construed, Plaintiff's Fourth Amended Complaint alleges that part of his lack of treatment was due to the failure of certain Defendants, including Defendants Khanum, Lisiak, and Saxon, to investigate whether Plaintiff's hepatitis C was chronic and whether the medical issues he was experiencing were related to his hepatitis C.

With respect to this portion of his claim, Plaintiff alleges that Defendants Khanum, Lisiak, and Saxon were aware that Plaintiff tested positive for hepatitis C, as such information was in his medical records. (*Id.* at ¶¶ 70, 83, 110). Plaintiff alleges that, beginning in August of 2014, he began experiencing complications from his hepatitis C in the form of a persistent skin rash. (*Id.* at ¶¶ 42, 63). He further asserts that he sought treatment of his skin condition from Defendants Khanum, Lisiak, and Saxon, but those Defendants did not test Plaintiff to see if his hepatitis C was chronic or whether his hepatitis C was the cause of his skin condition. (*Id.* ¶¶ 65-66, 70-71, 75, 83). These allegations are

24

sufficient to plead that Defendants Khanum, Lisiak, and Saxon were personally involved in the failure to treat Plaintiff's hepatitis C.

Accordingly, the Court will deny this portion of the Medical Defendants' Motion to Dismiss.

### 3. Mere Disagreement with the Treatment Provided

Finally, the Medical Defendants argue that Plaintiff's Eighth Amendment claims based on the treatment he received for his hepatitis C and skin condition—contained in Counts I and II of Plaintiff's Fourth Amended Complaint—fail to state a claim for relief because those claims, at best, merely state a non-cognizable disagreement with the treatment Plaintiff received. (Doc. 249 at 12-21). Stated otherwise, the Medical Defendants argue that Plaintiff has not pleaded a lack of medical care, but has instead only pleaded that he disagrees with the level and type of treatment that he was provided. The Medical Defendants urge that prisoner-plaintiffs cannot recover under section 1983 for this type of disagreement over the medical services provided.

Under the Eighth Amendment, made applicable to the states by the Fourteenth Amendment, a state must "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). To make out a claim under the Eighth Amendment for failure to provide adequate medical care, a "plaintiff[ ] must demonstrate (1) that the defendants were deliberately indifferent to

25

[his or her] medical needs and (2) that those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference is akin to "recklessness as that term is defined in criminal law." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). It "requires proof that the [prison] official 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). The defendant "must be 'both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . draw the inference.'" *Id.* (alterations in original) (quoting *Farmer*, 511 U.S. at 837). However, "simple medical malpractice is insufficient to present a constitutional violation." *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990).

A serious medical need "is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981)). Further, "[t]he seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment." *Id.*

In the context of an Eighth Amendment claim, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67.

26

Nevertheless, the Third Circuit has "found 'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197. "Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[ ] in interminable delays and outright denials of medical care to suffering inmates.'" *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 (alteration in original) (quoting *Todaro v. Ward*, 565 F.2d 48, 53 (2d Cir. 1977)). Finally, "[p]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Id.* (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)).

Here, the Medical Defendants do not argue that Plaintiff has failed to adequately plead that his skin condition and hepatitis C are "serious medical needs" within the meaning of the Eighth Amendment. Instead, the Medical Defendants only argue that Plaintiff has not adequately pleaded that the Medical Defendants were deliberately indifferent to either of Plaintiff's alleged medical conditions.

With respect to Plaintiff's hepatitis C claim, the Medical Defendants' once again argue that Plaintiff's Fourth Amended Complaint fails to allege that Defendants Khanum, Lisiak, and Saxon were personally involved in the decision of whether to treat Plaintiff's hepatitis C with antiviral medications. They further argue that Plaintiff has pleaded that the

27

Medical Department monitored Plaintiff's condition and treated his symptoms. Thus, they argue that Plaintiff has only pleaded a non-cognizable disagreement with the care he received. (Doc. 249 at 14-16).

