## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**MUMIA ABU-JAMAL**

     Plaintiff,                     Civil Action No. 3:15-CV-0967

     v.                            MARIANI, J.

**JOHN KERESTES, Supt. SCI Mahanoy,**
**et al.,**

     Defendants.


## PLAINTIFF'S BRIEF IN OPPOSITION TO DOC DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

*/s/ Bret D. Grote*
Bret D. Grote
PA I.D. No. 317273
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221
Telephone:  (412) 654-9070
bretgrote@abolitionistlawcenter.org

*/s/ Robert J. Boyle*
Robert J. Boyle
277 Broadway
Suite 1501
New York, N.Y. 10007
(212) 431-0229
Rjboyle55@gmail.com
NYS ID# 1772094
*Pro hac vice*

*Counsel for Plaintiff*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES...……………………………………………...iv

STATEMENT OF THE CASE……………………………………………....1

QUESTIONS PRESENTED……………………………………………......8

LEGAL ARGUMENT………………………………………………......10

I.    Plaintiff's Eighth Amendment hepatitis C claim against Defendant Noel should proceed to trial on the issue of damages……………………………………..10

    a.   Plaintiff Exhausted Administrative Remedies Against DOC Defendants on His Medical Care Claims…………………………..10

        i.   *Garrett* controls, and Plaintiff named all defendants and requested monetary damages prior to the filing of the Fourth Amended Complaint……………………………………….10

        ii.   In the alternative, defendants have waived this argument…..14

        iii.   In the alternative, defendants have acknowledged that monetary damages are not available for medical care grievances at SCI Mahanoy………………………………...17

    b.   The claims for injunctive relief against Defendant Delbalso and Silva are moot……………………………………………………..…18

    c.   Plaintiff does not contest that Defendants Kerestes, Wetzel, Oppman, and Steinhart lacked sufficient personal involvement for liability under the Eighth Amendment. …………………………...18

    d.   Material Issues Of Fact Exist as to Whether Defendant Dr. Noel Was Deliberately Indifferent to a Serious Medical Need When He Refused To Treat Plaintiff's HCV Infection Until February 2017…19

II.   Plaintiff Is No Longer his Claim Regarding his Skin Condition as a Separate Claim.  Rather it is Part of the Claim Asserted in Count I…………………....30

III.    Plaintiff is no longer pursuing his claim of deliberate indifference to his hyperglycemia against DOC defendants…………..…………….…………...30

IV.    Plaintiff's medical malpractice claim against defendant Noel should proceed to trial………………………………………………………………...………..31

        a.  Plaintiff Is Able to Prove That Defendants' Deliberate Indifference to His Need For Hepatitis C Treatment Caused Him Injury…..…..31

        b.  DOC Defendants' Certificate of Merit Issue Has Been Waived, Although the Certificate Was Filed in a Timely Fashion…………..33

        c.  Plaintiff did not previously nor is presently bringing a corporate negligence claim against Defendants Noel or Oppman……………34

V.    Plaintiff Is No Longer Pursuing a Medical Malpractice Claim Against DOC Conditions in Regard to His Skin Condition……………………………..…...34

VI.    Plaintiff is no longer pursuing his First Amendment claim of Right of Association and doesn't not challenge defendants motion for summary judgment for this claim…………………………………………………....34

VII.    Qualified Immunity Is Not Available to Defendant Noel…………………...34

VIII.    Plaintiff's claim for injunctive relief against DOC Defendants is now moot…41

CONCLUSION………………………………………………………......................41

# TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page**

*Abu-Jamal v. Kerestes*, 779 Fed. Appx. 893 (3d Cir. 2019) …………………………34, 36

*Abu-Jamal v. Wetzel*, 2017 WL 34700 (M.D. Pa. 2017)………………………...22-25, 29

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ……………………………………19

*Ahmed v. Dragovich* 297 F.3d 201 (3d Cir. 2002) ………………………………………..14

*Albers v. Whitley*, 743 F.2d 1372 (9th Cir. 1984) ……………………………………38-39

*Amon v. Cort Furniture Rental*, 85 F.3d 1074 (3d Cir. 1996) ……………………………19

*Anderson v. Creighton*, 483 U.S. 635 (1987) …………………………………………35

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986) …………………………………19, 28

*Barndt v. Pennsylvania Dept. of Corrections*, 2011 WL 4830181 (M.D.Pa. 2011)…………20

*BE and AR v. Teeter,* 2016 WL 3033500 (W.D. Wash 2016) …………………………27

*Beers-Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001)……………………………………38

*Bines v. Kulaylat*, 215 F.3d 381 (3d Cir. 2000) ………………………………………37-38

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ………………………………………………..37

*Brown v. Johnson*, 387 F.3d 1344 (11th Cir. 2004) ……………………………………20

*Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir. 1999)…………………………………38

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) …………………………………………19

*Charpentier v. Godsil*, 937 F.2d 859 (3d Cir. 1991) …………………………………...15, 33

*Christy v. Robinson*, 216 F.Supp.2d 398 (D.N.J. 2002) ………………………………..20

*Consonery v. Pelzer*, 558 Fed. Appx. 271 (3d Cir. 2014) ………………………………37

*Delgado-Brunet v. Clark*, 93 F.3d 339 (7th Cir. 1996) …………………………………38

*De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013) …………………………………..27

*Drysdal v. Woerth*, 153 F.Supp.2d 678, 689 (E.D. Pa. 2001) …………………………28

*Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993) ………………………………26, 29, 40

*Ellison v. United States*, 753 F.Supp.2d 468 (E.D.Pa. 2010)……………………………29

*Estelle v. Gamble*, 429 U.S. 97 (1976) ……………………………………………...20, 26

*Farmer v. Brennan*, 511 U.S. 825 (1994) ………………………………………………..20, 26

*Foreman v. Bureau of Prisons*, 2007 WL 108457 (3d Cir. 2007) …………………………37

*Garrett v. Wexford Health*, 938 F.3d 69 (3d Cir. 2019) …………………………...…12-14

*Harrison v. Barkeley*, 219 F. 3d 132 (2d Cir. 2000) ……………………………………25

*Hope v. Pelzer*, 536 U.S. 730 (2002) …………………………………………………...35

*In re Paoli* RR *Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) …………………………28

*Kannankeril v. Terminix International, Inc.*, 128 F.3d 802 (3d Cir. 1997) ………………..28

*McCoy v. Board of Trs. of Laborers' Int'l Union Local No. 222 Pension Plan*, 188 F. Supp. 2d 461 (D. N.J. 2002) ………………………………………………………………15

*McKee v. Turner*, 124 F.3d 198 [Table], 1997 WL 525680 (6th Cir. 1997) ……………..39

*Meyers v. Majkic*, 189 Fed. Appx. 142 (3d Cir. 2006) …………………………………37

*Miller v. Solem*, 728 F.2d 1020 (8th Cir. 1984) ……………………………………….39

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ………………………………………………35

*Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987)……..26

*Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3d Cir. 2003) ………….20, 36

*Parkell v. Markell*, 622 Fed. App'x. 136 (3d Cir. 2015) ……………………………29, 40

*Pearson v. Callahan*, 555 U.S. 223 (2009) ………………………………………..35

*Pearson v. Prison Health Service*, 850 F.3d 526 (3d Cir. 2017) …………………………37

*Ponzini v. Monroe County, et al*, 2015 WL 5123680 (M.D.Pa. 2015) …………………28

*Ray v. Kertes*, 285 F.3d 287 (3d Cir. 2002) ………………………………………15

*Robinson v. Johnson*, 313 F.3d 128 (3d Cir. 2002))..………………………………15

*Roe v. Elyea*, 631 F.3d 843 (7th Cir. 2011) ………………………………………27

*Ross v. Blake*, 136 S.Ct. 1850 (2016) ……………………………………..17, 18

*Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999) ……………………………26, 37

*Schneyder v. Smith*, 653 F.3d 313 (3d Cir. 2011) …………………………………35

*Smith v. Jenkins*, 919 F.2d 90 (8th Cir. 1990) ……………………………………27

*T Mobile Ne. LLC v. City of Wilmington, Del.*, 913 F.3d 311 (3d Cir. 2019) ………..12, 14

*Tolan v. Cotter*, 134 S.Ct. 1861 (2014) ………………...………………………19, 35-36

*Transcenic, Inc. v. Google, Inc.*, 2014 WL 7275835 (D.Del. 2014) …………………………29

*United States v. Lanier*, 520 U.S. 259 (1997) ………………………………………..35

*West v. Keve*, 571 F.2d 158 (3d Cir. 1978) ………………………………………...29, 40

*White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990) ……………………………………..29, 40

*Williams v. Nish*, 2015 WL 106387 (M.D.Pa. Jan. 7, 2015) …………………………15-16

## **Statutes**

42 U.S.C. § 1997(e)………………………………………………………...…10, 16

## **Statement of the Case**

On May 18, 2015, plaintiff, Mumia Abu-Jamal, an incarcerated person at SCI

Mahanoy filed the initial complaint, *Abu Jamal v. Kerestes*, alleging a denial of his First

Amendment rights arising from a denial of visitation while hospitalized at an outside

facility. (Dkt 1).[1] Thereafter, the complaint was amended and causes of action added

alleging violations of his Eighth Amendment right to adequate medical care. The

gravamen of the current, Fourth Amended Complaint is that the defendants were

deliberately indifferent to Mr. Abu-Jamal's serious medical needs when they refused to

administer Direct Acting Anti-Viral (DAADs) medication to treat plaintiff's

progressing hepatitis C infection, and when they refused to monitor and treat

dangerously elevated glucose levels resulting in an episode of diabetic ketoacidosis.

