**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**MUMIA ABU-JAMAL**

      Plaintiff,                  Civil Action No. 3:15-CV-0967

      v.                        MARIANI, J.

**JOHN KERESTES, Supt. SCI Mahanoy,**
**et al.,**

      Defendants.

## PLAINTIFF'S BRIEF IN OPPOSITION TO MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*/s/ Bret D. Grote*
Bret D. Grote
PA I.D. No. 317273
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221
Telephone:  (412) 654-9070
bretgrote@abolitionistlawcenter.org

*/s/ Robert J. Boyle*
Robert J. Boyle
277 Broadway
Suite 1501
New York, N.Y. 10007
(212) 431-0229
Rjboyle55@gmail.com
NYS ID# 1772094
*Pro hac vice*

*Counsel for Plaintiff*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES...………………………………………………...ii

STATEMENT OF THE CASE…………………………………………………...1

QUESTIONS PRESENTED…………………………………………………....11

LEGAL ARGUMENT…………………………………………………….. ...12

   I.    A Reasonable Fact-Finder Could Conclude That Defendants Cowan, Lisiak and Khanum's Refusal to Treat Plaintiff's Hepatitis C with DAADs Constituted Deliberate Indifference to a Serious Medical Need in Violation of the Eighth Amendment……………………….………….………..………..………12

  II.    Plaintiff is no longer pursuing his claim of deliberate indifference to his skin condition…………….…………….………….…………….……………..29

 III.    Defendants Khanum and Saxon are not entitled to summary judgement for Plaintiff's Eighth Amendment claim alleging deliberate indifference to Plaintiff's hyperglycemia……………….…………….…………….…………....................29

 IV.    Evidence that defendants Cowan, Lisiak and Khanum enforced a hepatitis C policy that deviated from the standard of care defeats their motion for summary judgment on plaintiff's medical malpractice claim regardless of whether they had any role in creating the policy………………………………………………..33

  V.    Plaintiff's claim for injunctive relief against DOC Defendants is moot……...34

CONCLUSION………………………………………………………....................35

# TABLE OF AUTHORITIES

## Cases

                                                                                                Page

*Abu-Jamal v. Kerestes*, 779 Fed.Appx. 893 (3d Cir. 2019)…………………....……22, 24

*Abu-Jamal v. Wetzel*, 16 Civ. 2000 (USDC-MDPA)…………………………………….27

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)………………………………………..12

*Amon v. Cort Furniture Rental*, 85 F.3d 1074 (3d Cir. 1996)…………………..…………12

*Anderson v. Creighton*, 483 U.S. 635 (1987) …………………………………………23

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986)…………………………………………12

*Barndt v. Pennsylvania Dept. of Corrections*, 2011 WL 4830181 (M.D.Pa. 2011)………...13

*Beers-Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001) …………………………………26

*Bines v. Kulaylat*, 215 F.3d 381 (3d Cir. 2000) …………………………………....…26

*Brown v. Johnson*, 387 F.3d 1344 (11th Cir. 2004)………………………………………13

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ………………………………....…………………24

*Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999) …………………………26

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)………………………………………...13

*Christy v. Robinson*, 216 F.Supp.2d 398 (D.N.J. 2002)………………………………………13

*Consonery v. Pelzer*, 558 Fed. Appx. 271, 275 (3d Cir. 2014) …………………………25

*De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013) …………………………….....14, 32

*Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993)………………….…....................13, 28, 32

*Estelle v. Gamble*, 429 U.S. 97 (1976)………………………………………13, 13, 25

*Farmer v. Brennan*, 511 U.S. 825 (1994)……………………………………………………13

*Filarsky v. Delia*, 566 U.S. 377 (2012) …………………………………………………..22

*Foreman v. Bureau of Prisons*, 2007 WL 108457 (3d Cir. 2007) …………………………25

*Forrester v. White*, 484 U.S. 219 (1988) …………………………………………………19

*Hope v. Pelzer*, 536 U.S. 730 (2002) …………………………………………………….23

*Meyers v. Majkic*, 189 Fed. Appx. 142 (3d Cir. 2006) …………………………………26

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ……………………………………………….23

*Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987)…13, 32

*Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3d Cir. 2003)…..13, 25, 28-29

*Parkell v. Markell*, 622 Fed. App'x. 136 (3d Cir. 2015). ……………………………….28

*Pearson v. Callahan*, 555 U.S. 223 (2009) …………………………………………..19, 22

*Pearson v. Prison Health Service*, 850 F.3d 526 (3d Cir. 2017) ……………………….23,25

*Redden v. Ballard*, 2018 WL 4327288, at *8 (S.D.W.Va. 2018) …………………….…..20

*Richardson v. McKnight*, 521 U.S. 399 (1997) ………………………………………..19.20

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)………………………….14,18

*Roe v. Elyea,* 631 F.3d 843 (7th Cir. 2011)………………………………….…..14, 32

*Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999)………………………………....13, 25, 32

*Schneyder v. Smith*, 653 F.3d 313 (3d Cir. 2011)…………………………………..…23

*Smith v. Jenkins*, 919 F.2d 90 (8th Cir. 1990) …………………………………...…14, 32

*Tolan v. Cotter*, 572 U.S. 650 (2014)…....………………………….............12, 24

*West v. Atkins*, 487 U.S. 42 (1988) ……………………………………………....21

*West v. Keve*, 571 F.2d 158 (3d Cir. 1978……………………………………………………..28

*White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990) …………………………………………28

*United States v. Lanier,* 520 U.S. 259 (1997) …………………………………………..23

## Statutes

42 U.S.C. § 1983…………………………………………………………………………19

## **STATEMENT OF THE CASE**

On May 18, 2015, plaintiff Mumia Abu-Jamal, an incarcerated person at SCI Mahanoy filed the initial complaint, *Abu Jamal v. Kerestes*, alleging a denial of his First Amendment rights arising from a denial of visitation while hospitalized at an outside facility. (Dkt. 1).[1] Thereafter, the complaint was amended and causes of action added alleging violations of his Eighth Amendment right to adequate medical care. The gravamen of the current, Fourth Amended Complaint is that the defendants were deliberately indifferent to Mr. Abu-Jamal's serious medical needs 1) when they refused to administer Direct Acting Anti-Viral Drugs (DAADs) to treat plaintiff's progressing hepatitis C infection, and 2) when they refused to monitor and treat dangerously elevated glucose levels resulting in a life-threatening episode of diabetic ketoacidosis. Dkt. 245, Fourth Amended Complaint (hereafter "4AC"). The Fourth Amended Complaint, names, *inter alia*, defendants Cowan, Lisiak, Saxon, and Khanum as among those responsible for the lack of medical treatment.

### **Hepatitis C**

Hepatitis C is a virus that infects the liver cells. (Trooskin: Pl. Ex. 2, p. 1). More than 17,000 people in the United States die each year from liver disease caused by Hepatitis C, a death rate that is higher than that of any other infectious disease. (Dr.

---

[1] Numerals preceded by "Dkt" refer to the documents number assigned to the pleading on the docket sheet.

