THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MUMIA ABU-JAMAL,                          :
                                          :
            Plaintiff,                    :
      v.                                  :        3:15-CV-967
                                          :        (JUDGE MARIANI)
JOHN KERESTES, et al.,                    :
                                          :
            Defendants.                   :

## MEMORANDUM OPINION

### I. INTRODUCTION

The above-captioned matter reflects the consolidation of two civil rights actions filed

by a Pennsylvania state prisoner, Mumia Abu-Jamal, ("Plaintiff" or "Abu-Jamal"), arising out

of the same set of facts.  Presently before the Court is a Motion for Summary Judgment filed

by defendants John Kerestes, Theresa DelBalso, Joseph Silva, John Wetzel, Christopher

Oppman, John Steinhart, and Dr. Paul Noel, (collectively, the "DOC Defendants").  (Doc.

299).[1]

Through his Fourth Amended Complaint, Plaintiff raised six claims against select

DOC Defendants for damages and injunctive relief, including claims for: deprivation of

Plaintiff's Eighth Amendment right to medical care for hepatitis C against all DOC

---

[1] A separate Motion for Summary Judgment has been filed by defendants Correct Care Solutions,
LLC, Dr. Jay Cowan, Dr. John Lisiak, Dr. Shaista Khanum, and physician's assistant Scott Saxon,
(collectively, the "Medical Defendants").  (Doc. 306).  The Court addresses this Motion in a separate
Memorandum Opinion.

Defendants (Count I); deprivation of Plaintiff's Eighth Amendment right to medical care for a pervasive skin condition against defendants Kerestes, Wetzel, and Noel (Count II); deprivation of Plaintiff's Eighth Amendment right to medical care for hyperglycemia against defendant Kerestes (Count III); medical malpractice for failure to treat Plaintiff's hepatitis C against defendants Oppman and Noel (Count V); medical malpractice for failure to treat Plaintiff's skin condition against defendants Oppman and Noel (Count VI); and deprivation of Plaintiff's First Amendment right of association against defendants Kerestes and DelBalso (Count VII).  (Doc. 245).

In accordance with the parties' briefing, however, only claims against defendant Noel seeking compensatory and punitive damages for a violation of the Plaintiff's Eighth Amendment right to medical care for hepatitis C (Count I) and medical malpractice for failure to treat Plaintiff's hepatitis C (Count V) remain in contention. The Plaintiff otherwise concedes that summary judgment should be entered as to the other DOC Defendants for Counts I and V and as to all DOC Defendants for the additional four claims.  (Doc. 330 at 8-9).  For the reasons that follow, the Court will thus deny the DOC Defendants' Motion for Summary Judgment as to defendant Noel for Counts I and V, grant the Motion as to defendants Kerestes, Wetzel, Oppman, Steinhart, Delbalso, and Silva for Counts I and V, and grant the Motion in its entirety as to all defendants for Counts II, III, VI, and VII and Plaintiff's claim for injunctive relief.

2

## II. Procedural History[2]

Plaintiff, Mumia Abu-Jamal, an inmate of the Pennsylvania Department of Corrections ("DOC") suffering from hepatitis C ("HCV"), a pervasive skin condition, and hyperglycemia, initiated proceedings through a Complaint filed on May 18, 2015 that asserted a violation of his First Amendment right to association and access to the courts. *See* (Doc. 1).  This matter, assigned case number 3:15-CV-967 ("*Abu-Jamal 1*"), included defendant Kerestes as one of two named defendants.  (Id.).  Plaintiff was initially joined by two fellow inmates raising similar claims but proceeded alone once his fellow plaintiffs filed notices of voluntary dismissal.  (Docs. 17, 18).  On August 3, 2015, Plaintiff filed a Motion for Leave to File a "First Amended and Supplemental Complaint."  (Doc. 21).  The First Amended Complaint, which not only added Eighth Amendment claims and state law medical malpractice claims but also various defendants, including defendants Oppman and Steinhart, was adopted and became the operative complaint.  (Doc. 57).

In light of the added claims set forth in his First Amended Complaint, Plaintiff filed a Motion for Preliminary Injunction on August 23, 2015, that asked the Court to require the defendants to:

> 1) immediately treat plaintiff's active hepatitis C infection with the latest direct acting anti-viral drugs; 2) immediately treat his skin condition, a manifestation of the hepatitis C, with zinc supplementation and Protopic cream; and 3) permit Mr. Abu Jamal to have an in-person examination by an independent physician

---

[2] The Court set forth a more extensive review of the procedural history of the current matter in its Memorandum Opinion granting in part and denying in part Motions to Dismiss filed by the DOC Defendants and Medical Defendants. *See* (Doc. 272 at 2-12).

of his own choosing under conditions that are appropriate for such examinations.

(Doc. 23 at 1).  After Magistrate Judge Karoline Mehalchick issued a Report and

Recommendation recommending that Plaintiff's Motion be denied, (Doc. 39), this Court held

a three-day evidentiary hearing to make a final ruling as to the Motion, (Docs. 94, 95, 96).

During this hearing, the Court reviewed the protocol maintained by the DOC and used when

determining the treatment inmates with HCV receive, and found that in accordance with this

protocol, a "Hepatitis C Treatment Committee has the ultimate authority" to decide the

treatment provided to inmates suffering from HCV.  (Doc. 191 at 11, 19).

In an Opinion dated August 31, 2016, this Court denied Plaintiff's Motion for

Preliminary Injunction.  (Id.).  The Court concluded that as "[t]he named Defendants [were]

not members of the Hepatitis C Treatment Review Committee" and this Committee alone

had the ability to prescribed an anti-viral drug to treat Plaintiff's HCV, the Court could not

"properly issue an injunction against the named Defendants, as the record contain[ed] no

evidence that they had authority to alter the interim protocol or its application to Plaintiff."

(Id. at 22).  The Opinion, however, did establish that "[t]he protocol as currently adopted and

implemented presents deliberate indifference to the known risks which follow from untreated

chronic hepatitis C."  (Id. at 21).  As such, if the proper defendants were named in the

operative complaint, "the Court believe[d] there [was] a sufficient basis in the record to find

that the DOC's current protocol may well constitute deliberate indifference in that, by its own

4

terms, it delays treatment until an inmate's liver is sufficiently cirrhotic" and "faces the imminent prospect of 'catastrophic' rupture."  (Id. at 31).[3]

Though Plaintiff had already filed a Second Amended Complaint in *Abu-Jamal 1* by the time his Motion for Preliminary Injunction was denied, Plaintiff filed a separate action on September 30, 2016, under case number 3:16-CV-2000 ("*Abu-Jamal 2*").  This Complaint contained a single count for "Deprivation of Eighth Amendment Right to Medical Care for Hepatitis C," naming various defendants not previously named in *Abu-Jamal 1*, including defendants Wetzel as Secretary of the Pennsylvania DOC, Silva as DOC Director of Bureau of Health Care Services, and Noel as DOC Bureau of Health Care Services Chief of Clinical Services and member of the Hepatitis C Treatment Committee.  *Abu-Jamal v. Wetzel*, 3:16-CV-2000-RDM (M.D. Pa. Sept. 30, 2016) at (Doc. 1).  On October 5, 2016, Plaintiff filed a Motion for Preliminary Injunction in *Abu-Jamal 2* seeking the same relief as requested in the Motion for Preliminary Injunction in *Abu-Jamal 1*.  *Id.* at (Doc. 7).  The parties agreed that the Court could rely on the same evidence presented in the preliminary injunction hearing held by the Court in *Abu-Jamal 1* in determining whether to grant or deny the Plaintiff's Motion in *Abu-Jamal 2*.

---

[3] "Cirrhosis" represents a late stage of inflammation or scarring –- i.e. "fibrosis" –- of an individual's liver and may lead to the failure of the organ or various other complications.  The benefit of early treatment of HCV thus includes the ability of the body to stave off further liver deterioration before it reaches a point bordering on a "'catastrophic' rupture."  *See also infra*, Section III (describing the diagnosis and characterization of the various levels of liver deterioration and the treatment offered by the DOC to inmates in response to such characterizations).

