THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MUMIA ABU-JAMAL,           :
                                :
          **Plaintiff,**      :
     v.               :     **3:15-CV-967**
                                :     **(JUDGE MARIANI)**
**JOHN KERESTES, et al.,**    :
                                :
          **Defendants.**    :

## MEMORANDUM OPINION

### I. INTRODUCTION

The above-captioned matter reflects the consolidation of two civil rights actions filed by a Pennsylvania state prisoner, Mumia Abu-Jamal, ("Plaintiff" or "Abu-Jamal"), arising out of the same set of facts. Presently before the Court is a Partial Motion for Summary Judgment filed by defendants Correct Care Solutions, LLC, Dr. Jay Cowan, Dr. John Lisiak, Dr. Shaista Khanum, and physician assistant Scott Saxon, (collectively, the "Medical Defendants"). (Doc. 306).[1]

Through his Fourth Amended Complaint, Plaintiff raised six claims against select Medical Defendants for damages and injunctive relief, including claims for: deprivation of Plaintiff's Eighth Amendment right to medical care for hepatitis C against defendants Cowan, Lisiak, Khanum, and Saxon (Count I); deprivation of Plaintiff's Eighth Amendment

_____
[1] A separate Motion for Summary Judgment has been filed by John Kerestes, Theresa DelBalso, Joseph Silva, John Wetzel, Christopher Oppman, John Steinhart, and Dr. Paul Noel, (collectively, the "DOC Defendants") (Doc. 306). The Court addresses this Motion in a separate Memorandum Opinion.

right to medical care for a pervasive skin condition against defendants Lisiak, Khanum, and Saxon (Count II); deprivation of Plaintiff's Eighth Amendment right to medical care for hyperglycemia against defendants Lisiak, Khanum, and Saxon (Count III); medical malpractice for failure to treat Plaintiff's hyperglycemia against defendants Lisiak, Khanum, and Saxon (Count IV); medical malpractice for failure to treat Plaintiff's hepatitis C against defendants Cowan, Lisiak, Khanum, and Saxon (Count V); and medical malpractice for failure to treat Plaintiff's skin condition against defendants Lisiak, Khanum, and Saxon (Count VI). (Doc. 245).

In accordance with the parties' briefing, however, only three claims remain in contention, including claims seeking compensatory and punitive damages against defendants Cowan, Lisiak, and Khanum for a violation of the Plaintiff's Eighth Amendment right to medical care for hepatitis C (Count I), defendants Khanum and Saxon for a violation of the Plaintiff's Eighth Amendment right to medical care for hyperglycemia (Count III), and defendants Cowan, Lisiak, and Khanum for medical malpractice for failure to treat Plaintiff's hepatitis C (Count V). The Plaintiff otherwise concedes that summary judgment should be entered as to defendant Saxon for Counts I and V, as to defendant Lisiak for Count III, and as to all Medical Defendants for the additional three claims and injunctive relief. (Doc. 332 at 11). For the reasons that follow, the Court will thus deny the Medical Defendants' Motion for Summary Judgment for defendant Cowan as to Counts I and V, grant the Motion in part for defendants Lisiak, Khanum, and Saxon as to Counts I and V, and grant the Motion in its

entirety for all defendants as to Counts II, III, IV, and VI, and Plaintiff's claim for injunctive relief.

## II. PROCEDURAL HISTORY[2]

Plaintiff, Mumia Abu-Jamal, an inmate of the Pennsylvania Department of Corrections ("DOC") suffering from hepatitis C ("HCV"), a pervasive skin condition, and hyperglycemia, initiated proceedings through a Complaint filed on May 18, 2015, that asserted a violation of his First Amendment right to association and access to the courts. *See* (Doc. 1). This matter was assigned case number 3:15-CV-967 ("*Abu-Jamal 1*"). (Id.). Plaintiff was initially joined by two fellow inmates raising similar claims but proceeded alone once his fellow plaintiffs filed notices of voluntary dismissal. (Docs. 17, 18). On August 3, 2015, Plaintiff filed a Motion for Leave to File a "First Amended and Supplemental Complaint." (Doc. 21). The First Amended Complaint, which not only added Eighth Amendment claims and state law medical malpractice claims but also various defendants, including defendants Lisiak, Khanum, and Saxon, was adopted and became the operative complaint. (Doc. 57).

In light of the added claims set forth in his First Amended Complaint, Plaintiff filed a Motion for Preliminary Injunction on August 23, 2015, that asked the Court to require the defendants to:

---

[2] The Court set forth a more extensive review of the procedural history of the current matter in its Memorandum Opinion granting in part and denying in part Motions to Dismiss filed by the DOC Defendants and Medical Defendants. *See* (Doc. 272 at 2-12).

> 1) immediately treat plaintiff's active hepatitis C infection with the latest direct acting anti-viral drugs; 2) immediately treat his skin condition, a manifestation of the hepatitis C, with zinc supplementation and Protopic cream; and 3) permit Mr. Abu Jamal to have an in-person examination by an independent physician of his own choosing under conditions that are appropriate for such examinations.

(Doc. 23 at 1).  After Magistrate Judge Karoline Mehalchick issued a Report and Recommendation recommending that Plaintiff's Motion be denied, (Doc. 39), this Court held a three-day evidentiary hearing to make a final ruling as to the Motion, (Docs. 94, 95, 96). During this hearing, the Court reviewed the protocol maintained by the DOC and used when determining the treatment inmates with HCV receive, and found that in accordance with this protocol, a "Hepatitis C Treatment Committee has the ultimate authority" to decide the treatment provided to inmates suffering from HCV.  (Doc. 191 at 11, 19).

In an Opinion dated August 31, 2016, this Court denied Plaintiff's Motion for Preliminary Injunction.  (Id.).  The Court concluded that as "[t]he named Defendants [were] not members of the Hepatitis C Treatment Review Committee" and this Committee alone had the ability to prescribe an anti-viral drug to treat Plaintiff's HCV, the Court could not "properly issue an injunction against the named Defendants, as the record contain[ed] no evidence that they had authority to alter the interim protocol or its application to Plaintiff." (Id. at 22).  The Opinion, however, did establish that "[t]he protocol as currently adopted and implemented presents deliberate indifference to the known risks which follow from untreated chronic hepatitis C."  (Id. at 21).  As such, if the proper defendants were named in the operative complaint, "the Court believe[d] there [was] a sufficient basis in the record to find

4

that the DOC's current protocol may well constitute deliberate indifference in that, by its own terms, it delays treatment until an inmate's liver is sufficiently cirrhotic" and "faces the imminent prospect of 'catastrophic' rupture."  (Id. at 31).[3]

Though Plaintiff had already filed a Second Amended Complaint in *Abu-Jamal 1* by the time his Motion for Preliminary Injunction was denied, Plaintiff filed a separate action on September 30, 2016, under case number 3:16-CV-2000 ("*Abu-Jamal 2*").  This Complaint contained a single count for "Deprivation of Eighth Amendment Right to Medical Care for Hepatitis C," naming various defendants not previously named in *Abu-Jamal 1*, including defendant Correct Care Solutions and Correct Care Solutions's "representative on the Hepatitis C Treatment Committee."  *Abu-Jamal v. Wetzel*, 3:16-CV-2000-RDM (M.D. Pa. Sept. 30, 2016) at (Doc. 1).  On October 5, 2016, Plaintiff filed a Motion for Preliminary Injunction in *Abu-Jamal 2* seeking the same relief as requested in the Motion for Preliminary Injunction in *Abu-Jamal 1*.  *Id.* at (Doc. 7).  The parties agreed that the Court could rely on the same evidence presented in the preliminary injunction hearing held by the Court in *Abu-Jamal 1* in determining whether to grant or deny the Plaintiff's Motion in *Abu-Jamal 2*.