Like the arguments the Medical Defendants advanced in the prior section, these arguments suffer from the flawed premise that Plaintiff's hepatitis C claim is concerned only with the hepatitis C treatment policy. As discussed above, the Court does not read Plaintiff's Fourth Amended Complaint so narrowly. Plaintiff's Fourth Amended Complaint alleges that (1) Defendants Khanum, Lisiak, and Saxon were aware that Plaintiff had hepatitis C, (2) Plaintiff was experiencing complications from his hepatitis C in the form of a rash, and (3) Defendants Khanum, Lisiak, and Saxon failed to investigate whether Plaintiff had chronic hepatitis C and whether his rash was connected to his hepatitis C. (Doc. 245 at ¶¶ 42, 63, 65-66, 70-71, 75, 83, 110). This is sufficient to plead that Defendants Khanum, Lisiak, and Saxon "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." See Farmer, 511 U.S. at 837.

Further, the Fourth Amended Complaint alleges that Defendant Cowan was involved in the formation of the hepatitis C protocol and in the decision to not treat Plaintiff with antiviral medications. (Id. at ¶¶ 50, 146). The Fourth Amended Complaint also alleges that there was no medical justification for denying Plaintiff antiviral medication and that the decision was based on concerns surrounding the cost of the medication. (Id. at ¶¶ 155-156). Accordingly, the Fourth Amended Complaint adequately pleads that Defendant

Cowan was deliberately indifferent to Plaintiff's hepatitis C because Defendant Cowan "delay[ed] necessary medical treatment based on a non-medical reason." *Rouse*, 182 F.3d at 197.

Nevertheless, the Medical Defendants argue that courts have routinely found that a defendant is not deliberately indifferent to a serious medical need when he or she complies with a hepatitis C treatment policy such as the one at issue here. (Doc. 249 at 16-18). The cases the Medical Defendants rely on, however, are readily distinguishable for at least two reasons. First, all of the cases on which the Medical Defendants rely were decided on Motions for Summary Judgement, not Motions to Dismiss. *See Lasko v. Watts*, 373 F. App'x 196 (3d Cir. 2010); *Josey v. Beard*, 2009 WL 1858250 (W.D. Pa. 2009); *Lee v. Beard*, 2008 WL 744736 (M.D. Pa. 2008); *Henry v. Maue*, 2008 WL 5188834 (W.D. Pa. 2008).

Second, all these cases were decided prior to 2013 and involved interferon-based treatment protocols. As one court has explained,

> Interferon treatment has serious potential side-effects, including nausea, anemia, depression, and decomposition of the liver. Its success rate is relatively low—15–30% for regular interferon and 40–50% for pegylated interferon treatment. The selection of patients for interferon treatment is highly individualized and depends upon many factors. Treatment is not appropriate for patients with advanced liver problems such as cirrhosis. Treatment for patients with mild liver problems may be safely deferred. Suitability for treatment is determined by measuring the degree of liver inflammation and fibrosis through a liver biopsy. However, even if the appropriate threshold levels of inflammation and fibrosis are present, treatment may be inappropriate if the patient is too young or too old, had a previous organ transplant, or suffers from depression, other mental health problems, heart disease, or untreated chemical dependency.

*Bender v. Regier*, 385 F.3d 1133, 1135 (8th Cir. 2004). Consequently, "[t]he decision whether or not to use [these] antiviral therap[ies] [was] a complex and controversial one." *Moore v. Bennett*, 777 F. Supp. 2d 969, 976 (E.D.N.C. 2011).

In contrast, Plaintiff has pleaded that in 2013 two new antiviral drugs, Harvoni and Sovaldi, became available to treat hepatitis C. (Doc. 245 at ¶ 43). According to Plaintiff's Fourth Amended Complaint, Harvoni and Sovaldi "have a 90-95% cure rate and few, if any, side effects." (*Id*.). Plaintiff further alleges that both the AASLD and the Centers for Disease Control recommend that everyone with chronic hepatitis C be treated with these new drugs. (*Id*. at ¶¶ 44-45). Accordingly, the Court will not grant the Medical Defendants' Motion to Dismiss on the strength of cases analyzing deliberate indifference in connection with interferon-based treatment protocols when Plaintiff has pleaded that the landscape for treating hepatitis C has dramatically changed with the advent of new, curative medications that are highly effective, low risk, and recommended for all those with chronic hepatitis C.