Docket  hereinafter "Dkt. 245, Fourth Amended Complaint (hereafter "4AC").  The

Fourth Amended Complaint, names, *inter alia*, defendant Dr. Paul Noel as among

those responsible for the lack of medical treatment.

Hepatitis C is a virus that infects the liver cells. (Trooskin: Pl. Ex. 2, p. 1).[2]

More than 17,000 people in the United States die each year from liver disease caused

by Hepatitis C, a death rate that is higher than that of any other infectious disease.

(Trooskin: Pl. Ex. 2, p.1). Even before the advanced stage of cirrhosis individuals with

---

[1] "Dkt." Refers to the number assigned to the document on the docket sheet.
[2] "Pl. Ex." Refer to Plaintiff's Exhibits to this opposition to the defendants' motion that are contained in the simultaneously filed Appendix.

chronic HCV can suffer from increased rates of heart attacks, diabetes, decreased cognitive function, fatigue, joint pain, depression, sore muscles, arthritis, various cancers, nerve damage and jaundice. (Trooskin: Pl. Ex. 2, p. 1). 20 % of those suffering from chronic HCV will develop cirrhosis. (Trooskin, Pl. Ex.2, p. 1). 5% of those who develop cirrhosis will develop heptoceullular carcinoma annually. (Trooskin, Pl. Ex. 2, p. 1; Cowan: Dkt. 96, p. 21-22).[3] Disease progression is measured by the extent of scarring, or fibrosis, to the person's liver.  F0 and F1 indicates minimal scarring.  F2 is an intermediate stage while F3 indicates severe fibrosis and F4 indicates cirrhosis.  (Trooskin, Pl. Ex. 2, p. 2).  20 % of those suffering from chronic HCV will develop cirrhosis. (Trooskin, Pl. Ex.2, p. 1). 5% of those who develop cirrhosis will develop heptoceullular carcinoma annually. (Trooskin, Pl. Ex. 2, p. 1; Cowan: Dkt. 96, p. 21-22). 20% of chronic hepatitis C patients will die from complications of the disease (liver cancer or cirrhosis). (CDC Report: Pl. Ex. 9).

Beginning in 2011, the Food and Drug Administration (FDA) began approving a series of drugs, known as Direct Acting Anti-Viral Drugs (DAADs) capable of curing hepatitis C infections. (Trooskin, Pl. Ex. 2, p. 2).  These drugs have come to have a 90-95% cure rate. (Trooskin, Pl. Ex. 2, p. 3).

---

[3] The transcript of the December 2015 preliminary injunction hearing is on file.  Dkt. 94 refers to the proceedings on December 18, 2015, Dkt. 95 refers to the proceedings on December 22, 2015 and Dkt. 96 refers to the proceedings on December 23, 2015.

The American Association for the Study of Liver Diseases (AASLD) develops nationwide standards for the care and treatment of chronic hepatitis C. (Trooskin, Pl. Ex. 2, p. 1). As of June 2015, the AASLD recommended that all HCV patients be treated with DAADs irrespective of fibrosis level but maintained prioritization categories. (Pl. Ex. 4; Harris: Dkt. 94, p. 122). In October 2015, the AASLD abandoned prioritization and simply stated that all HCV patients should be treated with DAADs without delay. (Pl. Ex. 5; Harris: Dkt. 94, p. 5-8; Trooskin, Pl. Ex. 2, p. 3). In December 2015, the Center for Disease Control stated that treatment with DAADs was the standard of care in the United States irrespective of fibrosis level and referred people to the AASLD for guidance. (Cowan: Dkt. 96, p. 33-34). Treatment with DAADs would reduce to zero the probability of a hepatitis C patient progressing to cirrhosis or liver cancer. (Cowan: Dkt. 96, p. 22). Early treatment also offers a host of other health benefits such as reducing fatigue, reducing the chance of diabetes and renal and cardiological complications. (Cowan: Dkt. 96, p. 26-28).

The plaintiff, Mumia Abu-Jamal, is in the custody of the Pennsylvania Department of Corrections (DOC) and housed at the State Correctional Institution at Mahanoy. In or about 2012, plaintiff tested positive for the antibody of the hepatitis C virus. (CCS Defendants' Exhibit A, p. 176-180, filed in Dkt. 309). No follow-up testing to determine whether Plaintiff suffered from chronic hepatitis C was conducted. (Abu-Jamal: Dkt. 94, p. 47; Trooskin, Pl. Ex. 2, p. 9). Three and a half years later and only after protests from plaintiff's counsel, bloodwork confirmed that

plaintiff suffered from chronic hepatitis C. (Trooskin, Pl. Ex. 2, p. 9; Letters from Counsel, Pl. Ex. 7). The failure of  to perform such follow-up tests in 2012 fell below the standard of care. (Trooskin: Pl. Ex. 2, p. 9).

20-40% of chronic hepatitis C sufferers have skin conditions linked to hepatitis C. (Harris: Dkt. 94, p. 113-115). Although its severity has waxed and waned, plaintiff has suffered from a frequently debilitating skin condition since the fall of 2014 to the present.  It has been diagnosed alternatively as eczema, psoriasis and pruritis. Common dermatological conditions such as psoriasis and pruritis have been lined to hepatitis C. (Pl. Ex. 8; Harris: Dkt. 94, p. 113-117). Drs. Schleicher and Cowan themselves admitted in their testimony at the December 2015 preliminary injunction hearing that at least 20-40% of hepatitis C patients suffer from skin conditions, including psoriasis and pruritis.  (Schleicher: Dkt. 95, p. 82; Cowan: Dkt. 96, p. 44). By February 2015, this pruritic skin rash covered 75-80% of plaintiff's body. (Abu-Jamal: Dkt. 94, p.  49-50; CCS Defendants Exhibit A, Dkt. 309, p. 386--389).  In September 2015, consulting infectious disease specialist Dr. Ramon Gadea opined that plaintiff's skin condition might be secondary to his hepatitis C. (CCS Exhibit A, Dkt. 309, p. 220, 309).

One of the ways used to determine the liver fibrosis (scarring) level is to determine the patient's APRI score. (Cowan: Dkt. 95, p. 205). At lower numbers, i.e. less than 1, the APRI score is unreliable as it will only identify 37% of those who actually have already progressed to cirrhosis. (Cowan: Dkt. 96, p. 36; Trooskin, Pl. Ex.

4

2, p. 8). The best test for measuring liver damage is the transient elastography, also known as a Fibroscan. (Trooskin, Pl. Ex. 2, p. 9). Plaintiff did not have a Fibroscan until March 29, 2017. (Trooskin, Pl. Ex. 2, p. 9).

Defendant Dr. Paul Noel is Chief of Clinical Services for the Pennsylvania Department of Corrections. (Noel: Dkt 96, p. 90).  Defendant Noel is familiar with plaintiff's health issues. (Noel: Dkt. 96, p. 94-96, 124).  By 2015, there were objective signs that Plaintiff's disease was progressing.  Beginning in October 2015 and lasting up to and including plaintiff's treatment with the DAADs in March 2017, his platelet levels were below the normal range. (Med. Defs. App'x, p. 95, 96, 97, 100, 1576, 1578, 1580, 1582, 1585, 1587, 1589). A reduction in platelet level is a sign of liver damage caused by hepatitis C. (Cowan: Dkt. 96, p. 40-41).  An abdominal ultrasound of the plaintiff performed at Schuylkill Medical Center on March 16, 2015 showed that his liver was "echogenic suggesting some degree of hepatic parenchymal disorder:" (Pl. Ex. 11, p. 1). A CT of plaintiff's abdomen conducted on April 15, 2015 showed fatty infiltration of the liver consistent with liver damage caused by hepatitis C. (Pl. Ex. 11, p. 2). A CT scan of the liver conducted on May 14, 2015 at Geisinger Medical Center found that the "overall appearance of [plaintiff's] liver to be irregular, please correlate clinically for cirrhosis." (Pl. Ex. 11). Except for bloodwork, the DOC did no follow-up testing of plaintiff's liver as a result of the foregoing.