Trooskin: Pl. Ex. 2, p.1; CV Pl. Ex. 1).[2] Even before the advanced stage of cirrhosis individuals with chronic HCV can suffer from increased rates of heart attacks, diabetes, decreased cognitive function, fatigue, joint pain, depression, sore muscles, arthritis, various cancers, nerve damage and jaundice. (Trooskin: Pl. Ex. 2, p. 1). At least 20 % of those suffering from chronic HCV will develop cirrhosis. (Trooskin, Pl. Ex.2, p. 1). 5% of those who develop cirrhosis will develop hepatocellular carcinoma annually. (Trooskin, Pl. Ex. 2, p. 1; Cowan: Dkt. 96, p. 21-22).[3] 20 % of chronic hepatitis C patients will die from complications of the disease (liver cancer or cirrhosis) (CDC Report: Pl. Ex. 6). Disease progression is measured by the extent of scarring, or fibrosis, to the person's liver.  F0 and F1 indicates minimal scarring.  F2 is an intermediate stage while F3 indicates severe fibrosis and F4 indicates cirrhosis. (Trooskin, Pl. Ex. 2, p. 2).

Beginning in 2011, the Food and Drug Administration (FDA) began approving a series of drugs, known as DAADs capable of curing hepatitis C infections. (Trooskin, Pl. Ex. 2, p. 2).  These drugs have come to have a 90-95% cure rate. (Trooskin, Pl. Ex. 2, p. 3).

---

[2] "Pl. Ex.  " refers to the Exhibits contained in the single Appendix filed in opposition to the DOC Defendants and Medical Defendants motions for summary judgment.
[3] The transcript of the December 2015 preliminary injunction hearing is on file. Dkt. 94 refers to the proceedings on December 18, 2015, Dkt. 95 refers to the proceedings on December 22, 2015 and Dkt. 96 refers to the proceedings on December 23, 2015.

The American Association for the Study of Liver Diseases (AASLD) develops nationwide standards for the care and treatment of chronic hepatitis C. (Trooskin, Pl. Ex. 2, p. 1). As of June 2015, the AASLD recommended that all HCV patients be treated with DAADs irrespective of fibrosis level but maintained prioritization categories. (Pl. Ex. 4; Harris: Dkt. 94, p. 122). As of October 2015, the AASLD abandoned prioritization and simply stated that all HCV patients should be treated with DAADs without delay. (Pl. Ex. 5; Harris: Dkt. 94, p. 5-8; Trooskin, Pl. Ex. 2, p. 3). In December 2015, the Center for Disease Control stated that treatment with DAADs was the standard of care in the United States irrespective of fibrosis level and referred people to the AASLD for guidance. (Cowan: Dkt. 96, p. 33-34). Treatment with DAADs would reduce to zero the probability of a hepatitis C patient progressing to cirrhosis or liver cancer (Cowan: Dkt. 96, p. 22). Early treatment also offers a host of other health benefits such as reducing fatigue, reducing the chance of diabetes and renal and cardiological complications (Cowan: Dkt. 96, p. 26-28).

The plaintiff, Mumia Abu-Jamal, is in the custody of the Pennsylvania Department of Corrections (DOC) and housed at the State Correctional Institution at Mahanoy. *Id.* In or about 2012, plaintiff tested positive for the anti-body of the hepatitis C virus. (Medical Defendants' Ex. A, p. 176-180). No follow-up testing to determine whether plaintiff suffered from chronic hepatitis C was conducted. (Abu-Jamal: Dkt. 94, p. 47; Trooskin, p. 9). Three and a half years later, and only after protests, from plaintiff's counsel, the medical defendants performed a diagnostic test

3

that confirmed that plaintiff suffered from chronic hepatitis C. (Trooskin, Pl. Ex. 2, p.

9 Letters from Counsel: Pl. Ex. 7). The failure of medical defendants to perform such

follow-up tests in 2012 fell below the standard of care. (Trooskin: Pl. Ex. 2, p. 9).

20-40% of chronic hepatitis C sufferers have skin conditions linked to hepatitis

C. (Article: Pl. Ex. 8). Although its severity has waxed and waned, plaintiff has

suffered from a frequently debilitating skin condition since the fall of 2014 to the

present.  It has been diagnosed alternatively as eczema, psoriasis and pruritis. (See, e.g.

Medical Defendants Ex. A, p. 384, 386,  388-389, 386).  Common dermatological

conditions such as psoriasis and pruritis have been linked to hepatitis C. (10; Harris:

Dkt. 94, p. 113-117). Drs. Schleicher and Cowan themselves admitted in their

testimony at the December 2015 preliminary injunction hearing that at least 20-40%

of hepatitis C patients suffer from skin conditions, including psoriasis and pruritis.

(Schleicher: Dkt. 95, p. 82; Cowan: Dkt. 96, p. 44).  By February 2015 this pruritic

skin rash covered 75-80% of Plaintiff's body. (Abu-Jamal: Dkt. 94, p.  49-50; Medical

Defendants' Exhibit A, p. 384, 386, 389).

One of the ways used to determine the liver fibrosis (scarring) level is to

determine the patient's APRI score. (Cowan: Dkt. 95, p. 205). At lower numbers, i.e.

less than 1, the APRI score is unreliable as it will only identify 37% of those who

actually have already progressed to cirrhosis. (Cowan: Dkt. 96, p. 36; Trooskin, Pl. Ex.

2, p. 8). The best test for measuring liver damage is the transient elastography, also

known as a Fibroscan (Trooskin, Pl. Ex. 2, p. 9). Plaintiff did not have a Fibroscan until March 29, 2017 (Trooskin, Pl. Ex. 2, p. 9).

The medical defendants were aware that plaintiff's disease was progressing and required immediate treatment.  Beginning in October 2015 and lasting up to and including plaintiff's treatment with the DAADs in March 2017, his platelet levels were below the normal range. (Med. Defs. App'x, Exhibit A,  p. 95, 96, 97, 100, 1576, 1578, 1580, 1582, 1585, 1587, 1589).  A reduction in platelet level is a sign of liver damage caused by hepatitis C. (Cowan: Dkt. 96, p. 40-41).

An abdominal ultrasound of the plaintiff performed at Schuylkill Medical Center on March 16, 2015 showed that plaintiff's liver was "echogenic suggesting some degree of hepatic parenchymal disorder:" (Pl. Ex. 11, p. 1). A CT of plaintiff's abdomen conducted on April 15 , 2015 showed fatty infiltration of the liver consistent with liver damage caused by hepatitis C. (Pl. Ex. 11, p. 2). A CT scan of the liver conducted on May 14, 2005 at Geisinger Medical Center found that the "overall appearance of [plaintiff's] liver to be irregular, please correlate clinically for cirrhosis." (Pl. Ex. 11, P. 4). Except for bloodwork, medical defendants did no follow-up testing of plaintiff's liver such as a Fibroscan to determine the extent of liver damage.

Another diagnostic tool for determining liver damage is the HALT-C score. (Noel: Dkt. 96, p. 119-120). As of the fall of 2015, Plaintiff's HALT-C score was 63, meaning that there was a 63% chance that he had already progressed to cirrhosis. (Noel: Dkt. 96, p. 120-123).

Notwithstanding the foregoing tests, defendants Khanum and Lisiak, and later defendant Cowan, never recommended a Fibroscan or treatment with DAADs for plaintiff.  Defendants were doctors employed by the medical contractor, Correct Care Solutions (CCS), and as such were responsible for plaintiff's care while he was at SCI Mahanoy and they were employed there. (Lisiak Deposition Transcript: Pl. Ex. 12 (p. 6-7, 9-10; Khanum Deposition Transcript: Pl. Ex. 13, p. 6-7, 8-9.) They were familiar with his medical conditions, including his hepatitis C, as is evidenced by plaintiff's medical records containing their names. *See also*, Lisiak Deposition, *passim*; Khanum Deposition, *passim*.