In an Opinion issued on January 3, 2017, this Court found that, despite the fact that the DOC replaced the interim protocol that was analyzed in *Abu-Jamal 1* with a new protocol, "the new protocol completely bars those with chronic hepatitis C but without vast fibrosis or cirrhosis from receiving DAA medications." *Id.* at (Doc. 23 at 32). More specifically, the Court concluded that:

> [t]he Hepatitis C Protocol deliberately delays treatment for hepatitis C through the administration of DAA drugs such as Harvoni, Sovaldi, and Viekira Pak despite the knowledge of Defendants that sit on the Hepatitis C Treatment Committee: (1) that the aforesaid DAA medications will effect a cure of Hepatitis C in 90 to 95 percent of the cases of that disease; and (2) that the substantial delay in treatment that is inherent in the current protocol is likely to reduce the efficacy of these medications and thereby prolong the suffering of those who have been diagnosed with chronic hepatitis C and allow the progression of the disease to accelerate so that it presents a greater threat of cirrhosis, hepatocellular carcinoma, and death of the inmate with such disease.
> . . .
> In choosing a course of monitoring over treatment, [defendants] consciously disregarded the known risks of Plaintiff's serious medical needs, namely continued liver scarring, disease progression, and other hepatitis C complications.

*Id.* at (Doc. 23 at 20-21). As such, the Court held that Plaintiff had a reasonable likelihood of success on the merits of his claims. *Id.* at (Doc. 23 at 27-41). After determining that the other preliminary injunction factors also weighed in Plaintiff's favor, the Court granted Plaintiff's Motion. *Id.* at (Doc. 23 at 42-43). The Court thereafter enjoined the *Abu-Jamal 2* defendants from enforcing the applicable hepatitis C protocol as it pertained to Plaintiff and directed the defendants to administer direct-acting antiviral drugs ("DAADs"), proven to treat

HCV, to Plaintiff unless such medications were found to be contraindicated by a medical professional.  *Id.* at (Doc. 24).

Following the Court's decision to grant Plaintiff's Motion for a Preliminary Injunction, however, the defendants in *Abu-Jamal 2* filed Motions for Reconsideration, Motions to Stay, and Notices of Appeal.  *Id.* at (Docs. 29-31, 36, 37).  As the Plaintiff thus continued to wait for treatment, he filed a Motion for Contempt in *Abu-Jamal 2* against the defendants for failure to perform in accordance with the Court's Preliminary Injunction Order, *id* at (Doc. 53), and filed a Third Amended Complaint on January 17, 2017, in *Abu-Jamal 1* adding Wetzel, Noel, and DelBalso as defendants, (Doc. 210).

Nevertheless, on March 31, 2017, the defendants in *Abu-Jamal 2* informed the Court that "[f]ollowing recent medical testing and a review of the results thereof, Plaintiff will be treated with the Federal Drug Administration (FDA) approved Hepatitis C direct[]-acting antiviral medication in accordance with the Hepatitis C protocol of the Department of Corrections."  *Abu-Jamal*, 3:16-CV-2000 at (Doc. 59 at 1).  On April 4, 2017, Plaintiff's counsel informed the Court that Plaintiff had undergone a "sonogram and a hepatic elastography" and that the test results revealed that his condition had "deteriorated to 'severe grade 4 liver cirrhosis.'"  *Id*. at (Doc. 61 at 2).  As a result, on April 5, 2017, the defendants in *Abu-Jamal 2* informed the Court that Plaintiff would be prescribed and start a regiment of the direct-acting antiviral drug Harvoni the following day.  Thereafter, the Court dismissed the pending Motions to Stay and Motions for Reconsideration.  *Id.* at (Doc. 63).

On April 18, 2017, the Court held a conference with the parties to determine whether *Abu-Jamal 1* and *Abu-Jamal 2* should be consolidated. The parties in the two cases agreed that the matters should merge and thereafter filed Joint Motions for Consolidation. (Doc. 223); *Abu-Jamal*, 3:16-CV-2000 at (Doc. 71). On May 4, 2017, the Court issued an Order consolidating *Abu-Jamal 1* and *Abu-Jamal 2* under case number 3:15-CV-967. (Doc. 224); *Abu-Jamal*, 3:16-CV-2000 at (Doc. 72). On August 23, 2017, Plaintiff filed his Fourth Amended Complaint, which remains the operative complaint. (Doc. 245).

In his Fourth Amended Complaint, Plaintiff maintained claims against various DOC Defendants, including: a Section 1983 claim for violation of Plaintiff's Eighth Amendment right to medical care for Plaintiff's hepatitis C (Count I); Section 1983 claim for violation of Plaintiff's Eighth Amendment right to medical care for Plaintiff's skin condition (Count II); Section 1983 claim for violation of Plaintiff's Eighth Amendment right to medical care for Plaintiff's hyperglycemia (Count III); state law medical malpractice claim for failure to treat Plaintiff's hepatitis C (Count V); state law medical malpractice claim for failure to treat Plaintiff's skin condition (Count VI); and a Section 1983 claim for violation of Plaintiff's First Amendment right of association (Count VII). (Doc. 245).

In response to the Fourth Amended Complaint in the consolidated action, the DOC Defendants and Medical Defendants filed Motions to Dismiss. (Docs. 248, 251). On May 10, 2018, this Court filed its Opinion granting in part and denying in part the DOC Defendants' Motion and denying the Medical Defendants' Motion. (Doc. 273). On January

30, 2020, after further discovery, the DOC Defendants filed the Motion for Summary Judgment currently before this Court.  (Doc. 299).

### III. STATEMENT OF UNDISPUTED FACTS

In support of their briefing, in accordance with Local Rule 56, the parties submitted Statements of Material Facts asserting and confirming various facts the Court now deems undisputed.  (Docs. 300, 331).

The Pennsylvania DOC maintains policies for the medical treatment of inmates within its facilities, including a policy for those suffering from hepatitis C.  Of note, the DOC issued an interim hepatitis C protocol on November 13, 2015, and an updated hepatitis C protocol on November 7, 2016, (collectively, the "Hepatitis C Protocols").   (Doc. 300 at ¶¶ 40, 43).  The DOC, in creating these protocols, relied strongly on treatment guidelines for testing, managing, and treating HCV published by the American Association for the Study of Liver Disease ("AASLD").  (Docs. 302-16 – 302-20).

Per the DOC Hepatitis C Protocols, the DOC would place all inmates with confirmed HCV in and monitors them through the Chronic Care Clinic ("CCC").  (Doc. 300 at ¶ 41). "Monitoring," for purposes of the CCC, included periodic examinations, testing, and review of blood test results.  (Id.).  For the DOC, however, potential treatment of an inmate's HCV hinged upon the degree of fibrosis exhibited in the inmate's liver, even as, by June 2015, the AASLD guidelines stated that delays in treatment may decrease the benefit of wiping

9

the hepatitis C virus from the inmate's bloodstream.[4]  (Id. at ¶ 49).  There are various

systems utilized to attempt to characterize the level of an individual's fibrosis, but the most

common framework is the METAVIR scoring system, which includes five levels: "F0 (no

fibrosis); F1 (mild fibrosis); F2 (moderate fibrosis); F3 (advanced fibrosis); and F4

(cirrhosis)."  (Doc. 300 at ¶¶ 113-114).  Additional methods also enumerated in the DOC

Hepatitis C Protocols that may be used to characterize the degree of inflammation or

scarring of the liver of an individual struggling with HCV include, amongst others, an AST to

Platelet Ratio Index ("APRI") test or CT scan.  (Id. at ¶¶ 66-67).