In an Opinion issued on January 3, 2017, this Court found that, despite the fact that the DOC replaced the interim protocol that was analyzed in *Abu-Jamal 1* with a new

---

[3] "Cirrhosis" represents a late stage of inflammation or scarring — i.e. "fibrosis" — of an individual's liver and may lead to the failure of the organ or various other complications.  The benefit of early treatment of HCV thus includes the ability of the body to stave off further liver deterioration before it reaches a point bordering on a "'catastrophic' rupture."

protocol, "the new protocol completely bars those with chronic hepatitis C but without vast

fibrosis or cirrhosis from receiving DAA medications." *Id.* at (Doc. 23 at 32).  More

specifically, the Court concluded that:

> [t]he Hepatitis C Protocol deliberately delays treatment for hepatitis C through
> the administration of DAA drugs such as Harvoni, Sovaldi, and Viekira Pak
> despite the knowledge of Defendants that sit on the Hepatitis C Treatment
> Committee: (1) that the aforesaid DAA medications will effect a cure of Hepatitis
> C in 90 to 95 percent of the cases of that disease; and (2) that the substantial
> delay in treatment that is inherent in the current protocol is likely to reduce the
> efficacy of these medications and thereby prolong the suffering of those who
> have been diagnosed with chronic hepatitis C and allow the progression of the
> disease to accelerate so that it presents a greater threat of cirrhosis,
> hepatocellular carcinoma, and death of the inmate with such disease.
> . . .
> In choosing a course of monitoring over treatment, [defendants] consciously
> disregarded the known risks of Plaintiff's serious medical needs, namely
> continued liver scarring, disease progression, and other hepatitis C
> complications.

*Id.* at (Doc. 23 at 20-21).  As such, the Court held that Plaintiff had a reasonable likelihood

of success on the merits of his claims.  *Id.* at (Doc. 23 at 27-41).  After determining that the

other preliminary injunction factors also weighed in Plaintiff's favor, the Court granted

Plaintiff's Motion.  *Id.* at (Doc. 23 at 42-43).  The Court thereafter enjoined the *Abu-Jamal 2*

defendants from enforcing the applicable hepatitis C protocol as it pertained to Plaintiff and

directed the defendants to administer direct-acting antiviral drugs ("DAADs"), proven to treat

HCV, to Plaintiff unless such medications were found to be contraindicated by a medical

professional.  *Id.* at (Doc. 24).

Following the Court's decision to grant Plaintiff's Motion for a Preliminary Injunction, however, the defendants in *Abu-Jamal 2* filed Motions for Reconsideration, Motions to Stay, and Notices of Appeal. *Id.* at (Docs. 29-31, 36, 37). As the Plaintiff thus continued to wait for treatment, he filed a Motion for Contempt in *Abu-Jamal 2* against the defendants for failure to perform in accordance with the Court's Preliminary Injunction Order, *id* at (Doc. 53), and filed a Third Amended Complaint on January 17, 2017, in *Abu-Jamal 1*, (Doc. 210).

Nevertheless, on March 31, 2017, the defendants in *Abu-Jamal 2*, including defendant Correct Care Solutions, informed the Court that "[f]ollowing recent medical testing and a review of the results thereof, Plaintiff will be treated with the Federal Drug Administration (FDA) approved Hepatitis C direct[]-acting antiviral medication in accordance with the Hepatitis C protocol of the Department of Corrections." *Abu-Jamal*, 3:16-CV-2000 at (Doc. 59 at 1). On April 4, 2017, Plaintiff's counsel informed the Court that Plaintiff had undergone a "sonogram and a hepatic elastography" and that the test results revealed that his condition had "deteriorated to 'severe grade 4 liver cirrhosis.'" *Id.* at (Doc. 61 at 2). As a result, on April 5, 2017, the defendants in *Abu-Jamal 2* informed the Court that Plaintiff would be prescribed and start a regiment of the direct-acting antiviral drug Harvoni the following day. Thereafter, the Court dismissed the pending Motions to Stay and Motions for Reconsideration. *Id.* at (Doc. 63).

On April 18, 2017, the Court held a conference with the parties to determine whether *Abu-Jamal 1* and *Abu-Jamal 2* should be consolidated. The parties in the two cases agreed

that the matters should merge and thereafter filed Joint Motions for Consolidation. (Doc.

223); *Abu-Jamal*, 3:16-CV-2000 at (Doc. 71). On May 4, 2017, the Court issued an Order

consolidating *Abu-Jamal 1* and *Abu-Jamal 2* under case number 3:15-CV-967. (Doc. 224);

*Abu-Jamal*, 3:16-CV-2000 at (Doc. 72). On August 23, 2017, Plaintiff filed his Fourth

Amended Complaint, which remains the operative complaint. (Doc. 245).

    In his Fourth Amended Complaint, Plaintiff maintained claims against various

Medical Defendants, including: a  Section 1983 claim for violation of Plaintiff's Eighth

Amendment right to medical care for Plaintiff's hepatitis C (Count I); Section 1983 claim for

violation of Plaintiff's Eighth Amendment right to medical care for Plaintiff's skin condition

(Count II); Section 1983 claim for violation of Plaintiff's Eighth Amendment right to medical

care for Plaintiff's hyperglycemia (Count III); state law medical malpractice claim for failure

to treat Plaintiff's hyperglycemia (Count IV); state law medical malpractice claim for failure

to treat Plaintiff's hepatitis C (Count V); and state law medical malpractice claim for failure

to treat Plaintiff's skin condition (Count VI). (Doc. 245).

    In response to the Fourth Amended Complaint in the consolidated action, the

Medical Defendants and DOC Defendants filed Motions to Dismiss. (Docs. 248, 251). On

May 10, 2018, this Court filed its Opinion granting in part and denying in part the DOC

Defendants' Motion and denying the Medical Defendants' Motion. (Doc. 273). On January

30, 2020, after further discovery, the Medical Defendants filed the Motion for Summary

Judgment currently before this Court. (Doc. 306).

### III. STATEMENT OF UNDISPUTED FACTS

In support of their briefing, in accordance with Local Rule 56, the parties submitted Statements of Material Facts asserting and confirming various facts which the Court deems undisputed.  (Docs. 308, 333).