Turning to Plaintiff's claims concerning his skin condition, the Medical Defendants argue that Plaintiff has pleaded that he underwent extensive testing and treatment. Thus, the Medical Defendants argue, Plaintiff's claim amounts to nothing more than a disagreement with his doctors about which course of treatment was proper. Such a disagreement, according to the Medical Defendants, is not cognizable under the Eighth Amendment. (Doc. 249 at 18-21).

The Medical Defendants are correct that Plaintiff has pleaded that he underwent various tests and received various treatments related to his skin condition. Nevertheless, Plaintiff has also pleaded that his skin condition was *caused* by his hepatitis C and that his skin condition would only be cured if his hepatitis C was treated. (Doc. 245 at ¶¶ 63, 131). Further, Plaintiff has pleaded that Defendants Khanum, Lisiak, and Saxon knew about both conditions but did not investigate the connection between the two, and that Defendant Cowan denied, for non-medical reasons, Plaintiff's request for hepatitis C treatment. (*Id.* at ¶¶ 42, 50, 65-66, 70-71, 75, 83, 110, 146, 155-56). Thus, Plaintiff has adequately pleaded that he received only monitoring and superficial treatment despite the availability of an effective and curative treatment. This is sufficient to state an Eighth Amendment claim. *See Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 ("Prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." (quotation marks omitted)).

Accordingly, the Court will deny the Medical Defendants' Motion to dismiss Count I and II of Plaintiff's Fourth Amended Complaint.

### B. The Corrections Defendants' Motion

The Corrections Defendants—that is, John Kerestes, the Pennsylvania Department of Corrections, Theresa DelBalso, Joseph Silva, John Wetzel, Dr. Paul Noel, Christopher Oppman, John Steinhart, Bureau of Health Care Services Assistant Medical Director, and Bureau of Health Care Service Infection Control Coordinator—raise a number of arguments

as to why parts of Plaintiff's Fourth Amended Complaint should be dismissed. Before

turning to those arguments, however, the Court will address the two initial matters: (1)

whether this Court should convert the Corrections Defendants' Motions to Dismiss into a

Motion for Summary Judgment; and (2) whether this Court should consider evidence offered

at the preliminary injunction hearing in resolving the Corrections Defendants' Motions to

Dismiss.

Turning to the first issue, although the Corrections Defendants label their Motion as a

Motion to Dismiss or for Summary Judgment, the Corrections Defendants fail to comply with

the procedural requirements for a Motion for Summary Judgment. Rule 56.1 of the Rules of

Court for the Middle District of Pennsylvania ("Local Rules") provides, in part, that

> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be
> accompanied by a separate, short and concise statement of the material
> facts, in numbered paragraphs, as to which the moving party contends there
> is no genuine issue to be tried.
>
> . . .
>
> Statements of material facts in support of, or in opposition to, a motion shall
> include references to the parts of the record that support the statements.

Local Rule 56.1. The required statement is "intended to alert the court to precisely what

factual questions are in dispute and point the court to the specific evidence in the record

that supports a party's position on each of these questions." *Landmesser v. Hazleton Area*

*Sch. Dist.*, 982 F. Supp. 2d 408, 412 (M.D. Pa. 2013) (quotation marks omitted). When a

moving party fails to comply with Local Rule 56.1 "the court should not have to proceed

32

further, regardless of how readily it might be able to distill the relevant information from the record on its own." *Id.* (quotation marks omitted).

Here, the Corrections Defendants have failed to include such a statement with its Motion, and therefore the Court is at a loss as to what facts the Corrections Defendants consider undisputed. Accordingly, the Court will not convert the Corrections Defendants' Motion to Dismiss into a Motion for Summary Judgment. *See id.* at 413 (dismissing a party's motion for summary judgment for failing to comply with Local Rule 56.1); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 476 (D.N.J. 1998) ("[F]ailure to comply with the Local Civil Rule would by itself suffice to deny [a] motion for summary judgment.").