Another diagnostic tool for determining liver damage is the HALT-C score. (Noel: Dkt. 96, p. 119-120). As of the fall of 2015, plaintiff's HALT-C score was 63,

meaning that there was a 63% chance that he had already progressed to cirrhosis. (Noel: Dkt. 96, p. 120-123).

Defendant Noel drafted the DOC's 2015 interim hepatitis C protocol. (Noel: Dkt. 96, p. 99-101). The interim protocol made no plans to treat all those with HCV. Nor did it prioritize treatment for all inmates. Rather, it was geared to identifying those with advanced disease. (Noel: Dkt. 96, p. 101, 127). Under the interim protocol only those hepatitis C patients with cirrhosis with esophageal varices, i.e. portal hypertension, were referred for further treatment. (Noel, Dkt. 96, 105). If the patient has cirrhosis but no portal hypertension they are not given treatment but simply evaluated every six months. (Noel: Dkt. 96, p. 106).

Notwithstanding the objective tests that showed that plaintiff's disease was progressing, in August 2015, defendant Noel determined that plaintiff did not meet the criteria for treatment with DAADs. (Noel, Dkt. 96, p. 120). In making that determination, Dr. Noel did not comment upon or even mention the diagnostic tests, including but not limited to the May 15, 2015 CT scan conducted at Geisinger Medical Center that showed that the structure of plaintiff's liver was irregular and that he should be "correlated" for cirrhosis.  (Pl. Ex. 11).

On January 3, 2017, this Court granted plaintiff's motion for a preliminary injunction and ordered that he be treated with DAADs. *Abu-Jamal v. Wetzel*, 16-Civ-2000.  This Court held that denying plaintiff with treatment the DAADs constituted deliberate indifference to a serious medical need.  By reliance on its protocols DOCS

6

> Deliberately chose a course of monitoring over treatment for
> non-medical reasons and are allowing plaintiff's condition to
> worsen while his liver functions and health continue to
> deteriorate.

16 Civ. 2000, Dkt. 23, p. 30.

On February 16, 2017, only one month after the injunction issued, an abdominal ultrasound of plaintiff's liver found chronic liver disease with portal hypertension. That the portal hypertension was not seen in prior ultrasounds is evidence that scarring of the liver progressed between 2015 and 2017. (Trooskin, Pl. Ex. 2, p. 12).

Defendant Noel knew that as of December 2015, the AASLD guidelines stated that all chronic HCV patients be treated with DAAs irrespective of fibrosis level. (Noel: Dkt. 96, p. 130). Nevertheless, defendant Noel only authorized treatment of plaintiff with DAADs on March 30, 2017, pursuant to this Court issuing a preliminary injunction on January 3, 2017 requiring treatment, and after a diagnostic test revealed that plaintiff was suffering from cirrhosis with portal hypertension. (Medical Defendants Exhibit L, Dkt. 318-10;  Medical Defendants Exhibit A: Dkt. 312;  p. 1601-1603).

Had the plaintiff been treated with DAADs when they became available, it is "almost certain" that he would have avoided further disease progression. (Cowan: Dkt. 96, p. 23; Trooskin, Pl. Ex. 2, p. 4-5). Had plaintiff been treated with DAADs before his condition progressed to cirrhosis, his risk of developing cirrhosis and/or

7

liver cancer would have been reduced to almost zero. (Cowan: Dkt. 96, p. 22;

Trooskin, Pl. Ex. 2, p. 4-5).

Because he progressed to cirrhosis before being treated with DAADs, Mr.

Abu-Jamal remains at higher risk for liver cancer and liver failure than the general

population and must undergo testing for liver cancer every six months for the rest of

his life. (Trooskin, Pl. Ex. 2, p. 12).

## Questions presented

1. Do disputes of material fact require a trial on the issues of liability and damages
   for plaintiff's Eighth Amendment hepatitis C claim against DOC defendants
   Noel?

Suggested Answer: Yes

   a.  Did plaintiff exhaust his administrative remedies?

   Suggested Answer: Yes

   b.  Are the claims for injunctive relief against defendants Silva and Delbalso
       moot?

   Suggested Answer: Yes

   c.  Does plaintiff contest that defendants Oppman, Kerestes, and Steinhart
       lacked sufficient personal involvement?

   Suggested Answer: No

   d.  Do disputes of material facts preclude summary judgment for defendant
       Noel on plaintiff's eighth amendment hepatitis C claim?

   Suggested Answer: Yes

2. Should the Court grant DOC defendants motion for summary judgment on
   plaintiff's Eighth Amendment claim regarding his skin condition since plaintiff

is no longer pursuing that as a claim separate from the Eighth Amendment hepatitis C claim?

Suggested Answer: Yes

3. Should the Court grant DOC defendants motion for summary judgment on plaintiff's Eighth Amendment claim regarding his hyperglycemia since plaintiff is only pursuing that claim against Medical defendants and not DOC defendants?

Suggested Answer: Yes

4. Do disputes of material fact require a trial on the issues of liability and damages for plaintiff's medical malpractice hepatitis C claim against DOC defendant Noel?

Suggested Answer: Yes

5. Should the Court grant DOC defendants motion for summary judgment on plaintiff's medical malpractice claim regarding his skin condition since plaintiff is no longer pursuing that as a claim against the DOC defendants?

Suggested Answer: Yes

6. Should the Court grant DOC defendants motion for summary judgment on plaintiff's First Amendment freedom of association claim since plaintiff is no longer pursuing that claim?

Suggested Answer: Yes

7. Does record evidence establish disputes of material fact on plaintiff's Eighth Amendment hepatitis C claim that preclude granting DOC defendants qualified immunity?

Suggested Answer: Yes

8. Should the Court grant DOC defendants motion for summary judgment on plaintiff's claim for injunctive relief pertaining to his hepatitis C claims as these claims are now moot?

Suggested Answer: Yes

## Legal Argument

I.  **Plaintiff's Eighth Amendment hepatitis C claim against Defendant Noel should proceed to trial on the issue of damages**

    a.  **Plaintiff Exhausted Administrative Remedies Against DOC Defendants on His Medical Care Claims**

        i.  ***Garrett* controls, and Plaintiff named all defendants and requested monetary damages prior to the filing of the Fourth Amended Complaint**

For the eighth time in this case, defendants advance a theory that plaintiff did not properly exhaust administrative remedies as required by 42 U.S.C. § 1997(e).[4] When satisfaction of the exhaustion requirement is assessed from the date of the operative pleading in this action, as the Third Circuit mandates, and the plain text of grievance number 635578 is reviewed, which defendants' pointedly omitted discussion of in their briefing, defendants' exhaustion argument is shown to be without merit.

---

[4] The first seven instances in which DOC defendants argued that plaintiff failed to exhaust administrative remedies for some or all of his claims were: Dkt. 28, Brief in Opposition to First Motion to Amend Complaint, (8/26/15); Dkt. 38, Brief in Opposition to Motion for Preliminary Injunction, p. 6 (9/10/15); Dkt. 65, Brief in Support of Appeal of Motion to Amend Decision, (arguing, unsuccessfully, that the date of the filing of the original complaint in this action (5/18/15) and not the date of the filing of any amended complaint was the operative date for assessing whether the exhaustion requirement had been satisfied) (12/07/15); Dkt. 156, Brief in Support of Motion for Summary Judgment, p. 8-9 (arguing failure to request monetary relief via the grievance process precludes seeking damages in civil action) (6/21/16); Dkt. 232, Brief in Support of Motion to Dismiss Third Amended Complaint or for Summary Judgment, 12-14 (raising exhaustion defense for freedom of association claim but not medical care claims despite raising the failure-to-exhaust-damages argument 11 months prior) (6/06/17); Dkt. 254, Brief in Support of Motion to Dismiss or in the Alternative for Summary Judgment, 9/21/17 (not raising exhaustion argument that plaintiff failed to identify defendants or request monetary relief in his grievance in motion to dismiss fourth amended complaint); Appellant's Brief to the Third Circuit, 12/17/18.