At the time of his December 2015 preliminary injunction hearing testimony, defendant Dr. Jay Cowan was  a paid consultant of the Correct Care Solutions (CCS) Hepatitis C treatment Committee for the Pennsylvania DOC. (Cowan: Dkt. 96, p. 4-5). At about the same time, DOC Defendant Dr. Noel drafted the DOC's 2015 interim hepatitis C protocol that purported to set criteria for treatment with DAADs. (Noel: Dkt. 96, p. 99-101). The interim protocol did not prioritize treatment for all inmates. Rather it was geared to identifying those with advanced disease. (Noel: Dkt. 96, p. 101, 127). Under it, only those hepatitis C patients with cirrhosis with esophageal varices, i.e. portal hypertension were referred for further treatment. (Noel, Dkt. 96, 105). If the patient had cirrhosis but no portal hypertension they were not given treatment but simply evaluated every six months. (Noel: Dkt. 96, p. 106).

Defendant  Cowan reviewed plaintiff's medical records. (Cowan: Dkt. 96, p. 29). He also attended meetings of the Committee during which plaintiff's request for treatment with DAADs was discussed. (Cowan: Dkt. 96, p. 5). The Committee prepared a report that Dr. Cowan reviewed prior to its submission to the Pennsylvania DOC. (Cowan: Dkt. 96, p. 28). That report determined that the Plaintiff was ineligible for treatment with DAADs and rejected the AASLD's recommendations as mere "opinion". (Dkt. 96, p. 6, 30, referring to Pl. Ex. 14).  Dr. Cowan agreed with and acquiesced in that decision even though he admitted at the preliminary injunction hearing that the October 2015 AASLD guidelines eliminated prioritization, and acknowledged that treatment for all with chronic hepatitis C infections was the standard of care. That plaintiff was denied treatment without medical justification was illustrated by Dr. Cowan's admission that he would have recommended treatment if plaintiff were not incarcerated. (Cowan: Dkt. 95, p. 211-212; Dkt. 96 p. 4-5 33-37, 83, v2 211-212; Trooskin, Pl. Ex. 2, p.  6, 8-9). Defendant Cowan acknowledged that the APRI score, upon which he relied to deny treatment, is unreliable. (Dkt. 96, p. 36). Yet he determined that under the DOC protocol, plaintiff's condition should simply be monitored every 30-90 days.  (Dkt. 95, p. 220).

Defendants Khanum and Lisiak were to gather relevant diagnostic information for use in treatment decisions by the DOC's Hepatitis C Committee. (Khanum: Pl. Ex. 13, p. 49-50; Lisiak Deposition: Pl. Ex. 12, p. 49-50). Even though both Khanum and Lisiak are bound to follow the standard of care for treating medical patients, both

abdicated this responsibility in declining to assess the need for treatment of plaintiff's

hepatitis C and recommend such treatment. (Khanum Deposition, Pl. Ex. 13 p.  49-

50; Lisiak Deposition: Pl. Ex. 12, p. 52 (testifying they are bound by "the standard of

care of medicine, but we also do follow any protocol of treatment of any medical

condition in the DOC" and then testifying that he would not recommend anybody

for hepatitis C treatment pursuant to the DOC protocol)).

    In refusing to make that treatment recommendation, defendants Lisiak and

Khanum did not comment upon or even mention the diagnostic tests in plaintiff's

medical chart, including but not limited to the May 15, 2015 CT scan conducted at

Geisinger Medical Center that showed that the structure of plaintiff's liver was

irregular and that he should be "correlated" for cirrhosis. (Pl. Ex. 11).

    Defendants Cowan, Lisiak, and Khanum never ordered or recommended

treatment of plaintiff's hepatitis C, even though they were aware that such was the

standard of care. In implementing the DOC's hepatitis C protocol each participated

and acquiesced in an unconstitutional denial of necessary treatment for a serious

medical need. (Trooskin, Pl. Ex. 2, p. 6-8).

    The order authorizing plaintiff's treatment with DAADs was issued on March

30, 2017 following this Court's issuance of a preliminary injunction.  *See Abu-Jamal v.*

*Wetzel*, 16 Civ. 2000, Dkt 23.   The decision to treat was also made after it was

determined that plaintiff suffered from severe F4 cirrhosis with portal hypertension.

(Medical Defendants Exhibit A p. 1603 and Exhibits L and M). Had the plaintiff been

treated with DAADs when they became available, it is "almost certain" that he would have avoided further disease progression. (Cowan: Dkt. 96, p. 23; Trooskin, Pl. Ex. 2, p. 4-5). Had plaintiff been treated with DAADs before his condition progressed to cirrhosis, his risk of developing cirrhosis and/or liver cancer would have been reduced to almost zero. (Cowan: Dkt. 96, p. 22; Trooskin, Pl. Ex. 2, p. 4-5). There was no medical reason for failing to treat the Plaintiff earlier. (Trooskin, Pl. Ex. 2, p. 4-6; Noel: Dkt. 96, p. 154). The delayed treatment accorded the plaintiff fell far below the standard of medical care and is not medically defensible. (Trooskin: Pl. Ex. 2, p. 6).

The failure to treat plaintiff earlier harmed his health. On February 16, 2017, an abdominal ultrasound of plaintiff's liver found chronic liver disease with portal hypertension. (Medical Defendants Exhibit A, p. 1604). That the portal hypertension was not seen in prior ultrasounds is evidence that scarring of the liver progressed between 2015 and 2017. (Trooskin, Pl. Ex. 2, p. 12). Because he progressed to cirrhosis before being treated with DAADs, plaintiff remains at higher risk for liver cancer and liver failure that the general population and must undergo testing for liver cancer every six months for the rest of his life.  (Trooskin, Pl. Ex. 2, p. 12).

**Hyperglycemia**

In early 2015 Plaintiff's blood glucose levels began to rise. By March 6, 2015, they had risen to 419. (Med. Defs. Appx, Ex. A, p. 164.; Khanum Deposition Transcript, P. Ex. 13, p.  22-24, 30;  Saxon Deposition Transcript, Pl. Ex. 15, p. 19). Despite defendants Saxon and Khanum being aware that plaintiff's glucose was

dangerously elevated, and that such elevation could result in diabetic ketoacidosis, diabetic coma, or even death, neither of them took the minimal and obvious step to measure his glucose level between March 6 and March 30, 2015. (Khanum Deposition Transcript, Pl. Ex. 13, p. 22-27, 30, 35, 37, 47; Saxon Deposition Transcript, Pl. Ex. 15, p.  14, 19-20, 28). On March 30, 2015, Mr. Abu-Jamal lost consciousness and was rushed to Schuylkill Medical Center where his blood glucose level was determined to be 507. (Medical Defendants' Exhibit A, p. 378-379; Medical Defendants Exhibit B, p. 124-135).  Upon his return to SCI Mahanoy, plaintiff experienced extreme weakness.  On one occasion when he rose to use the bathroom he fell to the ground and remained there for 20-25 minutes before help arrived. (Abu-Jamal: Dkt 94, p. 62-65; Medical Defendants Exhibit A, p. 960-961).

On May 10, 2018, this Court denied in part and granted in part DOC and medical defendants' respective motions to dismiss the Fourth Amended Complaint. Dkt. 272, 273. DOC defendants took an interlocutory appeal on issues of qualified immunity and exhaustion of administrative remedies. Dkt. 278, Notice of Appeal**.** The Third Circuit affirmed the district court's ruling on appeal, remanding for further proceedings. *Abu-Jamal v. Kerestes*, 779 Fed. Appx. 893 (3d Cir. 2019). Fact and expert discovery in this matter have been completed. Medical defendants have filed a motion for summary judgment, which plaintiff opposes herein.