Depending on the severity of fibrosis, an inmate may be prescribed direct-acting

antiviral drugs such as Harvoni or Sovaldi. (Doc. 300 at ¶ 119).  These DAADs, capable of

helping those suffering from HCV achieve a sustained virologic response, were first

approved by the FDA between late 2013 and 2014. (Id. at ¶ 106).  Prescribing such a

treatment, however, is in the control of DOC medical professionals.  See (Id. at ¶¶ 100, 102,

116) (defendants Kerestes, DelBalso, and Oppman "deferred to medical staff's expertise as

to the specifics regarding the provision of medical care to Plaintiff," whereas defendant Noel

"reviewed referrals and determined whether inmates were to be treated with DAADs").  In

instances where an inmate does not receive the treatment that he or she believes

_____

[4] Where the hepatitis C virus is no longer detected in an individual's bloodstream roughly twelve weeks after treatment with a DAAD is also known as reaching a "sustained virologic response," ("SVR"), and is the main "goal of treatment" according to the AASLD.  See (Doc. 302-16 at 1-2) ("The goal of treatment of HCV-infected persons is to reduce all-cause mortality and liver-related health adverse consequences, including end-stage liver disease and hepatocellular carcinoma, by the achievement of virologic cure as evidenced by an SVR.").

necessary, the DOC has made available the Inmate Grievance System, Policy DC-ADM 804, through which inmates can seek the resolution of claims. (Id. at ¶ 28). This policy sets forth a "three-step process for resolution of inmate grievances: the initial grievance at the institutional level, an appeal to the Facility Manager (Superintendent) and an appeal for final review to the SOIGA." (Doc. 302-9). The Inmate Grievance System also provides that an inmate filing a grievance shall identify individuals directly involved in the event in question. (Doc. 300 at ¶ 31).

Plaintiff Mumia Abu-Jamal is an inmate serving a life sentence within the Pennsylvania DOC at SCI-Mahoney. (Doc. 300 at ¶ 1). In 2012, Plaintiff while incarcerated, tested positive for HCV and was enrolled in the CCC. (Id. at ¶ 115). Plaintiff, however, though confirmed to have had HCV, was only given a viral load blood test in August 2015 confirming that his HCV was chronic. (Doc. 331 at ¶ 66). In addition, Plaintiff was initially not prescribed a DAAD to treat his HCV based on a medical review of his condition and the corresponding guidelines in the operative DOC's hepatitis C protocol. (Doc. 300 at ¶ 120). Specifically, DOC medical professionals agreed that in December 2015 Plaintiff had a METAVIR score of F2, which, per the DOC protocols, would not reach a level of fibrosis to require treatment with a DAAD. (Id. at ¶ 83). While waiting for treatment of his HCV, Plaintiff also began to experience other medical ailments including hyperglycemia and a skin condition that was "treated for several years with multiple modalities." (Doc. 300 at ¶¶ 75, 95).

On February 20, 2015, Plaintiff was admitted to the SCI-Mahoney infirmary in response to issues with his skin condition, where it was also determined that he had increased blood glucose levels.  (Doc. 305 at 13-18); (Doc. 304-2 at 33).  Thereafter, on March 30, 2015, Plaintiff was sent to the Schuylkill Medical Center after he lost consciousness as a result of diabetic ketoacidosis.  (Doc. 334-02 at 10); *see also* (Doc. 30 at 3); (Doc. 305-1 at 7).  On April 11, 2015, after his release from medical care, Plaintiff filed a grievance through the Inmate Grievance System claiming that the "medical staff's failure to properly diagnose and monitor [his] health" led Plaintiff "to suffer a diabetic shock."  (Doc. 302-11); *see also* (Doc. 300 at ¶ 33) (Plaintiff's April 2015 grievance was one of three such grievances filed between 2013 and 2017).  This grievance was denied, thereafter leading Plaintiff to file two subsequent appeals, both of which were denied.

As set forth above, Plaintiff instituted two separate actions against the DOC Defendants and various other medical and government defendants.  (Doc. 1); *see also Abu-Jamal*, 3:16-CV-2000 at (Doc. 1).  Per an Order granted by this Court, the defendants in the parallel civil action were eventually required to prescribe and treat Plaintiff "with DAA medications unless the Supervising Physician determines–in his or her professional and independent medical judgment–that there are medical contraindications to Plaintiff receiving DAA medication that render the administration of the medication not medically advisable." *Abu-Jamal*, 3:16-CV-2000 at (Doc. 24).  Following a sonogram and hepatic elastography, it was determined that Plaintiff's condition had "deteriorated to 'severe grade 4 liver cirrhosis'"

12

and that Plaintiff would be treated with "the Federal Drug Administration (FDA) approved Hepatitis C direct[]-acting medication in accordance with the Hepatitis C protocol of the Department of Corrections." *Id.* at (Doc. 59 at 1). Plaintiff therefore was treated with Harvoni from April 6, 2017, to June 28, 2017. (Doc. 300 at ¶ 67).

Though a later CT scan performed in April 2015 "suggested that Mr. Abu-Jamal had already progressed to cirrhosis" and an ultrasound from September 7, 2017, showed portal hypertension, a sign of liver damage, an ultrasound from March 21, 2019, showed no frank portal hypertension and improved portal velocity. (Doc. 302-27 at 3); (Doc. 300 at ¶¶ 66, 130-131). Likewise, though there is clear debate as to the strains Plaintiff's HCV had on his liver, it is agreed that Plaintiff had APRI scores of .423 and .392 in late 2015 and .410 in April 2016. (Doc. 300 at ¶¶ 85, 87). Following treatment, however, Plaintiff's lab results on September 22, 2017, indicated a sustained viral response, (Doc. 300 at ¶ 121), while his APRI scores from April 2018 of .299 and July 2019 of .223 showed improvement, (Doc. 300 at ¶¶ 123, 132-133).[5]

---

[5] Though the Plaintiff's APRI scores in late 2015 and April 2016 were higher than those after Plaintiff received treatment, the DOC Defendants maintain that Plaintiff's earlier APRI scores "did not suggest cirrhosis or even significant fibrosis" and, in accordance with the DOC protocols, were still below the required score to qualify Plaintiff as an inmate meeting the highest level of priority for treatment. (Doc. 300 at ¶¶ 58, 65); *see* (Docs. 302-14, 302-15). The DOC protocol effective as of November 2016 established that an APRI score greater than or equal to 2.0 "may be used to predict the presence of cirrhosis," whereas a "cutoff of [greater than or equal to] 1.5" may "predict the presence of significant fibrosis (stages 2 to 4, out of 4)." (Doc. 302-15 at 3).

## IV. STATEMENT OF DISPUTED FACTS

Regardless of the facts agreed between the parties, Plaintiff contends that he was subjected to an unconstitutional denial of adequate medical care. (Doc. 331 at ¶ 5). For Plaintiff, the provision of adequate medical care for those with HCV, or the "standard of care," as set forth by the AASLD and the Center for Disease Control, required that the DOC treat individuals suffering from chronic HCV with DAADs, regardless of the stage of fibrosis. (Doc. 331 at ¶¶ 47-48); (Doc. 330 at 3). In accordance with such guidance, the Plaintiff claims that the AASLD guidelines establish that there is "no medical justification for not offering treatment to those suffering from HCV." (Doc. 331 at ¶ 51); *see also* (Doc. 330 at 3) ("In October 2015, the AASLD abandoned prioritization and simply stated that all HCV patients should be treated with DAADs without delay.").

Moreover, though the DOC placed inmates with chronic HCV in the Chronic Care Clinic, Plaintiff argues that the CCC was not a true "clinic" and did not offer any treatment for those with HCV. (Doc. 331 at ¶¶ 41-42). Instead, Plaintiff claims that the CCC, in accordance with the Hepatitis C Protocols utilized by the DOC, did no more than monitor inmates with HCV until they reached a "catastroph[ic]" level of cirrhosis and esophageal varices with portal hypertension, thus forestalling the ability of inmates such as Plaintiff to receive necessary care and leading to long-term harm. (Doc. 331 at ¶¶ 107-109); *but see* (Doc. 300 at ¶ 45) (DOC Defendants claim the Hepatitis C Protocols maintained and used by the DOC in 2015 and 2016 "prioritized inmates for treatment with DAADs"); *see also*

(Doc. 302-14 at 7) ("The purpose of the current [DOC] Hepatitis C Protocol is to identify patients with advanced cirrhosis and to prioritize them for anti-viral treatment.").  As a result, Plaintiff contends that the DOC Defendants established and applied a protocol not in accordance with the standard of care and made medical care decisions for nonmedical reasons.  (Doc. 330 at 22-30).