Plaintiff Mumia Abu-Jamal is an inmate serving a life sentence within the Pennsylvania Department of Corrections at SCI-Mahoney.  *See* (Doc. 308 at ¶ 1).  Plaintiff suffered various maladies during his time of incarceration, which led to multiple medical trips to the SCI-Mahoney infirmary, Schuylkill Medical Center, and Geisinger Medical Center between 2014 and 2019.  *See generally* (Doc. 308).  While incarcerated, Plaintiff underwent blood work, X-rays, and various physical consultations with numerous physicians, hematologists, dermatologists, and rheumatologists.  (Id. at ¶ 33, 34, 142).

Plaintiff, in late 2014 and early 2015, faced ongoing dermatological issues that manifested through various symptoms including "pustules on the arms, and a 'spattering' of raised dark lesions on the legs," (Doc. 308 at ¶ 6), "open sores to his arm, back, and chest," (id. at ¶ 9), "thick scaling covering 75-80% of [his] body," (id. at ¶ 12), and swollen extremities, (id. at ¶ 15).  In response to Plaintiff's skin issues, Plaintiff was prescribed numerous treatments including, amongst other things, Benadryl, urea cream, clindamycin, Lubriderm, Motrin, Tylenol, triamcinolone, Augmentin, prednisone, a Kenalog injection, cyclosporine, Lasix, and Norvasc.  (Id. at ¶¶ 12-14, 20-21).  Plaintiff was also instructed to take measures to alleviate symptoms such as use of a warm towel, (id. at ¶11), changing of

soaps, (id. at ¶ 12), taking shorter showers, (Id.), or caring for wounds with Vaseline gauze, (id. at ¶ 79).  Such measures, however, had varying degrees of success and Plaintiff's skin condition persisted.

In addition to his skin condition, Plaintiff also started exhibiting high blood glucose levels, which led Plaintiff's physicians to prescribe him "insulin given the fact that his glucose was over 500 and he had ketoacidosis."  (Doc. 308 at ¶ 42).  Plaintiff was later prescribed Metformin to further deal with potential diabetes evidenced by his high blood glucose.  (Id. at ¶ 81).  Through testing, it was shown that Plaintiff's glucose levels rose from an unproblematic level in January 2015 to dangerous levels by April of the same year.  *See* (id. at ¶¶ 47, 49, 50, 54) (Plaintiff's blood glucose levels fluctuated from 149 mg/dl to 1000 mg/dl).  Plaintiff, however, through medication, was eventually able to manage his hyperglycemia.

Though these maladies impacted Plaintiff's overall health, Plaintiff was also confirmed to have HCV in 2012.  (Doc. 308 at ¶ 3).  Plaintiff was eventually given a viral load blood test in August 2015 that confirmed that his HCV was chronic.  (Doc 308 at ¶ 118-119).  The Pennsylvania DOC maintains policies for the medical treatment of inmates within its facilities, including a policy for those suffering from hepatitis C ("HCV").  Of note, the DOC issued an interim hepatitis C protocol on November 13, 2015, (id. at ¶ 157), and an updated hepatitis C protocol, (collectively, the "Hepatitis C Protocols"), on November 7, 2016, (id. at ¶ 188).  Under the interim protocol, the HCV patients "most in need of

*evaluation* [would] be defined as those with platelet counts below 100,000/mcL and those with HALT-C predicted likelihood of cirrhosis over 60%." (Id. at ¶ 157) (emphasis added). This, however, did not guarantee treatment for those meeting these conditions, which included the prescription of a direct-acting antiviral drug such as Harvoni or Sovaldi. (Id. at ¶ 188). The "prioritization" of such treatment for inmates suffering from HCV under the updated hepatitis C protocol depended on various factors including, but not limited to, liver damage shown through CT scans, AST to Platelet Ratio Index ("APRI") scores, and METAVIR scores.[4]  *See* (id.) ("[e]xceptions to the above criteria for Priority Levels 1-4 will be made on an individual basis and will be determined primarily by a compelling or urgent need for treatment, such as evidence for rapid progression of fibrosis, or deteriorating health status from other comorbidities").  Plaintiff and the Medical Defendants were regulated by these protocols.  (Id. at ¶ 134).

On August 24, 2015, Plaintiff's labs reflected a HALT-C score of 77%, though, according to Dr. Paul Noel, "his other scores [did] not indicate cirrhosis."  (Doc. 308 at ¶ 133).  Upon review, Dr. Noel testified that "[p]utting the entire picture together," the DOC's Hepatitis C Treatment Committee "determined that the HALT-C score that said he had 63 percent chance of cirrhosis overestimated, that he did not have cirrhosis [and] … that he fell

---

[4] The METAVIR scoring system categorizes the stages of liver fibrosis into five levels: F0 (no fibrosis); F1 (mild fibrosis); F2 (moderate fibrosis); F3 (advanced fibrosis); and F4 (cirrhosis).  (Doc. 308 at ¶ 188).  In contrast, an APRI score is calculated on a points scale where a score greater than or equal to 2.0 "may be used to predict the presence of cirrhosis," whereas a "cutoff of [greater than or equal to] 1.5" may "predict the presence of significant fibrosis (stages 2 to 4, out of 4)."  (Doc. 302-15 at 3).

in the category of a 37 percent with that Halt-C score that did not have cirrhosis." (Id.); *but see* (id. at 175) (examination revealed that Plaintiff's HALT-C score as of June 7, 2016, was 60%). Similarly, Plaintiff's APRI scores remained below 1.0, which, according to the Hepatitis C Protocols, would place him in "Priority Level 4 – Routine Priority for Treatment." (Id. at ¶¶ 171, 175, 185, 188, 191, 196, 217).

As such, though still suffering from the various maladies including chronic HCV that had beset him during his incarceration, Plaintiff was not prescribed one of the DAADs to treat his HCV as Dr. David Robel "explained that [Plaintiff] doesn't meet the DOC criteria for tx but may still be considered" as this "decision as a decision (for all Hep C tx for pts.) comes from Central Office." (Doc. 308 at ¶ 145); *see also* (Doc. 308 at 138) ("Essentially he is to be seen by Rheum[atology] to rule out all other causes of his skin issue. If no other causes, then consider Hep C tx. At this time, does not meet DOC criteria for tx."). Plaintiff did indicate that he "relates persistence of [skin] condition to ongoing HepC infection." (Id. at ¶ 187).

Plaintiff instituted two separate actions against the DOC Defendants and various other medical and government defendants. *See also Abu-Jamal v. Wetzel*, 3:16-cv-2000-RDM. Per Order issued by this Court dated January 3, 2017, the defendants in the parallel civil action were to prescribe and treat Plaintiff "with DAA medications unless the Supervising Physician determines–in his or her professional and independent medical

judgment–that there are medical contraindications to Plaintiff receiving DAA medication that render the administration of the medication not medically advisable." *Id*. at (Doc. 24).