Turning to the second issue, the Corrections Defendants' assert that this Court should consider the evidence that was submitted at the preliminary injunction hearing in resolving their Motion to Dismiss. The Corrections Defendants contend that the Court may properly consider such evidence under *McTernan v. City of York*, 577 F.3d 521, 530 (3d Cir. 2009). Specifically, counsel for the Corrections Defendants, Laura Neal, represents to the Court that in *McTernan* "evidence submitted at [a] preliminary injunction hearing was properly considered in granting a motion to dismiss without" converting it into a motion for summary judgment. (Doc. 254 at 5 n.1).

Attorney Neal grossly misrepresents *McTernan*. That case addressed the issue of whether, on a motion to dismiss, a "District Court erred in relying on the findings and conclusions it reached in its ruling denying Plaintiffs' motion for a preliminary injunction."

*McTernan*, 577 F.3d at 530. The Third Circuit held that in "rare" cases "a district court's *findings and conclusions* on a preliminary injunction motion could 'have preclusive effect if the circumstances make it likely that the findings are "sufficiently firm" to persuade the court that there is no compelling reason for permitting them to be litigated again.'" *Id*. (emphasis added) (quoting *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency*, 126 F.3d 461, 474 n. 11 (3d Cir. 1997)).

Here, the Corrections Defendants do not cite any of the findings of fact or conclusions of law that the Court made in connection with the preliminary injunction hearing. Instead, the Corrections Defendants want this Court to consider portions of the exhibits and testimony that were presented at the hearing. (Doc. 254 at 5-10). The mere fact that this evidence was presented to the Court at the preliminary injunction hearing, however, does not mean that this Court can consider it when ruling on a motion to dismiss. Indeed, this Court would have to contort the language of *McTernan* beyond recognition to find support for such a proposition.

Accordingly, in resolving the Corrections Defendants' Motion to Dismiss the Court will not consider the evidence presented at the preliminary injunction hearing.

### 1. Procedural Default

The Corrections Defendants first argue that Plaintiff, with respect to his freedom of association claim, has failed to exhaust his administrative remedies. (Doc. 254 at 11-13). That is, the Corrections Defendants argue that Plaintiff has never filed a grievance in

connection to the denial of visits during his May 2015 hospitalization and, as a result, has procedurally defaulted on his claim.

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions. *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 206 F.3d 289, 291 (3d Cir. 2000), *aff'd*, 532 U.S. 731, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). It has been made clear that the exhaustion requirement is mandatory. *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth*, 532 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to prison grievance systems "regardless of the relief offered through [these] administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same). "[I]t is beyond the power of [any] court . . . to excuse compliance with the exhaustion requirement." *Nyhuis*, 204 F.3d at 73 (quotation marks omitted).

The standard by which to measure whether a prisoner has exhausted his administrative remedies is whether he has complied with the grievance procedures and rules. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with

35

procedural requirements. *Spruill*, 372 F.3d at 227-32; *see also Nyhuis*, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. *Spruill*, 372 F.3d at 227-32; *see also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000). Finally, "failure to exhaust is an affirmative defense under the PLRA, and [ ] inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007).

Here, Plaintiff argues that on the date this lawsuit was filed, May 18, 2015, Plaintiff was in the hospital and did not have the materials required to file a grievance. Thus, he argues, there were no administrative remedies available for him to exhaust. (Doc. 256 at 8). Therefore, Plaintiff argues that his claim is not procedurally defaulted because, while "[a]n inmate . . . must exhaust available [administrative] remedies, [he] need not exhaust unavailable ones." *Ross v. Blake*, 136 S. Ct. 1850, 1858, 195 L. Ed. 2d 117 (2016).

"The availability of administrative remedies to a prisoner is a question of law." *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002). The Third Circuit has defined "available" administrative remedies "as those that are 'capable of use; at hand.'" *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016) (quoting *Brown*, 312 F.3d at 113). The Court is unconvinced that a weeklong hospital stay, standing alone, renders the Department of Corrections' grievance procedure incapable of use. Indeed, as discussed in a prior Opinion issued in this case, under the Pennsylvania Department of

36

Corrections Inmate Grievance System Policy that was in effect at the time, Plaintiff had fifteen days from the date of the event complained of to submit a grievance. (Doc. 157 at 6). Thus, it is unclear why Plaintiff could not file a timely grievance after his hospital stay ended. Nor is it clear that had Plaintiff requested a grievance form in the hospital, he would have been denied access to it.[5]

Nevertheless, the Court is cognizant of the fact that a motion to dismiss, not a motion for summary judgment, is presently before the Court. As the above discussion should make abundantly clear, resolving the issue of administrative exhaustion in this case would require examination of factual matters well outside of the pleadings. As such, this issue is not amenable to resolution at this stage. Accordingly, the Court will deny the Corrections Defendants' Motion to Dismiss Plaintiff's freedom of association claim. The Corrections Defendants, of course, are free to raise the issue again in a properly filed motion for summary judgment.