This time defendants have dusted off the theory that Mr. Abu-Jamal has

forfeited his request for monetary relief because he did not request such relief in

grievance number 561400 that was filed in April 2015. Dkt. 301, Brief in Support of

2020 Motion for Summary Judgment (hereafter "DOC Brief"), p. 19. This theory was

first raised in DOC defendants' motion for summary judgment in 2016. *See* Dkt. 156,

DOC Defendants' Brief in Support of 2016 Motion for Summary Judgment, 8-9**.**

That motion was rendered moot prior to a decision on the issue, and defendants

subsequently dropped this exhaustion theory from the case despite continuing to raise

other theories of failure to exhaust on multiple occasions. Dkt. 208, Order Dismissing

2016 DOC Motion for Summary Judgment as Moot; Dkt. 232, Brief in Support of

Motion to Dismiss Third Amended Complaint, or in the Alternative for Summary

Judgment (raising exhaustion argument in regard to freedom of association claims but

not in regard to medical care or damages claims); Dkt. 254 (same as Dkt. 232 except

filed in regard to Fourth Amended Complaint); Appellant's Brief to the Third Circuit,

12/17/18 (raising exhaustion argument on interlocutory appeal). Defendants also seek

dismissal against each DOC defendant due to Mr. Abu-Jamal not naming them in his

2015 grievance. DOC Brief, 19. This latest bite at the exhaustion apple can be swiftly

dispensed with, however, as the Third Circuit made clear in a precedential decision in

2019 that the date for assessing the applicability of the PLRA's exhaustion

requirement is the date on which the operative amended complaint was filed, and

when the Fourth Amended Complaint was filed in this case Mr. Abu-Jamal had also

exhausted grievance number 635578, which named each defendant and requested money damages. *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019); *See* Dkt. 302, Exhibit 11 (grievance 635578 from 7/16/16 naming, *inter alia*, Wetzel, Noel, Cowan, DOC's Hepatitis C Committee, DelBalso, Steinhart, and requesting "monetary compensation); *see also* Pl. Appx. Ex. 16, Grievance 635578 (including initial grievance and all grievance appeals and responses.

In *Garrett*, the Third Circuit conducted *de novo* review of a district court interpretation of the PLRA's language that "[n]o action shall be brought . . . until such administrative remedies are available are exhausted" established a requirement "that administrative exhaustion be complete as of the filing of the initial complaint, regardless of whether the complaint is supplemented or amended[.]" *Id.* at 81. The Third Circuit disagreed and held that the date of the filing of an amended complaint is the date from which satisfaction of the PLRA's exhaustion requirement must be assessed:

> "In general, an amended pleading supersedes the original pleading and renders the original pleading a nullity… Thus, the most recently filed amended complaint becomes the operative pleading… It has long been the rule then that where a party's status determines a statute's applicability, it is his status at the time of the amendment and not at the time of the original filing that determines whether a statutory precondition to suit has been satisfied."

*Garrett v. Wexford Health*, 938 F.3d 69, 82 (2019) (internal citations omitted); *see also T Mobile Ne. LLC v. City of Wilmington, Del.*, 913 F.3d 311 (3d Cir. 2019) (holding that although "T Mobile's complaint was not ripe when it was originally filed," the

"supplemental complaint could—and did—relate back to the date of the initial complaint to cure its initial unripeness.").

Thus, the date for "determin[ing] whether a statutory precondition to suit has been satisfied" in this case is the "not at the time of the original filing"; instead, this Court must look to the "time of the amendment" that established the "operative pleading." *Id.* As defendants acknowledged in their statement of facts, the Fourth Amended Complaint is the operative pleading, and it was filed on August 23, 2017. *See* Dkt. 245, Fourth Amended Complaint.

Defendants also acknowledge that Mr. Abu-Jamal filed and exhausted through final appeal to DOC's Central Office grievance number 635578. Dkt. 300, DOC Statement of Material Facts at ¶ 35. What defendants omit from the statement of facts and their briefing is precisely that information which is fatal to their most recent exhaustion argument: namely, that plaintiff named each of the current defendants and requested monetary relief in that grievance. Dkt. 302, Exhibit 11; *see also* Pl. Ex. 16. Plaintiff's final decision from central office on that grievance, finding it frivolous, was dated January 17, 2017, eight months prior to the date of the filing of the Fourth Amended Complaint from which this Court must "determine whether a statutory precondition to suit has been satisfied." *Garrett*, 938 F.3d at 82. Mr. Abu-Jamal named

each defendant and requested money damages, thus satisfying the precondition to suit and rendering defendants' latest exhaustion argument unavailing.[5]

This Court has already addressed the issue as to whether Mr. Abu-Jamal could bring medical care claims in an amended complaint that were only exhausted after his original complaint was filed in May 2015. *See* Dkt. 94, p. 37 ("Claims that arose as a cause of action prior to the filing of the initial complaint may be added to a complaint via an amendment, as long as they are administratively exhausted, prior to the amendment."). In that earlier iteration of the exhaustion defense, DOC counsel argued that the failure to exhaust his medical care claims prior to filing a lawsuit that raised other claims meant that he could not bring these claims in an amended complaint now that they had been exhausted. Dkt. 94, p. 19-20 (relying, incorrectly, on *Ahmed v. Dragovich* 297 F.3d 201 (3d Cir. 2002). This Court rejected that argument, instead assessing exhaustion from the date that the amended complaint was filed. As reinforced by controlling Third Circuit precedent of *Garrett* and *T Mobile*, the same result follows here.

## ii.  In the alternative, defendants have waived this argument

In the alternative, if this Court looks to the date of the First Amended Complaint in this action that raised his medical care claims against some of the DOC defendants for the first time, requesting damages as well, then defendants' latest

---

[5] Plaintiff does not concede that his not naming defendants or requesting money damages in his 2015 grievance constitutes a failure to satisfy 42 U.S.C. § 1997(e).

exhaustion defense should be deemed waived. It is well-established that "[f]ailure to raise an affirmative defense by responsive pleading or by appropriate motion generally results in the waiver of that defense." *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991). "[F]ailure to exhaust administrative remedies is an affirmative defense that Defendants must plead and prove." *Williams v. Nish*, No. 1:11-cv-0396, 2015 WL 106387, *4 (M.D.Pa. Jan. 7, 2015) (quoting *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)). This defense "should be raised as early as possible in the litigation. A party who fails to raise failure to exhaust in a timely fashion may be deemed to have waived the defense." *Id.* (citing *McCoy v. Board of Trs. of Laborers' Int'l Union Local No. 222 Pension Plan*, 188 F. Supp. 2d 461, 467-68 (D. N.J. 2002), aff'd, 60 F. App'x 396 (3d Cir. 2003)). The requirement of raising a defense "as early as possible" is intended "to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed." *Id.* (quoting *Robinson v. Johnson*, 313 F.3d 128, 134-35 (3d Cir. 2002)).

Despite raising various exhaustion arguments on 8 different occasions in this litigation, including the specific argument about plaintiff not requesting damages in his grievance in 2016, defendants failed to raise it for more than three years until this current motion. Although there is a boilerplate pleading that plaintiff failed to exhaust in DOC defendants' answer to the Fourth Amended Complaint, the assertion of the defense is so vague as to not specify *any* claims, defendants, or types of relief that it considered non-exhausted. Dkt. 277, DOC Defendants' Answer, p. 35 ("Plaintiff has

failed to exhaust the available administrative remedies as required by 42 U.S.C. §

1997e(a) and, as a result, he has procedurally defaulted on his claims and judgment

should be entered for Answering Defendants."). This is analogous to the boilerplate

pleading that plaintiff failed to "state a claim" that another Middle District of

Pennsylvania Court found insufficient to preserve an exhaustion defense. *See Williams*,

No. 1:11-cv-0396, 2015 WL 106387, *4. Although exhaustion is invoked in

defendants' response, given the plethora of distinct exhaustion arguments they have

already raised in this case, pertaining to different claims and defendants, this asserted

defense in no way suggested that the DOC intended to re-raise an argument once

raised in 2016 and then subsequently dropped.

If this Court were to determine that any of the exhaustion arguments

pertaining to plaintiff's medical care claims deployed in this DOC defendants' current

motion for summary judgment are valid, plaintiff can no longer remedy the defects by

filing a new lawsuit that follows exhaustion of his 2016-17 grievance, as the statute of

limitations would bar these claims if raised now. This raising, dropping, and re-raising

defenses at a more opportune time are precisely why the waiver doctrine exists.

Plaintiff would be materially prejudiced by permitting this defense at this point in the

litigation after it had previously been abandoned by defendants.

### iii. In the alternative, defendants have acknowledged that monetary damages are not available for medical care grievances at SCI Mahanoy

In the event this Court finds the First Amended Complaint to be the operative pleading, and does not deem the DOC defendants to have waived this exhaustion defense, it remains unavailing in regard to the monetary damages claims, as DOC defendants Steinhart and Kerestes have both stated in writing that monetary relief is not available for medical care grievances in the DOC grievance process. (Pl. Ex. 17, Lester Eaddy Grievance Responses (hereafter "Eaddy Grievances")).

The U.S. Supreme Court has held that a remedy is unavailable "if administrative officials have apparent authority, but decline ever to exercise it." *Ross v. Blake*, 136 S.Ct. 1850, 1859 (2016). Thus, "when the facts on the ground demonstrate that no such potential exists the inmate has no obligation to exhaust the remedy." A direct admission from defendant Steinhart that "Grievances do not deal with monetary demands" unambiguously shows that whether or not DOC personnel have any authority to provide monetary relief for medical grievances, and there is no evidence that they have such authority, SCI Mahanoy officials did not believe they did and "decline[d] to ever exercise it." (Pl. Ex. 17, Eaddy Grievances). This determination was echoed by defendant DelBalso in her upholding of the denial of Mr. Eaddy's grievance. *Id.* It is notable—and dispositive as to the unavailability of monetary relief in the grievance process—that both Steinhart and DelBalso indicate

that monetary damages are not available at all for medical care complaints in the grievance process, and not merely in his individual case.