## **Questions presented**

1.  Could a rational trier of fact find that defendants Cowan, Lisiak and Khanum were deliberately indifferent to a serious medical need when they participated in and/or acquiesced in the decision to deny plaintiff treatment with DAADs?

Suggested Answer: Yes

2.  Should the Court grant defendants Lisiak, Khanum, and Saxon summary judgment on plaintiff's Eighth Amendment claim regarding his skin condition since plaintiff is no longer pursuing that as a separate claim but rather as part of the hepatitis C Eighth Amendment claim?

Suggested Answer: Yes

3.  Could a rational trier of fact conclude that Defendants Khanum and Saxon were deliberately indifferent to a serious medical need with respect to plaintiff's hyperglycemia?

Suggested Answer: Yes

4.  Do disputes of material fact require a trial on plaintiff's medical malpractice hepatitis C claim against medical defendants?

Suggested Answer: Yes

5.  Should the Court grant medical defendants motion for summary judgment on plaintiff's claim for injunctive relief pertaining to his hepatitis C claims as these claims are now moot?

Suggested Answer: Yes

<u>**Legal Argument**</u>

I.     **A Reasonable Fact-Finder Could Conclude That Defendants Cowan, Lisiak, and Khanum's Refusal to Treat Plaintiff's Hepatitis C with DAADs Constituted Deliberate Indifference to a Serious Medical Need in Violation of the Eighth Amendment.**

**The Summary Judgment Standard.**

The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and the undisputed facts establish the movant's right to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). This burden remains with the moving party "regardless of which party would have the burden of persuasion at trial." *Amon v. Cort Furniture Rental*, 85 F.3d 1074, 1080 (3d Cir. 1996). The duty of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there are issues to be tried. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986). In making that determination, the court is to draw all inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits and depositions in the light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 255. "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotter*, 134 S.Ct. 1861, 1863 (2014). "'if…there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving

party simply cannot obtain summary judgment…'". *Amon,* 85 F.3d at 1081 (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, at 330, n.2 (1986)).

**The Right to Medical Care Under the Eighth Amendment**

Prison officials "have an obligation to provide medical care for those whom it

is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To prevail on

an Eighth Amendment medical care claim, a plaintiff "must show (i) a serious medical

need, and (ii) acts or omissions by prison officials that indicate a deliberate

indifference to that need." *Natale v. Camden County Correctional Facility*, 318 F.3d 575,

582 (3d Cir. 2003).

"Hepatitis C constitutes the type of 'serious medical need' which triggers

Eighth Amendment scrutiny in a corrections context." *Barndt v. Pennsylvania Dept. of

Corrections*, 2011 WL 4830181 *9 (M.D.Pa. 2011); see also, *Christy v. Robinson*, 216

F.Supp.2d 398, 413 (D.N.J. 2002) and *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir.

2004). Deliberate indifference to a serious medical need "requires proof that the

official 'knows of and disregards an excessive risk to inmate health or safety.'" *Natale*,

318 F.3d at 582 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Denial of a life-saving treatment with no medical justification is the definition

of "deliberate indifference." *Farmer,* 511 U.S. at 837 (knowledge of and disregard of an

excessive risk to inmate health and safety constitutes deliberate indifference.) See also

*Estelle*, 429 U.S. at 104; *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993); *Monmouth

County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987); *Rouse v.

*Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Likewise, deviation from the accepted

standard of care for treating an illness without medical justification constitutes

evidence of deliberate indifference to serious medical needs. *Roe v. Elyea,* 631 F.3d

843, 862-63 (7th Cir. 2011) ("a substantial departure from accepted professional

judgment, practice, or standards" without medical justification is deliberate

indifference); *De'lonta v. Johnson*, 708 F.3d 520, 525-26 (4th Cir. 2013) (failure to

provide care consistent with prevailing standard states a claim under the Eighth

Amendment); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (treatment that deviates

from professional standards may amount to deliberate indifference).

"A defendant in a civil rights action must have personal involvement in the

alleged wrongs[.]" *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Participation in or knowledge and acquiescence to a constitutional violation will

support a finding of personal involvement. *Id.*

### Defendant Dr. Jay Cowan

The record readily establishes, largely through defendant Cowan's own

testimony that he had sufficient personal involvement in the decision to deny Mr.

Abu-Jamal treatment in accordance with the standard of care for hepatitis C.

Defendant Dr. Jay Cowan was a paid consultant of Correct Care Solutions, the

contract health provider for the Pennsylvania DOC.  He became part of its Hepatitis

C Treatment Committee in October 2015. That Committee made treatment

recommendations to the DOC. (Dkt. 96, p. 4-5). He reviewed plaintiff's medical

records. (Cowan: Dkt. 96, p. 29). He attended meetings of the Committee during

which Plaintiff's request for treatment with DAADs was discussed. (Cowan: Dkt. 96,

p. 5). The Committee prepared a report that Dr. Cowan reviewed and joined prior to

its submission to the Pennsylvania DOC (Cowan: Dkt. 96, p. 28). That report

determined that the plaintiff was ineligible for treatment with DAADs and rejected

the AASLD's recommendations as mere "opinion". (Dkt. 96, p. 6, 30, referring to Pl.

Ex. 14). According to the Committee upon which Dr. Cowan sat:

> It is our recommendation that Mr. [MA-J] be continued in
> the HCV chronic care clinic with ongoing evaluation for
> HCV consistent with the BHCS guidelines for the evaluation
> of HCV virema…Mr. Abu-Jamal does not have clinically
> apparent portal hypertension

(Pl. Ex. 14).  In other words, Dr. Cowan opined that under the DOC protocol unless

plaintiff's condition deteriorated to cirrhosis with portal hypertension, he need not be

treated *Id.* See also (Cowan: Dkt 95, p. 220).  Notwithstanding the foregoing  Cowan

himself admitted that as of December 2015, treatment with DAADs was the standard

of care for all HCV patients irrespective of fibrosis level. (Cowan: Dkt. 96, p. 33-35;

Trooskin, Pl. Ex. 2, p. 3).

Dr. Cowan sought to justify the denial of treatment through reliance on plaintiff's

APRI score, an indicator of liver damage.  According to Dr. Cowan, under that test,

Mr. Abu-Jamal was a fibrosis level 2 and would not qualify for treatment under the

DOC's protocol. (Dkt., 96, p. 66-67; 75). That decision fell below the standard of

care. As of October 2015, the AASLD's guidelines stated that all HCV patients should

be treated irrespective of fibrosis level.  (AASLD October 2015 Guidelines, Pl. Ex. 5, p. 1-2; Trooskin, Pl. Ex. 2, p-3-4).  But Dr. Cowan's deliberate indifference to plaintiff's health went beyond that.  Dr. Cowan knew that the APRI test upon which he relied was not reliable.  It identifies only 37% of those who actually have cirrhosis. (Cowan: Dkt. 96, p. 36; Trooskin: Pl. Ex. 2, p. 8-9).  He was also aware that as of December 2015, plaintiff's platelet levels were, and had been, below normal for months.  Plaintiff also suffered from anemia.  As defendant Cowan admitted, both conditions are signs of HCV disease progression (Cowan: Dkt. 96, p. 41, 56-57).  In addition, Dr. Cowan knew of the CT scan of plaintiff's liver conducted at Geisinger Medical Center in May 2015. That test found the shape of plaintiff's liver to be irregular and suggested that the result be correlated for cirrhosis. (Cowan: Dkt. 96, p. 59-61). Defendant Cowan ignored the recommendations of Dr. Ramon Gadea, an infectious disease specialist. In September 2015, Dr. Gadea stated that plaintiff's skin condition "could be secondary to Hepatitis C" and that if a rheumatology consultation ruled out other disorders "consider obtaining approval for hepatitis C treatment." (Gadea Report: Pl. Ex. 9; Trooskin: Pl. Ex. 2, p. 11). When other disorders were ruled out, plaintiff was still not treated with the DAADs. (*Id.*). Dr. Cowan simply recommended that plaintiff be monitored every 30 to 90 days. (Cowan: Dkt. 95, p. 220).  This fell below the standard of care.  As Dr. Trooskin has opined:

> Mere observation and "monitoring" of HCV patients with no medical treatment is medically inappropriate, falls below the standard of care, and risks the life of the individual with

> HCV.  Delaying treatment has a variety of adverse effects
> including increasing risk of death, causing irreversible liver
> damage and needlessly prolonging suffering associated with
> the disease.