Plaintiff makes further assertions regarding his own physical condition that he claims evinced a clear need for treatment.  In particular, Plaintiff argues that as of 2015, in addition to the CT scan of Plaintiff's liver seemingly showing cirrhosis, Plaintiff's HALT-C score, "[a]nother diagnostic tool for determining liver damage," indicated that "there was a 63% chance that he had already progressed to cirrhosis."  (Doc. 330 at 5-6).  Furthermore, Plaintiff also claims that his skin condition may have been a "secondary" manifestation of his HCV, while his "platelet levels were below the normal range" which "is a sign of liver damage caused by hepatitis c."  (Id. at 4-5); see (Doc. 331 at ¶ 73) (though diagnosed with psoriasis, a chronic skin condition Plaintiff argues is an extrahepatic manifestation of his HCV, he claims he may also have suffered from necrolytic acral erythema ("NAE"), a marker of HCV).  In comparison, Plaintiff claims that APRI scores are not reliable, seemingly undermining the reliance by the DOC medical personnel on such a score when making a medical determination.  (Doc. 330 at 4).

Though Plaintiff eventually was treated with the DAAD Harvoni, Plaintiff argues that he was "not cured," but that he still suffers from a skin condition, hypertension, and a

greater risk of liver cancer as a result of the delay in treatment.  (Doc 331 at ¶¶ 69-72); *see*

(Doc. 334-02) (report of Plaintiff's expert Dr. Stacey Trooskin concluding that "[i]f [Plaintiff]

had been treated and cured in 2015 in accordance with the standard of care, the fibrosis

would have been significantly less likely to advance … [while] now that Mr. Abu-Jamal is

cirrhotic, he will be at increased risk of liver cancer and must undergo screening for liver

cancer every 6 months for the rest of his life").  Therefore, to Plaintiff, had he received

proper treatment when the treatment first became available, "it is 'almost certain' that he

would have avoided further disease progression" and "his risk of developing cirrhosis and/or

liver cancer would have been reduced to almost zero."  (Doc. 330 at 7-8); *see also* (Doc.

334-02).

## V. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law."  *Gonzalez v. AMR*, 549

F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary

basis on which a reasonable jury could find for the non-moving party, and a factual dispute

is material only if it might affect the outcome of the suit under governing law."  *Kaucher v.*

*County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of

those claims that do not present a "genuine dispute as to any material fact."  Fed. R. Civ. P.

§ 56(a).

16

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record ... [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. § 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. § 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied 507 U.S. 912 (1993). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255.

17

Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id*. (internal quotations, citations, and alterations omitted).

## VI. ANALYSIS

Throughout the pendency of the current litigation, Plaintiff has amended his Complaint several times. In the most recent iteration, Plaintiff's Fourth Amended Complaint set forth six separate counts against various DOC Defendants for damages and injunctive relief. (Doc. 245).[6] On January 30, 2020, the DOC Defendants filed a Motion for Summary Judgment, (Doc. 299), as to the six remaining claims set forth in Plaintiff's Fourth Amended

---

[6] As set forth above, Plaintiff, in his Fourth Amended Complaint, maintained claims against select DOC Defendants for the deprivation of his Eighth Amendment right to medical care for hepatitis C (Count I), skin condition (Count II), and hyperglycemia (Count III), medical malpractice for failure to treat Plaintiff's hepatitis C (Count V) and skin condition (Count VI), and violation of Plaintiff's First Amendment right of association (Count VII). (Doc. 245); *see also supra* Section II (describing the procedural history associated with Plaintiff's claims).

Complaint and a brief in support of the Motion, (Doc. 301).[7]  In response, Plaintiff filed a brief opposing the DOC Defendants' Motion as to his claims against defendant Noel seeking damages for deprivation of Plaintiff's Eighth Amendment right to medical care for hepatitis C and medical malpractice for failure of defendant Noel to treat Plaintiff's hepatitis C.  (Doc. 330).  The Plaintiff otherwise concedes that summary judgment should be entered as to the other DOC Defendants for these two claims and as to all DOC Defendants for the four additional claims raised in the Fourth Amended Complaint.  (Id.).  The Court will therefore separately review the two remaining claims and the grounds upon which the DOC Defendants seek summary judgment.  (Doc. 336).

## I.      Deprivation of Eighth Amendment Right to Medical Care for Hepatitis C

Of his two remaining contested claims against defendant Noel, Plaintiff first raises a claim for deprivation of his Eighth Amendment right to medical care for his chronic hepatitis C pursuant to 42 U.S.C. § 1983.  Section 1983 authorizes redress for violations of constitutional rights and provides in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

_____

[7] The DOC Defendants included various arguments in their initial Motion for Summary Judgment that they later withdrew, including arguments reflecting a failure to exhaust administrative remedies and a lack of standing.  (Doc. 301 at 18, 26); (Doc. 336 at 1-2).

42 U.S.C. § 1983.  Thus, to establish a violation under Section 1983, a plaintiff must demonstrate that the challenged conduct was committed by a person acting under color of state law and deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997). By its terms, Section 1983 does not create a substantive right, but merely provides a method for vindicating federal rights conferred by the United States Constitution and the federal statutes that it describes.  *Baker v. McCollan*, 443 U.S. 137 (1979); *see also Hart v. Tannery*, 2011 WL 940311 (E.D. Pa. Mar. 14, 2011).

Once setting forth the foundations for a Section 1983 claim, a deprivation of constitutional rights under the Eighth Amendment occurs in the medical context when state officials are deliberately indifferent to the serious medical needs of those in their charge. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  In opposition to Plaintiff's claim alleging an Eighth Amendment violation, the DOC Defendants thus contend that defendant Noel was not deliberately indifferent to Plaintiff's medical needs in light of the information available at the initiation of this litigation and that Plaintiff is unable to show a risk of future harm.  (Doc. 301 at 22-26).  The Court will address these arguments in turn.

### a. Failure to Show Defendant Noel was Deliberately Indifferent to Plaintiff's Medical Needs

As a violation of the Eighth Amendment, deliberate indifference may manifest in various forms, including an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable

requests for treatment that results in suffering or risk of injury. *Durrner v. O'Carroll*, 991

F.2d 64, 68 (3d Cir. 1993); *see also Rhines v. Bledsoe*, 388 F. App'x 225, 227 (3d. Cir.

2010) ("intentionally denying or delaying access to medical care or intentionally interfering

with the treatment once prescribed" sufficient to show deliberate indifference (quoting

*Estelle*, 429 U.S. at 104-05)).  Deliberate indifference may also be shown where a prison

official opts for "an easier and less efficacious treatment of the inmate's condition" or

"erect[s] arbitrary and burdensome procedures that result in interminable delays and

outright denials of medical care to suffering inmates." *Monmouth Cty. Corr. Inst. Inmates v.

Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks omitted); *see also

White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990) ("persistent conduct in the face of

resultant pain and risk of permanent injury" is sufficient to show deliberate indifference).

The mere misdiagnosis of a condition or medical need or the provision of negligent

treatment does not give rise to an actionable Eighth Amendment claim as although

"[d]eliberate indifference to a prisoner's serious medical needs can give rise to ... a

constitutional violation[,] ... mere medical malpractice will not." *Brown v. Borough of

Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *Estelle*, 429 U.S. at 106.  Furthermore, in

a prison medical context, deliberate indifference is generally not found when some

significant level of medical care has been offered to the inmate. *Clark v. Doe*, 2000 WL

1522855, at *2 (E.D. Pa. Oct. 1, 2000) ("courts have consistently rejected Eighth

Amendment claims where an inmate has received some level of medical care").  In fact,

"prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). There must, however, be a distinction between a case in which the prisoner claims a complete denial of medical treatment and one where the prisoner has received some medical attention and the dispute is over the adequacy of the treatment. *United States ex rel. Walker v. Fayette Cty*, 599 F.2d 573, 575 n.2 (3d Cir. 1979); *Farmer v. Brennan*, 511 U.S. 825 (1994).