On March 29, 2017, Plaintiff underwent an ultrasound to assess the condition of his liver, through which it was revealed that he had a "borderline small homogenous liver, portal hypertension, no ascites or splenomegaly, and cholelithiasis with no biliary dilation." (Doc. 308 at 199). A hepatic elastography, completed on the same day, showed that Plaintiff had severe grade 4 liver cirrhosis. (Id. at ¶ 199). According to Dr. Noel, based on the exams from the previous day, it was determined by the Hepatitis C Treatment Review Committee that Plaintiff "now met the criteria for treatment" with a DAAD. (Id. at ¶ 200). It was thus decided that Plaintiff "had been approved for treatment by the Hepatitis C Treatment Review Committee." (Id. at ¶ 200). Plaintiff was treated with Harvoni from April 6, 2017, to June 28, 2017. (Id. at ¶ 203).

## IV. STATEMENT OF DISPUTED FACTS

Though the parties are in agreement as to various facts within the complaint and subsequent filings, the Plaintiff maintains that the policies followed and medical decisions made by the Medical Defendants failed to meet the necessary standards of care. For one, Plaintiff questions the Medical Defendants' decision to "intentionally disregard[] plaintiff's elevated glucose" as Dr. Stacey Trooskin, Plaintiff's expert, asserted that "failure to monitor and treat an elevated glucose of 419 is 'far from the standard of care of the management of hyperglycemia.'" (Doc. 333 at ¶ 259). In part, Plaintiff argues that "[d]efendant Khanum

13

knew that uncontrolled hyperglycemia can cause diabetic ketoacidosis, loss of consciousness, seizures, and even death. Still, she did not even perform a basic test to see if plaintiff's 'high above normal' glucose had resolved or remained dangerously elevated." (Id. at ¶ 253). Plaintiff alleges that defendant Saxon likewise failed to monitor his glucose through a glucose test even when it reached a near "catastrophe[ic]" level.  (Id. at ¶ 258).

Plaintiff also attacks the Medical Defendants' unwillingness to take into account Plaintiff's diagnosed HCV when making medical decisions regarding his skin condition and hyperglycemia.  (Id. at ¶ 36) ("the record states that plaintiff is Hepatitis C positive yet there is no order for a viral load test and/or any treatment for the Hepatitis C notwithstanding the abnormal ultrasound, abnormal blood work and unresolved skin condition").  Plaintiff claims that the Medical Defendants were aware that Plaintiff was HCV positive but made no request for a hepatitis C workup to determine whether Plaintiff's case was chronic for years after his first diagnosis or consider his other conditions as extrahepatic manifestations of Plaintiff's HCV.  (Doc. 333 at ¶ 20).

Separately, Plaintiff claims that in regard to the treatment, or lack thereof, of his HCV, that the "interim protocol did not prioritize treatment; it denied treatment to the vast majority of those with hepatitis C."  (Doc. 333 at ¶ 157).  As noted by Plaintiff's expert, under the November 2016 DOC protocol, "[o]nly those individuals with cirrhosis who satisfied several other treatment criteria including length of sentence, sobriety criteria, adherence to other medications were given 'priority level 1' status for treatment .… There was no medical

justification for prioritization for treatment. This approach to treatment was in direct

opposition to the standard of care which was clearly established in 2015." (Id. at ¶ 188).

In line with such claims, Plaintiff alleges that defendant Dr. Jay Cowan was a paid

consultant of Correct Care Solutions and participated as a member of its Hepatitis C

Treatment Committee, which made treatment recommendations to the DOC regarding

treatment of HCV patients. (Doc. 333 at ¶ 267). It is argued that, as a member of this

Committee, defendant Cowan reviewed Plaintiff's medical records and "attended meetings

of the Committee during which Plaintiff's request for treatment with DAADs was discussed."

(Id. at ¶ 268). Plaintiff claims that this Committee prepared a report for the DOC that

determined Plaintiff was not eligible for treatment with a DAAD and that the DOC aligned its

decision with this determination even though defendant Cowan admitted that "he would

have recommended treatment if plaintiff were not incarcerated." (Id. at ¶ 270).

Though Plaintiff eventually was treated with the DAAD Harvoni, Plaintiff argues that

he was "not cured," but that he still suffers from cirrhosis and a greater risk of liver cancer as

a result of the delay in treatment. (Doc 333 at ¶ 212); see also (Doc. 334-02) (report of

Plaintiff's expert Dr. Stacey Trooskin concluding that "[i]f [Plaintiff] had been treated and

cured in 2015 in accordance with the standard of care, the fibrosis would have been

significantly less likely to advance ... [while] now that Mr. Abu-Jamal is cirrhotic, he will be at

increased risk of liver cancer and must undergo screening for liver cancer every 6 months

for the rest of his life"). Therefore, to Plaintiff, had he received proper treatment when the

treatment first became available, "it is 'almost certain' that he would have avoided further

disease progression" and "his risk of developing cirrhosis and/or liver cancer would have

been reduced to almost zero." *See* (Doc. 334-02).

## V. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549

F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary

basis on which a reasonable jury could find for the non-moving party, and a factual dispute

is material only if it might affect the outcome of the suit under governing law." *Kaucher v.*

*County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of

those claims that do not present a "genuine dispute as to any material fact."  Fed. R. Civ. P.

§ 56(a).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  Once such a showing has been made, the non-moving party must offer specific

facts contradicting those averred by the movant to establish a genuine issue of material fact.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  Therefore, the non-moving party

may not oppose summary judgment simply on the basis of the pleadings, or on conclusory

statements that a factual issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a

16

fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record ... [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. § 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. § 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied 507 U.S. 912 (1993). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255.

Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## VI. ANALYSIS

Throughout the pendency of the current litigation, Plaintiff has amended his

Complaint several times.  In the most recent iteration, Plaintiff's Fourth Amended Complaint

set forth six separate counts against various Medical Defendants for damages and

injunctive relief.  (Doc. 245).[5]  On January 30, 2020, the Medical Defendants filed a Motion

for Summary Judgment, (Doc. 306), as to the six remaining claims set forth in Plaintiff's

Fourth Amended Complaint and a brief in support of the Motion, (Doc. 307-2).  In response,

Plaintiff filed a brief opposing the Medical Defendants' Motion as to his claims seeking

damages for deprivation of Plaintiff's Eighth Amendment right to medical care for hepatitis C

as to defendants Cowan, Lisiak, and Khanum, deprivation of Plaintiff's Eighth Amendment

right to medical care for hyperglycemia as to defendants Khanum and Saxon, and medical

malpractice for failure to treat Plaintiff's hepatitis C as to defendants Cowan, Lisiak, and

Khanum.  (Doc. 332).  The Plaintiff otherwise concedes that summary judgment should be

entered as to defendant Saxon for the Eighth Amendment and medical malpractice claims

---

[5] As set forth above, Plaintiff, in his Fourth Amended Complaint, maintained claims against select
Medical Defendants for the deprivation of his Eighth Amendment right to medical care for hepatitis C
(Count I), skin condition (Count II), and hyperglycemia (Count III), and medical malpractice for failure to
treat Plaintiff's hyperglycemia (Count IV), hepatitis C (Count V), and skin condition (Count VI).  (Doc. 245);
*see also supra* Section II (describing the procedural history associated with Plaintiff's claims).  After
injunctive relief was granted by this Court, the parties no longer identified Correct Care Solutions as a
defendant and the parties' briefs fail to refer in substance to defendant Correct Care Solutions as part of
any active claims.

for failure to treat Plaintiff's hepatitis C, as to defendant Lisiak for the Eighth Amendment

claim for failure to treat Plaintiff's hyperglycemia, and as to all Medical Defendants for the

three additional claims raised in the Fourth Amended Complaint.  (Id.).  The Court will

therefore separately review the three remaining claims and the grounds upon which the

Medical Defendants seek summary judgment.  (Doc. 338).