## 2. The Department of Corrections

The Corrections Defendants next argue that the claims against the Pennsylvania Department of Corrections fail because that entity is not a "person" within the meaning of section 1983. (Doc. 254 at 13-14). Plaintiff, in his brief in opposition, states that he does not oppose the dismissal of the Pennsylvania Department of Corrections as a defendant.

---

[5] The Court rejects Plaintiff's argument that *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003), stands for the proposition that the Court should look to the date the lawsuit was filed and determine if administrative remedies were available to the inmate as of that date. *Johnson* concerned the issue of whether an inmate could properly exhaust his or her administrative remedies after commencing a lawsuit. It did not address the applicable date for determining whether administrative remedies were unavailable.

(Doc. 256 at 8-9). Accordingly, the Court will grant the Corrections Defendants' Motion as it pertains to the claims against the Pennsylvania Department of Corrections.

### 3. Qualified Immunity

Next, the Corrections Defendants argue that they are entitled to qualified immunity as it pertains to Plaintiff's Eighth Amendment claims based on the treatment he received for his hepatitis C.[6] (Doc. 254 at 14-18). Specifically, the Corrections Defendants argue that "there is no clearly established right to receive immediate treatment with direct-acting antiviral medication[ ] rather than monitoring and treatment under a prioritization protocol." (Id. at 18).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Qualified immunity serves the dual purpose of holding government officials accountable when their power is exercised unreasonably and protecting those officials from "harassment,

---

[6] Although the heading to this portion of the Corrections Defendants' brief appears to ask for dismissal of all of Plaintiff's constitutional claims, the Corrections Defendants only present arguments that relate to Plaintiff's Eighth Amendment hepatitis C claim. Thus, to the extent that the Corrections Defendants seek dismissal of Plaintiff's other constitutional claims based on qualified immunity, the Court finds that those arguments, for purposes of this motion, are waived. See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."). Consequently, the Court will only address the Corrections Defendants' qualified immunity arguments as they pertain to Plaintiff's Eighth Amendment hepatitis C claim.

distraction, and liability when they perform their duties reasonably." *Id.* "[Q]ualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (Kennedy, J., dissenting)).

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). The Supreme Court has indicated that, preferably, the issue of qualified immunity "ordinarily should be decided by the court long before trial." *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991). However, the Third Circuit has recognized that this preference sometimes must give way to the realities of a case's development. In response to *Hunter*, the Third Circuit said:

> That is well and good when there are no factual issues in a case, but often the facts are intensely disputed, and our precedent makes clear that such disputes must be resolved by a jury after a trial. As a practical matter, then, in such cases the immunity becomes no more than a mere defense, and a sometimes challenging one to establish at that.

*Curley v. Klem*, 499 F.3d 199, 208 (3d Cir. 2007) (internal citations omitted).

In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), the Supreme Court articulated a two-step test to determine the appropriate application of qualified immunity. A Court must decide: (1) whether the facts alleged or shown by the plaintiff demonstrate the violation of a constitutional right; and (2) if so, whether that right

39

was "clearly established" at the time of the alleged violation. *Id.* at 201. Qualified immunity attaches unless the official's conduct violated such a clearly established right. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). However, the *Saucier* procedure, which erected a rigid framework, no longer mandates that district courts decide the two prongs in any particular order. *Pearson*, 555 U.S. at 236. The decision is left to the discretion of the District Court. *Id.*

In the present motion, the Corrections Defendants only address the "clearly established" prong of the qualified immunity inquiry. "As a general matter, a right is clearly established for purposes of qualified immunity when its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006) (quoting *Saucier*, 533 U.S. at 202). While Supreme Court "case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (quotation marks and alterations omitted). "[I]n some cases 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Williams*, 455 F.3d at 191 (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)). Nevertheless, the Supreme "Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" *Kisela v.*

40

*Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775-76, 191 L. Ed. 2d 856 (2015)).