That monetary damages are not "available" for medical care claims in practice in the Pennsylvania DOC is buttressed by the fact that in his more than 35 years within the Department of Corrections, plaintiff is unaware of any prisoner receiving compensation for a medical care claim through the grievance process. (Pl. Ex. 18, Dec. of Mumia Abu-Jamal, sworn to August 4, 2016, ¶ 19). A procedural default argument in regard to a type of relief that defendants recognize is not available in the grievance process, and which would not have been granted to Mr. Abu-Jamal in any event as the merits of his grievances have been denied consistently, is without merit pursuant to *Ross*.

> ### b.  The claims for injunctive relief against Defendant Delbalso and Silva are moot

As plaintiff has been treated and achieved sustained virologic response pursuant to this court's grant of preliminary injunctive relief, plaintiff agrees that claims for injunctive relief on Count I are now moot.

> ### c.  Plaintiff does not contest that Defendants Kerestes, Wetzel, Oppman, and Steinhart lacked sufficient personal involvement for liability under the Eighth Amendment

Plaintiff does not contest this argument.

### d. Material Issues Of Fact Exist as to Whether Defendant Dr. Noel Was Deliberately Indifferent to a Serious Medical Need When He Refused To Treat Plaintiff's HCV Infection Until February 2017

### The Summary Judgment Standard

The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and the undisputed facts establish the movant's right to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). This burden remains with the moving party "regardless of which party would have the burden of persuasion at trial." *Amon v. Cort Furniture Rental*, 85 F.3d 1074, 1080 (3d Cir. 1996). The duty of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there are issues to be tried. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986). In making that determination, the court is to draw all inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits and depositions in the light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 255. "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotter*, 134 S.Ct. 1861, 1863 (2014). "'if…there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain summary judgment…'". *Amon*, 85 F.3d at 1081, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, at 330, n.2 (1986).

19

**The Right to Medical Care Under the Eighth Amendment.**

Prison officials "have an obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To prevail on an Eighth Amendment medical care claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate a deliberate indifference to that need." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

Hepatitis C constitutes such a serious medical need.  Those who have chronic hepatitis C have a 20-30% chance of deteriorating to cirrhosis, or severe liver scarring. (Cowan: Dkt. 95, p. 200; Trooskin: Pl. Ex. 2, p. 1).

"Hepatitis C constitutes the type of 'serious medical need' which triggers Eighth Amendment scrutiny in a corrections context." *Barndt v. Pennsylvania Dept. of Corrections*, 2011 WL 4830181 at *9 (M.D.Pa. 2011); see also, *Christy v. Robinson*, 216 F.Supp.2d 398, 413 (D.N.J. 2002) and *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). Deliberate indifference to a serious medical need "requires proof that the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Natale*, 318 F.3d at 582 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

In 2011 the Food and Drug Administration began approving drugs known as Direct-Acting Anti-Viral medications for treatment of hepatitis C. If administered to someone who, like Mr. Abu-Jamal, has genotype 1, there was a 90-95% chance of a sustained virological response (SVR). (Trooskin, Pl. Ex. 2, p. 3-4).  If a patient

achieves SVR before progressing to cirrhosis, risk of further disease progression  to

conditions such as cirrhosis, liver cancer or even severe fibrosis would be reduced to

zero. In addition, early treatment (i.e. prior to advanced fibrosis) affords numerous

other health benefits. (Harris: Dkt. 94, p. , 118-121; Cowan: Dkt. 96, p. , 22-27;

Trooskin, Pl. Ex. 2, p. 3).

These new medications are so effective and the individual and societal benefits

so great, that in 2015 the American Association for the Study of Liver Diseases

(AASLD)  recommended that all chronic hepatitis C patients be treated with DAADs

irrespective of fibrosis level. (Harris: Dkt. 94, p. 5-6; Troosin, Pl. Ex.2 p. 3; AASLD

Guidelines, Pl. Ex. 4.) The earlier recommendation for treatment prioritization has

been abandoned as not medically justifiable. (Harris: Dkt. 94, p. , 6; Cowan: Dkt. 96,

24-25; Noel: Dkt. 96, p. , 154; Trooskin: Pl. Ex.2, p. 3-5). The AASLD guidelines

recommending treatment for all constitute the medical standard of care for the

treatment of hepatitis C. (Harris: Dkt 94, p., 123-124;  Trooskin: Pl. Ex. 2, p. 3-5).  In

December 2015, the Center for Disease Control stated that treatment with DAADs

without delay was the standard of care in the United States irrespective of fibrosis

level and referred people to the AASLD for guidance. (Cowan: Dkt. 96, p. 33-34).  In

March 2016, the Department for Veterans Affairs has also abandoned prioritization

and has begun treating everyone with chronic hepatitis C irrespective of fibrosis stage.

(VA Press Release: Pl. Ex. 10).

Defendant Dr. Paul Noel is the DOC's Chief of Clinical Services. (Dkt. 96, p.

90).  He sits on the DOC's Hepatitis C Treatment Committee, the body that

determines whether an inmate with HCV will be treated with DAADs. In 2015

defendant Noel crafted a protocol for the DOC concerning treatment with DAADs.

(Noel: Dkt. 96, p. 129-130.  Under it only those inmates who have deteriorated to

decompensated cirrhosis with esophageal varices (bleeding) are referred for treatment

with the antiviral drugs. A person must be at imminent risk of death or, in Dr. Noel's

words, a "catastrophe" event  before being treated. (Noel: Dkt. 96, p.  104-106, 112,

128). Even those with decompensated cirrhosis but no varices are not treated. They

are simply seen by a medical professional every month. (Noel: Dkt. 96, p. 109).  The

protocol sets forth no plans for providing the cure to those, such as Mr. Abu-Jamal,

who had significant fibrosis or even cirrhosis without portal hypertension. (Noel: Dkt.

96, p. , 127-129). According to Noel, those with cirrhosis but without esophageal

varices "can wait".  (Noel: Dkt. 96, p. 129).  The protocol also does not take into

account those, like Mr. Abu-Jamal was, suffering from debilitating extra-hepatic

manifestations of hepatitis C such as his skin condition, anemia, fatigue and, most

likely, adult-onset diabetes. Those inmates are relegated to suffer from their

extrahepatic conditions until such time as they are on the verge of death from portal

hypertension. This is well below the standard of care in any community. (Trooskin, Pl.

Ex. 2, p. 7-9).  As this Court found in its decision granting a preliminary injunction

> The Hepatitis C Protocol, in both how it is written and how
> it is implemented bars those without vast fibrosis or cirrhosis
> from being approved for DAA medications.  As such the
> Hepatitis C protocol presents a conscious disregard of a
> known risk for inmates with fibrosis, like Plaintiff will suffer
> from Hepatitis C complications.

*Abu-Jamal v. Wetzel*, 16 Civ. 2000, Dkt. 23, p. 20).

The November 2016 protocol fares no better.  As Dr. Trooskin noted in her

report:

> [o]nly those individuals with cirrhosis who satisfied several
> other treatment criteria including length of sentence,
> sobriety criteria, adherence to other medications were given
> "priority level 1" status for treatment.  All other individuals
> were put into one of three priority categories.  All patients
> were subjected to review by the Hepatitis A Treatment
> Committee.  The Chronic Care Clinic Policies (Sections G,
> H and I) reflect the DOC rationing and prioritization
> process.  There was no medical justification for prioritization
> for treatment.  This approach to treatment was in direct
> opposition to the standard of care which was clearly
> established in 2015.  However, it was not until November
> 2018 that the PA DOC committed to the future use of DAA
> medications on a widespread basis, on an incrementally
> increasing basis. This failure to promptly adhere to the
> standard of care resulted in an increased risk of harm to
> incarcerated patients living with HCV.

(Trooskin, Pl. Ex. 2 p. 8).  This Court reached the same conclusion.  *Abu-Jamal v.*

*Wetzel*, 16 Civ. 2000, Dkt. 23, p. 32-33 (finding that November 2016 protocol did not

satisfy Eighth Amendment because it barred those with slight or moderate fibrosis

from treatment and did not ensure that those with vast fibrosis or even cirrhosis

would be treated as they were only referred to Dr. Noel's Committee for a decision).