(Trooskin, Pl. Ex. 2, p. 6).  Dr. Cowan's deliberate indifference caused harm to

Plaintiff:

> The PA DOC failed to adhere to the standard of care and
> did not even adhere to their own flawed protocol when they
> failed to recognize the presence of cirrhosis in Mr. Abu-
> Jamal in a timely fashion.  They unnecessarily delayed
> curative treatment allowing damage to Mr. Ab-Jamal's liver
> to progress resulting in the development of portal
> hypertension.

A vivid illustration of how denial of treatment to Mr. Abu-Jamal had no medical

justification was Dr. Cowan's admission that he would have recommended treatment

for Mr. Abu-Jamal if the plaintiff were not incarcerated and could afford to pay for

the DAADs.  (Cowan: Dkt. 96, p. 33-35; 68).

Defendant Cowan participated and/or acquiesced in a decision to withhold

treatment from plaintiff despite his knowledge that the treatment was necessary to

prevent worsening medical harm and constituted the standard of care for treatment of

hepatitis C. *Rode*, 845 F.2d at 1207.  A rational trier of fact could conclude that he had

sufficient personal involvement in the denial of HCV treatment under *Rode*. 845 F.2 at

1207.  His motion for summary judgment should be denied.

17

**Defendants Drs. Lisiak and Khanum**

Defendants Lisiak and Khanum, personal involvement in failing to treat plaintiff's HCV is shown through 1) their adherence to the DOC protocol despite its deviation from the standard of care, 2) their failure to conduct necessary diagnostic tests, and 3) their acquiescence in a policy of withholding medical care despite its being medically necessary to prevent plaintiff's condition from further deteriorating. (Khanum Deposition: Pl. Ex. 13, p. 49-50; Lisiak Deposition: Pl. Ex. 12, p. 52).

Defendants Lisiak and Khanum knew that plaintiff tested positive for the hepatitis C antibody in 2012, yet they failed to order a test for more than three years to see if he had an active infection. This fell below the standard of care. (Harris: Dkt. 94, p. 127; Trooskin: Pl. Ex. 2, p. 9). But they had further reason to investigate and move to treat his hepatitis C. A March 2015 ultrasound and a May 2015 CT scan in April 2015 revealed evidence of liver damage consistent with cirrhosis (Pl. Ex. 11)

Defendants Lisiak and Khanum were very familiar with plaintiff's severe skin condition. Yet despite the recommendations of infectious disease specialist Ramon Gadea they never pursued testing or treatment of his hepatitis C, even after plaintiff and his counsel were advocating for such informally and in court. Instead, the medical record shows them taking no action in regard to his hepatitis C, and their own testimony implicates them in accepting no role in treating their patient's hepatitis C other than obtaining diagnostic information. (Khanum Deposition: Pl. Ex. 13, p. 49-50; Lisiak Deposition, Pl. Ex. 12 p. 52). Accordingly, they were involved in plaintiff's

non-treatment of a serious medical need despite being aware of his condition and the obvious risks it posed. They are not entitled to summary judgment.

### a.  Defendants are not entitled to qualified immunity

### i.  As private contractors, defendants are precluded by Supreme Court precedent from asserting the defense of qualified immunity

"Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy." *Forrester v. White*, 484 U.S. 219, 224 (1988). As the private medical defendants stated in their brief on this issue, "[t]he doctrine of qualified immunity protects *government* officials from liability[.]" Medical Defs.' Brief in Support of Summary Judgment, p. 4 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (emphasis added). The U.S. Supreme Court has recognized "that private actors are not automatically immune" when subject to a lawsuit pursuant to 42 U.S.C. § 1983. *Richardson v. McKnight*, 521 U.S. 399, 412 (1997). Instead, the Supreme Court has instructed that the history and purpose of qualified immunity must be assessed in the context of each case in order to determine if qualified immunity applies to a private actor operating under color of state law. *Id.* at 402-04.

The CCS medical defendants failed to meet their burden of showing that qualified immunity should be extended to them. They did not discuss or even cite *Richardson*, which is directly on-point and dispositive on this issue, and instead relied on a non-binding district court opinion of dubious merit.

In *Richardson*, the Supreme Court held that defendant prison guards who were employed at a private prison facility contracted with the state of Tennessee were not entitled to a defense of qualified immunity. *Id.* at 401. Central to the Court's ruling were the following: 1) the Court's determination that there was no historical support for extending such immunity to "private individuals working for profit" to administer prisons, *Id.* at 404-07; 2) the "competitive market pressures" involved in the private prison industry vitiated the policy rationalizations behind the qualified immunity construct as the threat of competition will in theory incentivize both constitutional compliance and optimal performance, *Id.* at 409; and 3) privatization itself carries with it a greater prospect of insurance-coverage and indemnification, thus cutting against the potential deterring of qualified job applicants due to the prospect of civil liability. *Id.* at 411. There is no meaningful distinction between *Richardson*'s analysis of these factors in regard to two prison guards and the case before this Court in regard to the medical defendants. All were employed by a private contractor who was providing services (correctional in nature in *Richardson*, medical services in this case) on an institutional scale for profit. The private contractors in *Richardson* and this case face the same respective market pressures.[4] If anything, the rationale for extending qualified immunity is weaker in this case than it was in *Richardson*, as the latter

---

[4] Corizon, Wexford Health Services, Correct Care Solutions are among the companies that have been contracted to provide medical care to patients incarcerated in the PA DOC in the past decade alone.

involved a use of force claim that arguably implicated the Supreme Court's concerns over staff timidity in carrying out their job functions in an environment where there may be little time for studied reflection. Medical defendants here, however, are implicated in months-long conduct informed by a deliberate, thought-out, slow-moving policy determination to deny medical care to plaintiff for reasons of cost.