DOC Defendants claim that "Noel along with Dr. Cowan and Dr. Harris believed Plaintiff had a METAVIR score of F2 (moderate fibrosis)" during the relevant time period, and that "[p]rofessional judgment was exercised in developing policy that inmates with F2 would be treated later after the inmates with F4 and F3 had been treated." (Doc. 336 at 6). As a result, though Plaintiff was confirmed to have chronic hepatitis C, he was not to be prescribed a direct-acting antiviral drug until, in the view of defendant Noel and others charged with making such a determination, his liver further deteriorated to a point where treatment was necessary. It is now conclusive, however, that in 2017, after this Court ordered that testing be conducted to determine the state of Plaintiff's liver, it was found that Plaintiff's condition had "deteriorated to 'severe grade 4 liver cirrhosis,'" which qualified Plaintiff for treatment with an DAAD. *Abu-Jamal*, 3:16-CV-2000 at (Doc. 61 at 2).

In viewing the DOC's management of Plaintiff's HCV, questions of material fact clearly remain as to whether the steps taken by the DOC Defendants, irrespective of Court-ordered measures, truly constituted treatment or were merely efforts to delay or deny the

prescription of a necessary drug for non-medical purposes.[8]  Based on the DOC Hepatitis C

Protocols effective as of November 2015 and November 2016, the DOC's policies indicate

that "treatment" of hepatitis C involved the prescription of "Anti-Viral Medication."  (Doc. 302-

14 at 7); (Doc. 302-15 at 7).  The decision as to whether a patient would be prescribed a

DAAD was left to the "Hepatitis C Treatment Committee" and based on the degree of liver

damage as diagnosed and monitored by the infection control nurse, the site medical

director, and the Chronic Care Clinic.  (Doc. 302-14); (Doc. 302-15).  Defendant Noel and

other members of the Hepatitis C Treatment Committee, however, did not prescribe Plaintiff

a DAAD until after they were ordered to do so by this Court.

Therefore, whether the DOC Defendants, and more specifically, defendant Noel,

were deliberately indifferent by merely monitoring and diagnosing Plaintiff's chronic HCV –

as compared to the provision of treatment by prescription of a DAAD – when there arguably

were indications that Plaintiff "likely ha[d] cirrhosis as of April 2015" still remains an issue of

material fact.  (Doc. 300 at ¶¶ 66, 130-131); *see also* (Doc. 334-02 at 6) (expert report of Dr.

---

[8] The DOC Defendants also contend, in support of their claim that defendant Noel is entitled to qualified immunity, that Plaintiff failed to sufficiently prove that he was denied treatment for non-medical reasons.  *See infra* Section V(II).  For the reasons set forth below, the DOC Defendants' argument fails as there are clear questions of material fact as to why Plaintiff was not treated with a DAAD when first available.  *See id.* at n.12; *see also Chimenti v. Wetzel*, 2018 WL 3388305, at *9 (E.D. Pa. July 12, 2018) (summary judgment denied where evidence indicated "DOC's prioritization of its treatment of inmates with DAAs pursuant to the Hepatitis C Protocol is influenced by the cost of that treatment rather than solely by the medical needs of inmates with chronic HCV and, thus, that the DOC has delayed necessary medical treatment for a non-medical reason").

Trooskin arguing that delayed treatment of HCV with a DAAD "falls below the standard of care, and risks the life of the individual with HCV").

### b. Failure to Show a Risk of Future Harm

In addition to their claim that there are no remaining issues of material fact concerning Plaintiff's Eighth Amendment claim, the DOC Defendants also argue that Plaintiff failed to provide evidence that supports his assertion that he is likely to sustain damages for future injury. (Doc. 301 at 26). Similarly, the DOC Defendants claim that Plaintiff's request for damages resulting from the DOC Defendants' inability to properly treat the Plaintiff's skin condition are also unsupported. (336 at 7-8).[9]

Within the record, however, Plaintiff provides facts that support his claim that he has sustained and will continue to sustain injuries as a result of the delay in treatment with a DAAD. For example, by April 2017, a hepatic elastography and sonogram of Plaintiff's liver showed evidence of severe grade 4 cirrhosis. *Abu-Jamal*, 3:16-CV-2000 at (Doc. 61 at 2). If, as the DOC Defendants argue, Plaintiff merely had a METAVIR score of F2 at the time of the initiation of this litigation, indicating moderate fibrosis, then Plaintiff's liver was thus arguably damaged as a result of the DOC Defendants' decision not to prescribe a DAAD in 2015.[10] (Doc. 300 at ¶ 83). *But see* (Doc. 302-27 at 4) (DOC Defendants' expert concluding

---

[9] From its two remaining claims, including Plaintiff's claim for violation of his Eighth Amendment right to medical care, Plaintiff seeks both compensatory and punitive damages. (Doc. 245 at 36).

[10] The DOC Defendants' experts also claim that "[l]iver biopsies were traditionally done in most patients with HCV infection to determine their METAVIR score," (Doc. 302-31 at 7), or that a "liver biopsy is the current gold standard to document the degree of fibrosis," (Doc. 302-27 at 2), but a liver biopsy was

that "[i]t is my medical opinion that [Plaintiff] already had cirrhosis by early 2015"). The

Plaintiff's expert came to such a conclusion when determining that "[t]he delay in HCV

treatment for Mr. Abu-Jamal has negatively impacted his health," reflected in an abdominal

ultrasound taken on February 16, 2017 that demonstrated portal hypertension that "was not

previously seen on [Plaintiff's] prior ultrasounds from 2015 which is evidence that the

scarring to his liver progressed in the interval between 2015 and 2017." (Doc. 334-02 at

12). As a result, Plaintiff argues he has an "increased risk of liver cancer," which will require

that he "undergo screenings for liver cancer every 6 months for the rest of his life." (Id.).

Further, though Plaintiff withdrew his Eighth Amendment claim for failure to provide

medical care for his skin condition, if, as Plaintiff argues, his skin condition was caused by

his HCV and the only way to properly treat this condition would have been to treat his HCV,

then any injury caused by a failure to treat Plaintiff's HCV would incorporate the harm

endured as a result of his skin condition. In support of such an argument, the Court looks to

a letter dated December 17, 2015, from the Correct Care Solutions' "Hepatitis C Review

Committee" to defendant Noel and the DOC Hepatitis C Treatment Committee citing a

report by Dr. Joseph Harris in which Harris alleged that Plaintiff had "severe extra-hepatic

manifestations of hepatitis C as evidenced by … the skin condition NAE" and that "[f]ailure

to treat [Plaintiff's] hepatitis C will result in serious harm to his health as his current extra-

---

also not conducted to establish the degree of harm to Plaintiff's liver. There would thus also be questions
of material fact regarding the sufficiency of defendant Noel's efforts to monitor Plaintiff's condition.

hepatic symptoms will not be cured."  (Doc. 334-14 at 1); *see also* (Doc. 94 at 135-137) (testimony by Dr. Harris at a preliminary evidentiary hearing where he described his diagnostic conclusion that Plaintiff's skin condition was a condition "secondary to his Hepatitis C" and could be treated only by treating the underlying HCV).  Such factual assertions may support a finding of damages in Plaintiff's favor.

Nevertheless, even if Plaintiff failed to support a claim for compensatory damages showing actual injury, he may still be able to recover punitive damages.  As set forth in *Allah v. Al-Hafeez*, 226 F.3d 247,250 (3d Cir. 2000), even if a plaintiff were to fail to sufficiently prove injury, an inmate alleging a violation of his or her constitutional rights may still pursue the action to recover nominal or punitive damages.  As Plaintiff seeks punitive damages under his Eighth Amendment violation claim, in addition to his claim for compensatory damages, dismissal at this junction would be improper.  As a result, the DOC Defendants' Motion for Summary Judgment as to Plaintiff's claim for deprivation of his Eighth Amendment right to medical care on the grounds that Plaintiff failed to prove deliberate indifference or damages will be denied.