## I.      Deprivation of Eighth Amendment Right to Medical Care for Hepatitis C

Of his three remaining contested claims, Plaintiff first raises a claim for deprivation of

his Eighth Amendment right to medical care for his chronic hepatitis C pursuant to 42 U.S.C.

§ 1983.  Section 1983 authorizes redress for violations of constitutional rights and provides

in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory ... subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law, suit in equity,
> or other proper proceeding for redress....

42 U.S.C. § 1983.  Thus, to establish a violation under Section 1983, a plaintiff must

demonstrate that the challenged conduct was committed by a person acting under color of

state law and deprived the plaintiff of rights, privileges, or immunities secured by the

Constitution or laws of the United States.  *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997).

By its terms, Section 1983 does not create a substantive right, but merely provides a

method for vindicating federal rights conferred by the United States Constitution and the

federal statutes that it describes. *Baker v. McCollan*, 443 U.S. 137 (1979); *see also Hart v. Tannery*, 2011 WL 940311 (E.D. Pa. Mar. 14, 2011).

A deprivation of constitutional rights under the Eighth Amendment occurs in the medical context when state officials are deliberately indifferent to the serious medical needs of those in their charge. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In opposition to Plaintiff's claim alleging an Eighth Amendment violation, the Medical Defendants contend that defendants Lisiak and Khanum were not involved in the development or application of the DOC's Hepatitis C Protocols and that they, along with defendant Cowan, are entitled to qualified immunity to the degree they were merely following the DOC's protocols to determine whether Plaintiff was to be prescribed a DAAD. (Doc. 307-2 at 4-19).

a. Failure to Show Personal Involvement in the Decision to Not Prescribe Plaintiff a DAAD

As set forth in *Estelle*, to state a claim for a violation of his or her Eighth Amendment right to medical care, a plaintiff must sufficiently prove that a defendant was a state official who was indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. The Medical Defendants argue that defendants Lisiak and Khanum cannot and should not be held liable for any violation of Plaintiff's rights, if his rights were in fact violated, as they were not personally involved in the DOC's decision to not initially provide Plaintiff with a DAAD.[6]

---

[6] Though the Medical Defendants initially argue that defendant Cowan, along with defendants Lisiak and Khanum, was not involved in the DOC's decision to not prescribe Plaintiff a DAAD, they eventually concede in their reply brief in support of their Motion for Summary Judgment that there remain genuine issues of material fact regarding Cowan's involvement. (Doc. 307-2 at 15); (Doc. 338 at 8). The Medical Defendants also argue that defendant Saxon was not personally involved with the failure of the

(Doc. 307-2 at 12).  It is well established that "[a] defendant in a civil rights action must have

personal  involvement in the alleged wrongs to be liable...." *Baraka v. McGreevey*, 481 F.3d

187, 210 (3d Cir. 2007) (quotations omitted); *Roth v. PrimeCare*, 2019 WL 2745789, at *4

(E.D. Pa. June 27, 2019). "'Personal involvement can be shown through allegations of

personal direction or of actual knowledge and acquiescence" and such allegations "must be

made with appropriate particularity.'" *Roth*, 2019 WL 2745789, at *4 (quoting *Rode v.

Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

For the DOC, the ultimate authority as to whether a Plaintiff received a DAAD was

held by the Hepatitis C Treatment Committee.  (Doc. 307-2 at 14).  According to DOC

defendant Noel, members of this Committee included "[Noel], the Chief of Clinical Services,

the representative from the medical contractor CCS, Infectious Control Nurse, the Assistant

Medical Director for the DOC, and anyone [the DOC] might invite to participate in any

difficult cases."  (Id.) (quotation omitted); (Doc. 318-5 at 129-130).  In coming to a

determination as to treatment, the Hepatitis C Treatment Committee was to rely on the

standards within in the DOC's Hepatitis C Protocols, which set forth conditions upon which

an inmate may be prescribed a DAAD.  As a result, the ultimate decision as to whether an

inmate was to receive treatment would have its foundations in the medical or policy

---

DOC to initially prescribe Plaintiff a DAAD.  (Doc. 307-2 at 17).  As the Plaintiff has voluntarily withdrawn
his claim as to defendant Saxon for a violation of his Eighth Amendment right to medical care for hepatitis
C, analysis regarding defendant Saxon's involvement in Plaintiff's care is unnecessary.

decisions made by those who developed the Hepatitis C Protocols or were members of the Hepatitis C Treatment Committee.[7]

Though the Medical Defendants contend that Dr. Cowan was not involved in promulgation of the DOC Hepatitis C Protocols, they concede that there remains evidence sufficient to create genuine issues of material fact that would preclude summary judgment on his behalf at this stage.  (Doc. 338 at 8).  Therefore, it is merely left to determine whether issues of material fact remain as to whether defendants Lisiak and Khanum were personally involved in the decision to not prescribe a DAAD to Plaintiff.  Plaintiff alleges that:

> Defendants Lisiak and Khanum['s] personal involvement in failing to treat plaintiff's HCV is shown through 1) their adherence to the DOC protocol despite its deviation from the standard of care, 2) their failure to conduct necessary diagnostic tests, and 3) their acquiescence in a policy of withholding medical care despite its being medically necessary to prevent plaintiff's condition from further deteriorating.

(Doc. 332 at 18).  Plaintiff therefore argues that as defendants Lisiak and Khanum "knew that [P]laintiff tested positive for the hepatitis C antibody in 2012" and suffered from a "severe skin condition," (id.), the defendants' conformity with the DOC Hepatitis C Protocols and subsequent failure to treat Plaintiff's HCV equated to a constitutional violation.

It is generally shown through the record that  the only true "treatment" for hepatitis C that may directly address the illness in any significant manner would be the prescription of a

---

[7] As in this Court's earlier Opinion, the "members of the Hepatitis C Treatment Review Committee" were those charged with making a final determination as to whether an inmate is prescribed a DAAD, whereas "the DOC's current protocol may well constitute deliberate indifference in that, by its own terms, it delays treatment until an inmate's liver is sufficiently cirrhotic" and "faces the imminent prospect of 'catastrophic' rupture."  (Doc. 191 at 11, 19-21).

DAAD.  Though monitoring the progression of any illness is imperative, particularly as its

impact on a person's body may necessitate treatment, there must be a differentiation

between a failure to monitor and a failure to treat an inmate's HCV when determining if

there has been an Eighth Amendment violation.  Oftentimes, a failure to monitor an inmate's

condition will accompany a failure to treat as the former will often lead to the latter.  In the

case of a DOC inmate with HCV, however, even if independent medical professionals were

to properly monitor the inmate's condition and recommend treatment with a DAAD,

treatment may not be in the control of such professionals.