Here, Plaintiff has adequately pleaded that the Corrections Defendants violated a clearly established right. Specifically, at the time of the events in Plaintiff's Fourth Amended Complaint, binding Third Circuit case law established that prison officials violate the Eighth Amendment when they "delay[ ] necessary medical treatment based on a non-medical reason." *Rouse*, 182 F.3d at 197; *see also Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 346 ("Short of absolute denial, if necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (quotation marks and alterations omitted)). The Third Circuit has also stated that prison officials cannot, without violating the Eighth Amendment, "opt for an easier and less efficacious treatment of [an] inmate's condition." *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 (quotation marks and alteration omitted).

Plaintiff's Fourth Amended Complaint alleges the following:

> 5. Mr. Abu-Jamal is suffering from chronic hepatitis C. The disease has caused and is causing severe health problems. He has requested that he be provided with anti-viral medication that would cure his disease but the defendants have denied that treatment.
>
> . . .
>
> 50. In late 2015, defendants Oppman, Cowan, and Noel, with the knowledge and approval of defendant Wetzel formulated and adopted a medical protocol concerning who would be treated and not treated with hepatitis C anti-viral drugs.

41

. . .

52. Under that policy, only inmates with decompensated cirrhosis with bleeding are authorized to receive the anti-viral drugs.

53. When the disease has advanced to decompensated cirrhosis with bleeding, a person has already suffered irreversible damage to their health and are at a grave risk of death.

54. In addition, long before the disease has progressed to that stage, individuals suffering from it have suffered irreversible damage to their liver, decreased liver function, and are at a significantly higher risk of developing liver cancer. Many also suffer severe extrahepatic manifestations of the disease that adversely affect quality of life.

. . .

56.This policy was adopted and implemented by defendants Wetzel, Oppman, Noel, Kerestes, Steinhart, Cowan, and others even though they knew that denying treatment to inmates who did not fall under the protocol had no medical justification, causes harm to those inmates' health and places them at risk of death.

. . .

58. This protocol remains in effect and is administered and enforced by defendant Wetzel, defendant Silva, the current head of the Bureau of Health Care Services, defendant Noel, the Director of Clinical Services, defendant Cowan, defendant DelBalso, Superintendent of SCI Mahanoy and defendant Steinhart, Chief Health Care Administrator at SCI Mahanoy.

. . .

122. In or about late July 2015, hepatitis C bloodwork performed by [the Department of Corrections'] medical staff at Mahanoy revealed a viral load meaning that plaintiff has active hepatitis C and that the disease is chronic.

. . .

140. [Defendant Wetzel] is aware that the current hepatitis C protocol provides no treatment for those with hepatitis C until they have sustained extreme liver damage and related health problems, and only after they have been exposed to severe risks of injury and death.

. . .

146. Defendants Noel and Cowan in their role on the hepatitis C committee, determined that plaintiff should not be treated with the anti-viral medications. This decision to refuse treatment was done with the knowledge and approval of defendants Wetzel, Kerestes and Steinhart, who have all adopted that recommendation and refused to provide plaintiff with the anti-viral medication.

. . .

155. The sole basis for refusing to provide the anti-viral drugs to plaintiff is monetary cost[.]

156. There is no medical justification for failing to provide the anti-viral drugs to the plaintiff.

(Doc. 245). Based on these allegations, Plaintiff has adequately alleged that each of the

Corrections Defendants violated a clearly established right by creating and/or enforcing a

policy that denied necessary medical treatment to a suffering inmate for non-medical

reasons. See Rouse, 182 F.3d at 197; Monmouth Cty. Corr. Inst. Inmates, 834 F.2d at 346-

47.