That the plaintiff was suffering from chronic hepatitis C is not disputed.  At the time of the December 2015 preliminary injunction hearing, defendant Noel acknowledged that plaintiff's HALT-C score was 63, meaning that there was a 63% chance that he had already progressed to cirrhosis.  Yet he was not approved for treatment because his APRI score did not meet the protocol's criteria (Noel: Dkt. 96, p. 120-121.  Yet as explained by the DOC's own expert, Dr. Cowan, the APRI score is not a reliable indicator for cirrhosis.  At lower numbers, such as plaintiff's, it will identify only 37% of those who actually have cirrhosis.  (Cowan: Dkt. 96, p. 36-37). Thus, Noel based his treatment decision on a measurement that fails to identity more than half of the individuals with cirrhosis.  (Trooskin, Pl. Ex. 2, p. 8-9).  Despite this, Noel maintained at the time of the December 2015 hearing that it was "anything but clear" that plaintiff be treated with DAADs. (Noel: Dkt. 96, p. 125.).  His refusal to treat Plaintiff fell far below the standard of care and constitutes deliberate indifference.  As this Court found in its decision and order granting a preliminary injunction delaying treatment

> Allows progression of the disease to accelerate so that it will present a greater threat of cirrhosis, heptocellular carcinoma and death with such disease.

*Abu-Jamal v. Wetzel*, 16 Civ. 2000, Dkt. 23, p. 30. The DOC's protocols, this Court found:

> Does not ensure that those with vast fibrosis or cirrhosis and do not have contraindications will definitely receive DAA medication…"Outright refusal of any treatment for a

24

degenerative condition that tends to cause acute infection and pain if left untreated and imposition of a seriously unreasonable condition [for] such condition both constitute deliberate indifference on the part of prison officials."

*Id*, at 34 quoting *Harrison v. Barkeley*, 219 F. 3d 132, 138 (2d Cir. 2000).

Defendant Noel asserts that there "is no evidence that [he] knew that plaintiff was cirrhotic in 2015/2016". (DOC brief, p. 23). That self-serving assertion is refuted by the record.  First, by October 2015, at the latest, it was the standard of care to treat all chronic HCV patients  with the DAADs.  (Trooskin: Pl. Ex. 2, p. 3-6; Cowan: Dkt. 96, p. 33-35 (acknowledging that AASLD set standard of care and that same standard of care applies to people inside and outside of prison)).

Second, there is ample evidence in the record that Dr. Noel knew that by mid-2015 Plaintiff's Hepatitis C  had caused severe liver damage, if not cirrhosis.  A March 17, 2015 ultrasound performed at Schuylkill Medical Center found Plaintiff's liver to be "echogenic," a sign of severe liver damage (Pl. Ex. 11, Harris: Dkt. 94, p. 130; Trooskin: Pl. Ex. 2, p. 10).  A CT scan performed on April 15, 2015 at the same facility found "fatty infiltration" inside the liver, another sign of cirrhosis (*Id.*). Another CT scan performed on May 17, 2015 at Geisinger Medical Center found the overall appearance of plaintiff's liver to be "irregular" and instructed medical personnel to "please correlate clinically for cirrhosis." (Pl. Ex. 11; Trooskin, p. 11). But no "correlation" was performed.  Indeed, no further effort was made to determine whether plaintiff was, in fact, cirrhotic.  A reasonable fact-finder could

certainly conclude that defendant Noel's failure to follow up on these tests constituted deliberate indifference.

There was even more  evidence that plaintiff's liver was deteriorating. Beginning in October 2015 and lasting up to and including plaintiff's treatment with the DAADs in March 2017, his platelet levels were below the normal range. (Med. Defs. App'x, p. 95, 96, 97, 100, 1576, 1578, 1580, 1582, 1585, 1587, 1589). A reduction in platelet level is a sign of liver damage caused by hepatitis C. (Cowan: Dkt. 96, p. 40-41). As set forth *supra.*, plaintiff's  HALT-C score found that there was a 63% chance that plaintiff had already progressed to cirrhosis. Plaintiff remained anemic, another sign of progressing HCV. (Harris: Dkt. 94, p. 117-118). Finally, plaintiff's skin condition, an extrahepatic manifestation of hepatitis C, continued unabated despite various treatments. Despite this compelling evidence, Dr. Noel testified that plaintiff did not qualify for treatment under the DOC's protocol that he authored.  (Noel: Dkt. 96, p. 125).  Yet when pressed, Noel could not come up with a single  medical reason for denying treatment. (Noel: Dkt. 96, p. 154 ). His refusal to treat plaintiff with no medical justification is the definition of "deliberate indifference." *Farmer,* 511 U.S. at 837 (knowledge of and disregard of an excessive risk to inmate health and safety constitutes deliberate indifference.) See also *Estelle*, 429 U.S. at 104; *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993); *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Likewise, deviation from the accepted standard of

care, in this case the AASLD Guidelines, for treating an illness without medical justification constitutes evidence of deliberate indifference to serious medical needs. *Roe v. Elyea,* 631 F.3d 843, 862-63 (7th Cir. 2011) ("a substantial departure from accepted professional judgment, practice, or standards" without medical justification is deliberate indifference); *De'lonta v. Johnson*, 708 F.3d 520, 525-26 (4th Cir. 2013) (failure to provide care consistent with prevailing standard states a claim under the Eighth Amendment); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (treatment that deviates from professional standards may amount to deliberate indifference). *Cf. BE and AR v. Teeter,* 2016 WL 3033500 (W.D. Wash 2016) (granting preliminary injunction requiring State of Washington to provide hepatitis C direct-acting anti-virals to Medicaid recipients on ground that such treatment is medically necessary).

The expert report of Dr. Kenneth Rothstein that was filed by defendant Noel does not conclusively show otherwise.  (DOC Ex. 27).  Dr. Rothstein asserts that there was no evidence that plaintiff's disease had progressed to cirrhosis in 2015 while at the same time he concludes that plaintiff was cirrhotic in 2015. In doing so, he fails to comment upon the over three-year delay between the time plaintiff was found to have the hepatitis C antibody and the July 2015 test that confirmed that he did, in fact, suffer from chronic hepatitis C. And while he mentions the May 2015 CT scan at Geisinger Medical Center that found an overall irregular liver structure and advised that plaintiff be "correlate[ed] for cirrhosis", he does not comment upon the DOC's

failure to conduct additional testing to confirm whether or not plaintiff was cirrhotic and whether that failure fell below the standard of care.  DOC Ex. 27.

Dr. Rothstein asserts that Plaintiff suffered no adverse consequences from the DOC's failure to treat his hepatitis C.  Yet, as Dr. Trooskin points out, had plaintiff been treated in 2015 or earlier, he might not have progressed to cirrhosis. (Trooskin: Pl. Ex. 2, p. 12)  Additionally, in the time prior to treatment he suffered from fatigue, anemia, and a debilitating skin condition that was and is an extrahepatic manifestation of hepatitis C.  Plaintiff remains at a higher risk for liver failure and liver cancer as a result of defendant Noel's refusal to treat his hepatitis C with the readily available DAADs.  (Trooskin Supplemental Report: Pl. Ex. 3)

Of course, this Court need not resolve the any dispute between Drs. Trooskin and Rothstein.  On this motion for summary judgment, this Court is not to weigh the evidence and decide which expert opinion is worthy of belief.  Those determinations are reserved for the trier of fact. *Anderson,* 477 U.S. at 249.  *Kannankeril v. Terminix International, Inc.,* 128 F.3d 802, 808 (3d Cir. 1997) (weight to be given expert testimony reserved for trier of fact);  *In re Paoli RR Yard PCB Litigation,* 35 F.3d 717, 771, 778 (3d Cir. 1994) (contrary expert opinion that plaintiff's symptoms caused by PCBs sufficient to defeat summary judgment motion); *Ponzini v. Monroe County, et al,* 2015 WL 5123680 (M.D.Pa. 2015)(Mariani, J.); ("Questions about credibility and weight of expert testimony are also for the trier of facts since such testimony is ordinarily not conclusive." (quoting *Drysdal v. Woerth,* 153 F.Supp.2d 678, 689 (E.D. Pa. 2001));

*Transcenic, Inc. v. Google, Inc.*, 2014 WL 7275835 (D.Del. 2014) ("battle of the experts" not amenable to resolution on motion for summary judgment); *Ellison v. United States*, 753 F.Supp.2d 468, 491 (E.D.Pa. 2010) (medical malpractice case denying motion for summary judgment where expert opined that treatment fell below standard of care).

Finally, a reasonable fact-finder could conclude that this is not a case involving a dispute over two acceptable courses of treatment as defendants argue. Plaintiff's hepatitis C was <u>not</u> being treated. He was only being "monitored". As of 2015, there was but one recognized way to treat hepatitis C – with direct-acting antiviral medications that have the 90-95% cure rate. In Mr. Abu-Jamal's case, the failure to treat the disease with DAADs allowed progression to cirrhosis, thereby placing Mr. Abu-Jamal's very life in jeopardy. Had the DAADs been administered in 2015 it likely would have prevented further deterioration of his liver, cure the disease's other complications and alleviate his suffering.