Defendants rely on a district court case from West Virginia as precedent for the proposition that a private medical contractor can enjoy qualified immunity. Medical Defs.' Brief, p. 7-8. That case, *Redden v. Ballard*, however, itself relies on two inapposite cases for this holding. 2018 WL 4327288, at *8 (S.D.W.Va. 2018). The first, *West v. Atkins*, does not discuss qualified immunity at all; it merely determines that the conduct of contracted employees may still be the basis for a § 1983 suit. 487 U.S. 42, 54 (1988) (conduct of private physician employed to provide medical services in state prison "is fairly attributable to the State"). The second case, *Filarsky v. Delia*, concerns a fireman who brought a § 1983 suit against the city of Rialto, California and its hired private attorney. 566 U.S. 377 (2012). The Court held that the private attorney could still seek qualified immunity, but specifically distinguished its ruling from that of *Richardson*, stating:

> Our decisions in *Wyatt v. Cole*, *supra*, and *Richardson v. McKnight*, *supra*, are not to the contrary . . .
>
> In *Richardson*, we considered whether guards employed by a privately run prison facility could seek the protection of qualified immunity. Although the Court had previously determined that public-employee prison guards were entitled to qualified immunity, see *Procunier v. Navarette*, 434 U.S. 555,

> 98 S. Ct. 855, 55 L. Ed. 2d 24 (1978), it determined that prison guards
> employed by a private company and working in a privately run prison
> facility did not enjoy the same protection. We explained that the various
> incentives characteristic of the private market in that case ensured that the
> guards would not perform their public duties with unwarranted timidity
> or be deterred from entering that line of work. 521 U.S., at 410-411, 117,
> S. Ct. 2100, 138 L. Ed. 2d 540.

*Filarsky*, 566 U.S. at 392-93.

Like *Richardson*, the medical defendants herein were employed by a for-profit

private contractor to provide services at an institutional level. They are far more akin

to the private prison guards in *Richardson* than the contract attorney hired as an

individual (i.e. not employed by a for-profit, private company) to assist the

government in performing a limited function. Thus, the sole case defendants cite for

the proposition that they can raise qualified immunity is completely inapposite.

Having failed to meet their burden in showing that they are even permitted to

raise a defense of qualified immunity, their motion for summary judgment should be

denied.

### ii. In the alternative, defendants' deliberate indifference to plaintiff's need for hepatitis C treatment means he is not entitled to qualified immunity

The medical defendants seek qualified immunity without so much as

referencing the Third Circuit's decision on this issue in this very case. In that

decision, *Abu-Jamal v. Kerestes*, 779 Fed.Appx. 893 (3d Cir. 2019), the Court held that

Mr. Abu-Jamal had articulated a violation of a clearly established right. For the same

reasons, this Court should deny defendants Cowan, Lisiak, and Khanum's motion for summary judgment on qualified immunity..

A defendant is not entitled to qualified immunity if plaintiff's facts 1) "make out a violation of a constitutional right," and 2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 815-816 (2009). A right is clearly established when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation and citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell v. Forsyth*, 472 U.S. 511, 535 n. 12 (1985); but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

There need not be precedent involving "fundamentally similar" facts to the case at issue holding the government's conduct unlawful. *Hope*, 536 U.S. at 740-41; *United States v. Lanier,* 520 U.S. 259, 268 (1997). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful[.]'" *Id.* at 270-71 see also *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011). "The salient question is whether the state of

23

the law and the time of the incident provided 'fair warning' to the defendants that

their alleged conduct was unconstitutional. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014).

When making a qualified immunity determination on a motion for summary

judgment, a court must view the evidence in the light most favorable to the non-

movant, even where, as here, the movant's argument is limited to the "clearly

established" prong. *Tolan v, Cotton*, 134 S.Ct. at 1866.

The Third Circuit addressed the question of how to frame the clearly

established right in this case in its holding denying DOC defendants qualified

immunity at the motion to dismiss stage:

> At the time of the relevant events, it was clearly established that denying
> particular treatment to an inmate who indisputably warranted that
> treatment for nonmedical reasons would violate the Eighth
> Amendment. See id. at 346-47. Despite the Department Defendants'
> framing, Abu-Jamal's complaint does not rest on the appropriateness of
> the policy itself or a general right to be treated with the new antiviral drugs.
> Rather, Abu-Jamal pleads that he had chronic Hepatitis C and cirrhosis,
> his medical condition was worsening, he was a candidate for the antiviral
> drugs, there was consensus among the medical community that "everyone
> with chronic [H]epatitis C be treated with those antiviral drugs irrespective
> of disease stage," JA 3318, and despite all of this, the Department
> Defendants denied him antiviral drug treatment for purely cost and non-
> medical reasons.

*Abu-Jamal*, 779 Fed. Appx. at 900. This holding is dispositive, and it again requires

rejection of medical defendants' qualified immunity defense as plaintiff has produced

ample evidence that would allow a finder of fact to determine that defendants Cowan,

Lisiak, and Khanum participated and acquiesced in denying him hepatitis C treatment

for non-medical reasons. *See supra*, p. 2-8.

The Third Circuit's holding in this case was not a novel statement of the law. In fact, the standard for assessing medical care claims under the Eighth Amendment has been clearly established for 40 years. Deliberate indifference to a serious medical need "requires proof that the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Natale*, 318 F.3d at 582. This is not a "general" standard, especially when applied to the specific context of Mr. Abu-Jamal's case. *Brosseau v. Haugen*, 543 U.S. 194, 195, 198 (2004) (inquiry as to whether conduct violated clearly established law must be made "in light of the specific context of the case" and "construing facts…in a light most favorable to [the nonmovant]").

In a series of cases, the Third Circuit has recognized that when prison officials act with deliberate indifference to a serious medical need qualified immunity is not available. *Rouse*, 182 F.3d at 201 (3d Cir. 1999) (remanding for determination of "whether each of the individual defendants acted in an objectively unreasonable manner" in regard to insulin-dependent class members for purposes of determining qualified immunity issue); *Pearson v. Prison Health Service*, 850 F.3d 526, 542 n.6 (3d Cir. 2017) (recognizing that "[I]t was sufficiently clear at the time of these events that exposing an inmate to the kind of severe and protracted pain and mental anxiety alleged in this case could expose an official to Eighth Amendment liability"); *Consonery v. Pelzer*, 558 Fed. Appx. 271, 275 (3d Cir. 2014) (recognizing *Estelle* standard for prison medical care claims was "clearly established"); *Foreman v. Bureau of Prisons*, 2007 WL 108457 at *3 (3d Cir. 2007) ("[I]n deciding if individual defendants are entitled to

25

qualified immunity [in prison medical care case], this Court must determine whether they acted with deliberate indifference to Foreman's serious medical needs."); *Meyers v. Majkic*, 189 Fed. Appx. 142, 143 (3d Cir. 2006) ("It is now well established that deliberate indifference to the serious medical needs of a prisoner can rise to the level of a constitutional violation"); *Bines v. Kulaylat*, 215 F.3d 381, 385 (3d Cir. 2000) (recognizing that qualified immunity determination in prison medical care claim required factual analysis of whether defendant was deliberately indifferent to serious medical need). If a plaintiff can establish as a factual matter that defendants acted with deliberate indifference to a serious medical need then qualified immunity will be unavailing as a defense.

The above-cited cases established that the deliberate indifference standard itself vitiates defendants' qualified immunity defense as it is a form of intentional wrongdoing, and is therefore by definition unreasonable. *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (citing *Carter*). In *Carter*, the Third Circuit explicated how a finding of deliberate indifference will defeat a qualified immunity defense:

> Qualified immunity protects official action "if the officer's behavior was 'objectively reasonable' in light of the constitutional rights affected." If Carter succeeds in establishing that the DA's Office defendants acted with deliberate indifference to constitutional rights – as Carter must in order to recover under section 1983 – then *a fortiori* their conduct was not objectively reasonable.

*Carter*, 181 F.3d at 356.