## II.  Qualified Immunity as to Plaintiff's Eighth Amendment Claim

Though issues of material fact remain as to Plaintiff's claim for deprivation of his Eighth Amendment right to medical care for his hepatitis C, the DOC Defendants argue that defendant Noel is entitled to qualified immunity as to this claim.  (Doc. 301 at 39-45).  "Qualified immunity shields government officials from civil damages liability unless the

official violated a statutory or constitutional right that was clearly established at the time of

the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Qualified

immunity provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*,

502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As qualified

immunity is an immunity from suit, the Supreme Court has "repeatedly ... stressed the

importance of resolving immunity questions at the earliest possible stage in litigation."

*Campeggio v. Upper Pottsgrove Twp.*, 2014 WL 4435396, at *10 (E.D. Pa. Sept. 8, 2014)

(quoting *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009)); *but see Newland v. Reehorst*,

328 F. App'x 788, 791 n.3 (3d Cir. 2009) (It is "generally unwise to venture into a qualified

immunity analysis at the pleading stage as it is necessary to develop the factual record in

the vast majority of cases.").

   To determine whether a defendant is entitled to qualified immunity, courts will

analyze two factors: (1) whether the plaintiff has shown facts that make out a constitutional

rights violation, and if so, (2) whether those rights were "clearly established" at the time of

the incident. *Saucier v. Katz*, 533 U.S. 194 (2001); *but see Pearson*, 555 U.S. at 232-36

(finding that the sequence set forth in the *Saucier* two-step analysis was no longer

mandatory but could be employed at the court's discretion). A court must thus look to the

"objective legal reasonableness of the action, assessed in light of the legal rules that were

clearly established at the time it was taken." *Pearson*, 555 U.S. at 244; *see also Grant v.

City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the]

27

assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

As set forth above, an inmate's Eighth Amendment rights are violated where state officials are deliberately indifferent to serious medical needs.[11] *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 346 (describing two-part standard established in *Estelle v. Gamble*, 429 U.S. at 97). In support of their argument for qualified immunity, the DOC Defendants cite this Court's decision in *Abu-Jamal v. Wetzel* for its assertion that the DOC Defendants were not deliberately indifferent. (Doc. 336 at 4) (citing *Abu-Jamal v. Wetzel*, 2017 WL 34700 (M.D. Pa. Jan. 3, 2017)). In *Abu-Jamal v. Wetzel*, however, this Court determined that the Plaintiff was likely to succeed on the merits of his Eighth Amendment claim as he established, as here, "that Defendants have deliberately denied providing treatment to inmates with a serious medical condition and chosen a course of monitoring instead.... [and] have done so with the knowledge that (1) the standard of care is to administer DAA medications regardless of the disease's stage, (2) inmates would likely suffer from hepatitis C complications and disease progress without treatment, and (3) the delay in receiving DAA

---

[11] A serious medical need "is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347. The DOC Defendants do not contest the fact that Plaintiff had a serious medical need. HCV, which can cause life-threatening harm to the body, may lead to inflammation of the liver and scarring that can impact the ability of the liver to function or create complications such as increased rates of cancer, heart attacks, and diabetes. *See* (Doc. 334-02 at 1) (expert report of Dr. Stacey Trooskin). The Court will therefore accept this point as undisputed and proven.

medications reduces their efficacy." *Abu-Jamal,* 2017 WL 34700 at \*51; *see also supra*

Section VI(I)(a) (concluding that the deliberate indifference of defendant Noel remains an

issue of material fact). As such, as described above and as in *Abu-Jamal v. Wetzel,* Plaintiff

has provided ample evidence to make out a constitutional rights violation regarding the

DOC Defendants' treatment, or lack thereof, of Plaintiff's hepatitis C.[12]  Therefore, it is still

necessary to determine whether the Plaintiff's right to the medical care he was arguably

denied was "clearly established" at the time of the incident.

　　"To be clearly established, a right must be sufficiently clear that every reasonable

official would have understood that what he is doing violates that right." *Reichle,* 566 U.S.

at 664 (brackets and internal quotation marks omitted).  The Third Circuit has previously

concluded in this litigation that "[a]t the time of the relevant events, it was clearly established

that denying particular treatment to an inmate who indisputably warranted that treatment for

---

[12] DOC Defendants also argue, as compared to their argument against Plaintiff's Eighth Amendment claim, that they are entitled to qualified immunity as Plaintiff failed to show that the decision made by the DOC Defendants to not prescribe Plaintiff a DAAD was made for non-medical reasons.  (Doc. 336 at 2-4).  The DOC Defendants, however, explain that "the record evidence illustrates Plaintiff's case is [sic] the argument that the standard of care for treating HCV was to administer DAADs" and there may have not been "a medical reason not to individually treat Plaintiff sooner."  (Id. at 3-4).  Therefore, as there is ample evidence supporting Plaintiff's claim that, in a purely medical sense, there was no reason for the DOC Defendants to not treat his HCV with DAAD and he wasn't prescribed such a treatment, then the decision would have seemingly been made for non-medical reasons.  *See Davis v. Wetzel,* 2020 WL 3642382, at \*10 (M.D. Pa. July 6, 2020) ("When a defendant establishes evidence of a serious medical condition and is denied appropriate treatment for a nonmedical reason, then deliberate indifference is adequately supported." (citing *Abu-Jamal,* 779 F. App'x at 900)); *see also* (Doc. 96 at 68) (testimony from medical defendant Dr. Jay Cowan in which he states he would recommend treatment with a DAAD for those with HCV "[i]f they could pay $90,000"); (Doc. 302-31 at 7-9) (expert review of the DOC hepatitis C protocol of November 2016 characterizing "treatment" of HCV as the prescription of a DAAD and the main impediment to the prescription of a DAAD as cost).

nonmedical reasons would violate the Eighth Amendment." *Abu-Jamal v. Kerestes*, 779 F. App'x 893, 900 (3d Cir. 2019) (citing *Monmouth Cty. Corr. Inst. Inmates*, 834 F.3d at 346-47). It is also clear that deliberate indifference is manifest "[w]here prison officials deny reasonable requests for medical treatment ... and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth Cty. Corr. Inst. Inmates*, 834 F.3d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). Here, Plaintiff's claim "does not rest on the appropriateness of the [DOC] policy itself or a general right to be treated with the new antiviral drugs," but on the premise that he was denied a drug that he requested and should have been provided under the operative standard of care, and that he was denied this drug for non-medical reasons. *See Abu-Jamal*, 779 F. App'x at 900.[13]

The Plaintiff has thus sufficiently supported an Eighth Amendment violation and established that the Plaintiff's rights regarding necessary treatment of his HCV were "clearly established" at the time of the alleged constitutional violation. The DOC Defendants' Motion as to Plaintiff's Eighth Amendment claim will therefore be denied.

---

[13] Though, as the Third Circuit states, "Abu-Jamal's claim is predicated on the allegation that he was denied treatment for nonmedical reasons" and not the "propriety of the [DOC] Hepatitis C policy," it must also be recognized that the "propriety" of the DOC's Hepatitis C Protocols remains at the core of this matter as the protocols were allegedly used as justification for denying treatment and created with non-medical considerations in mind. *Abu-Jamal*, 779 F. App'x at 900 n.8; *see also supra* Section VI(I) (Section 1983 claims require a showing that an individual acting "under color of any statute, ordinance, regulation, custom, or usage" deprived the plaintiff of "rights, privileges, or immunities secured by the Constitution and laws").