Defendants Lisiak and Khanum were neither involved in the creation of the DOC

Hepatitis C Treatment Protocols nor members of the Hepatitis C Treatment Committee, and

Plaintiff fails to allege as such.  Instead, "[d]efendants Khanum and Lisiak were to gather

relevant diagnostic information for use in treatment decisions by the DOC's Hepatitis C

Committee."  (Doc. 332 at 7, 18) ("the medical record shows [Lisiak and Khanum] taking no

action in regard to [Plaintiff's] hepatitis C, and their own testimony implicates them in

accepting no role in treating their patient's hepatitis C other than obtaining diagnostic

information").  Though the gathering of information through testing would be linked to

Plaintiff's overall treatment, a direct causal connection between such testing and the alleged

failure to treat Plaintiff with a DAAD was foreclosed by the structure of the DOC's

prescription process.  As it was left to the Committee to make the final decision as to

treatment and the Committee relied on the Hepatitis C Protocols, it cannot be said that

either Lisiak or Khanum were in a decisional position that would have allowed them to ensure Plaintiff received treatment. Plaintiff thus fails to show that issues of material fact exist to support that defendants Lisiak and Khanum "violated a constitutional right" as there is insufficient evidence to show they were involved in the creation of the DOC policies or the decision-making process that led to the DOC's denial of Plaintiff's request to receive a DAAD. The Medical Defendants' Motion for Summary Judgement for Plaintiff's Eighth Amendment claim for failure to treat Plaintiff's hepatitis C as to defendants Khanum and Lisiak will thus be granted.

### b. Qualified Immunity as to Plaintiff's Eighth Amendment Claim

The Medical Defendants argue that defendants Cowan, Lisiak, and Khanum are entitled to qualified immunity as to this claim. (Doc. 301 at 39-45). "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Qualified immunity provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As qualified immunity is an immunity from suit, the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Campeggio v. Upper Pottsgrove Twp.*, 2014 WL 4435396, at *10 (E.D. Pa. Sept. 8, 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009)); *but see Newland v. Reehorst*, 328 F. App'x 788,

24

791 n.3 (3d Cir. 2009) (It is "generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases.").

To determine whether a defendant is entitled to qualified immunity, courts will analyze two factors: (1) whether the plaintiff has shown facts that make out a constitutional rights violation, and if so, (2) whether those rights were "clearly established" at the time of the incident. *Saucier v. Katz*, 533 U.S. 194 (2001); *but see Pearson*, 555 U.S. at 232-36 (finding that the sequence set forth in the *Saucier* two-step analysis was no longer mandatory but could be employed at the court's discretion). A court must thus look to the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244; *see also Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

An inmate's Eighth Amendment rights are violated where state officials are deliberately indifferent to the inmate's serious medical needs.[8] *Monmouth Cty. Corr. Inst.*

---

[8] A serious medical need "is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347. The Medical Defendants do not contest the fact that Plaintiff had a serious medical need. HCV, which can cause life-threatening harm to the body, may lead to inflammation of the liver and scarring that can impact the ability of the liver to function or create

*Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (describing the two-part standard

established in *Estelle v. Gamble*, 429 U.S. at 97).  As set forth above, Plaintiff has failed to

show facts that make out a constitutional rights violation as to defendants Lisiak and

Khanum, while issues of material fact exist as to defendant Cowen and his involvement in

the denial of treatment to Plaintiff.[9]  The Court will thus look to whether Plaintiff properly

supports a claim that defendant Cowan, as a state actor, was deliberately indifferent to

Plaintiff's condition and violated a clearly established right by failing to provide necessary

care.[10]

---

complications such as increased rates of cancer, heart attacks, and diabetes.  *See* (Doc. 334-02 at 1) (expert report of Dr. Stacey Trooskin).  The Court will therefore accept this point as undisputed and proven.

[9] In *Abu-Jamal v. Wetzel*, this Court determined that the Plaintiff was likely to succeed on the merits of his Eighth Amendment claim as he established, as here, "that Defendants have deliberately denied providing treatment to inmates with a serious medical condition and chosen a course of monitoring instead.... [and] have done so with the knowledge that (1) the standard of care is to administer DAA medications regardless of the disease's stage, (2) inmates would likely suffer from hepatitis C complications and disease progress without treatment, and (3) the delay in receiving DAA medications reduces their efficacy."  *Abu-Jamal*, 2017 WL 34700 at *51.

[10] An analysis as to whether a non-government defendant such as defendant Cowan is eligible to assert qualified immunity is guided by several Supreme Court cases, including *Wyatt v. Cole*, 504 U.S. 158 (1992), *Richardson v. McKnight*, 521 U.S. 399 (1997), and *Filarsky v. Delia*, 566 U.S. 377 (2012).  The availability of qualified immunity to private parties performing governmental functions depends on "the common law as it existed when Congress passed § 1983 in 1871" and the policy reasons the Supreme Court has "given for recognizing immunity under § 1983."  *Filarsky*, 566 U.S. at 384.  Such reasons center around "avoid[ing] unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions" of litigation.  *Id.* at 389-90 (quotation omitted).  A clear determination as to the ability of contractors providing medical services for the DOC to qualify for immunity, however, is unnecessary here as Plaintiff does not raise such an argument and defendant Cowan fails to qualify for immunity on other grounds.

As a violation of the Eighth Amendment, deliberate indifference may manifest in various forms, including an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury.  *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993); *see also Rhines v. Bledsoe*, 388 F. App'x 225, 227 (3d. Cir. 2010) ("intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed" sufficient to show deliberate indifference (quoting *Estelle*, 429 U.S. at 104-05)).  Deliberate indifference may also be shown where a prison official opts for "an easier and less efficacious treatment of the inmate's condition" or "erect[s] arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates."  *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 (internal quotation marks omitted); *see also White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990) ("persistent conduct in the face of resultant pain and risk of permanent injury" is sufficient to show deliberate indifference).

The mere misdiagnosis of a condition or medical need or the provision of negligent treatment does not give rise to an actionable Eighth Amendment claim, while "[d]eliberate indifference to a prisoner's serious medical needs can give rise to ... a constitutional violation[,] ... mere medical malpractice will not."  *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *Estelle*, 429 U.S. at 106.  Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical

care has been offered to the inmate. *Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 1, 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). In fact, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). There must, however, be a distinction between a case in which the prisoner claims a complete denial of medical treatment and one where the prisoner has received some medical attention and the dispute is over the adequacy of the treatment. *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979); *Farmer v. Brennan*, 511 U.S. 825 (1994).