The Corrections Defendants, however, argue that multiple courts have found no

Eighth Amendment violation when a correctional institution follows a prioritization protocol in

deciding which hepatitis C infected inmates should receive antiviral medications. (Doc. 254

at 16-18). Thus, the Corrections Defendants' contend, the right to receive antiviral

medications is not clearly established. Upon close examination of the cases that the

Corrections Defendants' cite, the Court finds that they do not establish that the right at issue in this matter is not clearly established. Given the on-point, binding Third Circuit case law discussed above, *see Rouse*, 182 F.3d at 197; *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 346-47, the Court need not look outside this circuit to determine if the right at issue is clearly established. Here, the Corrections Defendants only cite two cases from within this circuit to support their proposition. *See Maskelunas v. Wexford Health Source, Inc.*, 2015 WL 6686709 (W.D. Pa. 2015); *Allah v. Thomas*, 2016 WL 3258422 (E.D. Pa. 2016). Even a cursory review of both cases, however, reveals that they are significantly different from the case at hand in important respects.

In *Maskelunas*, a magistrate judge recommended granting a defendant's motion for summary judgement on Maskelunas's claim that he was denied treatment for his hepatitis C. *Maskelunas*, 2015 WL 6686709, at *1. Specifically, the magistrate judge concluded that there was no evidence in the record that the defendant had "any financial incentive to save money, or that countermanding treatment would in fact save money . . . or that [the defendant] in fact concluded that countermanding treatment would save money and acted as a result of that conclusion." *Id.* This recommendation was adopted after Maskelunas failed to object to the magistrate judge's Report and Recommendation. 2015 WL 6686719, at *1 (2015).

In contrast, the motion before the court is a motion to dismiss, not a motion for summary judgment. As such, the Court must take as true Plaintiff's allegation that "[t]he

44

sole basis for refusing to provide the anti-viral drugs to plaintiff is monetary cost" and that

there was "no medical justification for failing to provide the anti-viral drugs to the plaintiff."

(Doc. 245 at ¶¶ 155-56). Accordingly, this cases falls squarely within *Rouse* and

*Monmouth's* holding that prison officials act with deliberate indifference when they "delay[ ]

necessary medical treatment based on a non-medical reason." *Rouse*, 182 F.3d at 197;

*see also Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 346.[7]

In *Allah*, the Court granted an unopposed motion to dismiss Allah's claim that he was

being denied treatment for his hepatitis C. *Allah*, 2016 WL 3258422, at *1-*2. The Court

found that Allah failed to state an Eighth Amendment claim because "his Hepatitis C did not

require treatment prior to his incarceration, and his condition was not alleged to have

significantly deteriorated while he was in prison." *Id.* at *5. Nevertheless, the Third Circuit

reversed the dismissal, concluding "that the District Court misperceived Allah's allegations."

*Allah v. Thomas*, 679 F. App'x 216, 220 (3d Cir. 2017). According to the Circuit,

> Allah alleged that he did not receive *any* treatment for his Hepatitis C
> condition, that he was not placed on a newly developed Hepatitis C treatment
> regimen solely because it was cost-prohibitive, and that he was suffering
> medical complications as a result. Accepting these allegations as true, we
> conclude that Allah plausibly alleged an Eighth Amendment violation.

---

[7] *Maskelunas* is distinguishable for a number of other reasons as well. Most notably, Maskelunas
was approved for treatment prior to the advent of antiviral medications. *Maskelunas*, 2015 WL 6686709, at
*2. His treatment was put on hold, however, when the new antiviral medications became available. *Id.*
Soon after his treatment was put on hold, Maskelunas was released from prison. *Id.* at *1-*2. Thus, the
magistrate judge found that the defendant could not "be held liable for implementing (not giving) orders to
hold off on a potentially less effective treatment with known risks and side-effects during the time these new
treatments were being studied." *Id.* at *3. In contrast, Plaintiff claims here that he is being denied
treatment under a protocol that determines which inmates receive the newly available antiviral medications.

*Id.* (emphasis in original). Thus, *Allah* and *Maskelunas* provide no support for the Corrections Defendants' contention that Plaintiff has failed to plead that a clearly established constitutional right was violated by the Corrections Defendants.