But even if "active surveillance" and palliative measures could be deemed "treatment" they do not satisfy the Eighth Amendment. The provision of some "treatment" will not allow a defendant to evade liability if that treatment is knowingly less effective. *Durmer*, 991 F.2d at 69; *White v. Napoleon*, 897 F.2d 103, 109-11 (3d Cir. 1990); *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978); *Parkell v. Markell*, 622 Fed. App'x. 136, 141 (3d Cir. 2015). As this Court found, "medical treatment [in this case 'monitoring'] may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference. *Abu-Jamal v. Wetzel*, 16 Civ. 2000, Dkt. 23 p. 38.

For the foregoing reasons, a reasonable juror could find that Defendant Noel's failure to treat plaintiff's HCV until March 2017, after being ordered to do so by this Court, constituted deliberate indifference to a serious medical need.

## II.   Plaintiff Is No Longer his Claim Regarding his Skin Condition as a Separate Claim.  Rather it is Part of the Claim Asserted in Count I.

Count II of the Fourth Amended Complaint alleges that the defendants violated the Eighth Amendment by failing to treat plaintiff's skin condition as a manifestation of Hepatitis C.  Plaintiff is no longer pursuing  this as a claim separate from Count I.  Rather, the pain and suffering he experienced due to the skin condition constitute one part of the damages stemming from the failure to treat his HCV with DAADs.  For the reasons set forth *supra*. In subdivision I, *supra.*, material issues of facts exist as to whether 1) his skin condition was an extrahepatic manifestation of his hepatitis C; 2) whether he can recover any damages on account of pain and suffering caused by his skin condition if it was determined to be an extrahepatic manifestation of his hepatitis C; and 3) whether the severity of his skin condition and its correlation with his chronic hepatitis C provided another medical basis for providing him with direct-acting antiviral treatment for his hepatitis C.

## III.   Plaintiff is no longer pursuing his claim of deliberate indifference to his hyperglycemia against DOC defendants

Plaintiff is no longer pursuing his claim of deliberate indifference to his hyperglycemia against DOC defendants and does not challenge defendants' motion

for summary judgment for Eighth Amendment claims brought against defendants for deliberate indifference to his hyperglycemia.

### IV.   Plaintiff's medical malpractice claim against defendant Noel should proceed to trial

#### a.   Plaintiff Is Able to Prove That Defendants' Deliberate Indifference to His Need For Hepatitis C Treatment Caused Him Injury

Chronic hepatitis C patients have a 20-50% chance of deteriorating to cirrhosis, or severe liver scarring. That condition can cause liver failure and other life-threatening complications such as portal hypertension. (Harris: Dkt. 94, p. , 111-112, 151; Noel: Dkt. 96, p., 112.) Moreover, of those who develop cirrhosis, 2% to 7% per year will develop liver cancer. (Cowan: Dkt. 96, p. 21).

When direct-acting anti-viral medications are administered to someone who, like Mr. Abu-Jamal, has genotype 1, there is a 90-95% chance of cure. Risk of disease progression to conditions such as cirrhosis, liver cancer, or even severe fibrosis would be reduced to zero. In addition, early treatment (i.e. prior to advanced fibrosis) affords numerous other health benefits. (Harris: Dkt. 94, p. 118-121; Cowan: Dkt. 96, p., 22-27, Trooskin, Pl. Ex. 2, p. 3). Indeed, when Mr. Abu-Jamal was finally given DAADs, he achieved SVR within 90 days.

During a blood test in 2012, it was revealed that plaintiff had antibodies for the hepatitis C virus. Yet, contrary to the standard of care, there was no further testing to determine whether plaintiff had chronic hepatitis C, i.e. whether he had a viral load.

As discussed *supra*, tests conducted in March and May 2015 showed damage to plaintiff's liver.  The CT scan performed at Geisinger Medical Center in May showed an irregularly shaped liver and it was advised that the test be "correlate[d] for cirrhosis." Pl. Ex. 11). Although aware of those tests, defendant Noel did not follow up.  He also determined that plaintiff not be treated with the DAADs. (Noel: Dkt. 96, p. 120 By the time of the December 2015 preliminary injunction hearing, plaintiff's HALT-C score revealed that there was a 63% chance that plaintiff had already progressed to cirrhosis. *Id.*  His platelet count, a sign of liver damage, was below normal and declining. Yet defendant Noel, relying upon the protocol he authored, refused to treat plaintiff with the DAADs for the remainder of 2015 and throughout 2016.  It was only after this Court issued a preliminary injunction and a diagnostic test revealed that plaintiff had progressed to cirrhosis with portal hypertension that he was approved for treatment.  The refusal to treat plaintiff not only fell below the standard of care established by the AASLD and the CDC, it fell below the DOC's own deficient protocol.  (Harris: Dkt. 94, p. 22; Cowan: Dkt. 96, p. 75; Noel: Dkt. 96, p. 123; Trooskin, Pl. Ex. 2, p. 9-10).  It is virtually indisputable that defendants' delay was the cause of Mr. Abu-Jamal's disease progression, which could have easily become life-threatening.  (Trooskin: Pl. Ex. 2, p. 9-10; 12).  Causation of injury is clearly defendants' delay in administering appropriate treatment.  As Dr. Trooskin stated,

> The portal hypertension was not previously see on prior ultrasounds from 2015, which is evidence that the scarring to his liver progressed in the interval between 2015 and 2017. If [plaintiff] had been treated and cured in 2015 as indicated by the standard of care, the fibrosis would have been significantly less likely to advance in absence of the virus.

(Trooskin, Pl. Ex. 2, p. 12).

### b. DOC Defendants' Certificate of Merit Issue Has Been Waived, Although the Certificate Was Filed in a Timely Fashion

Plaintiff properly filed his certification of merit on March 8, 2016, within the sixty days after filing the complaint as required by Pennsylvania Rule of Civil Procedure 1042.3.

A review of DOC defendants' Answer to the Fourth Amended Complaint will reveal that they did not plead any defense based on an alleged deficiency in the Certificate of Merit filed in this case, thus constituting waiver of this defense. *Charpentier*, 937 F.2d at 863 ("[f]ailure to raise an affirmative defense by responsive pleading or by appropriate motion generally results in the waiver of that defense").

As Defendants point out, should the certificate of merit be deemed untimely, plaintiff would be severely prejudiced by not being able to bring his claim due to the running of the statute of limitations. Defendants had almost four years to raise this defense and failed to do so until the statute of limitations had run. Further, they failed to plead the defense in their Answer. It is therefore waived.

33

### c. Plaintiff did not previously nor is presently bringing a corporate negligence claim against Defendants Noel or Oppman

The heading of this sub-section speaks for itself.

## V.   Plaintiff Is No Longer Pursuing a Medical Malpractice Claim Against DOC Conditions in Regard to His Skin Condition

Plaintiff is no longer pursuing his claim of medical malpractice in regard to his skin condition and does not challenge defendants' motion for summary judgment on the medical malpractice skin condition claims.

## VI.   Plaintiff is no longer pursuing his First Amendment claim of Right of Association and doesn't not challenge defendants motion for summary judgment for this claim

Plaintiff does not contest defendants' summary judgment argument on his First Amendment claim as plaintiff is no longer pursuing this claim.

## VII.   Qualified Immunity Is Not Available to  Defendant Noel

Defendant Noel seeks qualified immunity without so much as referencing the Third Circuit's decision on this issue. That decision articulated the clearly established right and recognized that if plaintiff produces evidence that this right was violated then qualified immunity is not available to him. *Abu-Jamal v. Kerestes*, 779 Fed. Appx. 893 (3d Cir. 2019). As plaintiff has met his burden in this regard, this argument must again fail.

A defendant is not entitled to qualified immunity if plaintiff's facts 1) "make out a violation of a constitutional right," and 2) "the right at issue was 'clearly

established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 815-816 (2009). A right is clearly established when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation and citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell v. Forsyth*, 472 U.S. 511, 535 n. 12 (1985); but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

There need not be precedent involving "fundamentally similar" facts to the case at issue holding the government's conduct unlawful. *Hope*, 536 U.S. at 740-41; *United States v. Lanier,* 520 U.S. 259, 268 (1997). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful[.]'" *Id.* at 270-71 see also *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011). "The salient question is whether the state of the law and the time of the incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). When making a qualified immunity determination on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-

movant, even where, as here, the movant's argument is limited to the "clearly established" prong. *Tolan*, 134 S.Ct. at 1866.

The Third Circuit addressed the question of how to frame the clearly established right in this case in its holding denying DOC defendants qualified immunity at the motion to dismiss stage:

> At the time of the relevant events, it was clearly established that denying particular treatment to an inmate who indisputably warranted that treatment for nonmedical reasons would violate the Eighth Amendment. See id. at 346-47. Despite the Department Defendants' framing, Abu-Jamal's complaint does not rest on the appropriateness of the policy itself or a general right to be treated with the new antiviral drugs. Rather, Abu-Jamal pleads that he had chronic Hepatitis C and cirrhosis, his medical condition was worsening, he was a candidate for the antiviral drugs, there was consensus among the medical community that "everyone with chronic [H]epatitis C be treated with those antiviral drugs irrespective of disease stage," JA 3318, and despite all of this, the Department Defendants denied him antiviral drug treatment for purely cost and non-medical reasons.