The medical defendants argue that the right to HCV treatment was not clearly established as those standards were "evolving". (Medical Defendants' Brief, p. 11). The medical defendants are wrong. In October 2015, the AASLD abandoned prioritization and issued guidelines stating that all HCV patients be treated with DAADs irrespective of fibrosis level. (AASLD October 2015 Guidelines: Pl. Ex. 5). Defendant Cowan admitted that as of December 2015, the Center for Disease Control, deferring to the AASLD, stated that treatment with DAADs was the standard of care for all chronic HCV patients. (Cowan: Dkt. 96, p. 33-35). In denying plaintiff treatment, the medical defendants relied upon a protocol that itself fell below the standard of care. (Trooskin: Pl. Ex. 2, p. 7-9). That the AASLD issued a press release stating that their might be circumstances beyond the control of the medical provider to delay treatment does not alter the fact that the standard of care was to treat everyone irrespective of fibrosis level. In its decision granting Plaintiff's motion for a preliminary injunction, this Court agreed that both the interim protocol and November, 2016 protocol were deficient and fell below the standard of care. *Abu-Jamal v. Wetzel*, 16 Civ. 2000, Dkt 23, p. 32-33.

The medical defendants further argue that delay in treatment was appropriate and did not violate an established right because plaintiff had no "obvious" signs of cirrhosis. (Medical Defendants' Brief p. 12). Of course, waiting until an HCV patient develops cirrhosis to administer curative treatment falls well below the standard of

care.  (Trooskin: Pl. Ex. 2, p. 3-5). In addition, the medical defendants' assertion is

belied by the record.  Plaintiff's platelet level, a sign of disease progression was

consistently below normal from October 2015 until he began treatment with DAADs

in March 2017. (Med. Defendants Ex. A, p. 95, 96, 97, 100, 1576, 1578, 1580, 1582,

1585, 1587, 1589).  Diagnostic tests revealed structural changes to plaintiff's liver. (Pl.

Ex. 11).  A CT scan performed at Geisinger Medical Center in May 2015 showed the

shape of the liver to be "irregular" and that those findings be "correlated" for

cirrhosis.  (*Id.* at p. 4).  In late 2015, plaintiff's HALT-C score had risen to 63,

meaning that there was a 63% chance that he was already suffering from cirrhosis.

(Noel: Dkt. 96, p. 120-123). These "obvious" signs of disease progression were

ignored, causing harm to Plaintiff.  (Trooskin: Pl. Ex. 2, p. 9-11).  Instead of curing

the disease with a readily available drug, defendant Cowan acquiesced in opting for

"active surveillance" and ineffective palliative measures. This fell below the standard

of care in existence in 2015.  (Trooskin: Pl. Ex. 2, p. 6).This refusal to provide a

known cure placed Mr. Abu-Jamal at an "excessive risk" to health and safety. *Natale*,

318 F.3d at 582. The palliative measures that were administered do not constitute

treatment as they are knowingly less effective that a cure. *Durmer*, 991 F.2d at 69;

*White v. Napoleon*, 897 F.2d 103, 109-11 (3d Cir. 1990); *West v. Keve*, 571 F.2d 158, 162

(3d Cir. 1978); *Parkell v. Markell*, 622 Fed. App'x. 136, 141 (3d Cir. 2015).

Similarly, defendants Lisiak and Khanum acquiesced in a policy of non-

treatment and did not conduct necessary diagnostic tests that would have identified

the extent of disease progression. For these reasons, defendants are not entitled to qualified immunity.

## II.    Plaintiff is no longer pursuing his claim of deliberate indifference to his skin condition

Plaintiff is no longer pursuing, as a separate claim, his claim of deliberate indifference to his skin condition.  Rather, the suffering plaintiff experienced as a result of the defendants' deliberate indifference to his hepatitis C is one part of the damages resulting from the failure to treat the hepatitis C.

## III.   Defendants Khanum and Saxon are not entitled to summary judgement for Plaintiff's Eighth Amendment claim alleging deliberate indifference to Plaintiff's hyperglycemia

As already recognized *supra*, to prevail on an Eighth Amendment medical care claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate a deliberate indifference to that need." *Natale*, 318 F.3d at 582.

Defendants do not challenge that hyperglycemia is a serious medical condition requiring treatment. Instead, defendant Saxon acknowledged that untreated hyperglycemia resulting in in diabetic ketoacidosis could cause diabetic coma or death,

as well as dehydration, hypokalemia (low potassium), hypernatremia (high sodium levels in the blood), and encepalopathy. (Saxon Deposition, Pl. Ex. 15, p. 26:9-28:13). Defendant Khanum did as well, testifying that diabetic ketoacidosis caused by elevated glucose can cause somebody to lose consciousness, have seizures, or even die. (Khanum Deposition, Pl. Ex. 13 47:15-19). Both were aware that Mr. Abu-Jamal had an elevated glucose level of 419 in March 2015. (Saxon Deposition, Pl. Ex. 15 19:12-22; Khanum Deposition, Pl. Ex. 13, p. 24:15-19 (testifying that 419 is "high above normal")). Both also acknowledged that elevated glucose requires monitoring and treatment if it does not resolve on its own. (Saxon Deposition, Pl. Ex. 15, p. 20:20-24 (would have ordered another test of his glucose level if Abu-Jamal was not on steroids); Khanum Deposition, Pl. Ex. 13, p.  37:8-10 (acknowledging glucose levels remaining over 400 should be treated)). Saxon even testified that it is possible for steroids to cause hyperglycemia that persists even after the course of steroids is complete, thus showing his awareness of the risk that an elevated glucose level of 419 may not resolve on its own. (Saxon Deposition, Pl. Ex. 15, p. , 21:14-24).

Rather than perform the brief, simple Accu-chek[5] procedure that would have permitted them to assess whether or not his glucose level had lowered, or to perform several tests in order to assess whether his glucose stabilized, they utterly disregarded the risk, provided no monitoring or treatment of his condition. (Saxon Deposition, Pl.

---

[5] Accu-Chek is a "proprietary blood glucose measuring system used for home monitoring of glucose." https://medical-dictionary.thefreedictionary.com/Accu-Chek+system.

Ex. 15, p. 20:5-19; Khanum Deposition, Pl. Ex. 13, p.  25:15-17; 26:18-27:13

(testifying that "somebody coming in with . . . high glucose" should be given a

fingerstick)).

Dr. Lisiak testified to what seems obvious enough: elevated glucose should be

monitored and that "may start with one Accu-Chek" and if it remains elevated "you

may want to treat the glucose." (Lisiak Deposition, Pl. Ex. 12, p.  24:1-25:3).

The obvious, minimal requirement for them was to track his glucose level so as

to provide any necessary treatment interventions. Plaintiff's expert, Dr. Stacey

Trooskin, declared that the failure to monitor or treat his hyperglycemia was a "far

from the standard of care of the management of hyperglycemia":

> Although Dr. Khanum noted the glucose of 419 in the note, there is no
> clear recommendation made for adding medication to control the
> hyperglycemia nor is there an order for a recheck of his blood glucose.
> Steroids are known to elevate blood glucose, particularly among those
> with glucose intolerance and at risk for diabetes and to leave this
> unmonitored after obtaining such a high reading, while recommending the
> continuation of steroids, is far from the standard of care of the
> management of hyperglycemia. Mr. Abu-Jamal should have had a repeat
> glucose check immediately upon receipt of that elevated glucose reading
> of 419 and a urinalysis which showed 3+ glucose on 3/6/15. On 3/24/15
> Mr. Abu-Jamal had a sick call. The provider noted that the patient stated
> he "was not taking HCTZ because it made him pee a lot". Frequent
> urination is a side effect of the diuretic HCTZ, but it is also a manifestation
> of uncontrolled diabetes and with a recent blood glucose reading of 419
> that had not been acted upon the provider should have recognized this as
> a warning sign. Instead, Mr. Abu-Jamal's blood pressures were reviewed
> and he was switched to Norvasc. There was no mention of concern for
> hyperglycemia in the setting of recent steroid use. Six days later on
> 3/30/15 Mr. Abu-Jamal was hospitalized in the intensive care unit of the
> Schuylkill medical center with diabetic ketoacidosis, a serious and life
> threatening manifestation of uncontrolled blood glucose.