III.    **Medical Malpractice for Failure to Treat Plaintiff's Hepatitis C**

Pennsylvania courts have established that medical malpractice is a form of

negligence.  *Quinby v. Plumsteadville Fam. Prac.*, Inc., 589 Pa. 183, 199 (2006).  Therefore,

to substantiate a cause of action for medical malpractice, a plaintiff must demonstrate the

elements of negligence: "a duty owed by the physician to the patient, a breach of that duty

by the physician, that the breach was the proximate cause of the harm suffered, and the

damages suffered were a direct result of harm."  *Id.* (citing *Hightower–Warren v. Silk*, 548

Pa. 459 (1997)).  A "medical malpractice claim is further defined as an 'unwarranted

departure from generally accepted standards of medical practice resulting in injury to a

patient, including all liability-producing conduct arising from the rendition of professional

medical services.'"  *Ponzini v. Monroe Cty.*, 2015 WL 5123680, at *8 (M.D. Pa. Aug. 31,

2015) (quoting *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 602 Pa. 346 (2009)).  In regard

to the Plaintiff's medical malpractice claim, the DOC Defendants raise two separate grounds

for dismissal on summary judgment.

a.  Failure to Prove Causation of Injury

In opposition to the Plaintiff's medical malpractice claim, the DOC Defendants claim

that the Plaintiff fails to sufficiently prove causation of injury to sustain his claim.  In part, the

DOC Defendants argue that the expert opinion provided by the Plaintiff's expert, Dr. Stacey

Trooskin, "using words like 'may not have been', 'less likely' and 'significantly less likely'" in

regards to the harm that could have been avoided had defendant Noel's not delayed in

treating Plaintiff's HCV, "is insufficient evidence of causation." (Doc. 301 at 32).

   "'When a party must prove causation through expert testimony the expert must

testify with reasonable certainty that in his professional opinion, the result in question did

come from the cause alleged.'" *Reyes v. Otis Elevator Co.*, 2016 WL 6495115, at \*4 (E.D.

Pa. Nov. 2, 2016) (quoting *Cohen v. Albert Einstein Med. Ctr., N. Div.*, 592 A.2d 720, 723

(Pa. Super. Ct. 1991)). Thus, "[u]nder Pennsylvania law, medical experts opining on

causation must testify that defendant's actions caused plaintiff's condition with a reasonable

degree of medical certainty." *McLeod v. Dollar Gen.*, 2014 WL 4634962, at \*4 (E.D. Pa.

Sept. 16, 2014) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 750 (3d Cir. 1994)).

Absolute certainty in the medical context, however, cannot be expected either by the courts

or by patients. *See Hamil v. Bashline*, 392 A.2d 1280, 1286- 88 (Pa. 1978) (though "in the

world of medicine nothing is absolutely certain," expert opinions provide a basis upon which

juries may "balanc[e] probabilities"). Instead, "'a medical opinion need only demonstrate,

with a reasonable degree of medical certainty, that a defendant's conduct increased the risk

of the harm actually sustained.'" *Rolon v. Davis*, 232 A.3d 773, 777 (Pa. 2020) (quoting

*Vicari v. Spiegel*, 936 A.2d 503, 510-11 (Pa. Super. Ct. 2020) ("an expert's opinion will not

be deemed deficient merely because he or she failed to expressly use the specific words"));

*see also K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080, 1104 (Pa. Super. Ct. 2015) ("[i]n *Hamil*

32

*v. Bashline*, our Supreme Court adopted the relaxed 'increased-risk-of-harm' standard"
(citation omitted)).

The parties disagree about the impact that the DOC Defendants' delay in prescribing
a DAAD had on the deterioration of Plaintiff's liver and the perpetuation of his skin condition.
Plaintiff's expert, however, clearly asserts that the Plaintiff suffers from cirrhosis of the liver,
that this cirrhosis was directly linked to his HCV, and that "[i]f he had been treated and cured
in 2015 as dictated by the standard of care, the fibrosis would have been significantly less
likely to advance in the absence of the virus." (Doc. 334-02 at 12).  The Plaintiff's expert
further concluded that "[t]he delay in HCV treatment for Mr. Abu-Jamal has negatively
impacted his health." (Doc. 334-02 at 12).  The impact of this delay, resulting from a
determination made pursuant to the DOC Hepatitis C Protocols and by the Hepatitis C
Treatment Committee,[14] was best reflected in the abdominal ultrasound taken on February
16, 2017, that demonstrated a portal hypertension "not previously seen on [Plaintiff's] prior
ultrasounds from 2015 which is evidence that the scarring to his liver progressed in the
interval between 2015 and 2017." (Doc. 334-02 at 12).  Even as the DOC Defendants
argue that an ultrasound conducted in 2019 after treatment with Harvoni "show[ed] no portal
hypertension," this does not remove from the realm of disputed material facts the question
as to whether the condition of Plaintiff's liver deteriorated between the Plaintiff's first

_____

[14] Defendant Noel not only helped draft the DOC's hepatitis C protocol in 2015 and subsequent
updated protocols, but also sat on the Hepatitis C Treatment Committee.  (Doc. 96 at 99-101, 107, 129).

diagnosis of HCV by the DOC and the initiation of this litigation or that the damage or

scarring to the Plaintiff's liver endured during that same period was reversed with treatment.

The objections that the DOC Defendants raise with respect to Dr. Trooskin's

opinions reflect questions of material fact that would be improper for the Court to decide

here. *Ponzini*, 2015 WL 5123680, at *5. The facts asserted in the DOC Defendants'

Statement of Facts and Plaintiff's responses serve as a prime example of the factual issues

that remain in this case, for while the parties agree on the content of the experts' testimony

and opinions, their interpretations of the conclusions and state of Plaintiff's health at the

time this litigation was initiated vary widely. "Questions about credibility and weight of

expert opinion testimony are [likewise] for the trier of facts since such testimony is ordinarily

not conclusive." *Drysdale v. Woerth*, 153 F.Supp.2d 678, 689 (E.D. Pa. 2001).

> b. <u>Failure to Timely File a Certificate of Merit Against Defendant Noel</u>

Separately, the DOC Defendants claim that the Plaintiff failed to timely file a

necessary certificate of merit ("COM") pursuant to Pennsylvania Rule of Civil Procedure

1042.3. (Doc. 336 at 8). Rule 1042.3 requires a certificate of merit be filed in any action

based upon an allegation that a licensed professional deviated from an acceptable

professional standard. Pa. R. Civ. P. § 1042.3. Such a certificate must establish that:

> (1) an appropriate licensed professional has supplied a written statement
> that there exists a reasonable probability that the care, skill or
> knowledge exercised or exhibited in the treatment, practice or work that
> is the subject of the complaint, fell outside acceptable professional
> standards and that such conduct was a cause in bringing about the
> harm, or

(2)     the claim that the defendant deviated from an acceptable professional
        standard is based solely on allegations that other licensed professionals
        for whom this defendant is responsible deviated from an acceptable
        professional standard, or

(3)     expert testimony of an appropriate licensed professional is unnecessary
        for prosecution of the claim.

Pa. R. Civ. P. § 1042.3(a). The purpose of the COM requirement is to "assure that

malpractice claims for which there is no expert support will be terminated at an early stage

in the proceedings." *Chamberlain v. Giampapa*, 210 F.3d 154, 158-61 (3d Cir. 2000). At its

heart, the presence in the record of a COM "signals to the parties and the trial court that the

plaintiff is willing to attest to the basis of his malpractice claim; that he is in a position to

support the allegations he has made in his professional liability action; and that resources

will not be wasted if additional pleading and discovery take place." *Womer v. Hilliker*, 908

A.2d 269, 275-76 (2006) (citing Pa. R. Civ. P. §§ 1042.4, 1042.5). In contrast, the "absence

from the record of a COM signals to the parties and the trial court that none of this is so and

that nothing further should transpire in the action, except for the lawsuit's termination." *Id.*

(citing Pa. R. Civ. P. § 1042.6).

Though the Pennsylvania Supreme Court initially set forth a strict interpretation of

the COM filing requirement, it has since relaxed such exacting standards. In this regard,

"the courts of [Pennsylvania] have historically been loathe to put a litigant out of court on a

potential meritorious claim for missing a filing deadline due to lawyer oversight," while "there

is also ample law in Pennsylvania abhorring the practice of entering a snap judgment in

response to such a mistake." *See Schmigel v. Uchal*, 800 F.3d 113, 118 (3d Cir. 2015)

(quoting *Womer*, 908 A.2d at 282 (Baer, J., dissenting)).