It is sufficiently supported for this stage of the litigation that "treatment" of HCV is effected through the prescription of a DAAD, and that Plaintiff was denied this treatment until it was ordered by this Court. It is thus left to determine the part defendant Cowan played in denying Plaintiff a DAAD and whether this constituted deliberate indifference. Based on the DOC Hepatitis C Protocols, though Plaintiff was confirmed to have chronic hepatitis C in 2015, he was not to be prescribed a direct-acting antiviral drug until, in the view of those charged with making such a determination, his liver further deteriorated to a point where treatment was necessary. (Doc. 302-14); (Doc. 302-15). It is now conclusive, however, that in 2017, after this Court ordered that testing be conducted to determine the state of Plaintiff's liver, it was found that Plaintiff's condition had "deteriorated to 'severe grade 4 liver cirrhosis,'" which qualified Plaintiff for treatment with an DAAD. *Abu-Jamal*,

3:16-CV-2000 at (Doc. 61 at 2). The delay in such treatment, according to Plaintiff's expert, "negatively impacted [Plaintiff's] health," whereas "[i]f he had been treated and cured in 2015 as dictated by the standard of care, the fibrosis would have been significantly less likely to advance in the absence of the virus." (Doc. 334-02 at 6, 12) (Dr. Trooskin opines that delayed treatment of HCV with a DAAD "falls below the standard of care, and risks the life of the individual with HCV").

Though the final determination as to the prescription of a DAAD would lie with the Hepatitis C Treatment Committee, it is clear that the DOC Hepatitis C Protocols – and those who authored such Protocols – provide the governing rules and justification for the Committee's subsequent treatment decisions. The Medical Defendants seemingly concede that defendant Cowan's role in either making prescription decisions or developing the Hepatitis C Protocols remains an issue of material fact. (Doc. 338 at 8). As Plaintiff provides facts sufficient to support a claim that the failure to prescribe a DAAD could reflect deliberate indifference to Plaintiff's hepatitis C and defendant Cowan arguably was involved in this decision, Plaintiff has met his burden to make out a constitutional claim for Cowan's deliberate indifference. The Court will thus turn to whether the right to care was "clearly established."

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (brackets and internal quotation marks omitted). The Third Circuit has previously

concluded in this litigation that "[a]t the time of the relevant events, it was clearly established that denying particular treatment to an inmate who indisputably warranted that treatment for nonmedical reasons would violate the Eighth Amendment." *Abu-Jamal v. Kerestes*, 779 F. App'x 893, 900 (3d Cir. 2019) (citing *Monmouth Cty. Corr. Inst. Inmates*, 834 F.3d at 346-47). It is also clear that deliberate indifference is manifest "[w]here prison officials deny reasonable requests for medical treatment … and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth Cty. Corr. Inst. Inmates*, 834 F.3d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). Here, Plaintiff's claim "does not rest on the appropriateness of the [DOC] policy itself or a general right to be treated with the new antiviral drugs," but on the premise that he was denied a drug that he requested and should have been provided under the operative standard of care. *See Abu-Jamal*, 779 F. App'x at 900.[11]

The Plaintiff has thus sufficiently supported a claim for an Eighth Amendment violation and established that the Plaintiff's rights regarding necessary treatment of his HCV were "clearly established" at the time of the alleged constitutional violation. The Medical

_____

[11] Though, as the Third Circuit states, "Abu-Jamal's claim is predicated on the allegation that he was denied treatment for nonmedical reasons" and not the "propriety of the [DOC] Hepatitis C policy," it must also be recognized that the "propriety" of the DOC's Hepatitis C Protocols remains at the core of this matter as the protocols were allegedly used as justification for denying treatment and created with non-medical considerations in mind. *Abu-Jamal*, 779 F. App'x at 900 n.8; *see also supra* Section VI(I) (Section 1983 claims require a showing that an individual acting "under color of any statute, ordinance, regulation, custom, or usage" deprived the plaintiff of "rights, privileges, or immunities secured by the Constitution and laws").

Defendants' Motion for Summary Judgment for Plaintiff's Eighth Amendment claim for failure to treat Plaintiff's hepatitis C as to defendant Cowan will therefore be denied.

## II.    Deprivation of Eighth Amendment Right to Medical Care for Hyperglycemia

As set forth above, to state a claim for a violation of his or her Eighth Amendment right to medical care, a plaintiff must sufficiently prove that a defendant was a state official who was indifferent to a serious medical need. *Estelle*, 429 U.S. at 104.  The Medical Defendants argue that Plaintiff has failed to provide record evidence sufficient to support a claim against defendants Khanum and Saxon for a violation of Plaintiff's Eighth Amendment rights to medical care for his hyperglycemia.

By March 2015, Plaintiff had been prescribed a steroid to address his ongoing skin condition.  (Doc. 307-2 at 43) (citing Doc. 318-15 at 14-15).  Likewise, Plaintiff had also been prescribed hydrochlorothiazide, ("HCTZ"), to address an ongoing issue with high blood pressure.  (Doc. 309 at 381).  Plaintiff, however, stopped taking this drug as it had the unwanted side effect of acting as a diuretic, after which his "blood pressures were reviewed and he was switched to Norvasc."  (Id.); *see also* (Doc 332 at 31) (citing 334-2 at 10) (though Plaintiff's expert argues that increased urination could be seen as a "manifestation of uncontrolled diabetes," she also acknowledges that "[f]requent urination is a side effect of the diuretic HCTZ.").  Plaintiff asserts that by March 6, 2015, in addition to his skin condition and high blood pressure, testing conducted by the Medical Defendants showed signs of hyperglycemia as his blood glucose had risen to 419.  (Doc. 332 at 30).  Nevertheless,

defendants Khanum and Saxon allegedly did not immediately take steps to directly address or confirm Plaintiff's glucose levels, whereafter Plaintiff experienced an episode of diabetic ketoacidosis on March 30, 2015.  (Id. at 31).

As it pertains to an Eighth Amendment claim, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate.  *Clark*, 2000 WL 1522855, at *2.  In fact, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners."  *Durmer*, 991 F.2d at 67 (citations omitted).  Though courts, however, will thus "'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment," there must be a distinction between a complete denial of medical treatment and the provision of some medical attention where the dispute is over the adequacy of the treatment.  *Mayo*, 2015 WL 3936814, at *17 (quoting Inmates of Allegheny Cty. Jail, 612 F.2d at 762 (quoted case omitted)); *United States ex rel. Walker*, 599 F.2d at 575 n.2 (3d Cir. 1979).

Based on the facts set forth by the parties, the Medical Defendants were aware of the Plaintiff's heightened glucose levels.  Plaintiff argues that the standard of care for those suffering from elevated glucose levels required that medical professionals who recognize potential hyperglycemia provide "monitoring and treatment if it does not resolve on its own." (Doc. 332 at 30).  As such, Plaintiff claims that when defendant Khanum noted that Plaintiff had an increased glucose level, defendants Khanum and Saxon should have conducted a

repeat glucose check, which may have prevented the episode of diabetic ketoacidosis suffered by Plaintiff.  (Id. at 31).