Before moving on, the Court must note that it is deeply troubled that counsel for the Corrections Defendants, Laura Neal, would direct this Court's attention to *Allah* to support her argument but fail to inform the Court that *Allah* has been overturned by the Third Circuit on the very point on which she relied. As the Third Circuit issued its opinion in *Allah* over six months prior to Attorney Neal filing her brief with this Court, Attorney Neal's omission is inexcusable. At best, Attorney Neal's behavior is grossly negligent, irresponsible, and completely unprofessional. At worst, her actions have violated the rules that govern an attorney's conduct in the State of Pennsylvania. *See* PA. R. PROF'L CONDUCT 3.3 ("A lawyer shall not knowingly . . . fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel."). Unfortunately, this is not an isolated incident, but part of a pattern of unethical behavior on the part of Attorney Neal that the Court has observed over the course of this litigation. As such, Attorney Neal is on notice that further unethical behavior will not be tolerated by this Court and will result in sanctions.

Accordingly, the Court will deny the Corrections Defendants' Motion to Dismiss based on their claim of qualified immunity. In doing so, however, the Court does not

foreclose the possibility that a fully developed record may show that one or more of the Corrections Defendants are entitled to qualified immunity on Plaintiff's claims.

### 4. Personal Involvement

The Corrections Defendants next argue that, with the exception of Defendant Noel, Plaintiff's Fourth Amended Complaint fails to allege that the Corrections Defendants were personally involved in the asserted violations. (Doc. 254 at 19-20). Specifically, Plaintiff argues that Defendants Wetzel, Oppman, Silva, Kerestes, DelBalso, and Steinhart are not responsible for treating Plaintiff's condition, as none of these Defendants were on the hepatitis C treatment committee or played a role in determining whether Plaintiff should receive DAA medication.

As discussed in reference to the Medical Defendants' Motion to Dismiss, to state a claim under section 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. That is, "a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs.'" *Chavarriaga*, 806 F.3d at 222 (quoting *Rode*, 845 at 1207). "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Id*. "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Id*.

The Court has already recited the allegations against the Corrections Defendants in the prior section. These allegations adequately plead the personal involvement of Defendants Wetzel, Oppman, Silva, Kerestes, DelBalso, and Steinhart in the development and/or enforcement of the hepatitis C policy as it pertains to Plaintiff. Accordingly, the Court will deny the Corrections Defendants' Motion to Dismiss on the basis of lack of personal involvement.[8]

### 5. Mootness

Finally, the Corrections Defendants argue that Plaintiff's claims for injunctive relief related to his hepatitis C treatment are now moot because Plaintiff has been provided with DAA medications. (Doc. 254 at 20-21). Article III of the Constitution provides that the "judicial Power shall extend to . . . Cases . . . [and] to Controversies." U.S. CONST. art. III, § 2. This grant of authority embodies a fundamental limitation restricting the federal courts to the adjudication of "actual, ongoing cases or controversies." *Khodara Envtl., Inc.*, 237 F.3d at 193. The mootness doctrine is centrally concerned with a court's ability to grant effective relief. "If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak*, 77 F.3d at 698-99.

---

[8] The Corrections Defendants also argue that the "operative complaint" fails to allege any facts or claims against Defendant Assistant Medical Director and Defendant Infection Control Coordinator. (Doc. 254 at 20). This argument simply ignores the fact that this matter is now a consolidation of two actions. Plaintiff's Complaint, originally filed in *Abu-Jamal 2*, contains sufficient allegations against Defendant Assistant Medical Director and Defendant Infection Control Coordinator. (3:16-CV-2000, Doc. 1).

Here, the Corrections Defendants attempt to use an improper forum to advance their mootness argument. While the Court is of course aware that it ordered that Plaintiff be treated with DAA medications, the Court possesses no other information with respect to how the Order has been carried out. Without information about whether or not Plaintiff has been afforded a complete treatment and is now cured of hepatitis C, the Court has no way of evaluating whether Plaintiff's claims for injunctive relief are moot.

Accordingly, the Court will deny the Corrections Defendants' Motion to Dismiss Plaintiff's claims of injunctive relief.

## VI. CONCLUSION

For the reasons outline above, the Court will deny the Medical Defendants' Motion to Dismiss and grant in part and deny in part the Corrections Defendants' Motion to Dismiss. A separate order follows.

Robert D. Mariani
United States District Judge