*Abu-Jamal*, 779 Fed. Appx. at 900. This holding is dispositive, and it again requires rejection of DOC defendants' qualified immunity defense as plaintiff has produced ample evidence that would allow a finder of fact to determine that DOC defendants denied him hepatitis C treatment for non-medical reasons.

The Third Circuit's holding in this case was not a novel statement of the law either. In fact, the standard for assessing medical care claims under the Eighth Amendment has been clearly established for 40 years. Deliberate indifference to a serious medical need "requires proof that the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Natale*, 318 F.3d at 582. This is not a

"general" standard, especially when applied to the specific context of Mr. Abu-Jamal's case. *Brosseau v. Haugen*, 543 U.S. 194, 195, 198 (2004) (inquiry as to whether conduct violated clearly established law must be made "in light of the specific context of the case" and "construing facts…in a light most favorable to [the nonmovant]").

In a series of cases, the Third Circuit has recognized that when prison officials act with deliberate indifference to a serious medical need qualified immunity is not available. *Rouse*, 182 F.3d at 201 (remanding for determination of "whether each of the individual defendants acted in an objectively unreasonable manner" in regard to insulin-dependent class members for purposes of determining qualified immunity issue); *Pearson v. Prison Health Service*, 850 F.3d 526, 542 n.6 (3d Cir. 2017) (recognizing that "[I]t was sufficiently clear at the time of these events that exposing an inmate to the kind of severe and protracted pain and mental anxiety alleged in this case could expose an official to Eighth Amendment liability"); *Consonery v. Pelzer*, 558 Fed. Appx. 271, 275 (3d Cir. 2014) (recognizing *Estelle* standard for prison medical care claims was "clearly established"); *Foreman v. Bureau of Prisons*, 2007 WL 108457 at *3 (3d Cir. 2007) ("[I]n deciding if individual defendants are entitled to qualified immunity [in prison medical care case], this Court must determine whether they acted with deliberate indifference to Foreman's serious medical needs."); *Meyers v. Majkic*, 189 Fed. Appx. 142, 143 (3d Cir. 2006) ("It is now well established that deliberate indifference to the serious medical needs of a prisoner can rise to the level of a constitutional violation"); *Bines v. Kulaylat*, 215 F.3d 381, 385 (3d Cir. 2000)

(recognizing that qualified immunity determination in prison medical care claim required factual analysis of whether defendant was deliberately indifferent to serious medical need). If a plaintiff can establish as a factual matter that defendants acted with deliberate indifference to a serious medical need then qualified immunity will be unavailing as a defense.

The above-cited cases established that the deliberate indifference standard itself vitiates defendants' qualified immunity defense as it is a form of intentional wrongdoing, and is therefore by definition unreasonable. *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (citing *Carter*). In *Carter*, the Third Circuit explicated how a finding of deliberate indifference will defeat a qualified immunity defense:

> Qualified immunity protects official action "if the officer's behavior was 'objectively reasonable' in light of the constitutional rights affected." If Carter succeeds in establishing that the DA's Office defendants acted with deliberate indifference to constitutional rights – as Carter must in order to recover under section 1983 – then *a fortiori* their conduct was not objectively reasonable.

*Carter*, 181 F.3d at 356.

Other circuit courts have recognized that a finding of deliberate indifference defeats a defense of qualified immunity as well. *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996) (recognizing that qualified immunity and Eighth Amendment analyses "collapse into one" and that "no one in 1989 could reasonably have believed that he could have deliberately ignored a known threat or danger"); *Albers v. Whitley*,

743 F.2d 1372, 1376 (9th Cir. 1984) (recognizing that "A finding of deliberate indifference is inconsistent with a finding of good faith or qualified immunity. The two findings are mutually exclusive."), *reversed on other grounds*, 475 U.S. 312, (1986); *Miller v. Solem*, 728 F.2d 1020, 1024-25 (8th Cir. 1984) ("prison officials are not entitled to an objective good faith defense if they are aware of a risk of injury to an inmate and nevertheless fail to take appropriate steps to protect the inmate from that danger"); *McKee v. Turner*, 124 F.3d 198 [Table], unpublished opinion, 1997 WL 525680 at *4 (6th Cir. 1997) ("it would not make any sense to permit a prison official who deliberately ignored the serious medical needs of an inmate to claim that it would not have been apparent to a reasonable person that such actions violated the law.").

Defendant Noel knew that Mr. Abu-Jamal had tested positive for the hepatitis C antibody in 2012. Yet follow-up testing to determine whether the infection was active was not performed for over three years and only after Plaintiff's counsel demanded that such a test be done. (Letters Pl. Ex. 7; Trooskin: Pl. Ex. 2, p. 9). Defendant Noel also knew that as of mid-2015 the standard of care applicable to those with HCV was to treat with the DAADs without delay irrespective of fibrosis level. (Noel: Dkt. 96, p. 130, acknowledging that the AASLD guidelines call for treatment for everyone. Defendant Noel also knew that plaintiff's disease was progressing rapidly toward cirrhosis if he was not cirrhotic already. Radiology tests showed that plaintiff had severe liver damage suggestive of cirrhosis, had declining platelet levels, had a HALT-C score that indicated that there was a 63% chance that

he had cirrhosis, and that he suffered from a skin condition that was likely an extrahepatic manifestation of active hepatitis C. (Pl. Ex. 11; Noel: Dkt. 96, 120-123; CCS Defendants Exhibit A, p. 95, 96, 97, 100, 1576, 1580, 1583 1585, 1581, 1589). In accordance with the protocol he authored, defendant Noel made the decision not to treat the plaintiff because his disease had not progressed enough to be imminently life threatening or border on a catastrophe. (Noel: Dkt. 96, p. 105-106, 112). His lack of action not only violated the standard of care set by the AASLD, it was deliberately indifferent to plaintiff's serious medical needs. (Trooskin, Pl. Ex. 2, p. 7-10). Defendant Noel acknowledged at the December 2015 preliminary injunction hearing that there was no medical reason to deny plaintiff treatment with the DAADs. (Noel: Dkt. 96, p. 154). Instead of curing the disease with a readily available drug the defendants opted for "active surveillance" and ineffective palliative measures. This refusal to provide a known cure placed Mr. Abu-Jamal at an "excessive risk" to health and safety. *Natale*, 318 F.3d at 582. The palliative measures that were administered do not constitute treatment as they are knowingly less effective that a cure. *Durmer*, 991 F.2d at 69; *White*, 897 F.2d at 109-11; *West*, 571 F.2d at 162; *Parkell*, 622 Fed. App'x. at 141. For these reasons, defendants are not entitled to qualified immunity.

## VIII.  Plaintiff's claim for injunctive relief against DOC Defendants is now moot.

For the reason given previously, that plaintiff has been treated and achieved SVR pursuant to this Court's grant of preliminary injunctive relief, plaintiff agrees that the claim for injunctive relief is moot.

## Conclusion

In conclusion, plaintiff requests that this court deny DOC defendants' motion for summary judgment as to defendants Noel in regard to plaintiff's Eighth Amendment and medical malpractice claims.

/s/ Bret D. Grote
Bret D. Grote
PA I.D. No. 317273
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221
Telephone:  (412) 654-9070
bretgrote@abolitionistlawcenter.org

/s/ Robert J. Boyle
Robert J. Boyle
277 Broadway
Suite 1501
New York, N.Y. 10007
(212) 431-0229
Rjboyle55@gmail.com
NYS ID# 1772094
Pro hac vice

Counsel for Plaintiff

DATE: June 4, 2020

<u>CERTIFICATION</u>

I hereby certify that the foregoing brief consists of 10,742 words as measured

by Microsoft Word's word-counting function and is in compliance with this Court's

June 1, 2020 order permitting Plaintiff to file a brief not to exceed 12800 words.

Dated: June 4, 2020                                  <u>*/s/Bret Grote*</u>
                                                     Bret Grote
                                                     Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of this Brief in Opposition to DOC Defendants Motion for Summary Judgment upon each defendant in the following manner:

### Service By ECF:

For Defendants Kerestes, DelBalso, Norris, Oppman, and Steinhart:
Vincent Mazeski, Esquire
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
vmazeski@pa.gov

For Defendants Lisiak, Khanum, and Saxon:
Samuel H. Foreman, Esquire
Caitlin Goodrich, Esquire
sforeman@wglaw.com
cgoodrich@wglaw.com

/s/ Bret D. Grote
Bret D. Grote
PA I.D. No. 317273
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221
Telephone:  (412) 654-9070
bretgrote@abolitionistlawcenter.org

Dated: June 4, 2020