31

(Trooskin: Pl. Ex. 2, p. 10). In a supplemental report, Dr. Trooskin responded to defendants' expert's odd claim that defendants were right not to monitor or treat plaintiff's hyperglycemia:

> Dr. Peniston states in his expert report that "treating hyperglycemia from the affect of steroids could prove catastrophic" and uses this as the rationale for ignoring Mr. Abu-Jamal's elevated blood glucose and glucose in the urine and suggesting that it was appropriate care. While it may not be appropriate to start a patient on steroids with hyperglycemia on a long acting 24 hour insulin, a glucose reading of 419 (normal would be under 100) warrants close follow up. A repeat check upon receipt of the elevated laboratory result would have been medically appropriate and close monitoring of blood glucose at meals three times a day with sliding scale insulin (short acting insulin dosed to proportionally to the glucose reading) is an appropriate next step in managing hyperglycemia in a patient on steroids or recently on steroids.

(Trooskin Supplemental Report: Pl. Ex. 3).

Given the enormity of the risks posed by diabetic ketoacidosis, failure to conduct a simple Accu-Chek certainly manifests a refusal to provide necessary treatment, a deviation from the standard of care, and the assumption that it will hopefully resolve on its own is certainly a knowingly less effective manner of treating hyperglycemia than actually checking his glucose level. As all three formulations – no treatment, knowing deviation from accepted standard, and knowingly providing less effective treatment – all constitute deliberate indifference, a reasonable fact-finder could clearly find for Plaintiff on this claim.  Accordingly, defendant Khanum and Saxon's motions for summary judgment should be denied.  *Durmer*, 991 F.2d at 68; *Monmouth County Correctional Inst. Inmates*, 834 F.2d at 346-47; *Rouse*, 182 F.3d at 197; *Roe,* 631 F.3d at

862-63 ("a substantial departure from accepted professional judgment, practice, or

standards" without medical justification is deliberate indifference); *De'lonta*, 708 F.3d

at 525-26 (failure to provide care consistent with prevailing standard states a claim

under the Eighth Amendment); *Smith v. Jenkins*, 919 F.2d at 93 (treatment that

deviates from professional standards may amount to deliberate indifference).

Defendants' assertions that they believed his hyperglycemia would resolve on its

own are self-serving and not dispositive.  Given Dr. Trooskin's opinion, a reasonable

fact-finder could conclude that the defendants' purported explanation for failing to do

a simple Accu-Chek is simply a post-hoc rationalization for not doing what they know

they should have done. It is plainly insufficient to constitute a mere difference in

professional judgment. Plaintiff has produced expert testimony that defendants

'Khanum and Saxon's failures were a gross deviation from the appropriate standard of

care, Trooskin Report Pl. Ex. 2 p. 10, and that both defendants deviated despite being

aware of the risks faced by untreated hyperglycemia. (Saxon Deposition, Pl. Ex. 15, p.

26:9-28:13; Khanum Deposition, Pl. Ex. 13, p.  47:15-19). Plaintiff is entitled to a trial

on his hyperglycemia claim against defendants Saxon and Khanum.

**IV.     Evidence that defendants Cowan, Lisiak and Khanum enforced a hepatitis C policy that deviated from the standard of care defeats their motion for summary judgment on plaintiff's medical malpractice claim regardless of whether they had any role in creating the policy**

For the reasons already articulated in plaintiff's discussion of the Eighth

Amendment claim in regard to hepatitis C treatment, the medical defendants' motion

for summary judgment on the medical malpractice claim should be denied.  Contrary to defendants' argument, Dr. Trooskin's report implicates the entirety of plaintiff's medical care, including but not limited to their failure to treat his hepatitis C.  Section VI states that the "*practices* and policies" for hepatitis C treatment "deprived Mr. Abu-Jamal the necessary medical care for his serious medical condition. (Trooskin, Pl. Ex. 2, p. 8). Her analysis then notes that "Mr. Abu-Jamal had evidence of cirrhosis on imaging (abdominal ultrasound from 4/1/15, CT chest, abdomen and pelvis from 5/17/15), critical clues in his bloodwork (intermittently low platelets and low albumin) and evidence suggestive of extrahepatic manifestations of HCV (diabetes and a rash) in 2015, yet these were ignored by the PA DOC because his APRI score was not consistently above 2." (*Id.* at 9). Her report expressly indicates that the diagnostic indicators, all present in Plaintiff's medical records,  requiring more precise testing for liver damage and treatment were precisely those indicators in front of defendants Lisiak, Saxon, and Khanum.  They enforced, implemented, and otherwise acquiesced in an unconstitutional deviation from the standard of care. Accordingly, their motion for summary judgment should be denied.

## V.    Plaintiff's Claim for Injunctive Against the DOC Defendants Is Moot

For the reason given previously, that plaintiff has been treated and achieved SVR pursuant to this Court's grant of preliminary injunctive relief, plaintiff agrees that the claim for injunctive relief is moot.

**Conclusion**

In conclusion, plaintiff requests that this court deny medical defendants'

motion for summary judgment as to defendants Cowan, Lisiak, and Khanum on

plaintiff's Eighth Amendment and medical malpractice claims pertaining to his

hepatitis C, and to deny defendants Khanum and Saxon motion for summary

judgment on plaintiff's hyperglycemia Eighth Amendment claim

> */s/ Bret D. Grote*
> Bret D. Grote
> PA I.D. No. 317273
> Abolitionist Law Center
> P.O. Box 8654
> Pittsburgh, PA  15221
> Telephone:  (412) 654-9070
> bretgrote@abolitionistlawcenter.org
>
> */s/ Robert J. Boyle*
> Robert J. Boyle
> 277 Broadway
> Suite 1501
> New York, N.Y. 10007
> (212) 431-0229
> Rjboyle55@gmail.com
> NYS ID# 1772094
> *Pro hac vice*
>
> *Counsel for Plaintiff*

DATE: June 4, 2020

<u>CERTIFICATION</u>

I hereby certify that the foregoing brief consists of 8896 words as measured by Microsoft Word's word-counting function and is in compliance with this Court June 1, 2020 order permitting Plaintiff to file a brief not to exceed 12800 words.

Dated : June 4, 2020                                    <u>/s/ Robert J. Boyle</u>

                                                       ROBERT J. BOYLE

                                                       Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of this Brief in Opposition to Medical Defendants Motion for Summary Judgment upon each defendant in the following manner:

Service By ECF:

For Defendants Kerestes, DelBalso, Norris, Oppman, and Steinhart:
Vincent Mazeski, Esquire
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
lneal@pa.gov

For Defendants Lisiak, Khanum, and Saxon:
Samuel H. Foreman, Esquire
Caitlin Goodrich, Esquire
sforeman@wglaw.com
cgoodrich@wglaw.com

/s/ Robert J. Boyle
Robert J. Boyle
277 Broadway
Suite 1501
New York, N.Y. 10007
(212) 431-0229
NY Bar No. 1772094
Admitted *Pro Hac Vice*

Dated: June 4, 2020