The Pennsylvania Supreme Court has thus concluded that while full compliance with

Rule 1042.3 is expected, the Rule is nonetheless subject to certain equitable exceptions as:

> we have always understood that procedural rules are not ends in themselves,
> and that the rigid application of our rules does not always serve[] the interests
> of fairness and justice. It is for this reason that we adopted Rule 126, which
> provides in pertinent part that "[t]he court at every stage of any such action or
> proceeding may disregard any error or defect of procedure which does not
> affect the substantial rights of the parties." Pa. R. Civ. P. No. 126. With this
> language, we incorporated equitable considerations in the form of a doctrine of
> substantial compliance into Rule 126, giving the trial courts the latitude to
> overlook any "procedural defect" that does not prejudice a party's rights. Thus,
> while we look for full compliance with the terms of our rules, we provide a limited
> exception under Rule 126 to those who commit a misstep when attempting to
> do what any particular rule requires. Moreover, we made Rule 126 a rule of
> universal application, such that the trial court may disregard any such
> procedural defect or error at every stage of any action or proceeding to which
> the civil procedural rules apply.

*Booker v. United States*, 366 F. App'x 425, 427-28 (3d Cir. 2010) (quoting *Womer*, 908 A.2d

at 276 (internal citations omitted)).  In light of such guidance, "state and federal courts

applying Pennsylvania law have applied the 'substantial compliance' doctrine in situations

where the plaintiff has attempted but failed to meet the technical requirements of Rule

1042.3." *See id*. at 428-29 (providing list of federal and Pennsylvania state cases applying

the substantial compliance doctrine, though differentiating between efforts of a plaintiff to

comply with Rule 1042.3 in a substantive manner and a total disregard for the Rule until it

becomes a point of contention in the litigation).

In addition, in 2008, the Pennsylvania Supreme Court amended the State's Rules of
Civil Procedure in order to add further "conditions precedent" that must be met in order for a
court to dismiss a case for failure to meet the requirements under Rule 1042.  Pa. R. Civ. P.
§§ 1042.6(a), 1042.7(a).  Most notably, in instances where there was a deficiency in a COM
filing, dismissal is only permissible "no less than thirty days after the date of the filing of the
notice of intention to enter the judgment of non pros."  *Id.* at § 1042.7(a)(4); *see also*
*Schmigel*, 800 F.3d at 118-119 ("the injustice sought to be remedied [in *Womer*] was
accomplished via a subsequent amendment to the civil procedural rules requiring a
defendant to give a plaintiff a thirty-day written notice of intention to file a praecipe for a
judgment of non pros for failure to file a COM" (quoting *Anderson v. McAfoos*, 618 Pa. 478,
500 (2012) (Baer, J., concurring) (internal citations omitted))).  A motion for summary
judgment, however, as compared to a state non pros, satisfies such a notice requirement in
federal courts for purposes of Rules 1042.6 and 1042.7.  *Schmigel*, 800 F.3d at 122; *see*
*also Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown,*
*P.C.*, 692 F.3d 283, 304 n.13 (3d Cir. 2012) (concluding it was appropriate to file a motion
for summary judgment to effectuate dismissal under similar New Jersey rule).

Though the Plaintiff ineffectually asserts that the DOC Defendants waived[15] any
argument that the Plaintiff did not satisfy Section 1042 by waiting to raise such a claim in

---

[15] In accordance with Section 1042, parties in federal courts "cannot waive this requirement as it is
a rule of substantive law."  *Diaz v. Palakovich*, 2013 WL 4500049, at *1 (M.D. Pa. Aug. 21, 2013) (citing Pa.
R. Civ. P. 1042.3(a)); *see also Schmigel*, 800 F.3d at 120 (listing cases "support[ing] the notion that the

their Motion for Summary Judgment, Plaintiff does not contest the fact that the COM filed as part of this litigation failed to list defendant Noel as a recipient and was thus deficient pursuant to Rule 1042.3(b)(1). *See* Pa. R. Civ. P. § 1042.3(b)(1) ("A separate certificate of merit shall be filed as to each licensed professional against whom a claim is asserted."); (Doc. 109); *see also* (Doc. 301 at 32-33) (asserting that though Plaintiff filed a COM in March 2016 after the filing of the First Amended Complaint, he failed to file another COM when adding Dr. Noel as a defendant several months later). As notice of this defect was thus provided to Plaintiff by the DOC Defendants as part of their Motion for Summary Judgment, Plaintiff was given thirty days to rectify the deficiencies in his COM from the date of the DOC Defendants' filing. *Schmigel*, 800 F.3d at 122. Plaintiff, however, failed to take advantage of this thirty-day period.[16]

Nevertheless, the equitable considerations presented here support a finding that Plaintiff's medical malpractice claim should not be dismissed for failure to conform with Rule 1042.3's requirement to file a COM for each defendant. Pursuant to the doctrine of

---

COM regime's notice requirement should be construed as substantive law," and thus applicable in federal courts). Likewise, an argument that a defendant waives its affirmative defense by failing to raise the COM issue in an initial motion is unsupported. *See Lane v. Riley*, 2005 WL 3454401, at *1 n.1 (W.D. Pa. Nov. 22, 2005) (citing cases establishing that "failure to raise non compliance rule during preliminary proceedings did not waive Rule 1042.3" (citations omitted)); *Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007). The exceptions set forth in light of the *Womer* dissent, however, provide equitable relief to ensure that judicial resources are not wasted and justice remains paramount.

[16] Section 1042.7 provides further grounds that restrict a court's ability to dismiss claims for a failure to fully comply with Rule 1042.3. *See* Pa. R. Civ. P. § 1042.7(a) (for example, "a judgment of non pros against the plaintiff for failure to file a certificate of merit" will not be entered if there is a "pending motion for determination that the filing of a certificate is not required"). The Plaintiff, however, has failed to raise any such objections.

substantial compliance guided by Rule 126, courts are provided "the latitude to overlook any 'procedural defect' that does not prejudice a party's rights." *Womer*, 908 A.2d at 276; Pa. R. Civ. P. § 126. Plaintiff's filings to this point – including an initial COM, expert reports with curriculum vitae from a qualified physician, and deposition testimony concerning the Plaintiff's allegations – and the DOC Defendants' responses to such filings, clearly indicate that Plaintiff made efforts to substantially comply with the Rule and provide sufficient warning that he "is willing to attest to the basis of his malpractice claim; that he is in a position to support the allegations he has made in his professional liability action; and that resources will not be wasted if additional pleading and discovery take place." *Womer*, 908 A.2d at 275-76.

Further, the DOC Defendants, and specifically, defendant Noel, will not be prejudiced by Plaintiff's failure to fully comply with the COM requirement. Plaintiff's initial COM, though not served on Noel, set forth sufficient support for claims against individuals directly under defendant Noel's directives and put Noel on notice of his alleged culpability from the outset of the litigation. Plaintiff's medical malpractice claim has likewise been supported through pleadings and throughout discovery such that Noel was provided sufficient notice of the specific claims against which he shall be required to defend. Plaintiff, in comparison, would face significant prejudice if his medical malpractice claim was dismissed at this advanced stage of the litigation as he would be foreclosed by Pennsylvania's statute of limitations from relitigating this claim.

The DOC Defendants' Motion for Summary Judgment as to Plaintiff's claim for medical malpractice for failure of defendant Noel to adequately treat Plaintiff's hepatitis C on the grounds that Plaintiff failed to show causation or failed to timely file a COM will thus be denied.

## VII. CONCLUSION

For the reasons set forth above, the Court will deny the DOC Defendants' Motion for Summary Judgment as to defendant Noel for Counts I and V, grant the Motion as to defendants Kerestes, Wetzel, Oppman, Steinhart, Delbalso, and Silva for Counts I and V, and grant the Motion in its entirety as to all defendants for Counts II, III, VI, and VII and Plaintiff's claim for injunctive relief.

Robert D. Mariani
United States District Judge