The medical expert report prepared on behalf of the Medical Defendants indicates, however, that though Plaintiff suffered from elevated glucose levels, he was not initially prescribed medication for hyperglycemia in March 2015 due in part to his medical symptoms and his ongoing treatment with a steroid "as the [e]ffect of steroids could prove catastrophic." (Doc. 332 at 32).  Even as the Court recognizes that defendants Khanum and Saxon could have taken further steps to monitor Plaintiff's condition, the fact that Plaintiff's own expert agrees in hindsight that, in light of the information available at the time, the only clear step defendants Khanum and Saxon should have taken was to monitor the Plaintiff's condition tends to only support the finding that Plaintiff disagrees with the particular course of treatment provided.  (Doc. 334-03 at 2).  Nothing in the opinion of Plaintiff's expert could support a finding that defendants Khanum and Saxon were deliberately indifferent to the Plaintiff's needs in light of the factors they considered in making medical decisions pertaining to Plaintiff's treatment.

The Plaintiff has thus failed to sufficiently support an Eighth Amendment violation and establish that defendants Khanum and Saxon were deliberately indifferent and denied Plaintiff necessary treatment to which Plaintiff was entitled through a clearly established right.  The Medical Defendants' Motion as to Plaintiff's Eighth Amendment claim against

defendants Khanum and Saxon for failure to treat Plaintiff's hyperglycemia will therefore be granted.

### III.    Medical Malpractice for Failure to Treat Plaintiff's Hepatitis C

Pennsylvania courts have established that medical malpractice is a form of negligence.  *Quinby v. Plumsteadville Fam. Prac.*, Inc., 907 A.2d 1061, 1070 (Pa. 2006). Therefore, to substantiate a cause of action for medical malpractice, a plaintiff must demonstrate the elements of negligence: "a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of harm."  *Id.* (citing *Hightower–Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997)).  A "medical malpractice claim is further defined as an 'unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services.'"  *Ponzini v. Monroe Cty.*, 2015 WL 5123680, at *8 (M.D. Pa. Aug. 31, 2015) (quoting *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (2009)).

In opposition to the Plaintiff's medical malpractice claim, the Medical Defendants contend that the Plaintiff fails to provide sufficient expert support to sustain his claim.  In part, the Medical Defendants argue that in the expert opinions provided by the Plaintiff's expert, Dr. Trooskin, "Dr. Lisiak's and Dr. Khanum's names appear only in that portion of her report which discusses Plaintiff's hypoglycemic episode, and are entirely absent from

the discussion regarding care, diagnosis, and treatment of Hepatitis C." (Doc. 338 at 4). As

established above, it cannot be said that defendants Lisiak and Khanum were truly involved

in the care, diagnosis, and treatment of Plaintiff's HCV, which likely explains in part why

they were not mentioned in Plaintiff's expert's report. Sustaining a state law claim on the

same basic factual assertions against these defendants will thus be untenable. The

analysis therefore turns to whether Plaintiff has sustained a claim as to defendant Cowan.

"'When a party must prove causation through expert testimony the expert must

testify with reasonable certainty that in his professional opinion, the result in question did

come from the cause alleged.'" *Reyes v. Otis Elevator Co.*, 2016 WL 6495115, at *4 (E.D.

Pa. Nov. 2, 2016) (quoting *Cohen v. Albert Einstein Med. Ctr., N. Div.*, 592 A.2d 720, 723

(Pa. Super. Ct. 1991)). Thus, "[u]nder Pennsylvania law, medical experts opining on

causation must testify that defendant's actions caused plaintiff's condition with a reasonable

degree of medical certainty." *McLeod v. Dollar Gen.*, 2014 WL 4634962, at *4 (E.D. Pa.

Sept. 16, 2014) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 750 (3d Cir. 1994)).

Absolute certainty in the medical context, however, cannot be expected either by the courts

or by patients. *See Hamil v. Bashline*, 392 A.2d 1280, 1286-88 (Pa. 1978) (though "in the

world of medicine nothing is absolutely certain," expert opinions provide a basis upon which

juries may "balanc[e] probabilities"). Instead, "'a medical opinion need only demonstrate,

with a reasonable degree of medical certainty, that a defendant's conduct increased the risk

of the harm actually sustained.'" *Rolon v. Davis*, 232 A.3d 773, 777 (Pa. 2020) (quoting

*Vicari v. Spiegel*, 936 A.2d 503, 510-11 (Pa. Super. Ct. 2020) ("an expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words")); *see also K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080, 1104 (Pa. Super. Ct. 2015) ("[i]n *Hamil v. Bashline*, our Supreme Court adopted the relaxed 'increased-risk-of-harm' standard" (citation omitted)).

Medical Defendants contend that the opinions of Plaintiff's experts were insufficient to support Plaintiff's claims. (Doc. 338 at 2). For the Court, however, the assertions made within Dr. Trooskin's expert report reflect questions of material fact that would be improper for the Court to decide here. *Ponzini*, 2015 WL 5123680, at *5. For example, though the Medical Defendants contend that Plaintiff failed to establish the standard of care for treatment or that Cowan did not breach any such standard, Plaintiff's expert contends that: the prescription of "DAAs are the standard of medical care for the treatment of all individuals with HCV, regardless of their fibrosis score;" "[m]ere observation and 'monitoring' of HCV patients, with no medical treatment … falls below the standard of care;" and the DOC's delay in treating Plaintiff's HCV with a DAAD "has negatively impacted his health." (Doc. 334-02 at 3, 6, 12). As it is also alleged that defendant Cowan acted on behalf of the DOC, any violations referred to within Dr. Trooskin's expert report attributed to the DOC may also be imputed to defendant Cowan.[12]

_____

[12] As discussed above, though "Defendants do contend that Dr. Cowan was not involved in promulgation of DOC Hepatitis C policy, Defendants concede that this is at least a matter upon which there is evidence sufficient to create genuine issues of material fact which would preclude summary judgment on

The facts asserted in the Medical Defendants' Statement of Facts and Plaintiff's responses further elucidate the disputed factual issues that remain.  "Questions about credibility and weight of expert opinion testimony are [likewise] for the trier of facts since such testimony is ordinarily not conclusive." *Drysdale v. Woerth*, 153 F.Supp.2d 678, 689 (E.D. Pa. 2001).  The Medical Defendants' Motion for Summary Judgment as to Plaintiff's claim for medical malpractice for failure of defendant Cowan to adequately treat Plaintiff's hepatitis C will thus be denied, whereas the Medical Defendant's Motion will be granted as to defendants Lisiak and Khanum.

## VII. Conclusion

For the reasons set forth above, the Court will deny the Medical Defendants' Motion for Summary Judgment for defendant Cowan as to Counts I and V, grant the Motion in part for defendants Lisiak, Khanum, and Saxon as to Counts I and V, and grant the Motion in its entirety for all defendants as to Counts II, III, IV, and VI.  The Court will grant the Medical Defendants' Motion for Summary Judgment as to Plaintiff's claim for injunctive relief.

Robert D. Mariani
United States District Judge

---

his behalf at this stage."  (Doc. 338 at 8); *see also supra* Section VI(I)(b) (establishing that Plaintiff has established issues of material fact as to whether defendant Cowan was deliberately indifferent to Plaintiff's condition).